**Exhibit C**

# SUPERIOR COURT
(Commercial Division)

CANADA  
PROVINCE OF QUEBEC  
DISTRICT OF MONTREAL

No.:   500-11-0637787-242

DATE:   March 18, 2024
_____

**BY  THE HONOURABLE   MARTIN F. SHEEHAN, J.S.C.**
_____

**IN THE MATTER OF THE COMPROMISE OR ARRANGEMENT OF:**

**GOLI NUTRITION INC.**  
and  
**GOLI NUTRITION INC.**  
         Debtors - Applicants  
v.  
**DELOITTE RESTRUCTURING INC.**  
         Monitor

_____

**JUDGMENT ON APPLICATION FOR THE ISSUANCE OF A FIRST DAY INITIAL ORDER, AN AMENDED AND RESTATED INITIAL ORDER AND OTHER RELIEF, INCLUDING THE APPROVAL OF A TRANSACTION AND AN AGENCY AGREEMENT**  
(Sections 9, 10, 11,11.02, 11.03, 11.2, 11.52, 23 and 36 of the *Companies' Creditors Arrangement Act* ("**CCAA**"), RSC 1985, c C-36)
_____

## OVERVIEW

[1]    Applicants, Goli Nutrition Inc. ("**GOLI Canada**") and Goli Nutrition Inc. ("**GOLI USA**", collectively with GOLI Canada the "**Debtors**" or "**GOLI**") are wellness brand companies which sell and distribute nutritional products and supplements. They are facing significant cash flow challenges.

JS 1699

[2]   Eventually, GOLI proposes to address these cash flow and operation issues through a transaction (the "**Contemplated Transaction**") which involves the sale of the Atos Equipment (as defined below) and the signing of an agency agreement between GOLI Canada and Gordon Brothers Commercial & Industrial, LLC (on behalf of its contractual joint venture with Brandford Auctions, LLC) (the "**Agent**") pursuant to which the Agent shall be engaged for the purpose of proceeding with the orderly liquidation of the Atos Equipment.

[3]   The Contemplated Transaction was designed in consultation with the proposed monitor and with the consent of GOLI's principal lenders.

[4]   At the present stage, Debtors seek the issuance of a first day initial order under the CCAA (the "**Initial Order**") comprising of:

- 4.1. a declaration that the Applicants are corporations to which the CCAA applies;

- 4.2. a stay of all proceedings and remedies taken or that might be taken in respect of the Applicants and their respective past, present or future directors and officers, or any of their property, except as otherwise set forth in the Initial Order or as otherwise permitted by law (the "**Stay**"), for an initial period of ten (10) days in accordance with the CCAA (the "**Stay Period**");

- 4.3. the appointment of Deloitte Restructuring Inc. ("**Deloitte**" or the "**Monitor**") as the monitor of the Applicants in these proceedings and granting the Monitor certain powers;

- 4.4. an Administration Charge and D&O Charge (each as defined below) in amounts sufficient to cover the potential exposure of the beneficiaries of such charges for the initial Stay Period;

- 4.5. a declaration that Québec is the "center of main interest" of the Debtors and, accordingly, an authorization that the Applicants or the Monitor may apply, as they may consider necessary or desirable, to any other court, tribunal, regulatory, administrative or other body, wherever located, for orders to recognize and/or assist in carrying out the terms of the Initial Order and any subsequent Orders rendered by this Court in the context of these proceedings, including, without limitation, orders under Chapter 15 of the United States Bankruptcy Code 11 U.S.C. §§ 101-1532 (the "**U.S. Bankruptcy Code**");

- 4.6. a sealing order to apply to certain confidential exhibits which may be filed in support of this Application; and

- 4.7. other relevant first day relief.

500-11-063787-242　　　　　　　　　　　　　　　　　　　　　　　　　　　　　PAGE: 3

**1.　The Debtors**

　　1.1　GOLI Canada

[5]　GOLI Canada was incorporated by its founders Michael Bitensky and Deepak Agarwal (each a "**Founder**") on October 4, 2018, under the *Canada Business Corporations Act* ("**CBCA**").[1] Its domicile is in Saint-Laurent, Québec.

[6]　GOLI Canada's main shareholders are:

　　6.1.　11028154 Canada Inc. ("**11028154**") which owns 40.59% and is ultimately controlled by Melina del Carmen Ash (the wife of Mr. Deepak Agarwal);

　　6.2.　11028227 Canada Inc. ("**11028227**") which owns 40.59% and is ultimately controlled by Michael Bitensky;

　　6.3.　9204-1797 Québec Inc. which owns 7.95% and is ultimately controlled by Mr. Martin Leroux;

　　6.4.　VMG Partners IV L.P. and VMG Partners Mentors Circle IV L.P. (collectively "**VMG Partners**" (a California investment firm) which in the aggregate own 4.91%.

[7]　The balance of the shares are owned by various other entities including, Bank of Montreal (doing business as BMO Capital partners).

[8]　GOLI Canada employs approximately 35 employees most of whom are located and employed in Québec.

[9]　It also has an outsourcing contract with Liveketo Private Limited ("**Liveketo**") based in India, who provides services for finance, human resources, business intelligence, supply chain and retailer support services. It has also retained the services of Direct Digital Solutions ("**Direct Digital**") based in the Philippines for customer service, shipping, influencers and sales support.

[10]　GOLI Canada owned 25% of Better Nutritionals ("**BN**"), a corporation currently under chapter 7 of the US Bankruptcy Code. BN was previously GOLI's primary manufacturer.

[11]　GOLI Canada is also the sole shareholder of GOLI USA.[2]

　　1.2　GOLI USA

[12]　GOLI USA was incorporated on April 30, 2019, pursuant to the General Corporation Law of the State of Delaware. Even though it is a Delaware corporation, its principal place

---

[1]　*Canada Business Corporations Act*, L.R.C. 1985, c. C-44.
[2]　Exhibit P-3.

| | |
|---|---|
| 500-11-063787-242 | PAGE: 4 |

of business is located at GOLI Canada's domicile in Montreal, Québec. All operational and financial decisions of GOLI USA are made by GOLI Canada.

[13] GOLI USA employs approximately 4 employees located in various states throughout the United States.

[14] GOLI USA is a tenant under the lease ("**Norco Lease**")[3] for facilities located in Norco, California (the "**Norco Facility**") where the Atos Equipment (as defined below) is located. The understanding was that BN would occupy the Norco Facility and pay the rent as well as other expenses. BN's inability to do so compounded GOLI's financial difficulties.

[15] GOLI markets and sells a variety of nutritional and dietary supplements under the Goli® brand ("**GOLI Products**"). GOLI Products are sold in retail locations throughout Canada, the United States and worldwide, including retailers such as Walmart, Target, Kroger, Walgreens, GNC, The Vitamin Shoppe and others. It also sells its products through its online website www.goli.com, as well as online marketplaces such as Amazon, Walmart.com and others.

[16] All GOLI Products are manufactured by contract manufactures located in the United States.

[17] To distribute its products, GOLI relies on third-party logistics providers ("**3PL**"), such as Emerson Healthcare, LLC, Amazon, Media Solutions Group Canada and Amware Fulfillment LLC. GOLI distributes its to these 3PLs who then in turn handle the shipments to consumers in accordance with agreements in place between GOLI and the 3PL. The vast majority of GOLI products are thus held in 3PL storage facilities until they are sold. From December 2021 to December 2023, the book value of GOLI Canada's inventory decreased from $70M to $5.1M as a result of inventory obsolescence.

[18] GOLI's operations are conducted on a consolidated basis. The majority of the assets, including the Atos Equipment (as defined below) located in the Norco Facility, are owned by GOLI Canada.

**2.   Debtors' Financial Situation**

   2.1   Assets

[19] GOLI's assets include a combination of cash, accounts receivables, inventory, intellectual property (including the rights to the brand name GOLI, various trademarks and patents) as well as property and manufacturing equipment (collectively the "**Assets**").

[20] The manufacturing equipment comprises of equipment purchased by GOLI Canada from Atos on June 29, 2022 (the "**Atos Equipment**") in the course of a settlement

---

[3]   Exhibit P-12.

agreement with the manufacturer. The Atos Equipment is located at the Norco Facility leased by GOLI USA.

### 2.2   The Secured Indebtedness

[21]   GOLI Canada's predecessors had previously entered into an initial credit agreement dated October 21, 2021 (as amended on December 8, 2021) with the Bank of Montreal (in its capacity as lender and administrative agent), National Bank of Canada, Fédération des Caisses Desjardins and HSBC Bank Canada (collectively, the "**Lenders**").[4] GOLI remains indebted to the Lenders pursuant to a syndicated amended and restated credit agreement dated September 2, 2022, amongst GOLI Canada, as Borrower, GOLI USA, as guarantors and the Lenders (as amended on April 14, 2023, the "**Credit Agreement**").[5]

[22]   GOLI's operations are principally financed by the credit facilities provided under the Credit Agreement which include

- 22.1. a revolving credit facility up to a maximum of US$50,000,000 (the "**Revolving Credit Facility**"); and

- 22.2. a term facility up to a maximum of US$63,000,000 (the "**Term Facility**" and together with the Revolving Credit Facility, the "**Credit Facilities**").

[23]   The total amount outstanding under the Credit Facilities in principal, interest and fees as of the date of the present Application is approximately US$100,000,000 (the "**Loan**"), subject to adjustments.

[24]   Concretely, the Lenders' security (the "**Lender's Security**")[6] under the Credit Agreement can be summarized as follows:

- 24.1. A first ranking hypothec (or with respect to the Assets located outside of the Province of Québec a first ranking lien) of $300,000 on the universality of all present and future Assets of GOLI; and

- 24.2. A pledge by GOLI of all Capital stock issued to it by any GOLI entity.

[25]   The Lender's Security is registered at the appropriate registries.[7]

[26]   A review by independent legal professionals in Canada and the United States mandated by the Proposed Monitor confirms that the Lenders' Security is valid and enforceable.

---

[4]   Exhibit P-4.
[5]   Exhibit P-5.
[6]   Lenders' deed of hypothec ("**Deed of Hypothec**"), the US guarantee and security agreement ("**GOLI USA GSA**") and the US general security agreement ("**Borrower GSA**" together with the GOLI USA GSA the "**US Security Documents**"), exhibits P-6 and P-7.
[7]   Exhibits P-8 and P-9.

500-11-063787-242                                                                                                          PAGE: 6

[27]  GOLI is in default under the terms of the Credit Agreement since the spring of 2023.

[28]  As of the date of the application, the Lenders are the only secured creditors of the Debtors except for approximately US$700,000 advanced by 11028154 and 11028227 on October 2, 2023 (the "**Guarantees**").[8] These Guarantees rank subsequent to the Lenders' security.

### 2.3  Unsecured Indebtedness

[29]  At present, the Debtors also owe approximately US$69M to unsecured creditors.

[30]  The most significant of these unsecured creditors (other than the loans made by some shareholders) include:

- 30.1. DLA Piper (US) LLP for an amount claimed to be approximately US$8,000,000 for unpaid legal fees;

- 30.2. Income, goods and services as well as foreign taxes in the amount of approximately US$12.8M.

- 30.3. GOLI US owes approximately $1.5M in connection with outstanding rent, broker's fees, utilities and security personnel providers regarding the Norco Facility;

- 30.4. Credit card facilities for an amount of approximately US$7,500,000;

- 30.5. Advertising and promotion suppliers for an amount of approximately US$5,486,000; and

- 30.6. Third-party logistics and shipping supplies for an amount of approximately US$1,508,000.

### 2.4  Obligations and Contingent Liabilities

[31]  The Debtors are current in their payroll obligations aside for vacation back pay. There are no pension plans in place for GOLI employees.

[32]  GOLI intends to continue to pay their employees in the normal course of business throughout the CCAA proceedings.

[33]  The Debtors are also defendants in various litigation proceedings in the United States (some of which have been settled). At this time, it is impossible to quantify the probable liability of these cases. Nonetheless, the Debtors face a potential exposure in

---

[8]  Exhibits P-10 and P-11.

500-11-063787-242   PAGE: 7

the event of unfavourable judgments, as well as the legal expenses to further litigate these matters.

[34]   Finally, under the terms of the Norco Lease, the Debtors Applicants continue to owe the Norco Landlord approximately $550,000 per month. On March 12, 2024, the Applicants received a Three-Day Notice to Pay Rent or Quit.[9]

[35]   The Debtors and the Proposed Monitor believe that it is crucial that the present CCAA application be approved in order to protect the going concern value of GOLI and to ensure maximum creditor recovery.

### 3.  Financial Difficulties

[36]   The Debtors have suffered recurring operating losses. They have insufficient cash flow to meet their obligations as they become due.

[37]   The latest consolidated financial statements ending in December 31, 2023, show a reported EBITDA loss of approximately US$42.9 million in FY2023 and a net loss of $62.7M. The balance sheet shows a net deficit (shareholder deficiency) of CAN$110.9M. The Monitor's Pre-Filing Report (the "**Pre-Filing Report**") includes a 12-week cash flow forecast which illustrates a further cash flow shortfall.[10]

[38]   Factors contributing to the Debtors' financial difficulties including the following:

38.1. Decreased demand for GOLI's products which translated into an important reduction in sales. Excess inventory and short shelf life causing aging issues requiring significant write-offs of inventory, retailer chargebacks, refunds and penalties.

38.2. Increased marketing costs following the implementation of the IOS changes.

38.3. Costly legal disputes involving GOLI and certain of its directors and officers. Debtors have spent over US$10M in legal expenses defending such cases, including on the defense of a trademark dispute in which GOLI was ultimately successful.

38.4. BN's filing under Chapter 11 of the U.S. Bankruptcy Code (which was later converted to a Chapter 7) since GOLI USA had agreed to take on the primary responsibility for (a) the Norco Lease to be occupied by BN, in exchange for BN's promise to pay the deposit and monthly rent and expenses for the space and (b) the Atos Equipment under the same understanding and promise that BN would make all of the payments. Unfortunately, although BN initially made the payments, it has since ceased making these payments. As a result, the

---

[9]   Exhibit P-13
[10]  Exhibit P-14.

500-11-063787-242                                                                                          PAGE: 8

Debtors (as well as a number of their directors and officers) have been dragged into a number of costly litigation matters. At the risk of repossession of the Atos Equipment and being evicted from the Norco Facility, which was at the time being occupied by BN (GOLI's primary manufacturer), the Applicants were left with no choice but to resolve such matters directly by GOLI Canada making a settlement payment of $32M for the acquisition of the Atos Equipment and GOLI USA attending to the payment of the rent of the Norco Facility.

38.5. In addition, as a result of the significant arrears outstanding under the Norco Lease, the Norco Landlord sent a Notice of Events of Default for failure to pay rent when due on February 21, 2024. On February 29, 2024, the Norco Landlord applied a portion of its deposit in payment of the arrears (leaving a deposit balance of approximately $1.2M) and requested that the debtors replenish said deposit within 10 days. Since the Debtors will not be able to replenish the deposit and have not paid rent for the current month (in respect of which the Three-Day Notice to Pay Rent or Quit was sent), they are now at serious risk of being evicted from the Norco Facility, where the Atos Equipment is located.

38.6. Additionally, as a result of GOLI's cash flow issues it has, at times, been unable to pay suppliers and manufacturers in a timely manner which has created further disputes and has required the implementation of various payment plans putting further strain on the Debtors' cash flow.

## 4.  Pre-Filing Restructuring Efforts and Pre-Filing SISP

[39]  GOLI has worked hard to address the above-noted issues in a timely fashion and has implemented a series of operational restructuring efforts to try to remedy its financial situation.

[40]  GOLI has optimized and rationalized its operations in the United States, Canada and worldwide and developed strategies to improve profitability. It conducted a review of its operations to identify potential synergies and costs savings across the board. Many changes were made, including but not limited to (i) negotiating the early termination of one of their leased office space and the non-renewal of other leased office spaces (which was possible given that, following the COVID-19 pandemic, most of the employees were working from home); (ii) developing a new pricing strategy for both retailers and direct-to-consumer sales; (iii) reduction in the workforce and payroll (including, no bonuses being paid to management and the Founders drawing no salary or other employment remuneration); (iv) terminating any non-essential services; (v) engaging in negotiations with various vendors, service providers and suppliers for additional cost savings; (vi) settling (whether for monetary amount or otherwise) certain legal disputes to try to avoid the substantial continued expense of further litigation; and (vii) subletting portions of the Norco Property to help with the financial burden.

[41]  Unfortunately, these efforts have not been sufficient to offset the ongoing cash flow issues the Debtors have been plagued with over the last several months or to allow the Debtors to pay liabilities as they become due.

[42]  On May 30, 2023, the Lenders wrote to the Debtors informing them of the occurrence of various events of default under the terms and conditions of the Credit Agreement, calling the Loan, and providing the statutory security enforcement notices under the *Civil Code of Québec* ("**CCQ**") and the *Bankruptcy and Insolvency Act* ("**BIA**") ("**Notice of Default**").[11]

[43]  On June 6, 2023, formal statutory security enforcement notices under the *Civil Code of Québec* and the Bankruptcy and Insolvency Act (the "**Prior Notices**") were served on the Debtors.[12]

[44]  In June 2023, GOLI engaged the services of BMO Capital Markets to develop and implement a Sale and Investment Solicitation Process (the "**Pre-Filing SISP**") with a view to identifying one or more transactions in respect of the sale, investment in, or refinancing of all or part of the business and/or the property and/or Assets of the Debtors that would allow the repayment of their substantial indebtedness, with any balance to be used to pay creditors and allow for the continuation of all or part of the Debtors' activities on a going concern basis.

[45]  BMO Capital Markets, with the assistance of the Debtors, managed all SISP related documents (including the preparation of a teaser letter, a target list of potential purchasers or investors, and non-disclosure agreements) and provided all required information to potential bidders. BMO Capital Markets kept the Proposed Monitor apprised of the process. For their part, the Founders and other key management figures of the Debtors (including in-house counsel Randy Bitensky) worked to keep the employees motivated, and the business afloat as a going concern.

[46]  The teaser letter[13] was sent to 42 potential bidders from both strategic and financial sectors inviting potential bidders to submit a non-binding letter of intent for the entirety of GOLI's business and Assets, including the Atos Equipment.

[47]  In Phase 1 of the Pre-Filing SISP, BMO Capital Markets invited potential bidders to sign confidentiality agreements to access the virtual data room ("**VDR**"). Ultimately, 29 parties signed confidentiality agreements. Following this, interested parties were invited to submit non-binding letters of intent by no later than August 8, 2023.

[48]  On July 24, 2023, the Lenders wrote to the Debtors to restate the defaults under the Credit Agreement. They agreed to suspend exercising their rights until August 8, 2023, to allow the continuance of the Pre-Filing SISP (the "**July Lenders' Letter**").[14] The

---

[11] Exhibit P-15.
[12] Exhibit P-16.
[13] Exhibit P-17.
[14] Exhibit P-18.

suspension was conditional upon the Debtors receiving at least one letter of intent prior to the deadline.

[49]  On August 8, 2023, the debtors received four (4) non-binding indications of interest for GOLI's business. However, all four of these indications of interest excluded the Atos Equipment.

[50]  BMO Capital Markets then initiated Phase 2 of the Pre-Filing SISP and the four interested parties were invited to continue their due diligence and submit further indications of interest by September 26, 2023.

[51]  On September 13, 2023, the Lenders further wrote to the Applicants to repeat the contractual defaults under the Credit Agreement and inform the Applicants that the Lenders would continue to refrain from exercising their rights until October 15, 2023, on the condition that the Applicants obtain one binding offer in the context of the Pre-Filing SISP (the "**September Lenders' Letter**").[15]

[52]  By the September 26, 2023, deadline, BMO Capital Markets had only received two verbal indications of interest. The Pre-Filing SISP was extended to allow parties to conduct additional due diligence with the hopes of receiving one or multiple binding offers.

[53]  On October 31, 2023, BMO Capital Markets informed all remaining interested parties that binding offers were to be submitted by November 14, 2023, at which date the Pre-Filing SISP would terminate.[16]

[54]  In November 2023, BMO Capital Markets received three non-binding offers from bidders. After further due diligence, one of the bidders withdrew their indication of interest.

[55]  The two other bidders continued their due diligence and engaged in discussions about the structure of a potential transaction. Ultimately, after conducting further due diligence, and considering the indebtedness of GOLI, and the unwillingness to proceed with a transaction as part of insolvency proceedings, sometime in December/early January the remaining bidders ultimately withdrew their indication of interests.

[56]  In January 2024, three new parties expressed potential interest. After receiving access to the VDR and conducting initial due diligence, two of them expressed that they were no longer interested. On January 9, 2024, Group KPS (a healthcare company) in partnership with Bastion Capital (an investment management firm) (collectively, "**KPS-Bastion**") and conditional on the participation of Mr. Agarwal, sent a letter of interest for the purchase of GOLI's business, subject to certain terms and conditions, including the exclusion of the Atos Equipment.

[57]  Group KPS is a healthcare company with an extensive distribution network in Latin America. Group KPS currently distributes Goli products in Mexico and has a deep

---

[15]  Exhibit P-19.
[16]  Exhibit P-20.

| 500-11-063787-242 | PAGE: 11 |
|---|---|

understanding of its brand and the potential for growth. Bastion Capital has an extensive track record of financing and supporting successful consumer-based businesses.

[58] After negotiations with the Lenders, on February 3, 2024, KPS-Bastion, with the confirmed participation of Mr. Dee Agarwal, presented a revised offer to purchase GOLI's business to the Debtors and the Lenders (the "**KPS-Bastion Offer**").[17] KPS-Bastion also specified in the KPS-Bastion Offer that other existing shareholders of GOLI could participate in the transaction contemplated by the offer (the "**Contemplated Transaction**").

[59] On February 5, 2024, concerned that without a going concern transaction, there will likely be a material erosion to the value of the Lenders' security, thereby causing irreparable prejudice to the Lenders, the Lenders accepted the KPS-Bastion Offer and the Contemplated Transaction despite the fact that they will suffer a significant loss on the Loan.

[60] The Contemplated Transaction requires that GOLI's business be conveyed to the purchaser through a formal insolvency process. The Applicants, the Lenders and the Proposed Monitor are of the view that the Contemplated Transaction represents the best outcome available for GOLI and its stakeholders in the circumstances.

### 5.   Restructuring Objectives

[61] The Debtors and the Lenders have concluded that the only realistic option for a going concern transaction is to engage in a formal restructuring process in order to conclude the Contemplated Transaction. At the comeback hearing, Debtors will thus seek the approval of the Contemplated Transaction and of the Agency Agreement in order to proceed with the orderly liquidation of the Atos Equipment without further delay.

### **ANALYSIS**

[62] The purpose of the CCAA is to create "breathing room for an insolvent debtor to negotiate a way out of insolvency".[18] It is based on the premise that "debtor companies retain more value as going concerns than in liquidation scenarios".[19] As such, the act embraces "the simultaneous objectives of maximizing creditor recovery, preservation of going-concern value where possible, preservation of jobs and communities affected by the firm's financial distress […] and enhancement of the credit system generally".[20]

---

[17]   Exhibit P-21.
[18]   *Canada* v. *Canada North Group Inc.*, 2021 SCC 30, para. 19.
[19]   *Ibid*, para. 20; *Century Services Inc.* v. *Canada (Attorney General)*, 2010 SCC 60, para. 18.
[20]   *9354-9186 Québec inc.* v. *Callidus Capital Corp.*, 2020 SCC 10, at para. 42, quoting Janis Pearl Sarra, *Rescue! The Companies' Creditors Arrangement Act*, 2nd ed., Toronto, Carswell, 2013, p. 14.

500-11-063787-242                                                                                                               PAGE: 12

[63] Through its initial order, the court "preserves the *status quo* by freezing claims against the debtor while allowing it to remain in possession of its assets in order to continue carrying on business".[21]

[64] The various criteria for the issuance of an initial order under the CCAA are met.

[65] The Debtors are debtor companies within the meaning of section 2 of the CCAA. The parent company, GOLI Canada is a Canadian corporation incorporated under the CBCA. GOLI USA is a wholly owned subsidiary of GOLI Canada. Even though GOLI USA is a Delaware corporation, its principal place of business is located in Montreal. The operational and financial decisions regarding GOLI USA are made by GOLI Canada. Most of GOLI's employees are in Canada.

[66] The Debtors are insolvent because the value of their assets in a liquidation context would be insufficient to meet all their obligations to their creditors. They are also unable to meet their obligations as they become due.[22]

[67] The Debtors' total indebtedness exceeds the CAN$5,000,000 threshold required by the CCAA.

[68] The Debtors, in collaboration with the Lenders, wish to proceed with a restructuring, while ensuring the continuity of their activities in a viable manner. To do so, they need CCAA protection and the assistance of the Monitor to implement a court-supervised restructuring process.

[69] The clauses of the draft Initial Order are in line with the standard Initial Order.

## 1.   The Stay

[70] Without CCAA protection, the Debtors are in real danger of no longer being able to maintain their activities. A stay of proceedings for an initial period of 10 days, subject to extensions (the "**Stay Period**") is necessary to avoid a possible liquidation at a discount of the Debtors' assets in the context of multiple litigations and hypothecary recourses by the various creditors of the Debtors. Initial orders may be issued for the benefit of the debtor's officers and directors when required.[23]

## 2.   The Appointment Of The Monitor

[71] The appointment of Deloitte, a licensed insolvency trustee, to act as Monitor under the provisions of the CCAA is appropriate.

---

[21]   *Canada* v. *Canada North Group Inc.*, *supra*, note 18, para. 19.
[22]   *Stelco Inc., Re*, 48 C.B.R. (4th) 299, paras. 26 and 28.
[23]   *Great Basin Gold Ltd. (Re)*, 2015 BCSC 1199, para. 32.

| | |
|---|---|
| 500-11-063787-242 | PAGE: 13 |

[72]  Deloitte is not subject to any of the restrictions set out in Section 11.7(2) of the CCAA. Mr. Clouatre and Mr. Nadon and their team have significant experience acting as a CCAA monitor including in multi-jurisdictional proceedings.

[73]  Deloitte has been working with the Lenders since April 27, 2023, to address the debtors' financial and operational concerns. Deloitte has been involved in the Pre-Filing SISP.

### 3.    The Administration Charge

[74]  An Administration Charge of $300,000 is warranted under the circumstances.

[75]  Such charges "are required to derive the most value for the stakeholders". They are "beneficial to all creditors".[24]

### 4.    Directors and Officers Charge

[76]  Debtors also ask that a D&O Charge be put in place to guarantee the active and committed involvement and continued participation of the Debtors' directors and officers.

[77]  Such charges are appropriate to alleviate the concern that directors and officers may have about the possibility of personal liability. Even when the directors may benefit from some insurance coverage, such coverage may prove insufficient or be subject to standard exclusions which could make it difficult to cover all potential liabilities that can arise in the context of an insolvency process. More often than not, the continued service and involvement of the director and officers in CCAA proceedings is conditional upon the granting of an Order which includes a directors and officers charge.[25]

[78]  The amount requested of CAN$330,000 is reasonable. The D&O Charge will take rank after the Lenders' security.

[79]  The Applicants submit that the requested D&O Charge is reasonable and adequate given, notably, the potential expose of the directors and officers to personal liability.

[80]  The Lenders and the Monitor support putting in place the Administration Charge and the D&O Charge. The amounts are explained in the Monitor's report.

### 5.    United States Bankruptcy Chapter 15 Case

[81]  GOLI has operations, assets and valuable business and trade relationships with a number of parties in the United States.

---

[24]  *Canada* v. *Canada North Group Inc.*, *supra*, note 18, paras. 28 to 30; *Syndic de Chronométriq inc.*, 2023 QCCA 1295, para. 33.
[25]  *Nordstrom Canada Retail, Inc.*, 2023 ONSC 1422, paras. 56 and 57.

| | |
|---|---:|
| 500-11-063787-242 | PAGE: 14 |

[82]   After the commencement of CCAA proceedings in Canada, Debtors and the Monitor intend to initiate a case under Chapter 15 of the *U.S. Bankruptcy Code*, seeking an order to recognize and enforce these CCAA proceedings in the U.S. as foreign main proceedings and grant protection against any potential adverse action taken by GOLI's U.S. creditors and stakeholders (the "**Chapter 15 Case**").

[83]   Debtors ask that the Initial Order specify that the Debtors' center of main interest is in Canada. Such an order is appropriate here given that:

83.1. Section 45(2) of the CCAA sets out that a debtor's company registered office is deemed the center of its main interest. This office is in Montreal both for GOLI Canada and GOLI USA.

83.2. The Debtors operate on a consolidated basis and all of the important decisions are taken in Canada by the senior management of GOLI Canada.

83.3. The majority of the Debtors' Assets are located in Canada and/or owned by GOLI Canada. GOLI Canada is the sole owner of the Assets found in the United States of America.

83.4.  GOLI Canada is the ultimate parent, and sole beneficial owner of GOLI USA.

83.5. All human resource matters for GOLI USA are managed through personnel in Canada on GOLI Canada payroll.

83.6. GOLI Canada and GOLI USA utilize shared services, including among other areas, human resources, accounting, legal, information technology, marketing and sales and business applications (all of which, with the exception of the Chief Marketing Officer, are employed or subcontracted by GOLI Canada).

[84]   The relief sought has been ordered by other Initial Orders in the same circumstances.[26]

## 6.   Sealing of Confidential Documents

[85]   Debtors seek an order declaring the exhibits P-14 (Annexes A,B and D), P-21, P-24 and P-25 be filed under seal. They submit that these exhibits contain sensitive information regarding the valuation of the Assets which are commercially sensitive and risk impacting the closing of the Contemplated Transaction.

---

[26]   *In the matter of the compromise of Xebec*, September 29, 2022, 500-11-061483-224; *In the matter of the compromise of Stornoway Diamond*, September 9, 2019, 500-11-057094-191.

| | |
|---|---|
| 500-11-063787-242 | PAGE: 15 |

### 7. Execution Notwithstanding Appeal

[86]  Article 661 of the *Civil Code of Procedure* allows the court, upon application, to order provisional execution for the whole or a part only of the judgment, "if bringing an appeal is likely to cause serious or irreparable prejudice to one of the parties".

[87]  Given the urgency and severity of the circumstances confronting the Debtors, it is essential that the execution of the order sought herein be granted notwithstanding appeal. Without it, the restructuring efforts of the debtors would be put in serious jeopardy.

**FOR THESE REASONS, THE COURT:**

[88]  **GRANTS** the Application for the Issuance of the First Day Initial Order;

[89]  **SIGNS** the draft Initial Order submitted by the parties this day, March 18, 2024;

[90]  **THE WHOLE** without costs.

_____
MARTIN F. SHEEHAN, J.S.C.

Mtre Christian Lachance
Mtre Benjamin Jarvis
**DAVIES WARD PHILLIPS & VINEBERG S.E.N.C.R.L, S.R.L**
Counsel for the Debtors - Applicants

Mtre Noah Zucker
**NORTON ROSE FULBRIGHT CANADA S.E.N.C.R.L., S.R.L.**
Counsel for the Monitor

Mtre Sandra Abitan
**OSLER, HOSKIN & HARCOURT, S.E.N.C.R.L., S.R.L.**
Counsel for the Lender

Hearing date:    March 18, 2024