**Exhibit D**



**Deloitte Restructuring Inc.**
1190, Avenue des Canadiens-de-Montréal
Suite 500
Montreal QC H3B 0M7
Canada

Tel: 514-393-7115
Fax: 514-390-4103
www.deloitte.ca

C A N A D A                                            S U P E R I O R   C O U R T
PROVINCE OF QUEBEC                                     Commercial Division
DISTRICT OF QUEBEC
COURT. No.:    ●
OFFICE No.:    ●

**IN THE MATTER OF A PLAN OF**          **GOLI NUTRITION INC.**, a duly incorporated
**ARRANGEMENT OR COMPROMISE OF:**       company under the laws of Canada having its principal
                                        place of business at 2205 Boul. De la Côte-Vertu, suite
                                        200, in the city and judicial district of Montreal,
                                        Quebec, H4R 1N8;

                                        - and –

                                        **GOLI NUTRITION INC.**, a duly incorporated
                                        company under the laws of Delaware having its
                                        principal place of business at 2205 Boul. De la Côte-
                                        Vertu, suite 200, in the city and judicial district of
                                        Montreal, Quebec, H4R 1N8

                                         **Debtors**

                                        - and -

                                        **DELOITTE RESTRUCTURING INC.**, a duly
                                        incorporated company having a place of business at
                                        500-1190 Ave des Canadiens-de-Montréal, in the city
                                        and district of Montreal, province of Quebec, H3B
                                        0M7.

                                        **Proposed Monitor**

**FIRST REPORT TO THE COURT**
**SUBMITTED BY DELOITTE RESTRUCTURING INC.**
**IN ITS CAPACITY AS PROPOSED MONITOR**
(*Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended)

## INTRODUCTION

1)    Goli Nutrition Inc. ("**Goli Canada**") and Goli Canada's wholly owned subsidiary based
      in the United States, Goli Nutrition Inc. ("**Goli US**", and together with Goli Canada,
      the "**Debtors**" or the "**Company**") have filed an application (the "**CCAA Application**")
      before the Superior Court of Québec (commercial division) sitting in the district of
      Montreal (the "**Court**") under the *Companies' Creditors Arrangement Act* (the
      "**CCAA**"), seeking, *inter alia,* a first-day initial order (the "**Initial Order**") commencing
      proceedings in respect of the Debtors under the CCAA (the "**CCAA Proceedings**") and

appointing Deloitte Restructuring Inc. as the CCAA monitor of the Debtors ("**Deloitte**" or the "**Proposed Monitor**").

2)      At the comeback hearing on the CCAA Application (the "**Comeback Hearing**"), the Debtors will be seeking an amended and restated initial order (the "**Amended and Restated Initial Order**") as well as orders (the "**Transaction Approval Orders**") approving and granting accessory relief in connection with:

   a)   a transaction involving the transfer of substantially all of Goli Canada's business and assets, other than the Atos Equipment (as defined below), to an acquisition group, which includes one of the principal shareholders of Goli Canada (the "**Principal Transaction**"); and

   b)   the transactions resulting from an Agency Agreement (the "**Agency Agreement**") concluded with Gordon Brothers Commercial & Industrial, LLC ,on behalf of a contractual joint venture between itself and Branford Auctions, LLC, (collectively, the "**Agent**") in respect of the Atos Equipment (the "**Atos Transaction**" and together with the Principal Transaction, the "**Proposed Transactions**").

3)      The proposed Initial Order to be sought at the "first day" hearing of the CCAA Application includes, among other things, the following proposed relief:

   a)   a stay of proceedings in favor of the Debtors, their property and their directors and officers for an initial period of ten (10) days;

   b)   the appointment of Deloitte as monitor pursuant to section 11.7 of the CCAA;

   c)   the granting of an administration charge (the "**Administration Charge**") and a directors' and officers' charge (the "**D&O Charge**" and together with the Administration Charge, the "**CCAA Charges**");

   d)   a declaration that Montreal, Québec is the "center of main interest" of the Debtors and authorizing the Debtors or the Proposed Monitor to apply, as they may consider necessary or desirable, to any other court, tribunal, regulatory, administrative or other body, wherever located, for orders to recognize, enforce and/or assist in carrying out the terms of the Initial Order and any subsequent orders rendered in the CCAA Proceedings, including, orders under Chapter 15 of the United States Bankruptcy Code 11 U.S.C. §§ 101-1532 ("**Chapter 15**"); and

   e)   scheduling of the Comeback Hearing on terms to be determined by the Court;

4)      Since the Debtors have activities and assets in the United States, the Proposed Monitor intends to institute proceedings before the United States Bankruptcy Court for the District of Delaware, immediately following the issuance of the Initial Order, seeking the recognition of the CCAA Proceedings as foreign main proceedings under Chapter 15 as well as the recognition of Deloitte as foreign representative of the Debtors and certain other related relief (the "**Chapter 15 Case**").

5)      The Debtors' primary secured creditors are a syndicate of lenders composed of Bank of Montreal, as Administrative Agent, HSBC Bank Canada, National Bank of Canada and Fédération Des Caisses Desjardins Du Québec (collectively, the "**Syndicated Lenders**")

6)      This report (this "**First Report**") has been prepared by the Proposed Monitor in contemplation of its proposed appointment as monitor in the CCAA Proceedings to

provide information to the Court in respect of the relief sought at the initial hearing of the CCAA Application as well as at the Comeback Hearing.

7) If the Initial Order is granted, the Debtors intend to seek the issuance, at the Comeback Hearing, of the Transaction Approval Orders as well of the Amended and Restated Initial Order, which provides, *inter alia*, for additional powers for the Monitor to complete the Atos Transaction and any remaining restructuring steps following the closing of the Principal Transaction.

8) The Proposed Monitor intends to file a supplemental report to provide further information, including on the Proposed Transactions, as required, as well as its views and recommendations to the Court in respect of the relief to be sought by the Debtors at the Comeback Hearing.

## PURPOSE

9) The purpose of the First Report is to provide information to the Court with respect to:

   a) Deloitte's qualification to act as monitor;

   b) The business, financial affairs and financial results of the Company;

   c) The Company's creditors;

   d) The sale and investment solicitation process;

   e) The Proposed Transactions;

   f) The Company's cash flow forecast;

   g) The CCAA Charges;

   h) The Chapter 15 Case; and

   i) The Proposed Monitor's conclusions and recommendations.

10) In preparing this First Report and making the comments herein, the Proposed Monitor has been provided with, and has relied upon, unaudited financial information, the Debtors' books and records and financial information prepared by the Company and discussions with management ("**Management**") of the Company (collectively, the "**Information**").

11) Except as described in this First Report in respect of the Debtors' Cash Flow Statement (as defined below):

   a) The Proposed Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Proposed Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such information in a manner that would wholly or partially comply with Generally Accepted Assurance Standards ("**GAAS**") pursuant to the Chartered Professional Accountants Canada Handbook and, accordingly, the Proposed Monitor expresses no opinion or other form of assurance contemplated under GAAS in respect of the Information; and

   b) Some of the information referred to in this First Report consists of forecasts and projections. An examination or review of the financial forecast and projections, as

outlined in Chartered Professional Accountants Canada Handbook, has not been performed.

12) Future oriented financial information referred to in this First Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

13) Except otherwise indicated, the Proposed Monitor's understanding of factual matters expressed in the First Report concerning the Company and its business is based on the Information, and not independent factual determinations made by the Proposed Monitor.

14) Unless otherwise stated, all monetary amounts contained in this First Report are expressed in United States dollars.

## DELOITTE'S QUALIFICATION TO ACT AS MONITOR

15) Deloitte is a Licensed Insolvency Trustee within the meaning of subsection 2(1) of the *Bankruptcy and Insolvency Act* (Canada).

16) Deloitte is not subject to any of the restrictions to act as the Proposed Monitor as set out in Section 11.7(2) of the CCAA.

17) Deloitte has significant experience acting as a CCAA monitor and in other court officer capacities in formal insolvency proceedings.

18) Deloitte has been acting as financial advisor to the Syndicated Lenders since April 27, 2023, to, among other things, assist the Syndicated Lenders in understanding the Debtors' current financial situation and performance, evaluate the Company's assets and liabilities and undertake an assessment of the Syndicated Lenders' security position. Deloitte has also worked with Management over this time to prepare and update a 13-week cash flow forecast.

19) In the context of the foregoing, the Proposed Monitor's professional personnel associated with this matter have acquired knowledge of the Company and its business. The Proposed Monitor has spent time with Management understanding the operations and financial performance and has assisted in the preparation of the Cash Flow Forecast. The Proposed Monitor has also reviewed the CCAA Application materials, and various financial and other information and is, therefore, in a position to act as court-appointed monitor of the Debtors in an efficient and diligent manner in the CCAA proceedings for the benefit of all of the stakeholders.

20) Deloitte has determined that it is not in a position of conflict, in fact, or in perception. The Proposed Monitor is, therefore, in a position to act as a court-appointed monitor without delay, in a sufficient and diligent manner in the CCAA Proceedings.

21) Accordingly, Deloitte has consented to act as monitor of the Debtors should the Court grant the Initial Order materially on the terms sought and as foreign representative of certain Debtors in any ancillary foreign recognition proceedings, including the Chapter 15 Case.

22) The Proposed Monitor has retained Norton Rose Fulbright Canada LLP and Norton Rose Fulbright US LLP (collectively, "**NRF**") to act as its independent legal counsel in the

CCAA Proceedings and the Chapter 15 Case. Deloitte and/or NRF have also retained Holland & Knight LLP as well as Landis Rath & Cobb LLP to support NRF with certain aspects of the CCAA Proceedings and the Chapter 15 Case.

## THE BUSINESS, FINANCIAL AFFAIRS AND RESULTS OF THE COMPANY

### Business and financial affairs

23) The Company is a wellness brand company, using the "Goli" name, with a focus on selling and distributing nutritional gummies. The Company has a variety of different gummy products, with Apple Cider Vinegar gummies and Ashwagandha gummies being the largest sellers. The Company sells its products both directly to consumers ("**DTC**") through its own website and Amazon, and also through retailers ("**BTB**"), primarily in the United States, including Walmart, Walgreens and Kroeger, among others.

24) The Company was started in 2018 and grew rapidly to over $560 million in revenue by 2021. The Company uses several contract manufacturers based in the United States to manufacture its products, with inventory being distributed to consumers and retailers by a number of third-party logistics providers.

25) The primary beneficial shareholders of the company include the founders, Mr. Michael Bitensky ("**Mr. Bitensky**") and Mr. Deepak Agarwal ("**Mr. Agarwal**"), as well as VMG Partners (a private equity fund) which acquired a minority stake (5%) in the Company in late 2021.

26) The Company's corporate headquarters are located in Montreal, Quebec. As of the date of this First Report, Goli Canada employed approximately 35 people in Canada and the United States and Goli US employed 4 employees in the United States.

27) The Company has an outsourcing contract with Liveketo Private Limited ("**Liveketo**") based in India pursuant to which Liveketo provides the services of approximately 17 people to the Company in the functions of finance, human resources, business intelligence, supply chain and retailer support services.

28) The Company also has an outsourcing contract with Direct Digital Solutions ("**Direct Digital**") based in the Philippines pursuant to which Direct Digital provides the services of approximately 54 people to the Company in the functions of customer service, shipping, influencer and sales support.

29) In March 2020, Goli US entered into a lease in respect of four buildings in Norco, California (the "**Norco Facility**"), based on an understanding with Better Nutritionals LLC ("**BN**"), a former co-manufacturer for the Company, that BN would occupy the Norco Facility and pay the rent as well as other expenses related to the premises.

30) The Company's financial difficulties were aggravated due to the inability of BN, which is now subject to bankruptcy proceedings in the United States, to meet certain of its obligations related to the Norco Facility as well as to certain leased production line and manufacturing equipment located at the Norco Facility (the "**Atos Equipment**").

31) In June 2022, Goli Canada entered into a settlement agreement with the owner of the Atos Equipment, pursuant to which Goli Canada acquired such equipment for $32 million. The acquisition was funded by two of Goli Canada's shareholders, 11028227 Canada Inc. and 11028154 Canada Inc., entities related to Mr. Bitensky and

Mr. Agarwal. Accordingly, ownership of the Atos Equipment was transferred to Goli Canada.

32) Goli Canada's main assets are its accounts receivable, inventory, the Atos Equipment, brand and other intellectual property as described in more detail below:

a) <u>Accounts receivable:</u> As of December 31, 2023, the latest available internal financial statements, Goli Canada had ~$11.2 million in accounts receivable, owing from BTB customers, of which ~$10.6 million (54 accounts) related to sales to North American customers and ~$0.6 million (6 accounts) related to sales to customers in Europe and other global markets.

b) <u>Inventory:</u> As of December 31, 2023, Goli Canada had ~$3.9 million in gummy and packaging inventory, of which ~$1.6 million was located at a fulfilment centre in Indianapolis operated by Emerson Healthcare LLC (third party logistics company serving the Company's BTB customers). A significant portion is also located at Amazon fulfilment centres across North America (~$0.7 million) and at three different facilities operated by Staci Americas (~$1.1 million) in Vannuys (Los Angeles), Bolingbrook (Illinois) and Milton (Ontario). When manufactured, most of the gummy products have a shelf life of approximately 18 months. However, the larger retailers will only accept inventory with a shelf life of at least 9 months. Of the $3.9 million in inventory, approximately $1.3 million has a shelf life of less than 9 months.

c) <u>Atos Equipment:</u> The Atos Equipment comprises various installed and uninstalled manufacturing and production equipment located at the Norco Facility.

33) The table below demonstrates the Company's historical balance sheet, with an increasing working capital deficit and decreasing equity position over time:

**The Company Balance Sheet**

| US $'000 | Dec-21 | Dec-22 | Dec-23 |
|---|---|---|---|
| **Assets** | | | |
| Cash | 12,771 | - | 639 |
| Accounts receivable | 25,684 | 30,579 | 10,528 |
| Inventory | 66,970 | 29,557 | 5,143 |
| Investment in lease / Norco Equipment | 40,766 | 40,742 | 38,986 |
| Intangible assets | 4,627 | 2,957 | 495 |
| Other assets | 12,835 | 9,171 | 6,816 |
| **Total assets** | **163,653** | **113,006** | **62,608** |
| **Liabilities** | | | |
| Accounts payable | 39,253 | 34,020 | 31,308 |
| Other payables and provisions | 39,957 | 26,403 | 36,844 |
| Due to related parties | - | 45,403 | 17,590 |
| Revolving credit facility | 42,798 | 35,293 | 34,031 |
| Long-term loans | 88,599 | 56,698 | 53,732 |
| Capital leases | 15,824 | - | - |
| **Total liabilities** | **226,431** | **197,817** | **173,506** |
| **Shareholders' deficiency** | **(62,778)** | **(84,811)** | **(110,897)** |

Source: Dec-21 and Dec-22 draft audited accounts; Dec-23 draft internal financials

34) From December 2021 to December 2023, the book value of Goli Canada's inventory decreased from $70.0 million to $5.1 million. The Company experienced significant inventory obsolescence issues as its revenues declined, resulting in inventory write-offs and discounted liquidation sales.

35)  As of the date of this First Report, Management estimates that the Company's working capital is not sufficient to allow it to meet its financial obligations, commitments and necessary budgeted expenditures for the foreseeable future. The balance sheet indicates a net deficit (shareholder deficiency) of $110.9 million as of December 31, 2023.

36)  Consequently, the Proposed Monitor is on the view that both Goli Canada and Goli US are insolvent.

## Recent financial results

37)  The Company has faced a number of challenges, including a material reduction in sales as consumer health trends changed coming out of the Covid-19 pandemic. The Company has also suffered from several supply chain and inventory management issues, resulting in margin erosion and a tightening of liquidity.

38)  The following table provides a summary of the Debtors' consolidated revenue and net profit/loss, highlighting the negative trend in 2022 and 2023 in the business and material slowdown in sales:

**The Company Summary Income Statement**

| US $'000 | FY21 | FY22 | FY23 |
|---|---|---|---|
| **Revenue** | **501,939** | **187,342** | **118,174** |
| Cost of goods sold | 173,799 | 82,567 | 80,004 |
| **Gross profit** | **328,140** | **104,775** | **38,170** |
| **Expenses** | | | |
| Advertising and promotion | 188,936 | 55,811 | 18,020 |
| Delivery | 55,012 | 22,905 | 19,020 |
| Processing fees | 20,020 | 8,811 | 6,356 |
| Salaries and benefits | 7,936 | 9,656 | 6,098 |
| Professional fees | 5,588 | 9,051 | 12,500 |
| Office and miscellaneous | 4,301 | 6,861 | 19,051 |
| Other, interest, depreciation | 15,981 | 23,100 | 19,844 |
| **Total expenses** | **297,774** | **136,195** | **100,889** |
| **Net income/(loss) before tax** | **30,366** | **(31,420)** | **(62,720)** |

Source: FY21 and FY22 draft audited accounts; FY23 draft internal financials

39)  The Company has sustained significant losses since March 2022. According to Management, these losses are attributed to, among other things:

a)  Decreased demand for the Company's primary product, Apple Cider Vinegar gummies;

b)  Inventory purchases exceeding demand, resulting in inventory obsolescence issues, material charge backs from retailers, inventory write-offs and erosion of gross margins;

c)  Various litigation in the United States resulting in significant legal and settlement costs for the Company;

d)  Liquidity constraints impacting the Company's ability to advertise and promote its products; and

e)  Competition in the sector requiring sales prices of the Company's products to be decreased.

40) The Proposed Monitor's review of the latest financial statements for the year ended December 31, 2023 ("**FY23**") shows that gross revenues decreased by $69.2 million (37%) over the prior year and gross profit declined to $38.2 million. The Company estimates that inventory related write-offs and charge backs from retailers contributed to the losses of the Company by approximately $30.9 million during FY23.

41) Overall, the Company suffered an EBITDA loss of $42.9 million in FY23 and a net loss of $62.7 million, resulting in significant liquidity constraints on the business.

## THE COMPANY'S CREDITORS

### Secured creditors

42) Goli Canada is the borrower under an amended and restated credit agreement dated September 2, 2022 (as amended, the "**Senior Credit Agreement**") with the Syndicated Lenders. Pursuant to the Senior Credit Agreement, the Syndicated Lenders provided a Revolving Facility, a Term Facility, and Credit Card Facilities to Goli Canada (collectively, the "**Credit Facilities**"). Goli US has guaranteed all of Goli Canada's obligations to the Syndicated Lenders under the Credit Facilities.

43) As of the date of this Report, the total indebtedness under the Credit Facilities is approximately $99.1 million, as shown in the table below.

**The Company Secured Creditors**

| US $'000 | |
|---|---|
| **Senior Lender Credit Facilities** | |
| Revolving facility | 36,991 |
| Term facility | 60,493 |
| Credit card facilities | 1,581 |
| **Total Senior Lender obligations** | **99,065** |
| **Other secured obligations** | |
| Related party loans | 654 |
| **Total other secured obligations** | **654** |
| **Total secured obligations** | **99,719** |

Source: Financial information from Goli dated March 14, 2024

44) The Syndicated Lenders hold various registered security interests over all of the present and after-acquired movable and immovable (personal and real) property of Goli Canada and Goli US (collectively, the "**Syndicated Lenders' Security**"). According to searches conducted in public registries, the Syndicated Lenders hold first ranking security over the Company's assets in Canada and in the United States.

45) The Proposed Monitor has caused to be performed, by NRF and Holland & Knight LLP, an independent review of the Syndicated Lenders' Security, which has confirmed that such security is valid and enforceable in Canada and the United States.

46) Goli Canada is in default under the terms of the Senior Credit Agreement and has been since the spring of 2023. The Syndicated Lenders have sent various notices of default and of their intention to enforce their security but agreed to refrain from exercising their rights and recourses for a limited period, particularly to allow for the Company to implement the SISP (as defined below), which has culminated in the Proposed Transactions.

47) Goli Canada owes $0.7 million to 11028227 Canada Inc. and 11028154 Canada Inc., entities related to Mr. Bitensky and Mr. Agarwal, respectively, in connection with loans

advanced in October 2023 for the purpose of funding certain working capital obligations of the Company (the "**Related Party Loans**"). The Related Party Loans are secured by security registered over all of the Company's present and after-acquired real and personal property, which, according to searches conducted at public registries, ranks junior to the Syndicated Lenders' Security.

**Unsecured creditors**

48)  According to the Company's books and records, the following table summarizes the obligations of the Company to unsecured creditors as of March 14, 2024:

**The Company Unsecured Creditors**

| US $'000 | |
|---|---:|
| **Vendors** | |
| Professional fees | 10,454 |
| Contract manufacturers and packaging | 9,717 |
| Advertising and promotion | 5,306 |
| Third party logistics and shipping | 2,111 |
| Other vendors | 2,760 |
| **Total vendor creditors** | **30,349** |
| **Other unsecured obligations** | |
| Taxes payable | 12,748 |
| Credit card providers | 6,854 |
| Norco facility rent and other liabilities | 1,489 |
| Employees (vacation accrual) | 71 |
| Related party loans | 15,525 |
| Litigation settlement payments | 1,945 |
| **Total other unsecured obligations** | **38,632** |
| **Total unsecured obligations** | **68,981** |

Source: Financial information from Goli dated March 14, 2024

49)  The Company has several outstanding tax-related liabilities, including:

a)  Approximately $8.7 million owing to the Canada Revenue Agency ("**CRA**") in respect of income taxes for the financial years ended December 31, 2020 and 2021, in addition to penalties and interest;

b)  Goods and service taxes in the amount of approximately $0.2 million;

c)  State sales taxes of approximately $0.9 million owing to several different States including Virginia, Iowa, Nevada, Mississippi, New Mexico, Hawaii, Oklahoma and Arkansas; and

d)  Foreign sales taxes of approximately $2.9 million owing in respect of sales made to the United Kingdom, Australia, New Zealand, and the United States.

50)  The Company utilizes several accounts payable finance and credit card facilities to fund its inventory purchases and working capital requirements. As of the date of this First Report, we understand that the Debtors owe a total of approximately $6.9 million to four different service providers including American Express, Parker Group Inc., Brex Inc., and Slope Tech Inc (excluding the credit card facilities provided by the Syndicated Lenders).

51) In respect of the Norco Facility, Goli US owes amounts in connection with outstanding rent, brokers' fees, utilities and security personnel providers totalling approximately $1.5 million.

52) According to Management, payroll obligations are current, other than accrued vacation totalling approximately $0.1 million. Payments are made on a biweekly basis using outsourced payroll companies, namely ADP, for Canadian employees, and Trinet, for American employees. As per Management, all source deductions are current.

53) Goli Canada owes a further $15.5 million to 11028227 Canada Inc. and 11028154 Canada Inc. through unsecured loans.

54) The Debtors owe various parties approximately $1.9 million in respect of litigation settlement payments. The Debtors are also subject to several ongoing litigation proceedings for which the Company's exposure has not been quantified.

## THE SALE AND INVESTMENT SOLICITATION PROCESS

55) In June 2023, the Company retained BMO Capital Markets ("**BMOCM**") to proceed with a sale and investment solicitation process in respect of the business and assets of the Debtors (the "**SISP**"). Various marketing materials and a data pack were prepared by BMOCM with the support of the Company including, among other things, an executive summary providing an overview of the Company's business and operations and describing the investment opportunity (the "**SISP Executive Summary**"), a financial model, and a virtual data room ("**VDR**").

56) The SISP Executive Summary is attached, *under seal*, as **Appendix B** to this First Report. The SISP Executive Summary and information populated in the VDR provided additional information considered relevant to the opportunity and detailed analysis about the business to enable potential interested parties to make an informed assessment of the opportunity.

57) BMOCM, in collaboration with Management, established a list of forty-four (44) potential investors and purchasers, including national and international companies and private equity groups operating in the same industry as the Company.

58) BMOCM started to reach out to potential buyers in June 2023 and the full SISP process was undertaken over a seven (7) month period to January 2024.

59) The SISP conducted by BMOCM can be summarized as follows:

a) Forty-four (44) potential buyers were contacted by BMOCM;

b) Twenty-nine (29) interested parties (seven (7) strategic and twenty-two (22) financial) executed non-disclosure agreements were provided with a copy of the SISP Executive Summary and were granted access to the VDR;

c) Five (5) interested parties submitted a non-binding letter of interest ("**LOI**") through the process, including four (4) LOIs received in August 2023 and one (1) LOI received in November 2023 from a late entrant into the SISP;

d) Management presentations were made both virtually and in person in California to several parties that submitted LOIs in September 2023, with the full Management team;

e) On October 31, 2023, BMOCM sent a process letter to five (5) interested parties inviting the submission of final, binding proposals and including a draft definitive agreement for review and mark-up. A deadline for submission of proposals was set as November 14, 2023 ("**Binding Proposal Deadline**"). A copy of the process letter is attached hereto as **Appendix C**;

f) No binding offers were received by the Company by the Binding Proposal Deadline;

g) BMOCM continued its efforts to advance a transaction with interested parties and to facilitate due diligence requests, but several of the parties raised concerns regarding the operating results of the Company and required more time for the Company to demonstrate an improvement in its results;

h) A few interested parties undertook financial and commercial due diligence from September 2023 to January 2024; and

i) Ultimately, none of these parties decided to proceed with submitting a binding offer to acquire the Company.

60) The Proposed Monitor, then acting as financial advisor to the Syndicated Lenders, was kept apprised of the progress of the SISP and, in particular, received reports from BMOCM on the solicitation efforts, the due diligence process and any indications of interest or offers received in connection with the Company's business and assets, including the Atos Equipment.

61) The Proposed Monitor understands that the interested parties decided not to advance binding proposals for a variety of reasons, including concerns in relation to the Company's business model and profit margins, the Company's ability to grow its revenues and the overall viability of the business, as well as the additional liquidity that would be required to be invested following a transaction to support the Company.

62) In addition, some of the parties expressed concerns regarding the balance sheet of the Company and its material working capital deficit and were not interested in acquiring the Company through an insolvency process. The Proposed Monitor understands from BMOCM that all parties involved understood that they had the opportunity to acquire the business at an opportunistic value given the financial situation, but ultimately, they still decided not to move forward with any binding offers.

63) On January 15, 2024, considering the worsening liquidity position of the Company and the failure of the SISP to generate a binding offer, a strategic investor and financial sponsor that had not previously participated in the SISP, Group KPS and Bastion Capital, with the contemplated participation of one of the Company's founders, Mr. Agarwal, (the "**Consortium**") decided to submit a LOI to the Company (the "**Initial Consortium LOI**"). The terms of the Initial Consortium LOI provided for a rapid transaction that would preserve the value of the business as a going concern and allow it to continue its operations.

64) The Consortium's ability to pursue the acquisition quickly was facilitated by Mr. Agarwal's in-depth knowledge of the business, the lack of any requirement for due diligence and his confidence in being able to improve the financial performance of the Company.

65) The transaction value put forward in the Initial Consortium LOI was significantly less than the amount owed to the Syndicated Lenders under the Credit Facilities. Accordingly, being the stakeholder with the primary economic interest in the outcome of the transaction, over the next three (3) weeks, the Syndicated Lenders worked with

the Consortium to negotiate a transaction, including an increase to the proposed transaction value.

66)    On February 3, 2024, the Consortium entered into a non-binding LOI with the Syndicate Lenders pursuant to which the Syndicate Lenders agreed to work towards the drafting and execution of a definitive purchase agreement.

67)    With respect to the Atos Equipment, the Debtors received only one indication of interest over the course of the SISP. The interested party was granted access to the VDR and visited the Norco Facility to conduct due diligence, but, by early October 2023, it became clear that the prospective bidder was not interested in moving forward with a transaction in respect of those assets. In the absence of alternatives, the Debtors and the Syndicated Lenders initiated a process to liquidate the Atos Equipment through an auction.

68)    After receipt of four (4) proposals from different auctioneers and following extensive negotiations, the Debtors and the Syndicated Lenders accepted a proposal submitted by the Agent, which ultimately offered the highest guaranteed return and, given its familiarity and knowledge of the equipment in question, the strongest chances of selling the equipment and maximizing value. The Agent will market the Atos Equipment for sale and is expected to hold the auction in late April or the first week of May.

69)    Following further negotiations between the Debtors, the Syndicated Lenders and the Agent, in consultation with the Proposed Monitor, the terms of the Agency Agreement were agreed to in connection with the disposition of the Atos Equipment pursuant to the Atos Transaction.

## THE PROPOSED TRANSACTIONS

### The Principal Transaction

70)    On March 15, 2024, Goli Canada entered into a binding subscription agreement (the "**Subscription Agreement**") with the Consortium, pursuant to which a newly constituted entity will subscribe for new shares in Goli Canada and effectively acquire 100% of the equity interest in Goli Canada, the whole in accordance with the terms and conditions of the Subscription Agreement (the "**Principal Transaction"**). The Principal Transaction is described in the CCAA Application and a copy of the Subscription Agreement is communicated in support thereof *under seal* as Exhibit P-25.

71)    The Principal Transaction is intended to be approved and implemented as a "pre-pack" transaction under the CCAA pursuant to a reverse vesting order ("**RVO**") and thereafter recognized and enforced in the United States in the Chapter 15 Case. Certain excluded assets (including notably the Atos Equipment) as well as certain contracts and liabilities will be vested out of the Company and transferred to a "ResidualCo" as part of the contemplated RVO structure.

72)    Under the terms of the Subscription Agreement, consideration payable by the Consortium will include a cash payment, the payment of any priority claims to which the Company is subject and payment to cover the professional fees of the Proposed Monitor, its legal counsel and the legal counsel to the Syndicated Lenders. The aggregate consideration payable by the Consortium under the Subscription Agreement (the "**Consideration**") is set out in the schedule (the "**Consideration Schedule**") attached to this Report as *under seal* as **Appendix D**;

73) Pursuant to the terms of the Subscription Agreement, closing of the Principal Transaction is scheduled to occur on or around April 11, 2024, or as otherwise agreed upon by the Company and the Consortium with the consent of Proposed Monitor and the Syndicated Lenders. The Principal Transaction is not subject to any financing condition and the Consortium has provided certain documents to the Syndicated Lenders and the Proposed Monitor to demonstrate its ability to fund the Consideration.

74) Closing is conditional on approval of the Principal Transaction pursuant to the contemplated RVO by the Court and the recognition and enforcement of the RVO in the United States in the Chapter 15 Case.

**Appropriateness of RVO structure**

75) The Proposed Monitor is of the view that the RVO structure contemplated for the Principal Transaction is appropriate for the following reasons:

   a) Various agreements, licences and authorizations are part of the purchased assets that must be transferred to the Consortium as part of the Principal Transaction. It will be more complicated and costly to transfer these assets under a traditional vesting order structure since consents, approvals or authorizations may be required.

   b) The Proposed Monitor understands that certain of the Company's permits and licenses may take many months to be transferred or obtained, which could importantly impair the Company's ability to conduct its activities. An RVO structure will limit the risks, costs and delays related to the transfer of the Company's business and facilitate a smooth transition to the Consortium; and

   c) The creditors and other stakeholders affected by the Principal Transaction will not be in a worse position than they would be if the transaction was implemented pursuant to a traditional vesting order structure. In particular, given that the Syndicated Lenders will suffer a significant shortfall on their senior secured position, the Company's later ranking creditors, including unsecured creditors, will not be in a position to obtain recovery, regardless of the structure employed.

**The Atos Transaction**

76) On March 15 2024, the Company, after having consulted with the Proposed Monitor and the Syndicated Lenders, entered into the Agency Agreement with the Agent for the purpose of liquidating the Atos Equipment for the benefit of the Debtors' creditors. A copy of the Agency Agreement is communicated in support of the CCAA Application *under seal* as Exhibit P-24.

77) Pursuant to the Agency Agreement, the Agent will provide a net minimum guarantee, consisting of an up front cash payment with the balance payable following the sale of the Atos Equipment, and will share any further proceeds realized from the sale of such equipment with the Company. The Agent is also entitled to mark up the price of the Atos Equipment by a certain percentage (the buyer's premium) and to retain the benefit of that markup. The amount of the net minimum guarantee, the allocation of excess revenue and the Agent's mark-up are set out in the Consideration Schedule (Appendix D *under seal*).

78) Under the Agency agreement, the Agent will benefit from a court-ordered priority charge on the Atos Equipment and the proceeds derived from their contemplated sale, in order to secure the payment of the Company's obligations towards the Agent under the Agency Agreement, as is customary in these agreements.

79) The Agent also requires access to the Norco Facility for a period of at least 120 days after the approval by the Court of the Agency Agreement to complete the sale of the Atos Equipment, during which time Goli US will pay occupation rent and certain other related expenses.

80) The implementation of the Agency Agreement is conditional on approval of the Atos Transaction by the Court and the recognition and enforcement of the applicable Transaction Approval Order in the United States as part of the Chapter 15 Case.

**Proposed Monitor's assessment of the Proposed Transactions**

81) The Proposed Monitor is of the view that the SISP in this matter was robust in the circumstances and that the market was extensively canvassed by BMOCM over the course of the seven (7) month process prior to the initiation of the CCAA Proceedings. The Proposed Monitor was kept apprised of the progress of the SISP and considers that the process was conducted in a fair and transparent manner and that it was reasonable in the circumstances.

82) Ultimately, the SISP did not result in any binding offers to acquire the Company's business or assets other than the offer that has culminated in the Principal Transaction. Consequently, the Principal Transaction is the best and only option available in the circumstances that will allow for the preservation of the Company's going concern.

83) Furthermore, no offers were received through the SISP or through other approaches undertaken by the Company in the last several months for the Atos Equipment and the disposal of those assets pursuant to the Atos Transaction and in accordance with the Agency Agreement is the only viable option available to maximize recovery for the Company's creditors while limiting the ongoing hold costs associated with the Norco Facility.

84) The Proposed Monitor is further of the view that:

   a) the aggregate consideration provided for under each of the Proposed Transactions is fair and reasonable in the circumstances, taking into account the market value of the assets being disposed of;

   b) The Syndicated Lenders, the creditors with the only economic interest in the assets being disposed of, are supportive of the Proposed Transactions, notwithstanding that they will suffer a significant shortfall on the Credit Facilities;

   c) The Proposed Transactions will be more beneficial to the Company's creditors than a liquidation under a bankruptcy, which would, in particular, likely result in a materially worse outcome for the Syndicated Lenders;

   d) The Company's stakeholders stand to benefit from the business being transferred as a going concern pursuant to the Principal Transaction, including current employees and subcontractors of the Company as well as its vendors, customers and other trading partners;

   e) There is no evidence to suggest that any viable alternative exists that would result in a better outcome for the Company's creditors and other interested parties; and

   f) Good faith efforts were made to sell or otherwise dispose of the assets covered by the Principal Transaction to persons who are not related to the Company and no binding offers were received through the SISP.

85)    Based on the foregoing, the Proposed Monitor considers that the approval of the Proposed Transactions is in the best interests of the Company's stakeholders generally and will maximize the value of the Company's assets for the benefit of its creditors.

## THE COMPANY'S CASH FLOW FORECAST

86)    The Company, with the assistance of the Proposed Monitor, has prepared the statement of projected cash flow (the "**Cash Flow Statement**") for the 15-week period from March 18, 2024 to June 28, 2024,  (the "**Cash Flow Period**") for the purpose of projecting the Company's estimated liquidity needs during the Cash Flow Period. A copy of the Cash Flow Statement is attached *under seal* as **Appendix A** to this First Report.

87)    The Cash Flow Statement has been prepared by the Company using probable and hypothetical assumptions set out in the notes to the Cash Flow Statement.

88)    The Proposed Monitor's review of the Cash Flow Statement consisted of inquiries, analytical procedures and discussions related to information supplied by Management. Since the hypothetical assumptions need not to be supported, the Proposed Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Cash Flow Statement. The Proposed Monitor also reviewed the support provided by Management for the probable assumptions, and the preparation and presentation of the Cash Flow Statement.

89)    Based on the Proposed Monitor's review and the foregoing qualifications and limitations, nothing has come to its attention that causes it to believe that, in all respects:

a)    The hypothetical assumptions are not consistent with the purpose of the Cash Flow Statement;

b)    As at the date of this First Report, the probable assumptions developed by Management are not suitably supported and consistent with the plans of the Company or do not provide a reasonable basis for the Cash Flow Statement, given the hypothetical assumptions; or,

c)    The Cash Flow Statement does not reflect the probable and hypothetical assumptions.

90)    Since the Cash Flow Statement is based on assumptions regarding future events, actual results will vary from the information presented even if the hypothetical assumptions occur, and the variations may be material. Accordingly, the Proposed Monitor expresses no opinion as to whether the projections in the Cash Flow Statement will be achieved. The Proposed Monitor expresses no opinion or other form of assurance with respect to the accuracy of any financial information in this report, or relied upon in preparing this report. Neither does the Proposed Monitor express any opinion as to the performance of the Company's statutory obligations with regard to projected payments to be made in accordance with the Cash Flow Statement, *inter alia* the payment of wages, the government remittances and the payroll deductions to be made by the Company.

91)    The Cash Flow Statement has been prepared solely for the purpose described in the Notes to the Cash Flow Statement, and readers are cautioned that the Cash Flow Statement may not be appropriate for other purposes.

92)    The key assumptions used in the Cash Flow Statement are based on the revised 2024 fiscal year operating plan as well as the historical results of 2023. The Company's consolidated cash balance as of March 15, 2024, was approximately $15,000. The Cash

Flow Statement demonstrates that this liquidity level should be sufficient to fund the operations during the initial 15-week period (until June 28, 2024).

93) Management anticipates more restrictive payment terms for purchases from suppliers following the announcement of the CCAA proceedings. As such, Management has anticipated certain "cash on delivery" purchases.

94) As appears from the Cash Flow Statement and the Application, in order to preserve the going concern value of its operations with the view to completing the proposed Transaction, the Company intends to continue to pay its trade creditors for services rendered and goods supplied in the normal course of business during these CCAA proceedings.

95) Management has advised the Proposed Monitor that it believes that the forecast reflected in the Cash Flow Statement is reasonable.

## CCAA CHARGES SOUGHT IN THE PROPOSED INITIAL ORDER

### Administration Charge

96) The Initial Order being sought provides for an administration charge in the amount of CDN $300,000 in favor of the Proposed Monitor, the Proposed Monitor's legal counsel, the Debtors' legal counsel and the legal counsel of the Syndicated Lenders as security for their professional fees and disbursements incurred both before and after the making of the Initial Order in respect of the CCAA Proceedings (the "**Administration Charge**").

97) The amount and beneficiaries of the Administration Charge have been determined based on the respective professionals' previous experience with cross-border restructurings of similar magnitude and complexity and taking into account that the Subscription Agreement contemplates certain funding being allocated to cover professional costs related to the CCAA Proceedings and the Chapter 15 Case.

98) The Proposed Monitor is of the view that the Administration Charge is necessary to implement the proposed restructuring and that the proposed amount and beneficiaries are reasonable in the circumstances.

### D&O Charge

99) The Proposed Monitor understands from the information provided by Management that the Company holds insurance which provides for coverage with respect to directors' and officers' liability ("**D&O Insurance**") but that such coverage may be insufficient in respect of certain potential directors' and officers' liabilities, notably employee-related obligations.

100) The proposed Initial Order provides for a charge, ranking after the Syndicated Lenders' Security, in an amount of CDN $330,000, to secure the indemnity provided to the directors and officers of the Company in respect of liabilities incurred in such capacity after the contemplated issuance of the Initial Order, except to the extent that such obligations or liabilities were incurred as a result of the directors' and officers' gross negligence or willful misconduct (the "**D&O Charge**"). The D&O Charge becomes effective only if the existing D&O Insurance is not responsive or sufficient.

101) The amount of the D&O Charge has been calculated by the Proposed Monitor, taking into consideration the periodic payroll costs of existing employees, the accruing and

accrued vacation and average sales tax payments, having considered the analysis prepared by the Company in that regard. The details of the calculation are set out in the table attached as **Appendix E** to this First Report.

102) The Proposed Monitor is of the view that the D&O Charge, ranking after the Syndicated Lenders' Security and in the amount proposed by the Debtors, is reasonable in the circumstances.

**Increase in CCAA Charges sought in the Amended and Restated Initial Order**

103) The amount of the Administration Charge is proposed to be adjusted as part of the Amended and Restated Initial Order that will be sought at the Comeback Hearing.

104) Pursuant to the Amended and Restated Initial Order, the Debtors will seek an increase in the amount of the Administration Charge to CDN $750,000. No increase in the amount D&O Charge is currently contemplated.

105) The Proposed Monitor's view on the reasonableness of the increases to the Administration Charge sought in the Amended and Restated Initial Order will be set out in its supplemental report.

## RECOGNITION PROCEEDINGS IN THE UNITED STATES

106) Since the Company has activities and assets in the United States, Deloitte, provided it is authorized to act as foreign representative of the Debtors pursuant to the Initial Order, intends to file with the United States Bankruptcy Court for the District of Delaware (the "**US Court**"), immediately following the issuance of the Initial Order, petitions seeking recognition of the CCAA Proceedings as foreign main proceedings and its appointment as foreign representative of the Debtors, the whole in the context of the Chapter 15 Case.

107) It is also contemplated that Deloitte, in its capacity as foreign representative of the Debtors, will seek the recognition and enforcement of the Amended and Restated Initial Order as well as the Transaction Approval Orders to the extent they are granted at the Comeback Hearing.

108) The Proposed Monitor is of the view that the recognition of the CCAA Proceedings pursuant to the Chapter 15 Case is essential to properly initiate and implement the contemplated restructuring process for the benefit of the Company's creditors and other stakeholders. Such recognition is also a condition to both of the Proposed Transactions.

## THE PROPOSED MONITOR'S CONCLUSIONS AND RECOMMENDATIONS

109) In light of the foregoing, the Proposed Monitor is of the view that the Debtors qualify for and should be granted the benefit of protection under the CCAA as provided for in the proposed Initial Order, including the CCAA Charges provided for therein, in order to allow the Debtors the opportunity to proceed with the contemplated restructuring.

110) The Proposed Monitor respectfully recommends, for the reasons set out in this First Report, that the Debtors' request for the Initial Order be granted by the Court.

111) The Proposed Monitor respectfully submits to the Court its First Report.

DATED AT MONTREAL, this 16th day of March 2024.


**DELOITTE RESTRUCTURING INC.**
In its capacity as Proposed Court-Appointed Monitor of
Goli Nutrition Inc. (Canada) and Goli Nutrition Inc. (US)


Per:  Benoit Clouatre, CPA, CIRP, LIT            Jean-François Nadon, CPA, CIRP, LIT
      Senior Vice-President                      President

CAN_DMS: \1004057169