**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Canadian Overseas Petroleum Limited, *et al.*,[1] | Case No. 24-[    ](    ) |
| Debtors in a foreign proceeding. | (Joint Administration Requested) |

**DECLARATION OF PETER KRAVITZ**
**IN SUPPORT OF THE DEBTORS' VERIFIED**
**PETITION FOR (I) RECOGNITION OF FOREIGN MAIN**
**PROCEEDINGS, OR, IN THE ALTERNATIVE, FOREIGN NON-MAIN**
**PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Peter Kravitz, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the law of the United States, as follows:

1.      Between January 18, 2024 and the entry of the Initial Order (defined below) on March 11, 2024, I served as the Interim Chief Executive Officer ("Interim CEO") of Canadian Overseas Petroleum Limited ("COPL"), which is the duly appointed foreign representative ("Foreign Representative") of the above captioned debtors (collectively, the "Debtors" and together with those other Non-Filing Affiliates (defined below) attached hereto, the "COPL Group") in Canadian proceedings (the "Canadian Proceedings") commenced under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), pending before the Court of King's Bench of Alberta in Calgary (the "Canadian Court"). I

---

[1] The Debtors in these chapter 15 proceedings, together with the last four digits of their business identification numbers are: Canadian Overseas Petroleum Limited (8749); COPL Technical Services Limited. (1656); Canadian Overseas Petroleum (Ontario) Limited (8319); Canadian Overseas Petroleum (UK) Limited (7063); Canadian Overseas Petroleum (Bermuda Holdings) Limited (N/A); Canadian Overseas Petroleum (Bermuda) Limited (N/A); COPL America Holding Inc. (1334); COPL America Inc. (9018); Atomic Oil and Gas LLC (8233); Southwestern Production Corporation (8694); and Pipeco LLC (XXXX). The location of the Debtors' headquarters and the Debtors' duly appointed foreign representative is 715 5 Avenue SW, Suite 3200, Calgary, Alberta T2P 2X6, Canada.

currently serve as the Chief Restructuring Officer ("CRO") of the COPL Group and am authorized to provide this declaration on behalf of the Foreign Representative and each of the Debtors.

2.     I was appointed as CRO of the COPL Group on December 29, 2023. I am also a founding principal at Province, LLC, as well as Province Fiduciary Services, LLC (collectively, "Province"). Province is a leading restructuring advisory firm. During my time at Province, I have served in a multitude of roles, including as chief restructuring officer to a number of distressed companies, advisor to and member of bankruptcy oversight, equity, and creditor committees, as a Chapter 11 Liquidating Trustee and Plan Administrator, and as a member of numerous boards of directors. In my capacity as CRO and Interim CEO of the COPL Group, I have become familiar with the business and affairs of the Debtors, and have relied upon the books and records of COPL and my personal experiences with the Debtors. As such, I have personal knowledge of the matters set forth herein and, if called as a witness, I could and would testify thereto. Where I have relied on other sources of information, I have so stated, and I believe them to be true and accurate. In preparing this declaration (this "Declaration"), I have also consulted with members of the senior management teams of the COPL Group and the Debtors' financial and legal advisors. The Debtors do not waive or intend to waive any applicable privilege by any statement herein.

3.     I respectfully submit this Declaration in support of (i) the chapter 15 petitions filed by the Foreign Representative seeking recognition of the Canadian Proceedings by the Bankruptcy Court as a foreign main proceeding under section 1515 of title 11 of the United State Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and (ii) the Foreign Representative's motion for

provisional relief pursuant to section 1519 of the Bankruptcy Code (the "Provisional Relief

Motion").

## I.    Background of the Debtors.

### A.    COPL.

4.    COPL, the parent of the COPL Group, is incorporated pursuant to the laws of

Canada.  COPL's head office is located at Suite 3200, 715-5 Avenue SW, Calgary, Alberta and its

registered office is located at Suite 400, 444-7 Avenue SW, Calgary, Alberta.

5.    COPL is a publicly traded international oil and gas exploration, development, and

production company listed on the Canadian Stock Exchange ("CSE") under the symbol "XOP"

and the London Stock Exchange ("LSE") under the symbol "COPL".  COPL is headquartered in

Calgary, Alberta.

### B.    Corporate Structure.

6.    COPL is the holding company for the following ten wholly-owned direct and

indirect subsidiaries, each of which is a Debtor in these chapter 15 cases (these "Chapter 15

Cases"):

(a) COPL Technical Services Limited ("COPL Technical"), incorporated pursuant
to the laws of Alberta, performs geological, geophysical, engineering,
accounting and administration functions for the COPL Group;

(b) Canadian Overseas Petroleum (UK) Limited ("COPL UK"), registered under
the laws of England and Wales, performs certain technical and project-related
functions for the COPL Group;

(c) Canadian Overseas Petroleum (Bermuda) Limited ("COPL Bermuda"),
registered under the laws of Bermuda;

(d) Canadian Overseas Petroleum (Bermuda Holdings) Limited ("COPL Bermuda
Holdings"), registered under the laws of Bermuda; which, together with COPL
Bermuda, was incorporated for potential opportunities in Africa, and holds a
50% interest in a joint venture company called Shoreline Canoverseas

Petroleum Development Corporation Limited ("ShoreCan") (described further below);

(e) Canadian Overseas Petroleum (Ontario) Limited ("COPL Ontario"), registered under the laws of Ontario for the purposes of providing COPL with a vehicle with which it may act on potential acquisition opportunities in Canada;

(f) COPL America Holding Inc. ("COPL America Holding"), registered under the laws of the State of Delaware;

(g) COPL America Inc. ("COPL America"), registered under the laws of the State of Delaware, which, together with COPL America Holding, was incorporated for the purpose of oil and gas operations in the United States in connection with the Atomic Acquisition;

(h) Atomic (defined below), registered under the laws of the State of Colorado, is the titled interest holder for the COPL Group's working interest share of the Wyoming Assets (defined below);

(i) SWP (defined below), registered under the laws of the State of Colorado, is an operating company designated by Atomic and its agent, and the non-operating working interest partners, to operate the Wyoming Assets on behalf of Atomic and the non-operating working interest partners; and

(j) Pipeco (defined below), registered under the laws of the State of Wyoming, which together with Atomic and SWP, was acquired by COPL, through its wholly-owned subsidiary COPL America, in the Atomic Acquisition.

7.     A corporate chart depicting the structure of the COPL Group is set out below:



## C.     The Debtors' Business.

### (a)     Overview.

8.     As described in greater detail below, all or substantially of the senior management, strategic corporate functions and operational decision-making for the COPL Group is performed by and through COPL's head office in Calgary and/or by Canadian employees of the COPL Group. This includes, among other things, financial accounting, M&A and corporate strategy, legal and tax services.  In addition, Canadian employees of COPL Technical, also based out of Calgary, have historically performed substantially all of the geoscience and engineering-related services for the COPL Group.   Predominantly all of the operational and strategic decisions were directed by Canadian employees.

9.     Over the past few years, the COPL Group has been directed and controlled by COPL's board and its executive officers, the majority of whom were Canadian residents.  COPL's

Canadian-resident management, including former President and CEO, Arthur Millholland, directs the COPL Group's non-Canadian subsidiaries. Mr. Millholland is a resident of Calgary. He is currently the President of COPL America and a director of ShoreCan. Mr. Millholland's technical expertise has been instrumental in understanding the long-term value of the Barron Flats Unit miscible flood. COPL's specialized management team has been responsible for making decisions relating to petroleum engineering strategy, hiring, and financing for the entire COPL Group.

10. The COPL Group's exploration and development efforts are primarily based in the United States.

### (i) Wyoming Assets.

11. The COPL Group's oil producing assets and reserves are located in the State of Wyoming where the COPL Group, through COPL America and its direct subsidiaries, is the operator, and majority working interest owner, of the Wyoming Assets (defined and described below). The COPL Group also has a 50% interest in a joint venture company in Nigeria, which it formed several years ago as part of its strategy to diversify its asset portfolio. Almost exclusively, the COPL Group's revenues relate to oil production in Wyoming.

12. Operational and working interest control over the Wyoming Assets was acquired through two significant acquisitions in 2021 and 2022. In March 2021, COPL, through its subsidiary COPL America, acquired all of the membership interests in Atomic Oil and Gas LLC ("Atomic"), including its wholly owned subsidiary Pipeco LLC ("Pipeco") and the entire share capital of Southwestern Production Corporation ("SWP") (together the "Atomic Acquisition"). At the time, Atomic's assets were principally comprised of working interests in three federal oil producing units located in the Powder River Basin in Converse County, Wyoming: the Barron

Flats (Shannon) Unit ("BFSU") (58% working interest), Barron Flats (Deep) Unit ("BFDU") (55.56 % working interest) and the Cole Creek Unit ("CCU") (66.7% working interest).

13.     In July 2022, COPL America completed an acquisition of substantially all of the assets of Cuda Oil and Gas Inc. ("Cuda") (the "Cuda Acquisition", and together with the Atomic Acquisition, the "Acquisitions").  At the time of the Cuda Acquisition, Cuda had a 27% working interest in the BFSU, a 27.5% working interest in the BFDU and a 33.33% working interest in the CCU.  Following closing of the Cuda Acquisition, COPL America now has an 85-100% working interest across these three oil producing units in Wyoming, and through SWP acting as the operator for each unit.

14.     With the acquisition of the Cuda assets and those working interests wholly owned by COPL America, the COPL Group set upon a strategy to optimize and increase oil production in the Wyoming Assets and embark on future development.

15.     As noted above, on March 16, 2021, COPL America acquired 100% of privately-held Atomic, SWP, and Pipeco for consideration of $54 million consisting of assumed debt, cash and common shares of COPL.  COPL's wholly owned subsidiaries, COPL America and COPL America Holding entered into the Senior Credit Facility to help finance the Atomic Acquisition.

16.      On July 26, 2022, COPL America completed the acquisition of the assets of Cuda for a total cash consideration of $19.15 million, plus assumed liabilities at closing which were estimated to be approximately $1.6 million, consisting primarily of outstanding Joint Interest Billing obligations owing by Cuda to SWP under a Joint Interest Billing arrangement.

17.     Following completion of the Acquisitions, the COPL Group has a significant operating interest in 42,415.55 acres (gross) of contiguous leasehold in the Powder River Basin ("PRB") in Converse and Natrona Counties Wyoming, US, including the following three oil

exploration units (collectively, the "<u>Wyoming Assets</u>"): (i) an 85.52% working interest in the BFDU;[2] (ii) a 100% average working interest in the CCU;[3] and (iii) an 85.7% working interest in the BFSU.[4]  The COPL Group also has an interest in other non-utilized lands complimentary to the Wyoming Assets.  The leaseholds are a combination of (i) fee simple freehold leases; (ii) State of Wyoming leases, and (iii) Federal leases.

18.    The BFSU and CCU are at the beginning of their 40+ year life.  The produced crude oil is light (40.6°API) and sweet.

---

[2]  The primary working interest holders in the BFDU are: Atomic (55.55%), COPL America (27.77%) and China National Offshore Oil Corporation ("<u>CNOOC</u>") (16.66%). In March 2023, the BFDU lapsed as a result of missed drilling obligations within the unit.  At the time the BFDU dissolved, 2,693 net acres of undeveloped land were lost, which consisted of leases that were not producing at the time of dissolution and/or did not overlap with the BFSU. However, the COPL Group continues to hold an additional 4,750 net acres of term leases in the Barron Flats Deep area that will expire in the first quarter of 2024 unless additional development is conducted in this area perpetuating the leases.

[3]  The CCU is situated within the PRB, directly west of the BFSU. The primary working interest holders in the CCU are: Atomic (66.67%) and COPL America (33.33%).  The operator of the CCU is SWP.

[4]  The BFSU is situated within the PRB approximately 25 miles northeast of Casper, Wyoming.  The primary working interest holders in the BFSU are: Atomic (58.05%), COPL America (27.09%) and CNOOC (14.43%).

11367333v.8

19.     The following table summarizes the COPL Group's proved and probable oil and gas reserves in the Wyoming Assets as of December 31, 2022, as evaluated by Ryder Scott

| SUMMARY OF OIL AND GAS RESERVES AS AT DECEMBER 31, 2022 (Forecast Prices and Costs) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Light / Medium Oil | | Natural Gas | | Natural Gas Liquids | | Total | |
| Reserves Category | Gross (Mbbl) | Net (Mbbl) | Gross (Mmcf) | Net (Mmcf) | Gross (Mbbl) | Net (Mbbl) | Gross (Mboe) | Net (Mboe) |
| **Proved** | | | | | | | | |
| Developed producing | 9,204.2 | 7,191.2 | 5,077 | 3,968 | 564.1 | 440.9 | 10,614.6 | 8,293.4 |
| Developed non-producing | 160.4 | 124.0 | - | - | - | - | 160.4 | 124.0 |
| Undeveloped | 9,221.3 | 7,086.6 | 6,249 | 4,803 | 832.6 | 638.7 | 11,095.3 | 8,525.8 |
| **Total proved** | 18,585.9 | 14,401.8 | 11,326 | 8,771 | 1,396.7 | 1,079.6 | 21,870.3 | 16,943.2 |
| **Probable** | 15,211.9 | 11,726.6 | 8,643 | 6,647 | 1,211.8 | 931.0 | 17,864.3 | 13,765.4 |
| **Total proved plus probable** | 33,797.8 | 26,128.4 | 19,969 | 15,418 | 2,608.6 | 2,010.5 | 39,734.6 | 30,708.6 |

Company – Canada ("RS"). RS is an independent qualified reserves evaluator and auditor.[5]

20.     Predominantly all of the COPL Group's revenues relate to oil production in respect of the Wyoming Assets, which is currently sold under a contract with SWP and one purchaser, the price of which is based on the monthly average of West Texas Intermediate (WTI) for light sweet crude oil as quoted on the New York Mercantile Exchange.  For the three months ended September 30, 2023, the total gross lease oil sales from the Wyoming Assets averaged 1,193 barrels per day ("bbls/d"), with 1,104 bbls/d in the BFSU, 76 bbls/d in the CCU and 13 bbls/d in the BFD area.

**(ii)     Nigeria Operations.**

21.     In October 2014, COPL formed ShoreCan, a joint venture company with Shoreline Energy International Limited ("Shoreline").  COPL and Shoreline each hold a 50% interest in ShoreCan. ShoreCan is focused on acquiring upstream oil and gas exploration, development and

---

[5] The table is based on a report prepared in consultation with RS. The "Proved" reserves are those reserves that can be estimated with a high degree of certainty to be recoverable. There is a 90% probability that the actual remaining quantities recovered will exceed the estimated proved reserves. "Probable" reserves are those additional reserves that are less certain to be recovered than proved reserves. It is equally likely that the actual remaining quantities recovered will be greater or less than the sum of the estimated proved plus probable reserves.

11367333v.8

producing assets in Africa. ShoreCan presently holds 80% of the shares of Essar Exploration and Production Limited, Nigeria ("Essar Nigeria" and, together with ShoreCan, the "Non-Filing Affiliates"), which is registered under the laws of Nigeria. Essar Nigeria's sole asset is a disputed claim to a 100% interest and operatorship of an oil prospecting license, located about 50 kilometres offshore in the central area of the Niger Delta ("OPL 226"). Essar Exploration and Production Limited (Mauritius) ("Essar Mauritius") holds the remaining 20% of the equity of Essar Nigeria.

22.     COPL Technical provides ShoreCan with engineering, geological, geophysical and legal and accounting services, which in turn, flow through to Essar Nigeria. Shoreline provides ShoreCan with in-country Nigerian legal and accounting services and manages government relations.

23.     On March 27, 2020, Essar Mauritius filed a claim in the High Court of Justice of England and Wales against ShoreCan seeking various relief, including to terminate the Shareholders' Agreement and the Share Purchase Agreement, dated August 17, 2015, and the resulting transfer of its shares in Essar Nigeria to ShoreCan. Essar Mauritius also claimed damages in respect to historic amounts invested in Essar Nigeria for the OPL 226 project.

24.     On August 4, 2020, COPL announced that ShoreCan and Essar Mauritius had reached a tentative settlement and, in connection therewith, entered into certain definitive agreements with respect to Essar Nigeria, including a sale and purchase agreement, which among other things, set out their respective obligations under the shareholder agreement with respect to Essar Nigeria. ShoreCan and Essar Mauritius have since, on separate occasions, agreed to extend the completion date of the definitive agreements, most recently to December 31, 2021.

25.     Since December 2021, there have been no further developments with the joint venture partners. The COPL Group's efforts in Nigeria are currently on hold.

11367333v.8

26.     As noted below, pursuant to the Initial Order, the Canadian Court authorized the stay of proceedings extended over the Non-Filing Affiliates to prevent any realization and enforcement efforts that could compromise the joint venture business or the OPL 226 project.

**(b)     Employees and Employee Benefits.**

27.     As of March 7, 2024, the COPL Group has 23 full-time employees ("FTE"), one (1) part-time employee ("PTE"), and two (2) independent contractors.  Of these employees, 8 FTEs are located in Calgary, AB, 8 FTEs in the United Kingdom, and 8 FTEs and 1 PTE in the United States.  Historically, Canadian employees performed executive functions, whereas the US FTEs were more focused on operations.

28.     The COPL Group does not have any unionized employees and does not have any defined benefit or defined contribution pension plans for any of its directors, officers or employees.

29.     SWP sponsors Fidelity Investments' Savings Incentive Match Plan for Employees IRA Plan (the "Plan") for its eligible employees.  To be eligible for the Plan, employees must earn at least $5,000 annually from SWP. Eligible employees may opt to defer part of their compensation (up to the limits set out in the Internal Revenue Code) into an Individual Retirement Account ("IRA").

30.     SWP may choose to make contributions to the Plan based on one of two options. Under the first option, SWP contributes 2% of an employee's compensation to their IRA, regardless of the employee's contributions. Under the second option, SWP matches the employee's contributions dollar-for-dollar, up to 3% of the employee's compensation for the Plan year, or the applicable limit, whichever is lower. If SWP chooses the first option, employees will be informed prior to the Plan's 60-day election period. In the absence of a specific election, SWP defaults to

11367333v.8

the matching contribution option. Distributions from the IRA are subject to federal and potentially state income taxes in the year they are withdrawn.

**(c)     Leases and Real Property.**

31.     As discussed above, the COPL Group's most significant real property holding is the 42,415.55 acres (gross) of contiguous leasehold in relation to the Wyoming Assets.  The leaseholds with respect to the BFDU, CCU, and BFSU consist of (i) fee simple freehold leases, (ii) State of Wyoming leases, and (iii) Federal Leases.

32.     Relationships between the lessees are governed by unit operating agreements ("UOAs"), which provide the underlying contractual framework for the operation of units in the oil and natural gas industry.  There are UOAs for each of the three Unit areas.[6]  In two of the UOAs (BFDU and BFSU), there is one main partner, being the CNOOC Group.  In the Cole Creek UOA, nearly all interests are held by Atomic, SWP, or Pipeco (collectively, the "Atomic Group").  In all three UOAs, the participating parties have appointed SWP as the operator of the Unit and as such SWP is also a party to the UOA.  The Atomic Group's respective acreage interests in each Unit area as of 31 December 2022 are as follows:

| Atomic Group Wyoming leases | Cole Creek Unit (96.05% average working interest) | BFDU (85.52% average working interest) and BFSU (85.68% average working interest) | Acreage outside unitized lands (average working interest 85.82%) | Total Acreage |
| --- | --- | --- | --- | --- |
| Gross acres | 6,000.00 | 24,458.04 | 11,957.51 | 42,415.55 |
| Net acres | 5,763.08 | 20,955.77 | 10,470.43 | 37,189.28 |

---

[6]  The UOAs with respect to the Wyoming Assets are consistent with the typical UOAs, which include the following headings: Duration of the Agreement, Parties to the Agreement, Parties Participating Interests, Scope of Work, Exclusive Operations, Designated Operator, the Unit Operating Committee, Cost Control and Contracting, Hydrocarbon Allocation, Hydrocarbon Lifting and Disposal, Transfer of Interests, Withdrawal from UOA, Liabilities, Decommissioning, Default, Dispute resolution, and Accounting procedure.

11367333v.8

33. With respect to its Nigerian property interest, COPL, through its joint venture ShoreCan, owns shares in Essar Nigeria, which in turn is the disputed license holder of OPL 226. ShoreCan has entered into the Essar Nigeria Shareholders Agreement to set out the rights, duties and understandings of ShoreCan and its partners, and to govern the expectations with respect to how the project will be carried out.

34. COPL leases an office in Calgary, Alberta. COPL America leases office space in Lakewood, Colorado. Neither COPL nor COPL America own any real property.

**(d)     Distribution & Suppliers.**

35. All of the oil produced by the Wyoming Assets is sold by SWP under a purchase agreement with a Denver based trading group/aggregator named Texon L.P. ("Texon"). Texon collects and transports the crude oil directly from the field and pays SWP weekly.

36. In terms of suppliers, COPL America, through SWP, is party to a Natural Gas Liquids Purchase Agreement (as amended, "Tallgrass Agreements") with Tallgrass Midstream, LLC ("Tallgrass") whereby SWP has agreed to purchase all production of mixed natural gas liquids, consisting primarily of propane and butane, from a Tallgrass facility. These natural gas liquids purchased from Tallgrass are used as injectant liquid in the COPL Group's miscible flooding program.

37. The Tallgrass Agreements provide, among other things, that in the event SWP purchases less than all production during any month of the term of the Tallgrass Agreements, SWP shall pay to Tallgrass an additional payment in an amount equal to (a) the number of gallons not taken during such month, multiplied by (b) the difference between (i) the price SWP would have paid to Tallgrass for such product and (ii) the price Tallgrass received from selling the gallons not

taken into the local pipeline. The term of the Tallgrass Agreements is for five years, which commenced in October 2021.

38. It is vital to the preservation of the business of the COPL Group that it can continue its relationship with Tallgrass without disruption and on existing trade terms while the Debtors pursue their restructuring efforts pursuant to the Canadian Proceedings. The Initial Order authorizes the Debtors to pay pre-filing amounts to critical suppliers subject to the terms of the DIP Term Sheet (as defined below) and the Definitive Documents (as defined in the Restructuring Term Sheet, defined below) and with the consent of the Monitor (as defined below).

**(e)    Shared Services.**

39. As noted above, the COPL Group relies on COPL for certain administrative and business support services that are integral to the COPL Group's operations. These services include executive, M&A and strategic corporate, investigation of new projects and future development, capital expenditure review and approval, legal, tax, financial accounting, treasury, statutory reporting, Lender reporting, internal controls and tax, among other things (together, the "Management Services").

40. In addition, the COPL Group relies on COPL Technical for technical oil and gas operation services that are integral to the COPL Group's operation. These services include geological and geophysical services, engineering services and corporate development and land management services (together, the "Technical Services" and with the Management Services, the "Shared Services").

41. COPL and COPL Technical provide these Shared Services from the COPL Group's head office and remotely in Calgary. The COPL Group cannot operate or function, and a

restructuring within these proceedings could not occur, without the provision of the Shared Services from COPL and COPL Technical.

42.　　As described below, historically, COPL America was permitted under the Senior Credit Facility to disburse $166,666 per month to COPL on account of general and administrative expenses and Shared Services.  Such payments were made until August 2022 when, due to certain technical defaults occurring under the Senior Credit Facility, COPL America was restricted from making any further disbursements to COPL.

43.　　In October 2023, in connection with a $3.5 million equity financing, COPL America was permitted to start making payments of $85,000 per month to COPL in consideration for the Shared Services.  Draft shared services agreements were prepared between COPL and COPL America (in respect of the Management Services) and COPL Technical and COPL America (in respect of the Technical Services).  However, these agreements were never executed.  A second payment of $85,000 was made by COPL America in November 2023 for the Shared Services. However, these payments ceased in December upon the receipt by the COPL of the Default Notice (defined below).  Since December 2023, no payments have been made by COPL America in respect of the Shared Services.

**(f)　　Bank Accounts and Cash Management.**

44.　　The bank accounts maintained and administered in Canada by COPL (the "COPL Bank Accounts") consist of the following seven accounts maintained at National Bank in Calgary:

(a) COPL – Canadian dollar account;

(b) COPL – US dollar account;

(c) COPL – GBP account;

(d) COPL Technical – Canadian dollar account;

(e) COPL Technical – short term investment;

(f) COPL Business Interest Account – Canadian dollar account; and

(g) COPL Business Interest Account – US dollar account.

45.    The non-Canadian Debtors have assets in Canada in the form of funds held in the trust account of their Canadian counsel and/or in Canadian bank accounts.

46.    The COPL Bank Accounts also include two bank accounts at the Bank of Butterfield in Bermuda which are used in connection with the COPL Group's activities in Africa through COPL Bermuda Holdings and COPL Bermuda:

(a) COPL Bermuda Holdings – Account 8401565750013; and

(b) COPL Bermuda – Account 8400076300019.

47.    The bank accounts maintained by COPL America (the "COPL America Bank Accounts") consists of nine accounts at PNC Bank, one account at Wells Fargo and one account at First Interstate Bank, as follows:

(a) PNC Bank holds the following accounts:

(i) COPL America Holding - depository account;
(ii) COPL America - depository account;
(iii) COPL America - G&A account;
(iv) COPL America - collateral account;
(v) SWP - depository account;
(vi) SWP - controlled disbursement account;
(vii) SWP - royalty holding account;
(viii) SWP - tax holding account;
(ix) Atomic - depository account;
(x) Atomic - controlled disbursement account; and
(xi) Pipeco - depository account.

(b) Wells Fargo maintains an account to hold certain Bond funds for the State of Wyoming; and

(c) First Interstate Bank maintains an account to hold certain Royalty amounts owed.

48.     COPL America, through SWP, collects, transfers and disburses funds generated through the COPL Group's operations as required by the Joint Operating Agreements of which it is a part, and pursuant to COPL America's obligations under the Senior Credit Facility. COPL has designated control to COPL America to administer the COPL America Bank Accounts as a condition of the Senior Credit Facility.

49.     The Initial Order entered in the Canadian Proceedings authorizes the Debtors to continue to utilize the Cash Management System to maintain the funding and banking arrangements already in place for the COPL Group.

**D.      Financial Position of the COPL Entities.**

50.     As a publicly traded company, trading on the CSE and LSE, COPL files consolidated financial statements in accordance with its public disclosure obligations.  COPL's subsidiaries do not file stand-alone financial statements.  COPL's financial statements include the financial statements of the entities within the COPL Group.

**(a)      Assets.**

51.     As of September 30, 2023, COPL had combined total assets with a book value of approximately $114,829,000, consisting of approximately $3,852,000 in current assets and approximately $110,977,000 in long-term assets.

**(i)      Current Assets.**

52.     As of September 30, 2023, COPL's current assets consisted of the following (approximate values):

    (a) Cash and cash equivalents – $2,168,000;
    (b) Revenue receivables – $413,000;
    (c) Joint interest receivables – $558,000;
    (d) Other receivables – $30,000;
    (e) Prepaid expenses – $234,000;
    (f) Deferred share issue costs – $70,000;

(g) Deferred finance costs – $114,000;
(h) Oil inventory – $244,000;
(i) Condensate inventory – $11,000; and
(j) Short-term deposits – $10,000.

53.     The majority of COPL's current assets are therefore comprised of cash, cash equivalents, revenue and joint interest receivables.

54.     Each of the Debtors also has an interest in a retainer on deposit with Potter Anderson & Corroon LLP, in which each Debtor has an ownership interest. These funds are held in a bank account at Wells Fargo Bank, N.A. in accordance with Delaware Rule of Professional Responsibility 1.5.

**(ii)     Non-Current Assets.**

55.     As of September 30, 2023, COPL's non-current assets consisted of the following (approximate values):

(a) Exploration and evaluation assets - $5,336,000;
(b) Property and Equipment, net (relating primarily to two oil producing units) – $104,981,000;
(c) Right of Use Assets – $57,000; and
(d) Long-term deposits – $603,000.

56.     COPL's property and equipment, relating to the two oil producing facilities in Wyoming, constitute the majority of COPL's non-current assets, and COPL's assets as a whole.

**(b)     Liabilities.**

57.     As of September 30, 2023, COPL's total liabilities were approximately $92,022,000, consisting of current liabilities of approximately $20,461,000 and long-term liabilities of approximately $71,561,000.

### (i)    Current Liabilities.

58.    As of September 30, 2023, COPL's current liabilities (excluding operating leases) included (approximate values):

      (a)  Trade payables and accrued liabilities – $8,848,000;
      (b)  Revenue related payable – $1,977,000;
      (c)  Production taxes payable – $733,000;
      (d)  Commodity derivative net liability – $8,828,000; and
      (e)  Current portion of lease liabilities – $75,000.

### (ii)    Long-Term Liabilities.

59.    As of September 30, 2023, COPL's long-term liabilities included (approximate values):

      (a)  Convertible bonds – $17,742,000;
      (b)  Senior credit facility – $37,779,000;
      (c)  Derivative liabilities – $5,336,000;
      (d)  Commodity derivative net liability – $1,764,000;
      (e)  Ad valorem tax payable – $2,487,000; and
      (f)  Asset retirement obligations – $6,403,000.

60.    As described below, on October 4 and 13, 2023, COPL America terminated all the COPL Group's crude oil and butane hedging contracts and the outstanding obligations in respect of these contracts as of the date of signing were replaced with a loan (defined below as the "Swap Loan") with an initial principal amount of $11.9 million.

### (c)    Stockholders' Equity.

61.    As of September 30, 2023, the stockholders' equity in respect of COPL was $22,807,000, consisting of the following (approximate values):

      (a)  Share Capital – $244,307,000;
      (b)  Conversion Rights of Bonds – $2,934,000;
      (c)  Warrants – $226,000;
      (d)  Contributed Capital Reserve – $54,965,000;
      (e)  Accumulated Deficit – negative $257,727,000; and
      (f)  Accumulated other comprehensive loss – negative $1,898,000.

11367333v.8

### E. COPL Group's Capital Structure.

62.     As of March 31, 2023, there were 345,4518,705 common shares outstanding, 139,807,388 purchase warrants outstanding, and 18,020,796 options outstanding.  The chart below outlines the aggregate amount of the COPL Group's indebtedness:

| Facility | Maturity | Rate | Amt. Outstanding |
|---|---|---|---|
| *Secured Debt* | | | |
| Summit Loan | March-25 | 12.50% | $44,459,592 |
| BP Loan | March-25 | 10.50% + Adj. SOFR | 11,988,132 |
| **Total Secured** | - | - | **$56,447,724** |
| **Convertible Notes**[(1), (2)] | | | |
| 2028 Outstanding Notes | January-28 | 0.00% | $10,600,000 |
| 2029 Outstanding Notes | January-29 | 0.00% | 10,800,000 |
| **Total Convertible Notes** | - | - | **$21,400,000** |
| **Total Outstanding Debt** | - | - | **$77,847,724** |

*(1) 107 total convertible notes are outstanding at $200,000 each*
*(2) There is an outstanding conversion payment liability of $8,636,762.49*

#### (a)     Senior Credit Facility.

63.     As discussed above, COPL America is a borrower under a senior secured loan agreement originally dated March 16, 2021 (the "Senior Credit Agreement") and as amended through Amendment No. 11 dated as of October 13, 2023 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "Senior Credit Facility") entered into with the lender parties thereto (collectively, the "Lender") and ABC Funding, LLC as administrative and collateral agent (in such capacity, the "Agent").

64.     The Senior Credit Facility is repayable within a four-year term and provides for a base facility of $45 million, which was drawn by COPL America to fund, in part, the Atomic Acquisition, and up to $20 million to fund future development, the approval of which is at the sole discretion of the Lender.  The Senior Credit Facility is guaranteed by COPL America, COPL

America Holding, SWP, and Pipeco; however, it is not guaranteed by COPL or any of its subsidiaries outside of the US.

65.    The Senior Credit Facility is subject to an interest rate of Secured Overnight Financing Rate ("SOFR") plus 0.11448% plus 10.5% per annum.

66.    Under a separate warrant purchase agreement dated March 16, 2021, the Lender was granted warrants representing 5% of the fully diluted common shares of COPL America for an exercise price of $0.01 per share.

67.    Pursuant to a third amending agreement to the Senior Credit Facility as of March 31, 2022 and a sixth amending agreement to the Senior Credit Facility as of March 24, 2023, the Lender was granted an additional 1% and 2.5% respectively of the fully diluted common shares of COPL America for an exercise price of $0.01 per share for a combined total warrant coverage of 8.5% of such fully diluted shares (collectively, the "Lender Warrants").

68.    The Lender Warrants may be exercised, subject to the occurrence of certain trigger events, in whole or in part at any time and from time to time from and after March 16, 2021 until the later of: (a) the 60th day following the date on which the Senior Credit Facility is paid in full and (b) March 16, 2025.

69.    Upon the occurrence of certain trigger events, the Lender would be entitled to redeem such Lender Warrants for an amount equal to the greater of 8.5% of COPL's market capitalization on a fully diluted basis or 8.5% of the net asset value of COPL America at such time, subject to certain adjustments.  Trigger events include, among others: (i) the Maturity Date set out in the Senior Credit Agreement or any date on which the Loans are repaid in full; (ii) acceleration under the Senior Credit Facility; (iii) a refinancing, repayment or other transaction or series of transactions which results in the aggregate principal amount of outstanding Obligations (as defined

therein) decreasing to an amount equal to 50% or less of Obligations outstanding as of immediately after the issuance of the Warrants and consummation of the transactions contemplated by the Senior Credit Facility; (iv) a Liquidity Event; (v) the occurrence of a Change of Control; (vi) a Change of Control of a Material Subsidiary (as those terms are defined in the Senior Credit Facility).

70.     On October 4, 2023, COPL America signed a tenth amendment to the Senior Credit Facility that provides for COPL America to be able to elect a payment-in-kind of interest by increasing the outstanding principal amount of the Senior Credit Facility, rather than paying such portion of the interest in cash ("PIK Interest").  In addition, the amendment provides that such PIK Interest capitalization applies for the interest payment dates ending October 31, 2023, November 30, 2023, December 31, 2023, and January 31, 2024.

(b)     **Swap Intercreditor Agreement.**

71.     On March 15, 2021, as a condition of the Senior Credit Facility, and a means of mitigating exposure to commodity price risk volatility, COPL America entered into a master risk management agreement (as amended, restated, supplemented, or otherwise modified from time to time, the "BP Swap Counterparty Master Agreement") with BP Energy Company ("BP").

72.     In connection therewith, COPL America, BP, and the Lender entered into an intercreditor agreement originally dated March 16, 2021 and as amended through the second amendment dated as of October 13, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "Swap Intercreditor Agreement").  The Lender was administrative agent and collateral agent under the Swap Intercreditor Agreement.

73.     The Swap Intercreditor Agreement, among other things, provides that the obligations under the BP Swap Counterparty Master Agreement and the loan obligations under the

Senior Credit Facility were to be secured on a first priority, *pari passu* basis by the Liens on the Collateral granted to the Lender under the Collateral Documents (in each case as such terms are defined in the Senior Credit Facility).

(c)     **Swap Loan.**

74.     On October 4, 2023, COPL America and BP terminated all the COPL Group's crude oil and butane hedging contracts and the outstanding obligations under the BP Swap Counterparty Master Agreement, resulting in obligations due and owing to BP in an aggregate amount of $11,873,702.13 as of such date (collectively, the "BP Specified Swap Obligations") and memorialized in a letter agreement dated October 12, 2023 between and among COPL America, BP and the lender under the Senior Credit Facility (the "BP Swap Termination Documentation").

75.     Pursuant to the BP Swap Termination Documentation, the BP Swap Obligations were replaced with a loan in the principal amount of $11,873,702.13 (the "Swap Loan"). The BP Swap Termination Documentation provided that the Swap Loan remained an obligation under the BP Swap Counterparty Master Agreement.

76.     The Swap Loan bears interest at the same rate and calculation methodology as the Senior Credit Facility and has the same maturity date of March 16, 2025. The BP Swap Termination Documentation provided for an initial principal repayment of $500,000, which was made in October 2023.

77.     Further repayments of the Swap Loan or the Senior Credit Facility were to be made to both counterparties, in a ratio based on total obligations due to those parties, pursuant to the Swap Intercreditor Agreement.

11367333v.8

78.     The BP Swap Termination Documentation provides that the Swap Loan remains a Swap Obligation under the Swap Intercreditor Agreement and shall be treated as pari passu with the Loan Obligations (as defined in the Swap Intercreditor Agreement).

79.     Terminating the hedges and entering into the Swap Loan protected COPL's liquidity from monthly cash settlements of the swaps that could have resulted in further defaults under the Senior Credit Facility.

**(d)     Subordinated Credit Facility Agreement.**

80.     COPL America is also a borrower pursuant to a subordinated credit facility agreement originally effective March 16, 2021 and as amended through the third amended and restated subordinated credit facility agreement effective March 21, 2023 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Subordinated Intercompany Credit Facility Agreement") between COPL and COPL America.

81.     Under the Subordinated Intercompany Credit Facility Agreement, COPL agreed to provide a credit facility (the "Interco Credit Facility") under which COPL America may borrow amounts up to the sum of $53 million.  The full amount of the principal, accrued but unpaid interest, and any service charges under that certain shared services agreement with COPL UK are payable on the later of (i) March 16, 2026 and (ii) one year following the date that all Obligations (as defined in the Senior Credit Facility) under the Senior Credit Facility have been fully satisfied and paid in full in cash.

82.     Until the Obligations (as defined therein) under the Senior Credit Facility have been fully satisfied: (i) the indebtedness under the Interco Credit Facility is wholly subordinate and junior in payment to such Obligations; and (ii) COPL America is not permitted to make, and COPL

is not permitted to accept or retain, any payments under the Subordinated Interco Credit Agreement.

83.     The Interco Credit Facility is unsecured and unguaranteed and shall remain unsecured and unguaranteed.

### (e)     Convertible Bonds.

### (i)     Bond Issuances.

84.     On July 26, 2022, COPL issued two series of unsecured convertible bonds with an aggregate principal face value amount of $25.2 million, the proceeds of which were used in part to fund the cash component on the Cuda Acquisition, as follows:

(a) $12.6 million principal amount of senior convertible bonds due July 26, 2024 (the "2024 Bonds"); and

(b) $12.6 million principal amount of Bonds due July 26, 2025 (the "2025 Bonds" and together with the 2024 Bonds, including all subsequently issued bonds consolidated therewith to form a single series, collectively, the "Bonds").

85.     The bond instrument governing the 2024 Bonds was subsequently supplemented on March 24, 2023, October 10, 2023 and January 14, 2024 and the bond instrument governing the 2025 Bonds was subsequently supplemented on December 30, 2022, March 24, 2023, October 10, 2023 and January 15, 2024, in each case to reflect, among other things, an increase to the outstanding principal amount of the Bonds, a reduction in the conversion price per share, and to extend the maturity date of the Bonds.

86.     The 2024 Bonds now have a maturity date of January 26, 2028 (hereinafter, the "2028 Bonds") and the 2025 Bonds now have a maturity date of January 26, 2029 (hereinafter, the "2029 Bonds").

87.     For the purpose of interest calculations, the Bonds have a deemed issue date of July 26, 2022, whether or not they were actually issued on such date.

88. The Bonds are held in majority by one large institutional shareholder, being a UK-based fund (the "Lead Bondholder"), with the remainder held by other investors (all investors collectively, the "Bondholders").

89. As part of the issuance of certain of the Bonds, COPL has committed to certain undertakings and restrictions with the Lead Bondholder, including (among other things):

(a) the COPL Group shall not offer, issue or enter into any shares, convertible bonds or other convertible indebtedness without the prior written consent of the Lead Bondholder;

(b) COPL will not do any act or thing which would result in an adjustment of the Conversion Price, other than the issuance of shares in connection with the Lead Bondholder's purchase; and

(c) COPL shall not appoint or incur any costs and expenses relating to, any brokers or other financial or professional advisors in connection with any future equity or equity-linked financing, except with the prior written consent of the Lead Bondholder.

**(ii)      Commercial Terms of Bonds.**

90. The Bonds have the same commercial terms, other than in relation to their maturity dates. The Bonds are currently unsecured. However, the Bonds provide for the creation of a security interest in favor of the Bondholders in the following circumstances:

(a) the Bonds contain a negative pledge that while the Bonds are outstanding, COPL shall not grant any security, subject to certain exemptions, for financial indebtedness or financial indebtedness guarantees without, at the same time or before granting a *pari passu* equivalent security package to the relevant Bondholders; and

(b) the Bonds include a covenant that, upon security interests being granted in relation to a possible reserve-based loan ("RBL") facility that refinances the Senior Credit Facility, COPL and its subsidiaries must grant the Bondholders a customary second ranking "security and guarantee package" covering the same security collateral as provided in relation to the RBL.

91. The Bonds have a 13.0% interest rate per annum, which increases by 0.75% per annum quarterly from the issue date (each such anniversary an "Interest Payment Date") until

maturity or, until COPL gives notice to the relevant Bondholders that it shall pay all interest in cash for the relevant series of Bonds (each a "Cash Payment Notice"). COPL cannot issue a Cash Payment Notice until the Senior Credit Facility has been repaid and discharged. If it does so prior to the maturity of the Bonds, the interest rate applicable to the relevant series of Bonds will decrease by 2.0% per annum from the Cash Payment Notice date and no further quarterly increases will apply to the respective Bonds from that date.

92.     Unless COPL provides a Cash Payment Notice to the relevant Bondholders, interest is accrued and its payment deferred until the earlier of:

(a)  conversion of the relevant Bonds;

(b)  maturity of the relevant Bonds; or

(c)  certain contingent "early exit" type scenarios for the Bondholders.

However, if COPL provides a Cash Payment Notice, interest will be payable as follows:

(a)  all accrued unpaid deferred interest must be paid by COPL on the first Interest Payment Date after the Cash Payment Notice;

(b)  all interest relating to the interest period in which the Cash Payment Notice is given must be paid on the first Interest Payment Date after the Cash Payment Notice; and

(c)  all interest relating to an interest period falling after when the Cash Payment Notice is given must be paid on the Interest Payment Date at the end of such interest period.

93.     Bondholders have the right to convert their Bonds at anytime (the "Conversion Option") at a fixed conversion price per Common Share, which is subject to anti-dilution protections and price re-adjustments.

94.     The conversion of the Bonds also results in a payment due to the Bondholders (the "Conversion Payment") that is calculated based on, among other things, the principal face value

of the bond, the amount of interest payable from the conversion date to maturity and all accrued but unpaid interest to the conversion date.

95.     The Conversion Payment can, at the Bondholder's option, be settled in shares (the "Share Settlement Option").

96.     At the relevant maturity date, any relevant Bonds outstanding, except for the Bonds in which the Conversion Option has been exercised, will be redeemed by COPL by a cash payment on the maturity date.

97.     Subject to the right of each Bondholder to exercise its conversion rights, on notice to the Bondholders, COPL may at its option redeem all, but not some of the Bonds by cash payment, if certain conditions relating to the parity value of the relevant Bonds are met.

98.     Subject to a fundamental change event or an event of default, in each case as defined in the relevant Bonds the Bondholder will have the right to require COPL to redeem in cash any of its Bonds (the "Bondholders' Redemption Option").

### (iii)     Bondholder Warrants.

99.     As additional compensation to the respective Bondholders at the respective dates of issue of the Bonds, COPL has issued a total of 137,810,188 Common Share purchase warrants to such Bondholders (collectively, the "Bondholder Warrants").

### (iv)     Current Outstanding Bonds and Conversion Payment settlements.

100.     As of March 7, 2024, the following Bonds are outstanding:

(a) 53 unconverted 2028 Bonds with an aggregate principal face value of $10.6 million outstanding; and

(b) 54 unconverted 2029 Bonds with an aggregate principal face value of $10.8 million outstanding.

11367333v.8

101.    Based on my review of the COPL Group's books and records, COPL would be contractually required to pay at maturities a maximum of $10.6 million in respect of the 2028 Bonds and $10.8 million in respect of the 2029 Bonds, assuming that the Bonds are not repaid in cash earlier than at maturity, that all outstanding Bonds are not converted before maturity, and that none of the Bondholders that already converted elects to receive its Conversion Payment in shares earlier than at maturity.

102.    As of February 2, 2024, COPL has issued 308,156,665 Common Shares to Bondholders who have converted their Bonds and 1,632,492,052 shares as a result of Bondholders' exercise of the Share Settlement Option.

## II.    Events Leading to Canadian Proceedings.

103.    Following the Acquisitions, the COPL Group set upon a strategy to optimize and increase oil production in the Wyoming Assets and embark on future development. Since that time, however, COPL Group's financial and operational performance has struggled. The COPL Group has failed to deliver free cash flow in any single quarter over the past 18 months and COPL America has labored to service its debt. This has led to repeated requests by COPL America for waivers and amendments and improved credit from the Lender (as defined below) and repeated small equity and convertible debt "rescue" financing by COPL. In addition, over the past 12-18 months, a series of operational challenges and market conditions, as well as weather-related interruptions, combined with a challenging inflationary and high interest rate environment, the accumulation of hedging losses which, until recently, needed to be cash settled monthly, and the termination of a promising joint venture partnership, has led to significant financial challenges and liquidity constraints.

## A. Production Challenges, Market Conditions and Weather-related Interruptions.

104. Over the past two years, average daily oil production at the Wyoming Assets was significantly curtailed due to a series of operational interruptions related to the COPL Group's miscible flood program in the BFSU. Miscible flooding refers to a process used in the oil and gas industry whereby high-pressure solvent is injected into an oil reservoir, raising the reservoir pressure and mobilizing the oil in place, in order to increase oil recovery from the reservoir. The COPL Group introduced miscible flooding in the BFSU in 2021 to optimize the production rates in the field and take advantage of the oil production response to enriched gas injection. However, despite an initial positive reservoir response to the miscible flood program, over time, it was determined that the field's undersized low pressure gas gathering system ("GGS"), which was constructed with high density polyethylene plastic material, was not capable of accommodating the high pressure and volume of gas arriving at the producing wellheads and delivering it back to the gas plant for recycle. This led to unsafe operations and working conditions.

105. In order to mitigate the unsafe conditions, the COPL Group was forced to take a series of temporary measures which caused oil production to be significantly curtailed, including by shutting down certain wells for a period of time, reducing and redistributing the gas injection volumes to bring down the working pressures, and modifying well configurations by removing the low-pressure pumping equipment and replacing it with a high-pressure flowing configuration. At the same time, COPL sought and received approval in October 2022 from the Wyoming Oil & Gas Conservation Commission ("WOGCC") to temporarily flare excess gas at the Wyoming Assets to ease the high pressures and gas volumes at certain producing wells until a field wide solution could be engineered and implemented.

106.     Production interruptions were further exacerbated in late 2022 and early 2023 by record-breaking severe winter weather conditions and record-breaking precipitation in the spring and summer. Frequent storms, temperature extremes and high snowfall caused field wide shut-ins due to road closures and blockages within the fields restricting access for crude oil offtake. The difficult winter conditions also caused high impact producing wells to go offline for periods of time. The weather-related issues caused a substantial increase in operating costs.

107.     The COPL Group completed a series of capital-intensive upgrades to its GGS through 2022 and 2023, with accompanying changes to well site facilities to handle increased pressures, in order to resolve the production bottlenecks.  By July 2023, the first phase of the GGS upgrade had been completed, which addressed much of the low-pressure gas gathering line restrictions in the centre of the field.  With the system commissioned, the COPL Group was able to conclude its permitted gas flaring program in late 2023 and slowly started to see an increase in the overall production from the BFSU.  However, during this same period, the costs of enriching liquid purchases required for the higher injection rates increased significantly, to the point where the economic feasibility of the miscible flood program was being compromised.

108.     The efforts to mitigate the GGS restrictions and address the production bottleneck led to significant increased operating costs over the past two years, and considerable production downtime from high rate producing wells.  For the nine-months ended September 30, 2023, petroleum sales, net of royalties, were $16.5 million as compared to $21.3 million in the same period in 2022.

**B.     High Inflation and Interest Rate Environment.**

109.     In addition to production interruptions, since Russia's invasion of Ukraine in early 2022 and the recent conflict in the Middle East, there have been emerging global concerns over

31

oil and natural gas supply, which has resulted in more volatile benchmark commodity prices, including the price of crude oil. These conflicts have contributed to increased inflationary pressures on governments and businesses, and a corresponding interest rate hikes by central banks. This has led to significantly increased borrowing costs for COPL America under the Senior Credit Facility, which (as above) has a variable interest rate based on SOFR.

### C. Hedging Losses.

110. As noted above, as a condition of entering the Senior Credit Facility, COPL America was required to enter into certain hedging arrangements with BP. Until October 2023, COPL America had in place certain hedges with respect to the sale of its crude oil production and the purchase of natural gas liquids ("NGLs").

111. Through the course of 2023, COPL America experienced losses on its hedging contracts, which were required to be cash settled on a monthly basis.

112. More specifically, the COPL Group recognized an unrealized loss of $3.9 million and $2.1 million on crude oil contracts for the three and nine months ended September 30, 2023 and an unrealized gain of $0.6 million and unrealized loss of $1.6 million on butane contracts for the three and nine months ended September 30, 2023, respectively. As of September 30, 2023, the fair value of the hedging contracts had been recognized as a current commodity derivative liability of $8.8 million and a non-current commodity derivative liability of $1.8 million.

113. On October 4 and 13, 2023, all the COPL Group's crude oil and butane hedging contracts were terminated and the outstanding obligations in respect of these contracts as of the date of signing were replaced with the Swap Loan with an initial principal amount of $11.9 million.

### D. Cessation of G&A Expense Payments.

114. Under the initial terms of the Senior Credit Agreement, COPL America was expressly permitted to disburse $166,666.66 per month for *bona fide* administrative expenses and G&A expenses of COPL for the first 24-months following the effective date of the Senior Credit Facility (the "G&A Expense Payments"). The G&A Expense Payments were conditional upon, among other things, (i) the disbursements being made solely from a segregated G&A account, which had been prefunded through equity contributions in the amount of $3,834,000; and (ii) no "Default" or "Event of Default" having occurred under the Senior Credit Facility.

115. On or about November 29, 2021, COPL and COPL America entered into the second amendment to the Subordinated Intercompany Credit Facility (the "Second Amendment") confirming, among other things, that COPL America was permitted to pay to COPL, and COPL could accept and retain, the G&A Expense Payments. The Second Amendment also provided that COPL America shall not be permitted to make any payments to COPL if, at the time of such payment, a "Default" or "Event of Default" existed under the Senior Credit Facility.

116. In or about August 2022, the Lender advised COPL America that it had committed certain technical defaults under the Senior Credit Facility and, as a result, COPL America was prohibited from disbursing any further amounts on account of the G&A Expense Payments or Shared Services. Since that time, the COPL Group's general and administrative expenses have been funded solely through equity financing and bond offerings which, as further discussed below, are no longer available in the absence of the relief being sought in the Proposed Initial Order by way of the DIP Loan.

11367333v.8

### E. Termination of Joint Venture Opportunity.

117. On July 24, 2023, the COPL Group announced that COPL America had executed a non-binding letter of intent with an established energy company (the "JV Counterparty") to develop and exploit its oil reserves and resources at the CCU area. The letter of intent granted exclusivity to the JV Counterparty for a period of time to allow for the negotiation of terms, and the structure of the joint venture to be agreed upon. At the time it was announced, the Company was optimistic that the potential joint venture would lead to future development, and ultimately increased production and sales in the CCU.

118. However, on December 18, 2023, COPL announced that the JV counterparty had elected to terminate the letter of intent and that no further discussions were planned. This was a significant setback for the COPL Group, as reflected in the materially negative reaction of the trading price of COPL's common equity after the announcement. As a general matter, it will be difficult for the COPL Group to unlock value and develop the oil reserves in the CCU without a joint venture partner.

### F. Cost Reduction and Restructuring Initiatives.

119. In light of the Company's liquidity constraints, operational interruptions and increasing borrowing costs, the COPL Group undertook a number of cost reduction and restructuring initiatives over the past several months in an effort to address these issues and to preserve capital while it attempted to increase oil recovery from the Wyoming Assets and restructure its business. Among other things, over the past twelve months, the COPL Group has implemented the following cost reduction initiatives:

> (a) For about six months in 2023, the COPL Group "spiked" a slightly leaner 80% / 20% mixture of gas and liquids in the injectors, and then cut off for dry gas injection for the rest of the year. The purpose behind this cycling of mixtures was to reduce the purchased products costs of the liquid injectant;

(b) the COPL Group commenced the winding-up of its African subsidiary structures;

(c) the COPL Group reduced its annual G&A costs by over $2 million;

(d) the COPL Group restructured its debts by covering its hedging losses with the Swap Loan (described above), and by facilitating amendments to the Bonds and the Senior Credit Facility;

(e) During October and November of 2023, the COPL Group had increased its purchase of injectant to over $500,000 per month (more than double September's expenditure), but any corresponding increases in production and revenue were minimal, far below expectations and accordingly, did not merit continuing because they were outweighed by increased oilfield costs; and

(f) on December 29, 2023, in order to preserve liquidity, the COPL Group announced that it had stopped acquiring any propane or butane for injection in connection with the miscible flood program.

**G.     COPL Defaults under the Senior Credit Facility.**

120.     Notwithstanding these cost reduction initiatives, the financial performance of the COPL Group has continued to struggle. Province, in its capacity as financial advisor to the COPL Group, and to better understand historical performance and cost structure, prepared a variance report in February 2024 comparing the budgeted and actual financials of COPL in fiscal year 2023. Among other things, the variance report indicates that throughout 2023, actual revenue and operating income were consistently below budgeted amounts.

121.     On or about December 20, 2023, COPL America received a Notice of Default (the "Default Notice") from its Lender under the Senior Credit Facility in respect of COPL America's failure to comply with certain financial covenants.

122.     At various times prior to the delivery of the Default Notice, the COPL Group had been in breach of the financial covenants and other requirements under the Senior Credit Facility. However, in each instance, COPL America had been successfully able to obtain waivers from the

Lender for these breaches, as reflected in the series of amendments to the Senior Credit Facility. As a result of the waivers, the COPL Group had not previously defaulted under the Senior Credit Facility.

123.    In the Default Notice, the Lender advised COPL America that it was unwilling to further amend or waive the terms of its Senior Credit Facility. Without an amendment or waiver, COPL America would be in default of the Senior Credit Facility on or before January 1, 2024.

**H.    Forbearance Agreement and Emergency Financing.**

124.    On December 29, 2023, COPL America announced that it had entered into a Forbearance Agreement with the Lender (the "December Forbearance Agreement"), pursuant to which the Lender agreed not to enforce its rights and remedies under the Senior Credit Facility until the expiry of the agreement on February 29, 2024 subject to the satisfaction of certain conditions precedent. At the same time, the COPL Group announced that COPL had received a proposal for $2.5 million in emergency equity financing from its principal Bondholder. The emergency funding was designed to give the COPL Group an opportunity to remain listed while the COPL Group obtained an independent technical review of the assets, and approach investment banks with a view to obtaining indications as to the value of COPL's assets, in an effort to seek further funding. As a condition of the emergency financing, I was appointed as CRO with certain limitations in my authority as evidenced in an amendment to the engagement letter.

125.    On January 16, 2024, COPL closed the $2.5 million equity placement.

126.    On February 28, 2024, COPL America and the Lender entered into an amending agreement to the Forbearance Agreement, whereby the Lender agreed to further forbear until March 9, 2024 at 12:01 AM EST.

## I. Special Meeting Requisition.

127.  On February 28, 2024, COPL received an email from a lawyer who claimed he was representing 10 members of a group referring to itself as the "COPL Shareholder Action Group" (the "SAG"), purporting to requisition a special meeting of the shareholders of COPL (the "Requisition Notice").  The members of the SAG alleged that they held the combined beneficial holding of 6.60% of COPL's issued share capital.  I am advised by Canadian counsel for the Debtors in the Canadian Proceedings and believe that the Requisition Notice is deficient for the purposes of requisitioning a special meeting of shareholders under section 143 of the *Canada Business Corporations Act*.  The lawyer representing SAG was notified of the deficiencies.

## J. Results of Third-Party Technical Review.

128.  On February 19, 2024, the results of the third-party technical review were received. At a high level, the review demonstrated the immediate need for short and long-term expenditures and the material risks related to the field at the Wyoming Assets.  For proprietary and competitive reasons, the final report is not attached to this Declaration.

129.  The COPL Group expects that its cash reserves will be fully depleted no later than the early-middle of March 2024 and that it will require additional funding to be able to continue operations beyond such date.

## III. Pre-Filing Strategic Process and Urgent Need for Relief.

130.  Following the persistent production bottlenecks and simultaneous debt burden COPL has faced over the past several years, COPL faces significant liquidity challenges which threaten its ability to continue as a going concern.  Despite obtaining emergency equity financing in early January 2024, COPL will have no cash no later than the early-middle of March 2024.  The Debtors are therefore insolvent as they cannot meet their liabilities and obligations as they come

11367333v.8

due. In these circumstances, the Debtors in the Canadian Proceeding, require urgent relief under the CCAA in the Canadian Proceedings to ensure that they can continue as a going concern, service their customer base, maintain employment for their employees, and preserve enterprise value while they pursue the SISP.

**A.     Discussions with Stakeholders Regarding DIP Financing.**

131.    Given the COPL Group's limited remaining cash on hand, in recent weeks, COPL (with the assistance of its Financial Advisor (as defined below) began exploring DIP financing options with its key stakeholders and other third parties that either regularly provide such financings or may have a strategic interest in the Wyoming Assets in anticipation of an insolvency proceeding. At the same time, COPL American also engaged in discussions with the Lender regarding the terms on which it would support a restructuring of the COPL Group and provide DIP financing. The Lender has worked in good faith with the COPL Group over the past several years to address the COPL Group's challenging financial situation and better position it for long term success. Such efforts have included the various amendments to the Senior Credit Facility discussed above and the Forbearance Agreement.

132.    On February 20, 2024, I participated in a video conference with representatives from both the Lender and BP, as well as other members of the Province team. During this meeting, the COPL Group's dire liquidity situation and the pending expiration of the December Forbearance Agreement was discussed. I reviewed the proposed DIP loan budget and formally requested that BP participate in a proposed DIP loan at approximately its percentage of the senior secured *pari passu* debt. I also requested that BP participate in future funding of the business if its debt was made into equity as part of a reorganized capital structure in a potential post-CCAA emergence. I advised that the seniority of its debt would likely be impaired if it did not participate in the

proposed DIP. BP's representative stated his appreciation for my directness and asked for a copy of Province's AP priority schedule, DIP budget and term sheet (which was subsequently provided by email). BP also informed the COPL Group that it understood bankruptcy priorities but was unlikely to fund the DIP or future operations as that was not part of its funds' mandate.

### B. Restructuring Term Sheet.

133. These efforts were fruitful. On March 7, 2024, the COPL Group and the Lender executed the Restructuring Support Agreement (the "RSA"), a copy of which is attached hereto as **Exhibit A**. The RSA appends a term sheet (the "Restructuring Term Sheet") that sets the key terms to be included in a Stalking Horse Purchase Agreement, which will support the proposed SISP and may ultimately serve as the basis for the restructuring of COPL.

134. The proposed restructuring of the COPL Group provided for in the Restructuring Term Sheet is compromised of the following significant aspects:

(a) the COPL Group will seek Canadian Court approval of the SISP within 10 days of commencing the Canadian Proceedings;

(b) the applicable Debtors in the Canadian Proceedings will enter into the Stalking Horse Purchase Agreement with the Lender (or their assignee(s)), in such capacity the "Bidder". Among other things, the Stalking Horse Purchase Agreement will provide:

  i. a credit bid of the DIP Loan for all or substantially all of the assets (excluding the "Excluded Assets" (as defined therein)) and/or equity , as applicable and as determined by the Bidder, of the COPL Group, excluding COPL;

  ii. the assumption of the obligations under the Credit Agreement, to the extent not credit bid;

  iii. the requirement that a SISP be completed in accordance with the terms set forth therein and in the Stalking Horse Agreement;

  iv. the requirement that the Debtors reimburse the Bidder for its reasonable costs and expenses incurred in connection with the Stalking Horse Purchase Agreement; and

v. a break fee in the amount of $350,000; and

(c) the CCAA proceedings, the SISP and the SISP Approval Order will be recognized in the Chapter 15 Case.

## IV. Canadian Proceedings.

135. On March 11, 2024, the Canadian Court entered the Initial Order, which is attached to the Proposed Provisional Relief Order as <u>Exhibit 1</u>. Through the Canadian Proceedings, the Debtors seek various forms of relief, including the following:

### A. Stay of Proceedings.

136. The Debtors are insolvent and urgently require a broad stay of proceedings and other protections provided by the CCAA in order to preserve the status quo and secure breathing space to prevent the exercise of remedies by contractual counterparties and others. Additionally, the stay of proceedings will provide the Debtors the necessary time to finalize and complete a Transaction for a sale of some or all of the equity or assets of the COPL Group (following the conduct of the SISP). The Initial Order includes certain "Stay Period" provisions. More specifically, paragraphs 12 through 18 of the Initial Order provide as follows:

12. Until and including March 18, 2024, or such later date as [the Canadian Court] may order (the "<u>Stay Period</u>"), no proceeding or enforcement process in any court (each, a "<u>Proceeding</u>") shall be commenced or continued against or in respect of the [Debtors] or the Monitor or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, except with the prior written consent of the [Debtors] and the Monitor, or with leave of [the Canadian Court], and any and all Proceedings currently under way against or in respect of the [Debtors], or their employees or representatives acting in such capacities, or affecting the Business or the Property are hereby stayed and suspended pending further order of [the Canadian Court] or the prior written consent of the [Debtors] and the Monitor.

13. During the Stay Period, no Proceeding shall be commenced or continued against or in respect of those entities listed in Schedule "B" hereto (the "<u>Non-Filing Affiliates</u>"), or any of their current and future assets, businesses, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (collectively, the "<u>Non-Filing Affiliates' Property and Business</u>"), by reason of:

<ol type="a" start="1">
<li>(a) the insolvency of the [Debtors];</li>
<li>(b) any of the [Debtors] having made an application to [the Canadian Court] under the CCAA;</li>
<li>(c) any of the [Debtors] being a party to these proceedings;</li>
<li>(d) any of the [Debtors] taking any step related to these CCAA proceedings; or</li>
<li>(e) any default or cross-default arising from the matters set out in subparagraphs (a), (b), (c) or (d) above, or arising from the [Debtors] breaching or failing to perform any contractual or other obligations (collectively, the "<u>Non-Filing Affiliates' Default Events</u>"),</li>
</ol>

except with prior written consent of the [Debtors] and the Monitor, or with leave of [the Canadian Court].

14.   During the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "<u>Persons</u>" and each being a "<u>Person</u>"), whether judicial or extra-judicial, statutory or non-statutory against or in respect of the [Debtors] or the Monitor or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, are hereby stayed and suspended and shall not be commenced, proceeded with or continued except with the written consent of the [Debtors] and the Monitor, or leave of [the Canadian Court] . . . .

15.   Nothing in this Order shall prevent any party from taking an action against the [Debtors], or any of them, where such an action must be taken in order to comply with statutory time limitations in order to preserve their rights at law, provided that no further steps shall be taken by such party except in accordance with the other provisions of this Order, and notice in writing of such action be given to the Monitor and the [Debtors] at the first available opportunity.

16.   During the Stay Period, all rights and remedies of any Person against or in respect of the Non-Filing Affiliates, or affecting the Non-Filing Affiliates' Property and Business, as a result of a Non-Filing Affiliates' Default Event, are hereby stayed and suspended except with leave of [the Canadian Court] . . . .

17.   During the Stay Period, no person shall accelerate, suspend, discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, lease, sublease, licence or permit in favour of or held by the [Debtors], or the Non-Filing Affiliates (as a result of a Non-Filing Affiliates' Default Event), except with the written consent of the [Debtors] and the Monitor, or leave of [the Canadian Court].

18.   During the Stay Period, all persons having:

<ol type="a" start="1">
<li>(a) statutory or regulatory mandates for the supply of goods and/or services; or</li>
<li>(b) oral or written agreements or arrangements with the [Debtors] (or any of them), including without limitation all computer software, communication</li>
</ol>

and other data services, centralized banking services, cash management services, payroll and benefit services, insurance, transportation, services, logistics services, security services, management services, utility or other services to the Business or the [Debtors]

are hereby restrained until further order of [the Canadian Court] from discontinuing, altering, interfering with, suspending or terminating the supply of such goods or services as may be required by the [Debtors] or exercising any other remedy provided under such agreements or arrangements. The [Debtors] shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the usual prices or charges for all such goods or services received after the date of this Order are paid by the [Debtors] in accordance with the payment practices of the [Debtors], or such other practices as may be agreed upon by the supplier or service provider and each of the [Debtors] and the Monitor, or as may be ordered by [the Canadian Court].

Initial Order, ¶¶ 12-18.

## B. Extension of Stay of Proceedings to the Non-Filing Affiliates.

137. Pursuant to the Interim Order, during the Stay Period, no proceeding shall be commenced against or in respect of the two Non-Filing Affiliates: ShoreCan and Essar Nigeria with respect to the matters set forth above. As noted above, ShoreCan is a joint venture company in which Debtor COPL Bermuda Holdings has a 50% ownership interest with Shoreline (which is not a Debtor in the Canadian Proceedings or these Chapter 15 Cases). ShoreCan itself has an 80% equity interest in Essar Nigeria, whose sole asset is a 100% interest and operatorship of OPL 226. Extending the stay of proceedings to the Non-Filing Affiliates is necessary to prevent any default or cross-defaults from being declared in agreements of the Non-Filing Affiliates that may arise as a result of the insolvency of the Debtors, and to prevent any realization and enforcement attempts from being made in Nigeria or elsewhere. Such enforcement action could lead to the immediate loss of value of the COPL Group (including actions against the Non-Filing Affiliates that will directly impact the Debtors and/or distract their management) and their stakeholders.

## C. Appointment of Monitor.

138.    Pursuant to the Initial Order, KSV Restructuring Inc. ("KSV") will act as monitor (in such capacity, the "Monitor") in respect of the Debtors in the Canadian Proceedings.  I am advised by Mr. Noah Goldstein of KSV that KSV is a "trustee" within the meaning of section 2 of the *Bankruptcy and Insolvency Act*, and is not subject to any of the restrictions on who may be appointed as monitor set out in section 11.7(2) of the CCAA.  I understand that KSV has extensive experience acting as monitor or financial advisor to debtor companies under the CCAA, and has consented to act as the Monitor of COPL under the CCAA.

139.    I understand that the Monitor has filed a pre-filing report with the Canadian Court in conjunction with the relief requested under the CCAA by the Debtors in the Canadian Proceedings.

## D. Appointment of the Chief Restructuring Officer.

140.    As described above, the COPL Group engaged Province, using my services, to act as the CRO pursuant to the terms set forth in an executed engagement letter (the "CRO Engagement Letter").

141.    In the course of my duties as CRO, I have become and am familiar with the COPL Group's businesses, day-to-day operations, and financial affairs.  I understand the COPL Group's financial situation and am well-positioned to lead the enterprise through the restructuring process and into the SISP.

142.    I have significant restructuring advisory experience. I have acted on engagements for notable brands like NextPoint Financial (Liberty Tax), Circuit City, RESCAP, Fleetwood, Radio Shack, Aegean Marine Petroleum Network, Samson Resources, PetSmart, Core Media, Sable Permian, BoardRiders, Philadelphia Energy Solutions, Intelsat, Claire's and Washington

Prime Group, among others.  Notably, in NextPoint, I served as the CRO in a CCAA proceeding with a Delaware recognition.

143.    The Initial Order provides for a court-ordered charge on the Property (as defined in the Initial Order) in respect of the Debtors in the Canadian Proceedings (the "CRO Charge").  The CRO Charge is proposed to rank *pari passu* with the Administration Charge (defined below) and in priority to all other charges.  The Initial Order provides that the CRO Charge for the first ten days following the commencement of the Canadian Proceedings be limited to $500,000 and the Debtors will be seeking to increase the CRO Charge at the Comeback Hearing (defined below).  The Debtors will also seek approval of the CRO Engagement Letter at the Comeback Hearing.

144.    I am advised by Canadian counsel, and believe that many of the CRO-related provisions in the Initial Order are similar to protections afforded to chief restructuring officers in other CCAA proceedings.  These protections include that:

(a)    nothing in the Initial Order shall be construed as resulting in the CRO being an employer, successor employer, a responsible person, operator or person with apparent authority within the meaning of any statute, regulation or rule of law, or equity for any purpose whatsoever; and

(b)    no action or other proceeding shall be commenced directly, or by way of counterclaim, third-party claim or otherwise, against or in respect of the CRO and all rights and remedies of any Person against or in respect of the CRO are hereby stayed and suspended, except with the written consent of the CRO and the Monitor, or with leave of the Canadian Court on notice to the Debtors in the Canadian Proceedings, the Monitor, and the CRO.  I believe that my appointment as CRO is in the best interests of the COPL Group and its stakeholders.  I also understand that the Monitor supports my appointment as CRO.

**E.    Appointment of Financial Advisor.**

145.    On December 19, 2023, the COPL Group engaged Province as Financial Advisor to assist the COPL Group in dealing with the liquidity challenges it was facing and to provide financial advisory services to, among other things, assist in evaluating the COPL Group's liquidity

11367333v.8

and in the preparation of short-term cash flow forecasts, assist in formulating, evaluating and implementing various contingency plans and financial alternatives, assist in negotiations with creditors and stakeholders, assist in developing business plans and evaluating potential restructuring alternatives. The Monitor supports the engagement of Province as Financial Advisor to the COPL Group pursuant to the terms of the engagement letter executed between the COPL Group and Province (the "FA engagement Letter"). The Debtors will seek approval of the FA Engagement Letter at the Comeback Hearing.

F.     **Cash Flow Forecast.**

146.    The Debtors in the Canadian Proceedings have prepared 13-week cash flow projections and the underlying assumptions as required by the CCAA. A copy of the cash flow projections is attached hereto as **Exhibit B**. The projections demonstrate that the Debtors require access to additional funding during the Canadian Proceedings. The Debtors' principal use of cash during the Canadian Proceedings will be the costs associated with the ongoing operation of the COPL Group business including, among other things, employee compensation, supplier payments, lease payments and general administrative expenses. In addition to these normal course operating expenditures, the Debtors will also incur professional fees and disbursements during the Canadian Proceedings and these Chapter 15 Cases, including the SISP and the negotiation, approval and implementation of a transaction.

G.     **DIP Financing.**

147.    The interim financing authorized under the Initial Order is needed to provide stability and fund operations and restructuring efforts for a limited period of time under CCAA protection while the Debtors in the Canadian Proceeding pursue a Transaction.

148.     In the lead-up to the commencement of Canadian proceedings, I contacted a number of the COPL Group's large stakeholders and external parties, on behalf of the COPL Group, and provided them with information necessary to assess and evaluate an opportunity to provide debtor-in-possession financing.  I provided information by way of a situation update presentation, and a discussion of COPL's financial forecast.  I also responded to information requests and facilitated access to a virtual data room upon the execution of the form of non-disclosure agreement ("NDA").

149.     At the end of this process, only certain entities comprising the Lender were prepared to advance DIP funding. Accordingly, each of the Debtors, as borrowers, have entered into a term sheet dated March 7, 2024 (together, the "DIP Term Sheet") with Summit Partners Credit Fund II, L.P., Summit Investors Credit III, LLC; and Summit Investors Credit III (UK), L.P., as DIP Lender, pursuant to which the DIP Lender has agreed to fund a senior secured, super priority loan (the "DIP Loan") in a maximum principal amount of $11 million.  Under the DIP Term Sheet, the Debtors may draw the DIP Loans in multiple advances (each an "Advance"), with the timing and amount of each Advance determined by the funding needs of the Debtors and subject to certain conditions precedent.  A copy of the DIP Term Sheet is attached hereto as **Exhibit C**.

150.     Based on the Cash Flow Forecast, the DIP Loan is expected to provide the Debtors with sufficient liquidity to continue their business operating during the Canadian Proceedings while completing a Transaction for the benefit of the Debtors and their stakeholders.

151.     The DIP Term Sheet includes the following commercial terms:

(a) **Loan size**: $11 million fully-funded non-revolving term loan facility.

(b) **Outside Date**: August 30, 2024.

(c) **Interest**: SOFR rate in effect on such day plus 5% *per annum*, payable in cash.

(d) **Default rate**: 2% per annum, payable in cash.

(e) **Fees:** Commitment Fee equal to 0.75% of commitments and Exit Fee equal to 0.75% of commitments.

(f) **Conditions Precedent to Initial Advance**: the Canadian Court issuing the Initial Order.

(g) **Conditions Precedent to Subsequent Advances**: (i) the Canadian Court issuing the Initial Order and this Court recognizing the Initial Order; (ii) execution and delivery of the DIP Term Sheet; (iii) the Canadian Court issuing an amended and restated order and this Court recognizing the amended and restated order; (iv) the parties acting in accordance with the SISP, (v) no order in the Canadian Proceedings or these Chapter 15 Cases being stayed; (vi) no liens ranking in priority to or *pari passu* with the DIP Lenders' Charge (defined below), except for the Administration Charge and the CRO Charge; (vii) no Default or Events of Default (as defined therein); (viii) COPL delivering a written request for the advance; (ix) payment of all Interim Lender Expenses (as defined therein); and (x) entering into the RSA and, with respect to any advances after March 27, 2024, the Stalking Horse Purchase Agreement.

152.     Pursuant to the Initial Order, the DIP Loan secured by a Court-ordered charge (the "DIP Lenders' Charge") on all of the present and future assets, property and undertaking of the Property. The DIP Lenders' Charge will not secure any obligation that existed before entry of the Initial Order.  The DIP Lenders' Charge will have priority over all other security interests, charges and liens, except the Administration Charge and the CRO Charge (which will rank *pari passu* with one another) and the Directors' Charge.  Given the current financial circumstances of the Debtors, the DIP Lender has indicated that it is not prepared to advance funds without the security of the DIP Lenders' Charge, including the proposed priority thereof.

153.     The Initial Order authorizes the Debtors' in the Canadian Proceeding to request an initial draw of $1.5 million to enable them to pay specified amounts that are known to be due during the first 10 days of the Canadian Proceedings.  The balance of funds will only be used if necessary, and subject to Court approval, providing the Debtors with flexibility to address additional liquidity demands made during the first 10 days of the Canadian Proceedings given the

nature of the Debtors' business, unforeseen liquidity demands that may need to be satisfied to ensure the Debtors' ability to operate as a going concern. At the Comeback Hearing in the Canadian Proceedings, the Debtors intend to request the authority to draw down the remainder of the DIP Facility in accordance with the Cash Flow Forecast.

### H. Payments During the Canadian Proceedings.

154. During the course of the Canadian Proceedings, the Debtors intend to make payments for goods and services supplied post-filing in the ordinary course as set out in the Cash Flow Forecast described above and as permitted by the Initial Order.

155. Moreover, in order to ensure uninterrupted business operations during the Canadian Proceedings, the Debtors are authorized pursuant to the Initial Order, with the consent of the Monitor, and in accordance with the DIP Term Sheet and the Definitive Documents, to make certain payments, including payments owing in arrears, to certain third parties that are critical to the COPL Group's business and ongoing operations.

156. I am advised by Canadian counsel and believe that the nonpayment of certain taxes (including, without limitation, sales, use, withholding, unemployment, and excise) could result in a Director or Officer of COPL Entity being held personally liable in certain circumstances for such nonpayment as well as for taxes related to income or operations incurred or collected by a COPL Entity in the ordinary course of business. Accordingly, the Initial Order authorizes the COPL Entities to pay any such taxes.

### (a) Administration Charge.

157. The Initial Order provides that the Monitor, its Canadian and U.S. counsel, Canadian and U.S. counsel to the Debtors, and the Financial Advisor, be granted a court-ordered charge on the Property as security for their respective fees and disbursements relating to services

rendered in respect of the Debtors (the "<u>Administration Charge</u>").  The Administration Charge for the first ten days of the Canadian Proceeding shall be limited to CAD$1.5 million (approx. $1,115,527.50 USD) and the Debtors will be seeking to increase the charge at the Comeback Hearing.  The Administration Charge is proposed to rank *pari passu* with the CRO Charge and in priority to all other charges.  The Administration Charge was developed in consultation with the Monitor.

### (b)      Directors' Charge.

158.    A successful restructuring of the COPL Group will only be possible with the continued participation of its directors, officers, management, and employees.  These personnel are essential to the viability of the Debtors' continuing business and the preservation of enterprise value.

159.    I am advised by Canadian counsel and believe that, in certain circumstances, directors of Canadian companies can be held liable for certain obligations of a company owing to employees and government entities, which may include unpaid accrued wages, unpaid accrued vacation pay, and unremitted sales, goods and services, and harmonized sales taxes.  The Debtors estimate, with the assistance of KSV in its capacity as Monitor, that these obligations may amount to as much as approximately CAD$200,000 (approx. $148,737 USD) during the Initial Stay Period.

160.    I am also advised by counsel and believe that, in certain circumstances, directors of U.S. companies may be held liable for certain obligations of a company owing to employees and government entities, which may include sales and use taxes, employee withholding and certain payroll taxes, state income taxes in a few states, 401(k) and other obligations withheld from employees, unpaid wages (including paid vacation), ERISA fiduciary obligations, and non

payment of contractual obligations owed to suppliers of perishable agricultural commodities. The Debtors estimate, with the assistance of KSV in its capacity as Monitor, that these obligations may amount to as much as approximately CAD$250,000 (approx. $185,921 USD) during the Initial Stay Period.

161.　It is my understanding that the COPL Group's present directors and officers are insureds under the Chubb Commercial Excess and Umbrella Insurance Policy (the "D&O Insurance") which covers an aggregate annual limit of approximately $10,000,000. I understand that any amounts paid under the COPL Umbrella Insurance, defined as Losses therein, reduces the amount of the aggregate limit available for any other payment and that the policy has various exceptions, exclusions and carve outs where coverage may not be available. Therefore, I do not believe that the D&O Insurance provides sufficient coverage against the potential liability that the directors and officers of the COPL Group could incur in relation to the Canadian Proceedings and these Chapter 15 Cases.

162.　In light of the complexity and scope of the overall enterprise and potential liabilities and the uncertainty surrounding available indemnities and insurance, the directors and officers have indicated to the Debtors that their continued service to the company and involvement in this proceeding is conditional upon the granting of an order under the CCAA which grants a charge in favor of the directors and officers of the COPL Group in the amount of CAD$500,000 (approx. $371,843 USD) on the Property (the "Directors' Charge"). The Directors' Charge is proposed to be subordinate to the Administration Charge and the CRO Charge (which rank *pari passu* with one another) but shall rank in priority to all the other charges. The Directors' Charge is necessary so that the Debtors may benefit from their directors' and officers' experience with the Debtors'

business and industry, and so that its directors and officers can guide the Debtors' restructuring efforts.

## V. The Chapter 15 Cases.

163. On the date hereof, the Foreign Representative commenced these Chapter 15 Cases by filing the Official Form 401 for each of the Debtors and the *Verified Petition Under Chapter 15 for Order and Final Decree Granting Recognition of Foreign Main Proceeding and Other Related Relief* under chapter 15 of the Bankruptcy Code (collectively, the "Chapter 15 Petitions"). Contemporaneously herewith, the Foreign Representative filed, among other things: the (i) *Motion of Authorized Foreign Representative for Order Directing Joint Administration of Chapter 15 Cases and Granting Related Relief* (the "Joint Administration Motion"); (ii) *Ex Parte Motion for Provisional Relief in the Form of a Temporary Restraining Order and, After Notice and a Hearing, an Order for Provisional Relief Under Section 1519 of the Bankruptcy Code* ("Motion for Provisional Relief"); (iii) *Motion of the Foreign Representative for Chapter 15 Recognition and Final Relief* (the "Recognition Motion"); and (iv) *Foreign Representative's Motion for Order (A) Scheduling Hearing on Recognition of Chapter 15 Petition, (B) Specifying Form and Manner of Service of Notice, and (C) Authorizing Redaction of Certain Personally Identifiable Information of Individual Stakeholders* (the "Notice Procedures Motion").

### A. The Motion for Provisional Relief.

164. Pursuant to the Motion for Provisional Relief, the Foreign Representative seeks entry of a temporary restraining order (a "TRO") in the proposed form of order attached thereto as Exhibit A (the " Proposed TRO") on an *ex parte* basis staying execution against any assets of the Debtors in the United States and prohibiting all persons or entities from commencing or continuing any litigation or any other proceeding, including, without limitation, arbitrations, appeals,

mediation or any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever, or taking any other action against or involving the Foreign Representative, the Debtors, or any of the assets of the Debtors located within the territorial jurisdiction of the United States; and (ii) after notice and a hearing, an order in the form attached thereto as Exhibit B (the "Proposed Provisional Relief Order", collectively with the Proposed TRO, the "Provisional Relief Orders" and the relief sought thereunder, the "Provisional Relief") for relief on a provisional basis pending this Court's entry of an order recognizing the Canadian Proceedings.

165. The failure to secure the Debtors' assets will irreparably harm the Debtors and deplete their resources, thereby limiting their ability to maximize the assets available, on an equitable basis, for all creditors of the Debtors. The proposed relief will ease these concerns and allow for the orderly administration of the Debtors' affairs and equitable resolution of the Debtors' liabilities under supervision by the Canadian Court. A stay of actions against the Debtors will not only preserve the Debtors' assets for the benefit of their creditors, but also allow the Debtors to devote their full attention to effectively and efficiently administering their affairs in the Canadian Proceeding.

**B. Chapter 15 Petitions and Recognition Motion.**

166. Pursuant to the Chapter 15 Petitions and the Recognition Motion, the Foreign Representative seeks, among other things, entry of a final order (the "Recognition Order") recognizing the Canadian Proceedings as foreign main proceedings, or, in the alternative, as foreign non-main proceedings.

167. I believe that this Court should recognize the Canadian Proceeding as a "foreign main proceeding," as defined in section 1502(4) of the Bankruptcy Code. The Bankruptcy Code

11367333v.8

provides that a foreign proceeding is a "foreign main proceeding" if it is pending in the country where the debtor has its "center of its main interests." *See* 11 U.S.C. § 1517(b)(1).

168.     Because the COPL Group has operations, assets and valuable business and trade relationships in the U.S., contemporaneously with commencement of the Canadian Proceedings, COPL has initiated these Chapter 15 Cases and seeks entry of the Recognition Order to recognize and enforce the Canadian Proceedings in the U.S. and protect against any potential adverse action taken by the COPL Group's U.S.-based parties.

169.     As noted above, the COPL Group is a consolidated business, with operations in both Canada and the United States.  Those operations, however, are functionally and operationally integrated such that the US business cannot operate independently of the Canadian business and the key services provided by COPL are for the benefit of the entire COPL Group.  The Debtors' center of main interest is in Canada:

(a) Operations, and operational control, of the COPL Group are directed from COPL's head office in Calgary, Alberta. In particular, decisions relating to the COPL Group's primary business and all major stakeholder negotiations are primarily made/done in Canada.

(b) All other members of the COPL Group report to COPL.

(c) COPL acts as a centralized entity providing operational, financial accounting and administrative functions for the COPL Group as a whole. These functions are performed by COPL employees or COPL Group employees resident in Canada and include, among other things:

   i.   Financial accounting;

   ii.  planning and tax;

   iii. In-house legal services;

   iv.  IT services; and

   v.   M&A and corporate services

(d) COPL Technical, also based out of Calgary, provides the following services to the other companies within the COPL Group:

    i. Geological and geophysical services: coordination, management and implementation of seismic acquisition, processing and interpretation work, geological modeling, support to drilling operations, support to new prospect activities, etc.);

    ii. Engineering services: coordination, management and implementation of reservoir engineering basics and modeling; reservoir volumetrics; drilling and testing operations support; coordination, management and implementation of surface facility and artificial lift studies; other engineering support; and

    iii. Corporate development and land management services: negotiation, management and implementation of new or existing farm-in opportunities; coordination/preparation of all necessary agreements.

## C.    The Joint Administration Motion.

170. Joint administration is warranted in these cases. The Debtors are affiliated entities with closely related financial affairs and business operations, and joint administration will ease the administrative burden on the parties.

171. The Foreign Representative anticipates that the various notices, applications, motions, other pleadings, hearings and orders in these cases will affect each of the Debtors. The failure to administer these cases jointly would result in duplicative pleadings and service. Such unnecessary duplication would impose avoidable expenses on all interested parties.

172. Joint administration will permit this court to use a single docket for the jointly administered cases and combine notices to creditors and other parties-in-interest of the Debtors' estates.

173. Joint administration will protect parties-in-interest by ensuring that such interested parties will be appropriately apprised of all matters before the Court in each of the jointly administered cases by referencing a single docket.

11367333v.8

**D. The Notice Procedures Motion.**

174.    Contemporaneously with the filing of these Chapter 15 Cases, the Foreign Representative filed the Notice Procedures Motion requesting this Court to enter an order specifying the form and manner of service of the notice (the "Recognition Hearing Notice") regarding (i) the filing of the Debtors' Chapter 15 Petitions and certain related pleadings, including the Recognition Motion, (ii) the deadline to object (the "Recognition Objection Deadline") to this Court's entry of a final order granting recognition of the Canadian Proceeding as a foreign main proceeding, or in the alternative a foreign non-main proceeding, under the Bankruptcy Code (the "Recognition Order") and enforcing the Initial Order on a permanent basis in the United States, and (iii) the hearing (the "Recognition Hearing") for this Court to consider the Chapter 15 Petitions and entry of the Recognition Order.

175.    The Debtors have hundreds of potential creditors and other parties-in-interest, all of which need to be provided with notice of the Provisional Relief Order (once entered), the proposed Recognition Order, the Recognition Objection Deadline and the Recognition Hearing. Under the facts and circumstances of these Chapter 15 Cases, the Foreign Representative submits that service of the Recognition Hearing Notice in the manner proposed in the Notice Procedures Motion will provide the various parties-in-interest in these Chapter 15 Cases due and sufficient notice and service of such matters and any associated objection deadline and hearing dates.

176.    Furthermore, the Recognition Hearing Notice provides multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in these Chapter 15 Cases, as it provides a telephone number, a website maintained by the Foreign Representative and an email address that can be used to obtain such documents.  At the same time, it does not burden the Foreign Representative or the Debtors with the significant costs necessarily attendant to copying

and mailing the various documents associated with the Recognition Hearing Notice to hundreds of creditors and other parties-in-interest.

**VI. Relief to be Sought at the Comeback Hearing.**

177.    Within 10 days of the Initial Order being granted, the Debtors will request entry of an amended and restated Initial Order (the "<u>Amended and Restated Initial Order</u>") at a hearing (the "<u>Comeback Hearing</u>") in the Canadian Proceedings.

178.    At the Comeback Hearing, the Debtors also intend to seek entry of the SISP Approval Order.  The relief contemplated by each of the proposed orders is described below:

**A.     Amended and Restated Initial Order.**

179.    At the Comeback Hearing, the Debtors intend to seek an extension of the Stay Period (as defined in the Initial Order) up to and including May 18, 2024 to enable the Debtors to continue to operate the COPL Group business, while implementing the SISP.

**B.     Restructuring Support Agreement.**

180.    As discussed above, on March 7, 2024, the Consenting Lenders and the Debtors entered into the RSA.

181.    Under the terms of the RSA, the Lender and the Debtors have agreed to cooperate with each other in good faith and use commercially reasonable efforts with respect to the pursuit, approval, implementation and consummation of the transactions contemplated by the Restructuring Term Sheet (the "<u>Restructuring</u>") as well as the negotiation, drafting, execution and delivery of the Definitive Documents (as defined in the Restructuring Term Sheet) to implement the Restructuring.  The parties agree to negotiate in good faith to enter into the Stalking Horse Purchase Agreement on or prior to March 22, 2024, such Stalking Horse Purchase Agreement to

be substantially on the terms set out in the Restructuring Term Sheet, acting reasonably, with the approval of the Monitor.

182. Under the RSA, and unless inconsistent with the Consenting Lenders' obligations or rights under the DIP Facility, the Consenting Lenders agreed, among other things, to:

(a) support the Restructuring and exercise any powers or rights available to them in favour of any matter requiring approval to the extent necessary to implement the Restructuring;

(b) use commercially reasonable efforts to cooperate with and assist the COPL Group in obtaining additional support for the Restructuring from their other stakeholders;

(c) act in good faith and take all actions that are reasonably necessary or appropriate, and all actions required by the Canadian Court or this Court, to support and achieve the consummation of the Restructuring;

(d) not object to, delay, impede, or take any other action to interfere with the consummation or implementation of the Restructuring;

(e) not directly or indirectly take any action that could reasonably be expected to or would interfere with, delay, impede, or postpone the transactions;

(f) not exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any claims or interests in the COPL Group, other than as set forth in the RSA;

(g) not file any application, motion, pleading, or other document with the U.S. Bankruptcy Court, the CCAA Court, or any other court that is materially inconsistent with the Restructuring;

(h) not initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the CCAA Proceedings, the Chapter 15 Cases, this Agreement, or the Restructuring, other than to enforce the RSA or any Definitive Documents (defined therein);

(i) not exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims (defined therein) or interests in the COPL Group, other than as set forth in the RSA;

(j) not initiate, or have initiated on its behalf, not object to, delay, impede, or take any other action to interfere with the COPL Group's ownership and possession

of their assets, wherever located, or interfere with the stay imposed by the CCAA Court and the US Bankruptcy Court; and

(k) provide reasonably prompt written notice of the occurrence, or failure to occur, of any event which would be reasonably likely to cause any representation of warranty contained in the RSA to be untrue or inaccurate in any material respect, any contained in the RSA not to be satisfied in any material respect, or any condition precedent contained in the Stalking Horse Purchase Agreement, the RSA, or a Definitive Document not to occur or become impossible to satisfy.

183.    In turn, subject to the terms of the RSA, the COPL Group has agreed, among other things, to:

(a) support and use commercially reasonable efforts to complete the Restructuring as set forth in the Stalking Horse Purchase Agreement and the RSA;

(b) negotiate in good faith and execute and deliver the Definitive Documents and take any and all steps reasonably necessary and appropriate in furtherance of the Restructuring, the Stalking Horse Purchase Agreement, and the RSA;

(c) take commercially reasonable efforts to complete the Restructuring in accordance with each Milestone set forth in the RSA;

(d) use commercially reasonable efforts to cure, vacate, reverse, set aside, or have overruled any ruling or order of the Canadian Court, this Court, any regulatory authority, or any other court of competent jurisdiction enjoining or rendering impossible the consummation or substantial consummation of the Restructuring;

(e) take commercially reasonable efforts to ensure that all consents and approvals necessary for the implementation of the Restructuring have been obtained to the satisfaction of the Consenting Lenders, the Credit Facility Agent and the COPL Group;

(f) pay the reasonable and documented fees and expenses of the Consenting Lenders and the Credit Facility Agent (as defined therein) incurred in connection with the Restructuring;

(g) operate the business of the COPL Group in the ordinary course in a manner that is consistent with the RSA;

(h) prepare or cause to be prepared the applicable Definitive Documents and provide draft copies of all documents that the COPL Group intend to file with the Canadian Court or this Court, in each case, to counsel to the Consenting

Lenders at least three (3) calendar days before such documents are to be filed with the Canadian Court or this Court or as soon as practicable thereafter; and

(i) provide reasonably prompt written notice of (i) the occurrence, or failure to occur, of any event which would be reasonably likely to cause any representation of warranty contained in the RSA to be untrue or inaccurate in any material respect, any contained in the RSA not to be satisfied in any material respect, or any condition precedent contained in the Stalking Horse Purchase Agreement (as defined below), the RSA, or a Definitive Document not to occur or become impossible to satisfy (ii) any written notice from any third party alleging that the consent of such party is required as a condition precedent to the consummation of the transactions contemplated by the restructuring, (iii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, and (iv) to the extent involving COPL, any material governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same is contemplated or threatened); and

In addition, pursuant to the RSA, the COPL Group has agreed to provide on a confidential basis:

(a) to the legal counsel of the Consenting Lenders, legal counsel to the Monitor, and the Monitor, copies of any bona fide written proposal for the sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more of the COPL Group entities, one or more of the COPL Group's material assets, or the debt, equity, or other interests in any one or more of the COPL Group entities, that is an alternative to or otherwise inconsistent with the Restructuring (each, an "Alternative Restructuring Proposal") no later than two (2) calendar days following receipt thereof by the COPL Group or its advisors; and

(b) such other information as reasonably requested by the Consenting Lenders' and Monitor's legal counsel and financial advisors or as necessary to keep the Consenting Lenders and Monitor informed no later than two (2) calendar days after any such request or any material change to the proposed terms of any Alternative Restructuring Proposal and the status and substance of such discussions related thereto.

184. The RSA establishes the following milestones for the remainder of the Canadian Proceedings and these Chapter 15 Cases (as may be extended in accordance with the RSA):

| Milestone | Date |
|---|---|
| The COPL Group shall commence proceedings on or before March 8, 2024 under the CCAA in the Canadian Court and obtain an Initial Order in form and substance satisfactory to the Consenting Lenders, acting reasonably | March 8, 2024 |
| The Foreign Representative of the COPL Group shall have commenced these Chapter 15 Cases. | Within 1 business day of the commencement of Canadian Proceedings |
| The COPL shall seek a temporary restraining order in this Court to provide "stay" relief pending entry of the Recognition Order (as defined below) | Within 2 business days of the commencement of Canadian Proceedings |
| The Foreign Representative shall file a motion with this Court for entry of an order recognizing and enforcing the Initial Recognition Order (defined below). | 2 business days after entry of the Initial Order. |
| The COPL Group shall obtain an order from the CCAA Court approving the SISP, subject to Court availability | March 18, 2024 |
| The Foreign Representative shall file a motion with the U.S. Bankruptcy Court for an order recognizing and enforcing the SISP Order | 1 business day after entry of the SISP Order |
| The Foreign Representative shall obtain an order recognizing and enforcing the Initial Order (the "Initial Order Recognition Order") | April 8, 2024 |
| The Foreign Representative shall obtain an order recognizing and enforcing the SISP Order (the "SISP Recognition Order") | April 17, 2024 |
| The COPL Group shall obtain a vesting order (the "Vesting Order") from the Canadian Court, subject to court availability | 9 days after the selection of the Successful Bid |
| The Foreign Representative shall file a motion with this Court for an order recognizing and enforcing the Vesting Order | 2 business days after entry of Vesting Order |
| The Foreign Representative shall obtain the Vesting Recognition Order | 14 business days after the entry of the Vesting Order |
| The Restructuring shall close, provided, however, in the event the Initial Outside Date is not extended, the Initial Outside Date shall be the Outside Date. | 14 days after the date that the Foreign Representative obtains the Vesting Recognition Order (the "Initial Outside Date"), or |

11367333v.8

| Milestone | Date |
|---|---|
| | a later date on notice by the Consenting Lenders. |

185. The RSA may be terminated by mutual written agreement by the Consenting Lenders and the COPL Group, or:

    (a) unilaterally by the Consenting Lenders, acting reasonably, upon the occurrence of certain specified events, including (i) the failure of the COPL Group to meet any of the milestones under the RSA, (ii) the termination of the Stalking Horse Purchase Agreement, (iii) if the CCAA Proceedings are dismissed, terminated, stayed, modified, or converted to a proceeding under the BIA or the *Winding-Up and Restructuring Act* (Canada), (iv) if the U.S. Bankruptcy Court enters an order dismissing the Chapter 15 Proceeding (or any portion thereof) or appointing a trustee or an examiner with expanded powers, (v) if any condition precedent contained in the RSA or any of the Definitive Documents becomes incapable of being satisfied, (vi) the COPL Group requests or the CCAA Court grants any amendments or modifications to the SISP Order that are not acceptable to the Consenting Lenders, (vii) if any of the milestones set out in the SISP are not met, (viii) if the COPL Group entities waive or seek authority to waive any of the requirements under the SISP that they are not permitted to waive, or (ix) a failure by the COPL Group to pay the fees and expenses of the Consenting Lenders including but not limited to their legal advisors; or

    (b) unilaterally by the COPL Group upon the occurrence of certain specified event, including (i) a material breach by one or more of the Consenting Lenders of any representation, warranty, or covenant in the RSA, (ii) the failure to meet any of the milestones under the RSA unless such failure is the result of an act, omission or delay on the part of the COPL Group, (iii) the determination, upon the advice of outside legal counsel and financial advisors, by the board of directors, board of managers, or such similar governing body of any COPL Group entity, that proceeding with the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable law, or (iv) any party terminates its obligations under the RSA and such termination renders the Restructuring incapable of consummation or materially changes the overall economic terms of the Restructuring in a manner that is adverse to the COPL Group.

186. The Debtors intend to seek approval of the RSA and authorization to perform its obligations thereunder at the Comeback Hearing. In the Debtors' view, the RSA represents an important development in their ongoing efforts to restructure. The RSA facilitates consensus with

the Debtors' most significant secured creditors and facilitates access to the DIP Facility, and the certainty and stability provided to the SISP by the Stalking Horse Transaction.

## C.     SISP.

187.    The Debtors intend to seek approval of the proposed SISP at the Comeback Hearing which, together with the Stalking Horse Purchase Agreement, will establish a process to canvass the market for the best possible transaction for the sale of all or substantially all of the Debtors' Property for the benefit of stakeholders.  The approval by the Canadian Court of the SISP in the form attached as Exhibit A to the RSA and entry by this Court of the SISP Recognition Order are both milestones under the RSA.

188.    The Debtors have developed the proposed SISP in consultation with the Monitor and the Lender.  The SISP sets out the manner in which (a) binding bids for executable transaction alternatives that are superior to the transaction to be provided for in the Stalking Horse Purchase Agreement involving the shares and/or business and assets of some or all of the COPL Group will be solicited from interested parties; (b) any such bids received will be addressed; (c) any Successful Bid (as defined below) will be selected; and (d) court approval of any Successful Bid will be sought.

189.    Pursuant to the proposed SISP, interested parties must enter into a non-disclosure agreement in form and substance satisfactory to the COPL Group and submit a letter of intent to bid (each, an "LOI") that identifies the potential purchaser and a general description of the assets and/or business(es) of the COPL Group that would be the subject of the bid and that reflects a reasonably likely prospect of culminating in a Qualified Bid (as defined below), as determined by the COPL Group in consultation with the Monitor and Consenting Lenders within 30 days after commencement of the SISP (the "LOI Deadline").  If, by the LOI Deadline, no LOI has been

received, the SISP will be terminated and the Stalking Horse Transaction will be the Successful Bid (as defined below) and, subject to the Canadian Court issuing the Vesting Order, will be consummated in accordance with the RSA and the Stalking Horse Transaction Agreement.

190. In order to constitute a Qualified Bid, each bid must:

(a) provide for (i) payment in full in cash on closing of the DIP Facility, the Expense Reimbursement, the Break Fee, plus cash consideration equal to at least $250,000; (ii) payment in full in cash of all amounts outstanding under the Senior Credit Facility, unless otherwise agreed to by the lenders thereunder in their sole discretion; and (iii) the payment in full in cash on closing of any claims ranking in priority to the foregoing claim, unless otherwise agreed to by the applicable holders thereof in their sole discretion;

(b) provides a detailed sources and uses schedule that identifies, with specificity, the amount of cash consideration (the "Cash Consideration Value") and any assumptions that could reduce the net consideration payable;

(c) be reasonably capable of being consummated within 30 days after completion of the Auction (as defined below) if selected as the Successful Bid;

(d) contain duly executed binding transaction documents, certain defined information regarding the bidder, a redline to the Stalking Horse Purchase Agreement (unless the bid is in the form of a plan of arrangement, in which case copies of the plan of arrangement and all documentation that is contemplated to be executed in connection therewith), evidence of authorization and approval from the bidder's board of directors, disclosure of any connections or agreements with the COPL Group, and such other information reasonably requested by the COPL Group or the Monitor;

(e) includes a letter stating that the bid is submitted in good faith, is binding and is irrevocable until the selection of the Successful Bid;

(f) provides written evidence of a bidder's ability to fully fund and consummate the transaction and satisfy its obligations under the transaction documents;

(g) does not include any request for or entitlement to any break fee, expense reimbursement or similar type of payment;

(h) is not conditional upon approval from the bidder's board of directors or equity holders, the outcome of any due diligence by the bidder or the bidder obtaining financing;

(i) includes an acknowledgment and representation that the bidder has had an opportunity to conduct any and all required due diligence prior to making its bid;

(j) specifies any regulatory or other third-party approvals the party anticipates would be required to complete the transaction;

(k) includes full details of the bidder's intended treatment of the COPL Group's employees under the proposed bid;

(l) is accompanied by a cash deposit (the "Deposit") by wire transfer of immediately available funds equal to 10% of the Cash Consideration Value;

(m) includes a statement that the bidder will bear its own costs and expenses in connection with the proposed transaction; and

(n) is received by May 2, 2024 (the "Qualified Bid Deadline").

191.    If one or more Qualified Bids (other than the Stalking Horse Transaction) has been received by the COPL Group on or before the Qualified Bid Deadline, the COPL Group will proceed with an auction process to determine the successful bid(s) (the "Auction"). The Auction will be conducted in accordance with the requirements and process appended at Schedule "A" to the SISP. The successful bid(s) selected within the Auction shall constitute the "Successful Bid".

192.    Following selection of the Successful Bid and finalization of all definitive agreements, the Debtors will apply to the Canadian Court for an order or orders approving such Successful Bid and/or the mechanics to authorize the COPL Group to complete the transactions contemplated thereby, as applicable, and authorizing the COPL Group to: (a) enter into any and all necessary agreements and related documentation with respect to the Successful Bid; (b) undertake such other actions as may be necessary to give effect to such Successful Bid, and (iii) implement the transaction(s) contemplated in such Successful Bid.

193.    All Deposits paid in accordance with the SISP will be retained by the Monitor in a noninterest-bearing trust account. If a Successful Bid is selected and either the Vesting Order or

some other implementation order (the "Implementation Order") is granted, any Deposit paid in connection with such Successful Bid will be non-refundable and applied to the cash consideration to be paid in connection with the Successful Bid (or be dealt with as otherwise set out in the definitive agreements(s)). Any Deposit delivered with a Qualified Bid that is not selected as a Successful Bid, will be returned to the applicable bidder as soon as reasonably practicable after the Successful Bid is approved by Vesting Order or Implementation Order, as applicable, or such earlier date as may be determined by the COPL Group, in consultation with the Monitor.

194. The proposed SISP requires the Debtors to provide information in respect of the SISP to the Consenting Lenders on a confidential basis, including copies of any LOIs or bids received that are below the consideration contemplated for the Stalking Horse Purchase Agreement, and any other information reasonably requested by the Consenting Lenders or their legal or financial advisors or which may be necessary to keep the Consenting Lenders informed (including any material changes to the proposed terms of any bid received, including any Qualified Bid).

195. A summary of the significant dates and processes within the proposed SISP is as follows:

| SISP Process | Deadline |
|---|---|
| Canadian Court approval of SISP and authorizing the applicable COPL Group entities to enter into the Stalking Horse Purchase Agreement, and commencement by COPL Entities of solicitation process | March 18, 2024 |
| LOI Deadline | April 17, 2024 |
| Qualified Bid Deadline | May 2, 2024 |
| Auction | May 3, 2024 |

| SISP Process | Deadline |
|---|---|
| Vesting Order or Implementation Order[7] | If no LOI is submitted, by no later than 9 days after the LOI Deadline subject to court availability. |
| | If there is no Auction, by no later than 9 days after the Qualified Bid Deadline, subject to court availability. |
| | If there is an Auction) – by no later than 9 days after completion of the Auction, subject to court availability. |

196.    The Debtors are of the view that the timelines set out in the proposed SISP are appropriate, will allow interested parties to participate in the SISP, and will provide an appropriate test for whether the Stalking Horse Transaction delivers the best possible result for stakeholders. The Debtors are also of the view that the proposed SISP provides a fair and reasonable process that will adequately canvass the market.  In my experience and based on my knowledge of the COPL Group's business, I am of the view that the timelines and terms in the proposed SISP are fair, reasonable and appropriate in the circumstances, and provide sufficient time to allow interested parties to fully participate in the SISP (to the extent desired).  In addition, the Debtors do not have funds or access to DIP financing sufficient to extend the timelines for the proposed SISP any further.

**D.    Stalking Horse Transaction.**

197.    The Debtors are of the view that the inclusion of the Stalking Horse Transaction as part of the SISP will benefit the COPL Group's efforts to maximize value for the benefit of all stakeholders by, among other things: (a) setting a "floor price" and commercial terms for a transaction involving the shares and/or the business and assets of some of the COPL Group entities;

---

[7]  In all cases, the deadlines for obtaining the Vesting Order or Implementation Order are subject to court availability.

(b) helping to generate interest in the COPL Group among potential purchasers; and (c) providing a level of certainty, stability and efficiency during the SISP, both in terms of setting a baseline price and documentation for the SISP and assuring stakeholder groups that there will be a going concern sale of a significant portion of the COPL Group's business.

**E.      Relief from Certain Securities Filing Requirements and in Respect of the AGM.**

198.    As noted above, COPL is a publicly traded company and reporting issuer, whose common shares previously traded on the CSE under the trading symbol "XOP" as well as on the LSE under the trading symbol "COPL".

199.    Given the COPL Group's significant liquidity constraints, the Debtors have determined that directing further time and resources to securities reporting is not appropriate or practical at this time. Accordingly, the Debtors will be seeking relief at the Comeback Hearing in the Canadian Proceedings authorizing its decision to incur no further expenses in relation to any filings, disclosures, core or non-core documents, restatements, amendments to existing filings, press releases, financial reporting or any other actions that may be required by any federal, provincial or other law respecting securities or capital markets in Canada the United States, or the United Kingdom and other rules and policies of the CSE or LSE.

200.    Additionally, the Debtors believe it would be a distraction and an unnecessary expense for it to hold an annual general meeting in the circumstances where it is subject to creditor protection.  As a result, the Debtors also seek authorization in the Canadian Proceedings to be relieved of any obligations to call and hold an annual general meeting until further order of the Canadian Court.

201.    I understand that the Monitor will post all Canadian Court materials, which will include the Debtors' cash flow projections and variance analyses, such that shareholders and other

stakeholders will still have uninterrupted access to, among other things, the Debtors' operational and financial information.

## VII. Conclusion.

202.     The Debtors, with the assistance of their advisors, have reviewed and considered the potential options and alternatives available to them in the circumstances, taking into account, among other things, their limited remaining liquidity and current inability to repay their indebtedness.  The Debtors have determined that it is in their best interests and those of their stakeholders to commence the Canadian Proceedings and these Chapter 15 Cases with the support of the Lender.  Without the relief requested, including the stay of proceedings and access to DIP financing, the COPL Group faces an immediate cessation of going concern operations, the liquidation of its assets, and the loss of its employees' jobs.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 11, 2024

*/s/ Peter Kravitz*
Name:  Peter Kravitz
Title:   CRO of Canadian Overseas Petroleum Limited

11367333v.8