## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| Canadian Overseas Petroleum Limited, *et al.,*[1] | Case No. 24-10376 (JTD) |
| Debtors in a foreign proceeding. | (Jointly Administered) |
| | **Objection Deadline: May 14, 2024 at 4:00 p.m. ET**<br>**Hearing Date: May 21, 2024 at 2:30 p.m. ET** |

### MOTION OF THE FOREIGN REPRESENTATIVE FOR ENTRY OF AN ORDER (I) RECOGNIZING AND ENFORCING THE CCAA VESTING ORDER, (II) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' INTERESTS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (III) CONDITIONALLY APPROVING DISMISSAL PROCEDURES FOR DEBTOR SOUTHWESTERN PRODUCTION CORPORATION; AND (IV) GRANTING RELATED RELIEF

Canadian Overseas Petroleum Limited ("COPL"), in its capacity as the duly-appointed foreign representative (the "Foreign Representative") for the above-captioned debtors (collectively, the "Debtors"), in the proceedings (the "Canadian Proceedings")[2] currently pending before the Court of King's Bench of Alberta in Calgary (the "Canadian Court"), initiated under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as amended, the "CCAA"), by and through its undersigned counsel, respectfully submits this motion (the "Motion") seeking entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"):[3]

---

[1]  The Debtors in these chapter 15 proceedings, together with the last four digits of their business identification numbers are: Canadian Overseas Petroleum Limited (8749); COPL Technical Services Limited (1656); Canadian Overseas Petroleum (Ontario) Limited (8319); Canadian Overseas Petroleum (UK) Limited (7063); Canadian Overseas Petroleum (Bermuda Holdings) Limited (N/A); Canadian Overseas Petroleum (Bermuda) Limited (N/A); COPL America Holding Inc. (1334); COPL America Inc. (9018); Atomic Oil and Gas LLC (8233); Southwestern Production Corporation (8694); and Pipeco LLC (0925).  The location of the Debtors' headquarters and the Debtors' duly appointed foreign representative is 715 5 Avenue SW, Suite 3200, Calgary, Alberta T2P 2X6, Canada.

[2]  Information on the Canadian Proceedings and documents filed in connection therewith, including reports from the Monitor (as defined herein) and motion materials, can be found at the website of the Monitor at https://www.ksvadvisory.com/experience/case/canadian-overseas-petroleum.

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the CCAA Vesting Order (as defined below), the RSA (as defined below), and the Kravitz Declaration (as defined below), as applicable.

(a)    Seeking additional assistance from this Court through the recognition and enforcement of the Canadian Court's *Approval and Vesting Order* (the "CCAA Vesting Order"), which is attached to the Proposed Order as **Exhibit 1**;

(b)    approving, under section 1520 and section 363 of title 11 of the United States Code (the "Bankruptcy Code"), the sale of the Debtors' rights, title, and interests in and to the Purchased Assets (as defined in the Purchase Agreement) to the Purchasers (as defined below), pursuant to the Purchase Agreement, as may further be amended in accordance with the terms of the CCAA Vesting Order, free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances (as defined in the Purchase Agreement));

(c)    Conditionally approving the SWP Dismissal Protocol (as defined below); and

(d)    granting related relief.

In support of this Motion, the Foreign Representative respectfully incorporates by reference the *Declaration of Peter Kravitz in Support of the Motion of the Foreign Representative for Entry of an Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially all of the Debtors' Interests Free and Clear of Liens, Claims, and Encumbrances, (III) Conditionally Approving Dismissal Procedures for Debtor Southwestern Production Corporation; and (IV) Granting Related Relief* (the "Kravitz Declaration") filed contemporaneously with this Motion.  In further support of this Motion, the Foreign Representative respectfully states the following:[4]

---

[4] A detailed description of the Debtors and their businesses and the facts and circumstances surrounding these chapter 15 cases is set forth in (a) the *Verified Petition for (I) Recognition of Foreign Main Proceedings, or, in the Alternative, Foreign Non-Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 3] (the "Verified Petition" and, together with the official form petitions filed concurrently therewith, the "Chapter 15 Petitions"), (b) the *Declaration of Peter Kravitz in Support of the Debtors' Verified Petition for (I) Recognition of Foreign Main Proceedings, or, in the Alternative, Foreign Non-Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 11] (the "Initial Kravitz Declaration"), and (c) the *Declaration of David Rosenblat as Canadian Counsel to the Debtors in Support of the Debtors' Chapter 15 Petitions and Requests for Certain Related Relief Pursuant to Chapter 15 of the Bankruptcy Code* [D.I. 10].

## Jurisdiction and Venue

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference of the United States District Court for the District of Delaware, dated February 29, 2012.

2.      The Foreign Representative has properly commenced these chapter 15 cases (the "Chapter 15 Cases") under sections 1504 and 1515 of title 11 of the United States Code (the "Bankruptcy Code").  This is a core proceeding under 28 U.S.C. § 157(b)(2).

3.      Venue for these cases is proper in this Court under 28 U.S.C. § 1410 because COPL has its principal operating assets in the United States—its equity ownership in COPL America Holdings, Inc., a Delaware corporation—located in Delaware.  Each Debtor also has an interest in a retainer on deposit with Potter Anderson & Corroon LLP, in which each Debtor has an ownership interest.  These funds are held in a bank account at Wells Fargo Bank, N.A. in accordance with Delaware Rule of Professional Responsibility 1.5.  *See* Initial Kravitz Declaration (as defined below) ¶ 54.

4.      Pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware ("Local Rules"), the Foreign Representative consents to the entry of final orders or judgments by the Court if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

5.      The statutory bases for the relief requested are sections 105(a), 363, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

I.     **Events Leading to the Canadian Proceedings and Chapter 15 Cases**

A.     **The Debtors and the Canadian Proceedings**

6.     As more fully described in the Verified Petition and in the Initial Kravitz Declaration, the Debtors comprise an international oil and gas exploration, development, and production company.

7.     In March 2021, COPL, through its subsidiary COPL America, acquired (the "Atomic Acquisition") all of the membership interests in Atomic Oil and Gas LLC ("Atomic"), including its wholly owned subsidiary Pipeco LLC ("Pipeco") and the entire share capital of Southwestern Production Corporation ("SWP").   In July 2022, COPL America completed an acquisition (the "Cuda Acquisition", and together with the Atomic Acquisition, the "Acquisitions") of substantially all of the assets of Cuda Oil and Gas Inc. ("Cuda").   At the time of the Cuda Acquisition, Cuda had a 27% working interest in the BFSU, a 27.5% working interest in the BFDU and a 33.33% working interest in the CCU.   Following closing of the Cuda Acquisition, COPL America acquired an 85-100% working interest across three oil-producing units in Wyoming, operating each unit through SWP.

8.     Following the Acquisitions, the COPL Group set upon a strategy to optimize and increase oil production in the Wyoming Assets and embark on future development.   Since that time, however, COPL Group's financial and operational performance has struggled.   The COPL Group has failed to deliver free cash flow in any single quarter in the 18 months leading up to the filing of the Canadian Proceedings and these Chapter 15 Cases and COPL America labored to service its debt.   This led to repeated requests by COPL America for waivers and amendments and improved credit from the lender parties to the Senior Credit Facility (collectively, the "Lender") and repeated small equity and convertible debt "rescue" financing by COPL.   In addition, in the

4

12-18 months leading up to the filing of the Canadian Proceedings and these Chapter 15 Cases, a series of operational challenges and market conditions, as well as weather-related interruptions, combined with a challenging inflationary and high interest rate environment, the accumulation of hedging losses which, until recently, needed to be cash settled monthly, and the termination of a promising joint venture partnership, led to significant financial challenges and liquidity constraints.

9.      On March 7, 2024, to address these challenges, the COPL Group and the Lender executed the RSA.  The RSA embodies a restructuring (the "Restructuring") by which the Debtors agreed to engage in a fulsome sale process for the Debtors' businesses to maximize value for all stakeholders.

10.      On March 19, 2024, the Canadian Court granted the Amended and Restated Initial Order (the "ARIO"), which approved, among other things, the Debtors' entry into the RSA, the SISP Order, and entry into the Purchase Agreement.

**B.      The Chapter 15 Cases**

11.      On March 11, 2024, the Foreign Representative commenced these Chapter 15 Cases by filing the Chapter 15 Petitions.  On March 12, 2024, the Court entered an order [Docket No. 27] authorizing the joint administration and procedural consolidation of these chapter 15 cases under Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.  Also on March 12, 2024, the Court entered an order [Docket No. 28] that, among other things and on a provisional basis, recognized and gave effect to the Initial Order and enjoined the commencement or continuation of any action or proceeding in the United States against the Debtors.

12.      On April 8, 2024, this Court entered an order [D.I. 41] (the "Recognition Order") granting recognition of the Canadian Proceedings as a "foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code.  The Recognition Order provides, among other provisions,

that (i) section 363 of the Bankruptcy Code applies to this proceeding, (ii), the "right to transfer, encumber, or otherwise dispose of the Debtors' assets absent the express written consent of the Debtors is hereby suspended," and (iii) the Foreign Representative is entrusted with the right to "exercise the rights and powers of a trustee," entitling him to "administer and realize all or part of the Debtors' assets within the territorial jurisdiction of the United States." *Id*. at ¶¶ 5-7.

## II.    The Sale and Investment Solicitation Procedures

13.    As stated above, on March 19, 2024, the Canadian Court granted the SISP Order.

14.    On March 21, 2024, the Foreign Representative filed the SISP Recognition Motion in the Chapter 15 Cases seeking recognition and enforcement of the SISP Order, which approved, among other things:

(a)    Sale and investment solicitation procedures (the "SISP") and implementation thereof;

(b)    the Debtors' entry into the Purchase Agreement, substantially on the terms set forth in the RSA; and

(c)    the Break-Up Fee (defined below).

15.    On April 2, 2024, the Foreign Representative filed the *Declaration of Peter Kravitz in Support of the Motion of the Foreign Representative for Entry of an Order (I) Recognizing and Enforcing the SISP Order and (II) Granting Related Relief* [Docket No. 35] (the "Kravitz SISP Declaration").

16.    As detailed in the SISP Recognition Motion and the Kravitz SISP Declaration, after extensive negotiations between the Debtors and their key stakeholders, the Debtors determined that the SISP was the only viable going-concern exit strategy available to facilitate their exit from the Canadian Proceedings and these Chapter 15 Cases.  The SISP was backstopped by the Debtors' entry into the Purchase Agreement and supported by the Debtors' key stakeholders, the Debtors' primary secured creditors.  The SISP provided for a thorough marketing process that established

6

clear and open procedures for the solicitation, receipt, and evaluation of bids on a reasonable timeline and provided parties with sufficient time and information to submit a competitive bid.

17.    On April 8, 2024, this Court entered an order granting the relief requested in the SISP Recognition Motion (the "SISP Recognition Order" and, together with the SISP Order, the "SISP Orders"), recognizing and enforcing the SISP Order within the territorial jurisdiction of the United States.

18.    The Debtors, with the assistance of their financial advisor, Province, LLC ("Province"), Peter Kravitz, the Debtors' Chief Restructuring Officer ("CRO"), under the supervision of the Canadian Court's independent monitor (the "Monitor"), and in conjunction with their respective counsel, implemented and administered the SISP, as detailed in the Kravitz Declaration. Through this process, the Debtors reached out to 137 different parties to solicit interest in the SISP. *See* Kravitz Decl., ¶ 22. When reaching out to such parties, the Debtors provided a teaser letter, a copy of the SISP Order and a form of non-disclosure agreement ("NDA"), along with a summary of the proceedings and link to the Monitor's website. *Id.* Potential bidders were identified by the Debtors and Province, in consultation with the Monitor, through:

> (a)    extensive research on industry participants, consisting of both financial and strategic parties;
>
> (b)    discussions with the Debtors' management and board of directors (the "Board"); and
>
> (c)    inbound inquiries, both prior to and during the Canadian Proceedings, received directly through the Monitor.

*Id.*

19.    In addition, on March 21, 2024, the Debtors issued a press release announcing that the SISP Order had been granted, and that bids to purchase the business and/or assets of the COPL

Group were being solicited.  *Id.* at ¶ 23.  The press release also included a link to the Monitor's website, where all court orders and related materials could be found.  *Id.*

20.    Ultimately, four interested parties executed a form of NDA.  *Id.* at ¶ 24.  Including the Stalking Horse Purchaser, five parties were provided with access to a virtual data room, which among other information, included the Confidential Information Memorandum ("CIM").  *Id.*

21.    Province, in coordination with the Debtors, responded to diligence request lists from three parties engaged in the process.  *Id.* at 25.  These requests centered around production data, land and well files, financial data, and environmental testing results.  *Id.*  John Roche, a member of the Province team with executive experience in the oil and gas industry, assisted with responses to diligence items, in addition to the buildout of the CIM, buildout of the target list, and outreach strategy for various potential purchasers.  *Id.*  Additionally, the Debtors and Province arranged for two parties to take site visits, consisting of one day in the corporate office location and one day in the Wyoming field.  *Id.*  Both site visits were successfully completed during the week of April 8, 2024.  Province also held virtual calls with management and providers of reservoir management consulting services.  *Id.*

22.    In addition, the Debtors engaged with certain shareholders of COPL, including members of a group of COPL shareholders identifying themselves as the COPL Action Group (the "CAG") and facilitated their participation in the SISP.  *Id.* at ¶¶ 13, 26.

23.    Prior to the application for the SISP Order, an individual identifying himself as a representative of the CAG and as one of six leaders of same (the "CAG Representative") contacted the Canadian Court and the Monitor with respect to the SISP Order.  *Id.* at 26.  The Monitor recommended that the CAG Representative retain counsel.  *Id.*  The CAG Representative did not appear at the Comeback Hearing, nor did any counsel representing the CAG Representative or the

8

CAG. *Id.* On April 2, 2024, the CAG Representative contacted the Monitor and advised that "we now wish to enter into the bidding process." *Id.* Following this, the Debtors provided the CAG Representative with the teaser, form of NDA and final SISP Order, and have responded to inquiries from the CAG Representative. *Id.* The CAG maintains a website, as well as a social media presence on Facebook and on X (formerly Twitter), where the CAG provides updates with respect to the CCAA Proceedings, including information pertaining to the SISP. *Id.* On a social media post dated March 18, 2024 (after service of the application for the SISP Order but prior to the granting of same), the CAG stated that they were in the process of contacting potential bidders who may be interested in participating in the bidding process. *Id.*

24.     Throughout the implementation of the SISP, the Monitor and the Board have provided meaningful assistance and oversight to the Debtors. *Id.* at ¶ 27. The Monitor and the Board have assisted with the crafting of the Debtors' outreach strategy, the preparation of the teaser letter and CIM, and the buildout of the target outreach list. *Id.* The Monitor has also coordinated with Province on outreach and joined in discussions with certain potential bidders, as applicable. *Id.*

25.     The CIM was materially prepared by Province, with meaningful assistance from COPL management and the Monitor. *Id.* No drafts of the CIM were shared with the Stalking Horse Bidder, nor any other party in interest, until the final version was uploaded to the virtual data room on March 22, 2024, where it was made available to all potential bidders who had executed an NDA. *Id.*

## III.    Termination of the SISP

26.     The SISP provided that if, by April 17, 2024 (the "<u>LOI Deadline</u>"), no letters of intent are received reflecting a reasonable prospect of culminating in a Qualified Bid, as

determined by the Debtors in consultation with the Monitor and the Consulting Lenders (a "LOI"), the SISP shall be deemed to be terminated and the Transaction shall be the Successful Bid.

27.     Despite the Debtors' considerable efforts, with ongoing support from the Monitor, the Board and Province, the Debtors did not receive any LOIs from potential bidders as of the LOI Deadline. *Id.* at ¶ 30.  No LOI was received from the CAG or parties affiliated with the CAG. Therefore, in accordance with the terms of the SISP, following the LOI Deadline, the Stalking Horse Bid was declared as the Successful Bid and the SISP was terminated. *Id.*

28.     The Canadian Court granted the CCAA Vesting Order on April 24, 2024. Accordingly, the Foreign Representative is seeking recognition of the CCAA Vesting Order in these Chapter 15 Cases.  A description of the proposed relief set forth in the CCAA Vesting Order is set forth below.

### The Transaction Under the CCAA Vesting Order

29.     In accordance with the terms of the SISP, on April 8, 2024, the Debtors and the Stalking Horse Purchaser entered into the Purchase Agreement providing for the purchase of substantially all of the Debtors' assets by the Stalking Horse Purchaser (the "Transaction").  As provided for in the SISP Order, the terms of the Purchase Agreement are substantially the same as the terms set out in the Restructuring Term Sheet which is attached to the RSA.  A copy of the fully executed Purchase Agreement is attached to the CCAA Vesting Order as "Schedule 'B.'"

30.     Pursuant to the SISP, on April 9, 2024 the Purchase Agreement was served on the service list maintained in the Canadian Proceedings, posted on the Monitor's website, and provided to potential bidders who had executed an NDA via the virtual data room. *Id.*  at ¶ 32.

31.     The Transaction contemplated in the Purchase Agreement is the only executable transaction available following a thorough canvassing of the market pursuant to the SISP. *Id.* at ¶ 33.  The Purchase Agreement will ensure that the Debtors' enterprise continues as a going

concern for the benefit of a broad array of stakeholders, including the Debtors' creditors, commercial partners, vendors, and applicable employees. *Id.*

32. The key commercial terms of the Purchase Agreement include the following:

(a) A purchase price comprised of:

(i) An amount equal to the outstanding obligation owing pursuant to the DIP and;

(ii) the assumption of the Assumed Liabilities (defined below).

(b) in accordance with the CCAA Vesting Order and the Implementation Steps (defined below) to be agreed to by the parties, the Stalking Horse Purchaser shall purchase from the Debtors, free and clear of all encumbrances, other than the Permitted Encumbrances (defined below), all of the "Purchased Assets", which are defined as follows (except to the extent that any of the following constitutes Excluded Assets (as defined below)):

(i) all Hydrocarbon leases (and all leasehold estates created thereby), subleases, mineral fee interests, working interests, overriding royalties, production payments, net profits interests, non-participating royalty interests, non-participating mineral interests, carried interests, options, rights to Hydrocarbons in place, and all other Hydrocarbon interests of any kind or character derived therefrom whether producing or non-producing, in each case, located within the Sale Area, (the "Leases"), together with all rights, privileges, benefits and powers conferred upon the Debtors as the holders of the Leases with respect to the use and occupation of the surface of the lands covered thereby, and together with any and all rights, titles and interests of the Debtors in and to any units or pooling arrangements (including statutory forced pooling orders) wherein all or any part of the Leases are pooled, communitized or unitized, (the "Units"), and including all interests of the Debtors derived from the Leases in production of Hydrocarbons from any such Unit, whether such Unit production of Hydrocarbons comes from Wells located on or off of a Lease;

(ii) any and all Hydrocarbon, $CO_2$, injection and disposal wells located on or under the Leases or the Units (whether or not completed), whether such wells are producing, shut-in or abandoned (the "Wells", and collectively with the Leases and Units, the "Properties", and each individually a "Property");

(iii) all equipment, gathering systems, pipelines, flow lines, water lines, machinery, fixtures, improvements and other real, personal and

mixed property, operational or nonoperational that is located on the lands within the Sale Area or otherwise used in connection with the Properties or the other Purchased Assets, including well equipment, casing, tubing, pumps, motors, machinery, rods, tanks, tank batteries, pipes, compressors, meters, separators, heaters, treaters, boilers, fixtures, structures, materials and other items and appurtenances relating to or used in connection with the ownership or operation of the Properties or the other Purchased Assets, including certain of the midstream and gathering facilities (collectively, the "Personal Property");

(iv)     to the extent assignable, all Permits relating to the ownership or operation of the Properties and Personal Property;

(v)      to the extent assignable, all of the easements, rights-of-way, surface fee interests, surface leases, surface use agreements and other surface usage rights existing as of the Closing Date to the extent used in connection with the ownership or operation of the Properties or other Purchased Assets;

(vi)     all material pipeline or well imbalances associated with the Properties;

(vii)    all Assigned Contracts;

(viii)   all radio and communication towers, personal computers, SCADA systems and wellhead communications systems and other equipment and automation systems and related telemetry on wells, any central SCADA server and all software associated with any SCADA system (including any network equipment and associated peripherals), all radio and telephone equipment and all licenses relating thereto, in each case that are used in connection with the operation of the Properties or other Purchased Assets;

(ix)     all offices, warehouses, laydown yards and other similar assets located in the Sale Area (including any owned or leased real or personal property relating thereto);

(x)      the Records;

(xi)     a vehicle;

(xii)    all Hydrocarbons produced from or allocated to the Properties on and after the Effective Time and all production proceeds attributable thereto;

(xiii)   all rights, claims and causes of action (including all audit rights, rights of indemnity, set-off or refunds and any and all rights and

12

interests of the Debtors under any policy or agreement of insurance) of the Debtors to the extent (and only to the extent) such rights, claims or causes of action relate to any of the Assumed Obligations;

(xiv) any and all actual or potential avoidance, fraudulent transfer, preference, recovery, subordination, claim, action, proceeding or remedy that may be brought by or on behalf of the Debtors' bankruptcy estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including under sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws solely to the extent relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses and counterparties to any Contract or Lease arising out of or relating to events occurring on or prior to the Closing Date or any of the Purchased Assets or Assumed Liabilities; and

(xv) to the extent the Purchasers acquire the SWP Interests at Closing pursuant to the Equity Purchase Option as set forth in Section 7.11 of the Purchase Agreement, the SWP Interests.

33.    Further details regarding the Purchase Agreement are as follows:[5]

| Term | Details | Reference |
|---|---|---|
| **Sellers** | The following entities, or a subset thereof: COPL, COPL America Inc., Canadian Overseas Petroleum (Ontario) Limited, COPL Technical Services Limited, SWP, Atomic, and Pipeco (collectively with COPL, the "COPL Entities" and each a "COPL Entity") | Preamble; Art. 2.1(a). |
| **Purchasers** | Summit Partners Credit Fund III, L.P., Summit Investors Credit III, LLC, Summit Investors Credit III (UK), L.P. and Summit Investors Credit Offshore Intermediate Fund III, L.P. (the "Purchasers") | Preamble; Art. 2.1(a). |
| **Purchase Price** | Credit bid in an amount equal to the outstanding obligations owing pursuant to the DIP; and the assumption of the Assumed Liabilities. | Art. 3.1(a). |
| **Transaction Structure** | At the Closing and effective as of the Closing Time, the Purchasers shall purchase from the COPL Entities, and the COPL Entities shall sell to the Purchasers, free and clear of | Art. 2.1(a), 2.6(b). |

---

[5] Capitalized terms used in this paragraph but not otherwise defined herein shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.

| Term | Details | Reference |
|---|---|---|
| | all Encumbrances other than the Permitted Encumbrances, the Purchased Assets pursuant to the AVO and the Implementation Steps.<br><br>On or prior to the Closing Date, the COPL Entities shall effect the transaction steps and pre-closing reorganization (collectively, the "Implementation Steps") to be agreed upon by the COPL Entities and the Purchasers, each acting reasonably, at least 10 days prior to the Closing Date (or such later date as the Parties may agree in writing). Without limiting the generality of the foregoing, the Implementation Steps may include, without limitation, resolving intercompany obligations, the formation of new entities required to implement the transactions contemplated by the Purchase Agreement in a tax efficient manner and transfers of equity interests in the Debtors.<br><br>The Implementation Steps shall occur, and be deemed to have occurred in the order and manner to be set out therein. | |
| **Assigned Contracts and Leases** | Subject to the terms and conditions of the Stalking Horse Purchase Agreement, at the Closing Time, the COPL Entities shall assign to the Purchasers all of the COPL Entities' rights, benefits and interests in and to any Assigned Contracts and Leases, and the Purchasers shall, on the terms and subject to the conditions set forth in such Assigned Contracts and Leases, assume the obligations and liabilities of the COPL Entities under such Assigned Contracts and Leases at, and arising after, the Closing (including the Cure Costs and Post-Filing Costs).<br><br>Notwithstanding the foregoing, the Stalking Horse Purchase Agreement and any document delivered thereunder shall not constitute an assignment or an attempted assignment of any Purchased Asset contemplated to be assigned to the Purchasers that is not assignable without the Consent and Approval of a third party unless (i) such Consent and Approval has been obtained or (ii) the assignment has been ordered by the CCAA Court and, if so required, recognized by the U.S. Court.<br><br>To the extent any Consent and Approval necessary for the assignment of any Contract or Leaser to the Purchasers is not obtained prior to the application for the AVO, the COPL Entities shall bring an application to the CCAA Court for | Art.   2.2(a), 2.2(e). |

| Term | Details | Reference |
|------|---------|-----------|
| | approval of the Assignment Order and, if required, to the U.S. Court. | |
| **Excluded Assets** | The Purchased Assets shall not include any of the following assets or any other assets set forth in Schedule 2.3 of the Disclosure Letter, which Schedule may be modified as agreed upon by the COPL Entities and the Purchasers, each acting reasonably, at least 3 Business Days prior to the Closing Date (or such later date as the Parties may agree in writing):<br><br>Income tax returns of the COPL Entities;<br><br>Books and records and other documents, in each case, related solely to any of the Excluded Liabilities;<br><br>Excluded Contracts;<br><br>All communications, information or records, written or oral, to the extent related to (i) the transactions contemplated by the Purchase Agreement, (ii) the bids submitted by other prospective purchasers of the Purchased Assets or any other interest in the Purchased Assets; (iii) any Excluded Asset; and (iv) any Excluded Liability;<br><br>Escrowed cash in the amount of $500,000 to fund professional fee retainers incurred in connection with post-Closing matters and/or to wind-up and terminate the CCAA Proceedings and the Chapter 15 Case, and any further proceedings involving the COPL Entities;<br><br>Personal information that cannot be transferred without violating Applicable Law and any information protected by attorney-client privilege or work-product doctrine;<br><br>All Hedge Contracts; and<br><br>All claims and/or Causes of Action to the extent arising from or related to the Excluded Assets or Excluded Liabilities. | Art. 2.3. |
| **Assumed Liabilities** | All debts, liabilities and obligations under the Assigned Contracts and Leases (to the extent assigned or transferred to the Purchaser on the Closing) that are not Excluded Contracts.<br><br>All debts, liabilities and obligations (including Environmental Liabilities) arising from the ownership, use | Art. 2.4. |

| Term | Details | Reference |
|------|---------|-----------|
| | or operation on or after the Closing of the Purchased Assets transferred to the Purchasers on the Closing.<br><br>All Asset Taxes allocated to the Purchasers pursuant to Section 7.6 of the Purchase Agreement (being all Asset Taxes attributable to any Tax period beginning on or after the Effective Time and the portion of any Straddle Period beginning on the Effective Time).<br><br>Amounts outstanding under the Credit Agreement. | |
| **Excluded Liabilities** | Except as expressly assumed pursuant to or specifically contemplated by Section 2.4 of the Purchase Agreement, the Purchasers shall not assume and shall not be liable, directly or indirectly, or otherwise responsible for any claims, debts, obligations, or Liabilities (including Environmental Liabilities) of the COPL Entities or any predecessors of the COPL Entities or otherwise with respect to the Business or Purchased Assets, of any kind or nature (collectively, the "Excluded Liabilities"), all of which Excluded Liabilities shall be retained by, and be the sole liability and obligation of, the COPL Entities and which further include the following except as expressly assumed pursuant to or specifically contemplated by Section 2.4 of the Purchase Agreement:<br><br>(a) all Liabilities (including Environmental Liabilities) arising out of the ownership, use or operation of the Purchased Assets prior to the Effective Time; provided that such Liabilities with respect to Environmental Liabilities shall only be Excluded Liabilities to the extent permitted by Applicable Law pursuant to the laws of the state where the applicable Purchased Assets are located;<br><br>(b) except with respect to the Credit Agreement, all indebtedness of the COPL Entities;<br><br>(c) all Liabilities of the COPL Entities to any owner or former owner of capital stock or warrants, or holder of indebtedness for borrowed money;<br><br>(d) all (i) Asset Taxes allocated to the COPL Entities pursuant to Section 7.6 of the Purchase Agreement (being all Asset Taxes attributable to any Tax period ending prior to the Effective Time and the portion of any Straddle Period ending immediately prior to the | Art. 2.5. |

| Term | Details | Reference |
|------|---------|-----------|
| | Effective Time), (ii) income, franchise or similar Taxes imposed on any COPL Entity (or any of their Affiliates); (iii) Taxes attributable to the Excluded Assets and (iv) other Taxes relating to the acquisition, ownership or operation of the Purchased Assets or the production of Hydrocarbons or the receipt of proceeds therefrom that are attributable to any Tax period (or portion thereof) ending prior to the Effective Time; | |
| | (e) all guarantees of third party obligations by the COPL Entities and reimbursement obligations to guarantors of the COPL Entities' obligations or under letters of credit; | |
| | (f) the Causes of Action set forth on (or that should have been set forth on) Schedule 4.6 of the Disclosure Letter and any other Causes of Action against a COPL Entity or any of its properties asserted on or prior to the Closing Date; | |
| | (g) all Liabilities at any time relating to or arising out of the employment or service with or termination of employment or service from the COPL Entities or any of its Affiliates of any Person (including any employee who is employed with Purchasers or its Affiliates after Closing), including any severance or incentive compensation, bonus payments, retention payments, change of control payments or similar payments, whether or not such Liabilities, obligations or commitments arise or vest (whether fully or partially) as a result of the transactions contemplated by the Purchase Agreement and whether or not immediately due and payable upon the consummation of the transactions contemplated by the Purchase Agreement; | |
| | (h) all Liabilities at any time arising out of, or relating to, the Worker Adjustment and Retraining Notification (WARN) Act or any similar Applicable Law as it relates to Business Employees terminated by the COPL Entities or their Affiliates; | |
| | (i) all Liabilities at any time arising out of, or relating to, any collective bargaining agreement of which any of the COPL Entities or any of their Affiliates is a party; | |

17

| Term | Details | Reference |
|------|---------|-----------|
| | (j) all Liabilities (including Environmental Liabilities) related to arising out of the ownership, use or operation of the Excluded Assets; provided that such Liabilities shall only be Excluded Liabilities to the extent permitted by Applicable Law pursuant to the laws of the state where the applicable Excluded Assets are located and solely limited to Environmental Liabilities for Purchased Assets that are designated as Excluded Assets after the date of the Purchase Agreement; and<br><br>(k) all intercompany obligations and balances which do not continue as Assumed Liabilities pursuant to the Implementation Steps. | |
| **Employees** | The Purchasers shall, in their sole discretion, have the option, but not the obligation, to offer employment as of the Closing Date to such Business Employees as it determines (the "Offered Employees") on terms and conditions to be determined in the Purchaser's sole discretion.<br><br>Each Offered Employee who accepts the Purchasers' offer of employment and actually commences employment with the Purchaser shall be referred to as a "Continuing Employee". | Art. 7.10. |
| **Release by the COPL Entities** | Except in connection with any obligations of each Purchaser and the Monitor contained in the Purchase Agreement or any Closing Documents, effective as of the Closing, and subject to the Initial CCAA Order, the COPL Entities release and forever discharge each Purchaser, the Credit Facility Agent, the CRO, the Monitor and their respective Affiliates, and each of their respective successors and assigns, and all officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them, from any and all actual or potential Released Claims which such Person had, has or may have in the future to the extent relating to the Purchased Assets, the Assumed Liabilities, the Excluded Assets or the Excluded Liabilities, save and except for Released Claims arising out of fraud or willful misconduct. | Art. 7.9. |
| **Purchase of Equity** | No later than two Business Days prior to the scheduled Closing Date, the Purchasers, in their sole discretion, may elect by written notice to the COPL Entities to acquire one | Art. 7.11. |

18

| Term | Details | Reference |
|------|---------|-----------|
| | hundred percent (100%) of the equity of SWP (the "Equity Purchase Option") for no additional consideration. If the Purchasers elect the Equity Purchase Option, the applicable COPL Entities shall execute and deliver a mutually agreeable assignment of all of the equity interests of SWP (the "SWP Interests") to the Purchasers (or their designated affiliates) at Closing and any Purchased Assets owned by SWP shall not be conveyed at Closing under the Assignment. For the avoidance of doubt, unless the Purchasers affirmatively elect the Equity Purchase Option, the Purchased Assets of SWP (rather than the SWP Interests) will be acquired at Closing pursuant to the Purchase Agreement. | |
| **Closing Date** | The Closing shall take place remotely and electronically (a) on **May 31, 2024**; provided that Purchasers may elect, at least two Business Days prior to May 31, 2024 with written notice to the COPL Entities, to extend such date (to a date not later than the Outside Date) if Purchasers or their designated Affiliate(s) do not have the appropriate approvals or requirements in place from a Governmental Authority to take assignment of the Purchased Assets; (b) if all conditions to Closing under Article 6 of the Purchase Agreement have not yet been satisfied or waived on such date, on the first day of the following month (or, if not a Business Day, the next Business Day) after the conditions set forth in Article 6 of the Purchase Agreement have been satisfied or waived, other than the conditions set forth in Article 6 of the Purchase Agreement that by their terms are to be satisfied or waived (to the extent permitted by Applicable Law) at the Closing, but subject to the satisfaction or waiver (to the extent permitted by Applicable Law) of such condition at the Closing; provided that, the Purchasers may (in their sole discretion) elect to close earlier than first day of the month if the conditions set forth in Article 6 of the Purchase Agreement have been satisfied or waived; or (c) on such other date as the Parties may agree in writing; provided that, in any case, if there is to be a Closing hereunder, then the Closing Date shall be no later than the Outside Date (i.e., **August 31, 2024**). | Art. 10.1. |

34.     As discussed above, there was simply no other viable alternative transaction available to the Debtors after canvassing the market.  *Id.* at ¶¶ 33, 36  Any other structure risks the

Debtors' businesses going-concern value and exposes the Debtors to significant risk, regulatory uncertainty, and delays. Such risk and uncertainty is likely to be reflected by any purchaser in the value offered for the Debtors' businesses as the risks outlined above could have dramatic impacts on the Debtors' ability to carry on business and generate revenue for the benefit of their stakeholders, while also delaying the Debtors' emergence from the Canadian Proceedings and these Chapter 15 Cases. The only going-concern option is the Transaction with the Purchasers under the Purchase Agreement. *Id.*

35.     In connection with the Transaction, the CCAA Vesting Order approved a release provision in favor of (a) the current and former employees, directors, officers, legal counsel and advisors of the Debtors; (b) the Monitor and its legal counsel; (c) Province, its affiliates and their respecting current and former directors, officers, employees, legal counsel and advisors, including the CRO; and (d) the Purchasers, and their respective affiliates, and each of their respective current and former directors, officers, employees, legal counsel and advisors. The releases provided in the Transaction and the CCAA Vesting Order contain carveouts for fraud, willful misconduct, and gross negligence. Each of the parties receiving a release or being exculpated has made a material contribution to the success of the Debtors' businesses, the Restructuring, or the Transaction. *Id.* at ¶ 37. The Monitor was supportive of the proposed releases and is of the view that they are consistent with releases granted in recent CCAA proceedings where there is no plan of compromise and arrangement. *See Second Report of the Monitor*, dated April 19, 2024, and attached hereto as **Exhibit B**, at § 5.0.

36.     The Foreign Representative submits that recognition of the Transaction, as approved in the CCAA Vesting Order, is in the best interests of the Debtors and their stakeholders by preserving the going-concern value of the Debtors' businesses. *Id.* at ¶¶ 38, 40. The

20

Transaction is critical to maximizing the value of the Debtors' enterprise and has the support of the Debtors' key stakeholders. *Id.* The Transaction is the best option available to the Debtors under the circumstances and will ensure the Debtors' businesses continue as a going-concern for the benefit of the Debtors' customers and employees. The Debtors require a timely and efficient closing to achieve their restructuring objectives, and the Foreign Representative understands that the Monitor is supportive of the Transaction, including its contemplated structure. *See id.* at ¶¶ 40-41.

37.     The Foreign Representative submits that the Transaction is fair and reasonable under the circumstances, is the result of good-faith, arm's-length negotiations, and is in the best interests of the Debtors, their creditors, and other stakeholders. *See id.* at ¶ 44.

## The CCAA Vesting Order

38.     As set forth above, the Canadian Court granted the CCAA Vesting Order in the Canadian Proceedings on April 24, 2024.

39.     Parties in interest were properly noticed under Canadian law and had an opportunity to be heard in the Canadian Proceedings.

40.     Entry of the Proposed Order is a requirement of the RSA. This Court's recognition and enforcement of the CCAA Vesting Order within the territorial jurisdiction of the United States and approval of the Transaction will permit the Debtors to sell the Purchased Assets efficiently and cost-effectively. Recognition of the CCAA Vesting Order will ensure that the Debtors can close the Transaction for the benefit of their stakeholders, including employees.

41.     The Foreign Representative submits that the sale of the Purchased Assets in accordance with the terms and conditions of the Purchase Agreement, the CCAA Vesting Order, and the Proposed Order represents the best realization of value for the Debtors' businesses under

the circumstances, and this Court's recognition of the CCAA Vesting Order and approval of the sale of the Purchased Assets pursuant to the Purchase Agreement free and clear is critical to achieving that result.

### The SWP Dismissal Procedures

42.     As set forth in Section 7.11 of the Purchase Agreement, the Purchasers may, up to two business days prior to the Closing Date, elect to exercise their rights under the Equity Purchase Option to acquire one hundred (100%) of the SWP Interests for no additional consideration.  If the Purchasers elect to do so, the applicable COPL Entities shall execute and deliver a mutually agreeable assignment of all of the SWP Interests to the Purchasers (or their designated affiliates) at Closing and any Purchased Assets owned by SWP shall not be conveyed at Closing.  Further, the CCAA Vesting Order provides that "[i]n the event that [SWP] is to be acquired pursuant to the Transaction, the Monitor's Certificate shall acknowledge same and, upon the filing with the [Canadian] Court of a copy of a Monitor's Certificate with such acknowledgment, SWP shall and shall be deemed to cease to be an applicant in [the Canadian Proceedings] and shall be deemed to be released from the purview of the ARIO and all other Orders of [the Canadian] Court granted in respect of [the Canadian Proceedings], save and except for [the CCAA Vesting Order], the provisions of which (as they relate to SWP) shall continue to apply in all respects."  CCAA Vesting Order, ¶ 9.

43.     To the extent the Purchasers acquire the SWP Interests at Closing pursuant to the Equity Purchase Option, the Debtors request that, upon the filing of a certification of counsel, substantially in the form attached the Proposed Order as Exhibit 2 (the "Certification of Counsel and Request for Dismissal"), the Court enter an order, substantially in form attached to the Proposed Order as Exhibit 3 (the "Dismissal Order"), dismissing the Chapter 15 Case of SWP.

22

The Certification of Counsel and Request for Dismissal will, among other things, (a) confirm that the Purchasers have acquired the SWP Interests in connection with the Transaction and (b) request entry of the Dismissal Order for SWP's Chapter 15 Case.  This protocol (the "<u>SWP Dismissal Protocol</u>") will enable the Debtors to avoid unnecessary ongoing administrative expenses associated with keeping SWP's case open longer than necessary and will thus benefit the Debtors and all stakeholders.

<b><u>Relief Requested</u></b>

44.     By this Motion, the Foreign Representative seeks the entry of the Proposed Order (i) recognizing and enforcing of the CCAA Vesting Order, (ii) approving, under section 1520 and section 363 of the Bankruptcy Code, the sale of the Debtors' rights, title, and interests in and to the Purchased Assets to the Purchasers pursuant to the Purchase Agreement, which may further be amended in accordance with the terms of the CCAA Vesting Order, free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances); (iii) conditionally approving the SWP Dismissal Protocol and (iv) granting related relief.  The relief requested in the Proposed Order is authorized by sections 105(a), 305, 363, 365, 1520, and 1521 of the Bankruptcy Code.

<b><u>Basis for Relief</u></b>

**I.     The Court Should Recognize and Enforce the CCAA Vesting Order and Authorize the Sale of the Purchased Assets Pursuant to Section 363 of the Bankruptcy Code.**

45.     The Foreign Representative is entitled to administer the Debtors' property within the territorial jurisdiction of the United States and is given the powers and duties of a trustee under the Bankruptcy Code, including to sell a foreign debtor's property within the territorial jurisdiction of the United States.

23

46.     Section 1520 of the Bankruptcy Code applies where, as here, a bankruptcy court has recognized a foreign proceeding as a foreign main proceeding.  11 U.S.C. § 1520.  Among other things, section 1520(a)(2) of the Bankruptcy Code provides that the standards of section 363 apply with respect to any transfer of assets within the territorial jurisdiction of the United States. *See* 11 U.S.C. § 1520(a)(2); *Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.)*, 768 F.3d 239, 245 (2d Cir 2014); *In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012) (noting that in a chapter 15 case "section 363 and, by implication, its standards are applicable to the transfer of assets located in the United States by a foreign debtor in a foreign main proceeding outside the ordinary course of business").  Further, section 105(a) of the Bankruptcy Code authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

47.     Section 363(b)(1) of the Bankruptcy Code authorizes the sale of a debtor's property outside the ordinary course of business if there is a good business reason for doing so.  *See* 11 U.S.C. § 363(b)(1)*; Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176-81 (D. Del. 1991) (affirming decision permitting debtor to sell assets where sound business judgment reasons supported the sale). The bankruptcy court has considerable discretion in approving such sale.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 152-53 (D. Del. 1999).  Once a debtor articulates a good business reason for the sale of estate property outside the ordinary course of business, it is presumed that the debtor's decision to move forward with the sale was made "on an informed basis, in good faith and in the honest belief that the [transaction] was in the best interests of the [debtor] company."  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990).

24

48.     Entering into the Transaction is a prudent exercise of the Debtors' business judgment.  First, the Transaction is the culmination of the Debtors' restructuring efforts, which included extensive stakeholder negotiations and engagement, entry into the RSA, negotiation of the Purchase Agreement, a thorough, transparent, and fair marketing process under the SISP, and finally, negotiation of the Purchase Agreement.  The Transaction is the only viable going-concern sale available to the Debtors to exit their Canadian and United States insolvency proceedings.  As such, recognition of the CCAA Vesting Order is necessary and appropriate, and there are sound business reasons justifying the sale of the Purchased Assets to the Purchasers pursuant to the Purchase Agreement.  *See* Kravitz Decl., ¶¶ 36-41.

49.     Further, the Purchase Price, as defined in the Purchase Agreement, is fair and reasonable and provides the highest and otherwise best value to the Debtors for the Purchased Assets.  The fairness and reasonableness of the consideration to be received by the Debtors from the Purchasers has been validated by a robust and thorough "market test" pursuant to the Court-approved SISP—a reliable means for establishing whether a purchase price is fair and reasonable.  *See* Kravitz Decl., ¶¶ 20, 22-30.  The Transaction presents the best and, indeed, only, opportunity to preserve the value of the going concern businesses. *See* Kravitz Decl., ¶¶ 36-41.  For all of the foregoing reasons, the Foreign Representative has determined that the sale of the Purchased Assets pursuant to the Transaction is in the best interests of the Debtors, their creditors, and other parties in interest, thereby satisfying the sound business purpose test under sections 363 and 1520 of the Bankruptcy Code.

50.     Sections 1525 and 1527 of the Bankruptcy Code contemplate cooperation "to the maximum extent possible with the foreign court or a foreign representative," which includes, "coordination of the administration and supervision of the debtor's assets and affairs" and

"approval or implementation of agreements concerning the coordination of proceedings." 11 U.S.C. §§ 1525, 1527.  Accordingly, the Debtors respectfully request that the Court recognize and give effect to the CCAA Vesting Order and approve the sale of the Purchased Assets.

## II.   The Court May Provide Additional Assistance Pursuant to Section 1507 of the Bankruptcy Code.

51.     Section 1507 of the Bankruptcy Code also permits the Court to grant the requested relief as "additional assistance." 11 U.S.C. § 1507; *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 626 n.10 (Bankr. S.D.N.Y. 2010) (explaining that section 1507 is a broad "'catch-all' provision") (citing *In re Condor Ins. Ltd.*, 601 F.3d 319, 325 (5th Cir. 2010)); *see also* H.R. Rep. No. 109-31, pt. 1, at 109 (2005) (noting that section 1507 authorizes "additional relief" beyond that available under section 1521 of the Bankruptcy Code).

52.     In determining whether to exercise its discretion to grant additional relief under section 1507(a), a court should consider "whether such additional assistance, consistent with the principles of comity, will reasonably assure" the: (1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; and (3) prevention of preferential or fraudulent dispositions of property of the debtor.  Recognition and enforcement of the CCAA Vesting Order is appropriate under section 1507 of the Bankruptcy Code, as all applicable factors are satisfied.

53.     First, the CCAA is a just and reasonable procedure, as previously recognized by numerous United States courts, and provides a scheme for the "equitable, orderly, and systematic" distribution to creditors.  *See, e.g. Allstate Life Ins. Co. v. Linter Grp. Ltd.*, 994 F.2d 996, 1000 (2d Cir. 1993).  Courts in the United States have routinely concluded that the CCAA is a sound statutory insolvency scheme that fosters reorganization in a manner that is consistent with

fundamental principles and policies of the United States. *See Cornfeld v. Invs. Overseas Servs., Ltd.*, 471 F.Supp. 1255, 1259 (S.D.N.Y. 1979) ("The fact that the foreign country involved is Canada is significant. It is well-settled in New York that the judgments of the Canadian courts are to be given effect under principles of comity. . . . More importantly, Canada is a sister common law jurisdiction with procedures akin to our own, and thus there need be no concern over the adequacy of the procedural safeguards of Canadian proceedings.") (internal quotation marks and citations omitted); *see also In re Grant Forest Prod., Inc.*, 440 B.R. 616, 622 (Bankr. D. Del. 2010); *In re Crystallex Int'l Corp.*, No. 11-14074 (LSS), 2022 WL 17254660, at *6 (Bankr. D. Del. Nov. 28, 2022).

54.     Second, the Debtors' creditors and parties in interest have been treated fairly in connection with the Debtors obtaining the CCAA Vesting Order.  The Canadian Proceedings provide creditors with notice and an opportunity to retain counsel, to appear, to raise objections, and to appeal.  The SISP process is substantially similar to procedures typically approved by United States bankruptcy courts in bidding procedures, and this Court recognized the appropriateness of the SISP in the SISP Recognition Order.

55.     Finally, preferential or fraudulent transfers are not permitted under the CCAA, which provides for the avoidance and recovery of such transfers.

56.     Accordingly, recognition and enforcement of the CCAA Vesting Order is appropriate under section 1507 of the Bankruptcy Code as such relief will provide the Debtors and all parties in interest with certainty that the CCAA Vesting Order will be enforceable not only in Canada, but also in the United States, and will therefore protect and prevent prejudice to such parties by ensuring uniform application of the CCAA Vesting Order.  In addition, entry of an order

of this Court recognizing and giving effect in the U.S. to the CCAA Vesting Order is an express condition to the Purchase Agreement and the RSA.

## III.     The Requested Relief Is Not Contrary to Public Policy

57.     A court may deny a request for chapter 15 relief that would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

58.     Courts have emphasized that section 1506 of the Bankruptcy Code applies only in very narrow circumstances where the most fundamental policies of the United States are implicated.  *See In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 309 (3d Cir. 2013); *In re Ram*, 607 F.3d 1017, 1021 (5th Cir. 2010); *see also Collins v. Oilsands Quest Inc.*, 484 B.R. 593, 597 (S.D.N.Y. 2012) ("the legislative history of section 1506 makes clear that the public policy exception should be narrowly interpreted and is restricted to the most fundamental policies of the United States.") (internal quotation marks and citations omitted).

59.     Courts have held that a United States court is not required to undertake an "independent determination about the propriety of individual acts of a foreign court." and may not employ the public policy exception simply because some procedural or constitutional rights are absent from the foreign proceeding.  *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010); *see also In re PT Bakrie Telecom Tbk*, 601 B.R. 707, 724 (Bankr. S.D.N.Y. 2019).  In this case, the Transaction structure is not to blame for general unsecured creditors' lack of recovery—and, by extension, for equity's lack of recovery—rather, it is a function of the Debtors' value, as tested through the market.

60.     The Transaction is similar to asset sales frequently utilized in chapter 11 cases that are preceded by a set of procedures intended to enhance competitive bidding consistent with the goal of maximizing the value received by the estate. An asset sale under section 363 of the Bankruptcy Code where the debtors sell assets while preserving liabilities in bankruptcy is

functionally the same as the Transaction contemplated by the CCAA Vesting Order in the Canadian Proceedings.  In both situations, the purchaser is purchasing interests in certain of the debtors' profitable property while the creditors and equity holders are left with an interest in any remaining assets.

61.    The Transaction, as structured, is consistent with the United States public policy of maximizing assets for distribution to creditors, and not manifestly contrary to public policy. 11 U.S.C. § 1501(a).  Further, as previously discussed, the Canadian Proceedings comply with fundamental standards of fairness and due process.

## IV.    The Court Should Authorize and Approve the Sale of the Purchased Assets "Free and Clear" Under Section 363(f) of the Bankruptcy Code.

62.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

63.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated in section 363(f) will suffice to warrant the sale of the Purchased Assets free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges or encumbrances), except with respect to any interests that may be assumed under the Purchase Agreement.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) (noting that, because section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of assets free and clear of liens and interests); *In re Dura Auto. Sys., Inc.*, No. 06-11202 KJC, 2007 WL 7728109, at *93 (Bankr. D. Del. Aug. 15, 2007) (same).

64.     Pursuant to section 363(f) of the Bankruptcy Code, the Foreign Representative has obtained the requisite consent to sell the Purchased Assets free and clear of all liens, claims, interests, or encumbrances.  Those creditors that hold such liens, claims, encumbrances, or other interests, who did not object to the Motion or the sale of the Purchased Assets or whose objections were overruled, should be deemed, subject to the terms of the Proposed Order and the CCAA Vesting Order, to have consented to such sale free and clear pursuant to section 363(f)(2) of the Bankruptcy Code.  The Foreign Representative submits that the sale of the Purchased Assets free and clear of all interests, other than as provided in the Proposed Order and the CCAA Vesting Order, satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

65.     A sale to the Purchasers of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests is consistent with the best interests of the Debtors and their creditors.  Pursuing a sale other than one that is "free and clear" would yield substantially less value for the Debtors and their creditors.   Therefore, a sale free and clear of all interests (other than Permitted Encumbrances) is in the best interests of the Debtors, their creditors, and other parties in interest and is consistent with the sale approved by the CCAA Vesting Order.

## V.     The Court Should Afford the Purchasers Protection Under Sections 363(m)[6] and (n)[7] of the Bankruptcy Code as a Good Faith Purchaser.

66.     The Foreign Representative also submits that the Purchasers are entitled to the benefits and protections set forth in sections 363(m) and (n) of the Bankruptcy Code.

---

[6] Section 363(m) of the Bankruptcy Code provides, in pertinent part, that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m).

[7] Section 363(n) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive

30

67.     Section 363(m) of the Bankruptcy Code protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal so long as such purchaser leased or purchased the assets in "good faith."  While the Bankruptcy Code does not define "good faith," the Third Circuit has observed that "[t]he requirement that a purchaser act in good faith … speaks to the integrity of his conduct in the course of the sale proceedings" and that "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" is misconduct that could destroy a purchaser's good faith status. *See, e.g.*, *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).  Courts generally conclude that a purchaser has acted in good faith as long as the consideration is adequate and reasonable and the terms of the transaction are fully disclosed.  *Id.* at 149–50.  The Foreign Representative submits that the Purchasers are "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code.

68.     As set forth in more detail above, the consideration to be received by the Debtors pursuant to the Purchase Agreement is substantial, fair, and reasonable.  In addition, there exists no indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Transaction to be avoided under section 363(n) of the Bankruptcy Code.  *See id.* at 147 (describing types of misconduct that negate a purchaser's good faith status (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))).  The Purchase Agreement is the result of an extensive marketing process and the product of arm's-length, good-faith negotiations between the parties thereto, under which (a) the Purchasers served as the stalking horse whose bid

---

damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection." 11 U.S.C. § 363(n).

11473038v.9

was subject to higher or otherwise better offers and (b) the Canadian Court-approved SISP was crafted to ensure that the Purchased Assets are sold for the maximum potential price.  Ultimately, no other qualified bid, other than the Purchasers bid as stalking horse, emerged.

69.     Accordingly, the Foreign Representative seeks a finding that the Purchasers are good faith purchasers under section 363(m) of the Bankruptcy Code and have not violated section 363(n) of the Bankruptcy Code.

## VI.   The Court Should Approve the SWP Dismissal Protocol Pursuant to Sections 105(a) and 305 of the Bankruptcy Code.

70.     The Foreign Representative "may seek dismissal or suspension" of a chapter 15 case if (i) a petition for recognition has been granted and (ii) "the purposes of chapter 15 of this title would be best served by such dismissal or suspension."  11 U.S.C. §§ 305(a)(2) & (b).

71.     With respect to (i), this Court granted the Foreign Representative's petition for recognition on April 8, 2024 through the Recognition Order.

72.     With respect to (ii), section 1501(a) provides, in relevant part, that the purpose of chapter 15 is to

> provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—
> . . .
>
> (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;
>
> (4) protection and maximization of the value of the debtor's assets; and
>
> (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501.

11473038v.9

73.     The SWP Dismissal Protocol is structured to serve the purposes of chapter 15 of the Bankruptcy Code because it provides for the efficient administration of the Canadian Proceedings and these Chapter 15 Cases, protects and maximizes the value of the Debtors' assets, and facilitates the restructuring of the Debtors, which are facing a liquidity crisis that prompted the filing of the Canadian Proceedings and these Chapter 15 Cases.  Namely, in the event that the Purchasers elect to exercise the Equity Purchase Option, the SWP Dismissal Protocol satisfies each of these purposes by providing a streamlined process for dismissing the Chapter 15 Case of SWP thereby minimizing the expense of administering the SWP case.  Moreover, the Certification of Counsel and Request for Dismissal required by the SWP Dismissal Protocol will include all information necessary to comply with Local Rule 5009-2.

74.     Accordingly, the Foreign Representative respectfully requests approval of the SWP Dismissal Protocol as described herein and in the Proposed Order.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

75.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Foreign Representative respectfully submits that cause exists to waive the 14-day stay under Bankruptcy Rule 6004(h).  Waiving the 14-day stay will not prejudice the Debtors or any party in interest because all parties will have notice and an opportunity to be heard in the Canadian Proceedings.  Further, the Debtors must complete the Closing within 14 days of the entry of the Proposed Order under the terms of the RSA.  The 14-day stay should be waived to permit the Foreign Representative and the Debtors to take actions that they determine are reasonably necessary to consummate the Transaction within the required time frame.  Accordingly, the Foreign Representative requests that the Court waive the 14-day stay provided for in Bankruptcy Rule 6004(h).

33

**Notice**

76.     Notice of this Motion will be provided in accordance with the Court's *Order*

*(A) Scheduling Hearing on Recognition of Chapter 15 Petition, (B) Specifying Form and Manner*

*of Service of Notice, and (C) Authorizing Redaction of Certain Personally Identifiable Information*

*of Individual Stakeholders* [Docket No. 29].  The Foreign Representative submits that, in light of

the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

77.     No prior request for the relief sought in this Motion has been made to this or any

other court.

**Conclusion**

**WHEREFORE**, the Foreign Representative respectfully requests that the Court enter the

Proposed Order granting the relief requested in this Motion and such other and further relief as

may be just and proper.

Dated: April 30, 2024                         Respectfully submitted,
Wilmington, Delaware

                                              */s/ Gregory J. Flasser*
                                              Christopher M. Samis (No. 4909)
                                              L. Katherine Good (No. 5101)
                                              Gregory J. Flasser (No. 6154)
                                              Levi Akkerman (No. 7015)
                                              **POTTER ANDERSON & CORROON LLP**
                                              1313 N. Market Street, 6th Floor
                                              Wilmington, Delaware 19801
                                              Telephone: (302) 984-6000
                                              Facsimile:  (302) 658-1192
                                              Email:  csamis@potteranderson.com
                                                      kgood@potteranderson.com
                                                      gflasser@potteranderson.com
                                                      lakkerman@potteranderson.com

                                              *Counsel to the Foreign Representative*

11473038v.9