**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| Canadian Overseas Petroleum Limited, *et al.,*[1] | Case No. 24-10376 (JTD) |
| Debtors in a foreign proceeding. | (Jointly Administered) |

**DECLARATION OF PETER KRAVITZ IN SUPPORT OF THE MOTION OF
THE FOREIGN REPRESENTATIVE FOR ENTRY OF AN ORDER (I) RECOGNIZING
AND ENFORCING THE CCAA VESTING ORDER, (II) APPROVING THE SALE
OF SUBSTANTIALLY ALL OF THE DEBTORS' INTERESTS FREE AND
CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (III) CONDITIONALLY
APPROVING DISMISSAL PROCEDURES FOR DEBTOR SOUTHWESTERN
PRODUCTION CORPORATION; AND (IV) GRANTING RELATED RELIEF**

I, Peter Kravitz, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the law of the United States, as follows:

1.      Between January 18, 2024 and the entry of the Initial Order (defined below) on March 11, 2024, I served as the Interim Chief Executive Officer ("Interim CEO") of Canadian Overseas Petroleum Limited ("COPL"), which is the duly appointed foreign representative ("Foreign Representative") of the above captioned debtors (collectively, the "Debtors" and together with those other Non-Filing Affiliates (defined below) attached hereto, the "COPL Group") in Canadian proceedings (the "Canadian Proceedings") commenced under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), pending before the Court of King's Bench of Alberta in Calgary (the "Canadian Court"). I

---

[1]  The Debtors in these chapter 15 proceedings, together with the last four digits of their business identification numbers are: Canadian Overseas Petroleum Limited (8749); COPL Technical Services Limited (1656); Canadian Overseas Petroleum (Ontario) Limited (8319); Canadian Overseas Petroleum (UK) Limited (7063); Canadian Overseas Petroleum (Bermuda Holdings) Limited (N/A); Canadian Overseas Petroleum (Bermuda) Limited (N/A); COPL America Holding Inc. (1334); COPL America Inc. (9018); Atomic Oil and Gas LLC (8233); Southwestern Production Corporation (8694); and Pipeco LLC (0925).  The location of the Debtors' headquarters and the Debtors' duly appointed foreign representative is 715 5 Avenue SW, Suite 3200, Calgary, Alberta T2P 2X6, Canada.

currently serve as the Chief Restructuring Officer ("CRO") of the COPL Group and am authorized to provide this declaration on behalf of the Foreign Representative and each of the Debtors.

2.      I was appointed as CRO of the COPL Group on December 29, 2023.  I am also a founding principal at Province, LLC, as well as Province Fiduciary Services, LLC (collectively, "Province").  Province is a leading restructuring advisory firm.  During my time at Province, I have served in a multitude of roles, including as chief restructuring officer to a number of distressed companies, advisor to and member of bankruptcy oversight, equity, and creditor committees, as a Chapter 11 Liquidating Trustee and Plan Administrator, and as a member of numerous boards of directors.  In my capacity as CRO and Interim CEO of the COPL Group, I have become familiar with the business and affairs of the Debtors and have relied upon the books and records of COPL and my personal experiences with the Debtors.  As such, I have personal knowledge of the matters set forth herein and, if called as a witness, I could and would testify thereto.  Where I have relied on other sources of information, I have so stated, and I believe them to be true and accurate.  In preparing this declaration (this "Declaration"), I have also consulted with members of the senior management teams of the COPL Group and the Debtors' financial and legal advisors.  The Debtors do not waive or intend to waive any applicable privilege by any statement herein.

3.      I respectfully submit this Declaration in support of the *Motion of the Foreign Representative for Entry of an Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially all of the Debtors' Interests Free and Clear of Liens, Claims, and Encumbrances, (III) Conditionally Approving Dismissal Procedures for Debtor*

*Southwestern Production Corporation; and (IV) Granting Related Relief* (the "<u>Vesting Recognition Motion</u>") filed concurrently herewith.[2]

4.    Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 15 Cases is set forth in detail in the *Declaration of Peter Kravitz in Support of the Debtors' Verified Petition for (I) Recognition of Foreign Main Proceedings, or, in the Alternative, Foreign Non-Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 11] (the "<u>Kravitz Declaration</u>"), which is incorporated by reference herein.

## I.    Background of the Debtors' Activities Following the Comeback Hearing

### A.    The Canadian Proceedings

5.    On March 11, 2024, the Canadian Court entered an initial order (the "<u>Initial Order</u>"),[3] *inter alia*, (a) declaring that the Debtors are companies to which the CCAA applies; (b) appointing KSV Restructuring Inc. as the Debtors' Monitor in the Canadian Proceedings; (c) granting a stay of proceedings in respect of the Debtors up to and including March 18, 2024; (d) extending the stay of proceedings to the Non-Filing Affiliates; (e) authorizing the Debtors to obtain and borrow under a senior secured, super priority loan (the "<u>DIP Loan</u>"), with borrowings not to exceed US $1.5 million and, to the extent drawn either in whole or in part, a corresponding charge in favour of the DIP Lender; (f) granting a charge as security for the respective fees and disbursements of counsel to the Debtors, the Monitor and the Monitor's Counsel, and Province relating to services rendered in respect of the Debtors; (g) granting a charge in favor of the directors

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Vesting Recognition Motion, the Kravitz SISP Declaration (defined below), or the SISP Order (defined below), as applicable.

[3]  A certified copy of the Initial Order is attached as <u>Exhibit 1</u> to the Provisional Relief Order (defined below).

and officers of the Debtors; and (h) granting a charge in favor of the CRO to secure its fees and disbursements.

6.      Since the Initial Order was granted by the Canadian Court, the Debtors, in close consultation and with the assistance of the Monitor, have been working in good faith and with due diligence to:

> (a) stabilize the COPL Group's business and operations as part of the Canadian Proceedings;
>
> (b) advise its stakeholders of the granting of the Initial Order;
>
> (c) commence these Chapter 15 Cases;
>
> (d) continue to advance discussions with the Lender and DIP Lender regarding the Purchase Agreement; and
>
> (e) respond to certain employee, shareholder, and vendor inquiries regarding the Canadian Proceedings and these Chapter 15 Cases.

7.      More specifically, the Debtors have conducted a meeting with the COPL and COPL America finance teams to discuss the consolidated management of DIP funds and identification of critical accounts payable.

8.      I have also responded to inbound shareholder emails received since the issuance of the Initial Order, including several emails from retail investors regarding allegations of prior short selling by a third-party that is not the Lender, DIP Lender, nor Stalking Horse Bidder.

9.      On March 11, 2024, COPL issued a press release announcing that it had commenced the Canadian Proceedings and had obtained the Initial Order.  COPL also requested a suspension of trading in COPL's common shares on both the London Stock Exchange ("LSE") and the Canadian Securities Exchange ("CSE").  The UK securities regulator confirmed that the shares of COPL were suspended on the LSE.  To date, the CSE has not delisted or suspended trading of COPL's common shares on the CSE.

10.     Further, in accordance with the Initial Order:

(a) On March 11, 2024, the Monitor posted the Initial Order and related application materials on the Monitor's website: http://www.ksvadvisory.com/experience/case/canadian-overseas-petroleum;

(b) On March 14, 2024, the Monitor issued a notice to creditors of the Debtors, advising creditors of the commencement of the Canadian Proceedings, the issuance of the Initial Order, and the use of the Monitor's website to access information relating to the Canadian Proceedings;

(c) the Monitor published a notice in the *New York Times*, the *Calgary Herald* and the *Globe and Mail* containing the information prescribed under the CCAA on March 19, 2024; and

(d) the Monitor provided notice of the Canadian Proceedings to the Non-Filing Affiliates.

11.     On March 19, 2024, after the comeback hearing (the "Comeback Hearing") the Canadian Court granted the *Amended and Restated Initial Order* (the "ARIO"), which approved, among other things, the Debtors' entry into the RSA, as well as the SISP Order,[4] which, among other things, approved the entry into the Purchase Agreement subject to the terms therein.

12.     Since the Comeback Hearing, the Debtors' activities have included:

(a) Carrying out the terms of the SISP pursuant to the SISP Order (discussed in greater detail below), including the marketing of the Debtors' business and property, the preparation of the teaser letters and the Confidential Information Memorandum ("CIM"), the negotiation of non-disclosure agreements ("NDA") with potential bidders, preparing a virtual data room for potential bidders, attending to potential bidder inquiries, as well as the negotiation and execution of the Purchase Agreement;

(b) maintaining the daily ordinary course operations of the Debtors' business, with no service interruptions; and

(c) maintaining daily liquidity and cash flow forecasts, and budget variances.

---

[4] A certified copy of the SISP Order is attached as Exhibit 1 to the Proposed Order granting the SISP Recognition Motion.

13.    In addition, the Debtors have engaged with certain shareholders of COPL, including members of a group of COPL shareholders identifying themselves as the COPL Action Group (the "CAG") and facilitating their participation in the SISP, as described below.

14.    On April 24, 2024, the Canadian Court granted the *Approval and Vesting Order* (the "CCAA Vesting Order"), which approved, among other things, the Transaction with the Stalking Horse Purchaser under the terms of the Transaction Documents.

**B.    The Chapter 15 Cases**

15.    On March 11, 2024, the Foreign Representative commenced these cases (the "Chapter 15 Cases") with the United States Bankruptcy Court for the District of Delaware (the "Court") seeking the recognition of the Canadian Proceedings under chapter 15 of Title 11 of the U.S. Bankruptcy Code.

16.    On March 12, 2024, the Court granted the *Order Granting Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* [Docket No. 28] (the "Provisional Relief Order").

17.    On March 21, 2024, the Foreign Representative filed the SISP Recognition Motion in the Chapter 15 Cases seeking recognition and enforcement of the SISP Order, which approves, among other things:

(a)    the Sale Procedures and implementation thereof;

(b)    the Debtors' entry into the Purchase Agreement, substantially on the terms set forth in the RSA; and

(c)    the Break-Up Fee (defined below).

18.    On April 2, 2024, the Foreign Representative filed the *Declaration of Peter Kravitz in Support of the Motion of the Foreign Representative for Entry of an Order (I) Recognizing and*

6

*Enforcing the SISP Order and (II) Granting Related Relief* [Docket No. 35] (the "<u>Kravitz SISP Declaration</u>").

19.     On April 8, 2024, this Court entered an order granting the relief requested in the SISP Recognition Motion (the "<u>SISP Recognition Order</u>").

**C.     The SISP Process**

20.     As discussed in the SISP Recognition Motion and the Kravitz SISP Declaration, the SISP, backstopped by the Staking Horse Bid, was developed by the Debtors in consultation with Province and the Monitor to provide a fair and reasonable process to canvass the market for interest in the COPL Group's business or assets, while providing stakeholders with the certainty of a "floor" bid that would see the Debtors' business continue as a going concern.  Since the SISP Order was issued on March 19, 2024, the Debtors have conducted the SISP with the assistance of Province, under the supervision of the Monitor, and in accordance with the SISP Order.

21.     The terms of the SISP are comprehensively summarized in SISP Recognition Motion.  The following table sets out the key processes and dates as set out in the SISP, approved by the SISP Order, and recognized in this Court through the SISP Recognition Order.

| SISP Process | Deadline |
|---|---|
| Court approval of SISP and authorizing the applicable members of the COPL Group to enter into the Purchase Agreement, and commencement by COPL Entities of solicitation process | March 19, 2024 |
| Deadline to submit letter of intent | April 17, 2024 at 11:59 p.m. MT (the "<u>LOI Deadline</u>") |
| Deadline to submit a Qualified Bid | May 2, 2024 at 11:59 p.m. MT |
| Deadline to determine whether a bid is a Qualified Bid and, if applicable, to notify those parties who submitted a Qualified Bid of the Auction | May 6, 2024 at 5:00 p.m. MT |
| The COPL Entities to hold Auction | May 8, 2024 at 10:00 a.m. MT |

| SISP Process | Deadline |
|---|---|
| Implementation Order | If no LOI is submitted, by no later than 9 days after the LOI Deadline subject to Court availability.<br><br>If there is no Auction, by no later than 9 days after the Qualified Bid Deadline, subject to Court availability.<br><br>If there is an Auction, by no later than 9 days after completion of the Auction, subject to Court availability. |

22.     Promptly following the granting of the SISP Order, the Debtors reached out to 137 different parties to solicit interest in the SISP.  When reaching out to such parties, the Debtors provided a teaser letter, a copy of the SISP Order and a form of NDA, along with a summary of the proceedings and link to the Monitor's website.  Potential bidders were identified by the Debtors and Province, in consultation with the Monitor, through:

(a) Extensive research on industry participants, consisting of both financial and strategic parties;

(b) discussions with the Debtors' management and board of directors (the "Board"); and

(c) inbound inquiries, both prior to and during the Canadian Proceedings, received directly through the Monitor.

23.     In addition, on March 21, 2024, the Debtors issued a press release announcing that the SISP Order had been granted, and that bids to purchase the business and/or assets of the COPL Group were being solicited.  The press release also included a link to the Monitor's website, where all court orders and related materials could be found.

24.     Ultimately, four interested parties executed a form of NDA.  Including the Stalking Horse Purchaser, five parties were provided with access to a virtual data room, which among other information, included the CIM.

25.     Province, in coordination with the Debtors, responded to diligence request lists from three parties engaged in the process.  These requests centered around production data, land and well files, financial data, and environmental testing results.  John Roche, a member of Province's team with executive experience in the oil and gas industry, assisted with responses to diligence items, in addition to the buildout of the CIM, buildout of the target list, and outreach strategy for various potential purchasers.  Additionally, the Debtors and Province arranged for two parties to take site visits, consisting of one day in the corporate office location and one day in the Wyoming field.  Both site visits were successfully completed during the week of April 8, 2024. Province also held virtual calls with management and providers of reservoir management consulting services.

26.     In addition, the Debtors also facilitated the participation of members of the CAG in the SISP.  Prior to the application for the SISP Order, an individual identifying himself as a representative of the CAG and as one of six leaders of same (the "CAG Representative") contacted the Canadian Court and the Monitor with respect to the SISP Order.  I understand that the Monitor recommended that the CAG Representative retain counsel.  The CAG Representative did not appear at the Comeback Hearing, nor did any counsel representing the CAG Representative or the CAG.  On April 2, 2024, the CAG Representative contacted the Monitor and advised that "we now wish to enter into the bidding process."  Following this, the Debtors provided the CAG Representative with the teaser, form of NDA and final SISP Order, and have responded to inquiries from the CAG Representative.  I understand that the CAG maintains a website, as well as a social media presence on Facebook and on X (formerly Twitter), where the CAG provides updates with respect to the CCAA Proceedings, including information pertaining to the SISP.  On a social media post dated March 18, 2024 (after service of the application for the SISP Order but prior to the

9

granting of same), the CAG stated that they were in the process of contacting potential bidders who may be interested in participating in the bidding process.

27.     Throughout the implementation of the SISP, the Monitor and the Board have provided meaningful assistance and oversight to the Debtors.  The Monitor and the Board have assisted with the crafting of the Debtors' outreach strategy, the preparation of the teaser letter and CIM, and the buildout of the target outreach list.  The Monitor has also coordinated with Province on outreach and joined in discussions with certain potential bidders, as applicable.

28.     The CIM was materially prepared by Province, with meaningful assistance from COPL management and the Monitor.  No drafts of the CIM were shared with the Stalking Horse Bidder, nor any other party in interest, until the final version was uploaded to the virtual data room on March 22, 2024, where it was made available to all potential bidders who had executed an NDA.

29.     The SISP provides that if, by April 17, 2024, no LOIs are received reflecting a reasonable prospect of culminating in a Qualified Bid, as determined by the Debtors in consultation with the Monitor and the Consulting Lenders, the SISP shall be deemed to be terminated and the Stalking Horse Transaction shall be the Successful Bid.

30.     Despite the Debtors' considerable efforts, with ongoing support from the Monitor, the Board and Province, the Debtors did not receive any LOIs from potential bidders as of the LOI Deadline.  No LOI was received from the CAG or parties affiliated with the CAG.  Therefore, in accordance with the terms of the SISP, following the LOI Deadline, the Stalking Horse Bid was declared as the Successful Bid and the SISP was terminated.

11460256v.5

II.     **The Purchase Agreement.**

31.     In accordance with the terms of the SISP, on April 8, 2024, the Debtors and the Stalking Horse Purchaser entered into the Purchase Agreement providing for the purchase of substantially all of the Debtors' assets by the Stalking Horse Purchaser (the "Transaction").  As provided for in the SISP Order, the terms of the Purchase Agreement are substantially the same as the terms set out in the Restructuring Term Sheet which is attached to the RSA.

32.     Pursuant to the SISP, on April 9, 2024 the Purchase Agreement was served on the service list maintained in the Canadian Proceedings, posted on the Monitor's website, and provided to potential bidders who had executed an NDA via the virtual data room.

33.     The Transaction contemplated in the Purchase Agreement is the only executable transaction available following a thorough canvassing of the market pursuant to the SISP. The Purchase Agreement will ensure that the Debtors' enterprise continues as a going concern for the benefit of a broad array of stakeholders, including the Debtors' creditors, commercial partners, vendors, and applicable employees.

34.     The key commercial terms of the Purchase Agreement include the following:

(a) A purchase price comprised of:

    i. An amount equal to the outstanding obligation owing pursuant to the DIP and

    ii. the assumption of the Assumed Liabilities (defined below).

(b) in accordance with the CCAA Vesting Order and the Implementation Steps (defined below) to be agreed to by the parties, the Stalking Horse Purchaser shall purchase from the Debtors, free and clear of all encumbrances, other than the Permitted Encumbrances (defined below), all of the "Purchased Assets", which are defined as follows (except to the extent that any of the following constitutes Excluded Assets (as defined below)):

    i. all Hydrocarbon leases (and all leasehold estates created thereby), subleases, mineral fee interests, working interests, overriding royalties, production payments, net profits interests, non-participating royalty

interests, non-participating mineral interests, carried interests, options, rights to Hydrocarbons in place, and all other Hydrocarbon interests of any kind or character derived therefrom whether producing or non-producing, in each case, located within the Sale Area, (the "<u>Leases</u>"), together with all rights, privileges, benefits and powers conferred upon the Debtors as the holders of the Leases with respect to the use and occupation of the surface of the lands covered thereby, and together with any and all rights, titles and interests of the Debtors in and to any units or pooling arrangements (including statutory forced pooling orders) wherein all or any part of the Leases are pooled, communitized or unitized, (the "<u>Units</u>"), and including all interests of the Debtors derived from the Leases in production of Hydrocarbons from any such Unit, whether such Unit production of Hydrocarbons comes from Wells located on or off of a Lease;

ii.   any and all Hydrocarbon, CO2, injection and disposal wells located on or under the Leases or the Units (whether or not completed), whether such wells are producing, shut-in or abandoned (the "<u>Wells</u>", and collectively with the Leases and Units, the "<u>Properties</u>", and each individually a "<u>Property</u>");

iii.  all equipment, gathering systems, pipelines, flow lines, water lines, machinery, fixtures, improvements and other real, personal and mixed property, operational or nonoperational that is located on the lands within the Sale Area or otherwise used in connection with the Properties or the other Purchased Assets, including well equipment, casing, tubing, pumps, motors, machinery, rods, tanks, tank batteries, pipes, compressors, meters, separators, heaters, treaters, boilers, fixtures, structures, materials and other items and appurtenances relating to or used in connection with the ownership or operation of the Properties or the other Purchased Assets, including certain of the midstream and gathering facilities (collectively, the "<u>Personal Property</u>");

iv.   to the extent assignable, all Permits relating to the ownership or operation of the Properties and Personal Property;

v.    to the extent assignable, all of the easements, rights-of-way, surface fee interests, surface leases, surface use agreements and other surface usage rights existing as of the Closing Date to the extent used in connection with the ownership or operation of the Properties or other Purchased Assets;

vi.   all material pipeline or well imbalances associated with the Properties;

vii.  all Assigned Contracts;

12

viii. all radio and communication towers, personal computers, SCADA systems and wellhead communications systems and other equipment and automation systems and related telemetry on wells, any central SCADA server and all software associated with any SCADA system (including any network equipment and associated peripherals), all radio and telephone equipment and all licenses relating thereto, in each case that are used in connection with the operation of the Properties or other Purchased Assets;

ix. all offices, warehouses, laydown yards and other similar assets located in the Sale Area (including any owned or leased real or personal property relating thereto);

x. the Records;

xi. a vehicle;

xii. all Hydrocarbons produced from or allocated to the Properties on and after the Effective Time and all production proceeds attributable thereto;

xiii. all rights, claims and causes of action (including all audit rights, rights of indemnity, set-off or refunds and any and all rights and interests of the Debtors under any policy or agreement of insurance) of the Debtors to the extent (and only to the extent) such rights, claims or causes of action relate to any of the Assumed Obligations;

xiv. any and all actual or potential avoidance, fraudulent transfer, preference, recovery, subordination, claim, action, proceeding or remedy that may be brought by or on behalf of the Debtors' bankruptcy estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including under sections 502, 510, 542, 544, 545, 547–553, and 724(a) of the Bankruptcy Code or under other similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws solely to the extent relating to or arising against suppliers, vendors, merchants, manufacturers, counterparties to leases, counterparties to licenses and counterparties to any Contract or Lease arising out of or relating to events occurring on or prior to the Closing Date or any of the Purchased Assets or Assumed Liabilities; and

xv. to the extent the Purchasers acquire the SWP Interests at Closing pursuant to the Equity Purchase Option (defined below) as set forth in Section 7.11 of the Purchase Agreement, the SWP Interests.

35.    Further details regarding the Purchase Agreement and the Transaction are as follows:

| Term | Details |
|---|---|
| **Sellers** | The following entities, or a subset thereof: COPL, COPL America Inc., Canadian Overseas Petroleum (Ontario) Limited, COPL Technical Services Limited, SWP, Atomic, and Pipeco (collectively with COPL, the "<u>COPL Entities</u>" and each a "<u>COPL Entity</u>") |
| **Purchasers** | Summit Partners Credit Fund III, L.P., Summit Investors Credit III, LLC, Summit Investors Credit III (UK), L.P. and Summit Investors Credit Offshore Intermediate Fund III, L.P. (the "<u>Purchasers</u>") |
| **Purchase Price** | Credit bid in an amount equal to the outstanding obligations owing pursuant to the DIP; and the assumption of the Assumed Liabilities. |
| **Transaction Structure** | At the Closing and effective as of the Closing Time, the Purchasers shall purchase from the COPL Entities, and the COPL Entities shall sell to the Purchasers, free and clear of all Encumbrances other than the Permitted Encumbrances, the Purchased Assets pursuant to the CCAA Vesting Order and the Implementation Steps. |
| | On or prior to the Closing Date, the COPL Entities shall effect the transaction steps and pre-closing reorganization (collectively, the "<u>Implementation Steps</u>") to be agreed upon by the COPL Entities and the Purchasers, each acting reasonably, at least 10 days prior to the Closing Date (or such later date as the Parties may agree in writing). Without limiting the generality of the foregoing, the Implementation Steps may include, without limitation, resolving intercompany obligations, the formation of new entities required to implement the transactions contemplated by the Purchase Agreement in a tax efficient manner and transfers of equity interests in the Debtors. |
| | The Implementation Steps shall occur, and be deemed to have occurred in the order and manner to be set out therein. |
| **Assigned Contracts and Leases** | Subject to the terms and conditions of the Stalking Horse Purchase Agreement, at the Closing Time, the COPL Entities shall assign to the Purchasers all of the COPL Entities' rights, benefits and interests in and to any Assigned Contracts and Leases, and the Purchasers shall, on the terms and subject to the conditions set forth in such Assigned Contracts and Leases, assume the obligations and liabilities of the COPL Entities under such Assigned Contracts and Leases at, and arising after, the Closing (including the Cure Costs and Post-Filing Costs). |

11460256v.5

| Term | Details |
|------|---------|
| | Notwithstanding the foregoing, the Stalking Horse Purchase Agreement and any document delivered thereunder shall not constitute an assignment or an attempted assignment of any Purchased Asset contemplated to be assigned to the Purchasers that is not assignable without the Consent and Approval of a third party unless (i) such Consent and Approval has been obtained or (ii) the assignment has been ordered by the CCAA Court and, if so required, recognized by the U.S. Court. |
| | To the extent any Consent and Approval necessary for the assignment of any Contract or Leaser to the Purchasers is not obtained prior to the application for the AVO, the COPL Entities shall bring an application to the CCAA Court for approval of the Assignment Order and, if required, to the U.S. Court. |
| **Excluded Assets** | The Purchased Assets shall not include any of the following assets or any other assets set forth in Schedule 2.3 of the Disclosure Letter, which Schedule may be modified as agreed upon by the COPL Entities and the Purchasers, each acting reasonably, at least 3 Business Days prior to the Closing Date (or such later date as the Parties may agree in writing): |
| | Income tax returns of the COPL Entities; |
| | Books and records and other documents, in each case, related solely to any of the Excluded Liabilities; |
| | Excluded Contracts; |
| | All communications, information or records, written or oral, to the extent related to (i) the transactions contemplated by the Purchase Agreement, (ii) the bids submitted by other prospective purchasers of the Purchased Assets or any other interest in the Purchased Assets; (iii) any Excluded Asset; and (iv) any Excluded Liability; |
| | Escrowed cash in the amount of $500,000 to fund professional fee retainers incurred in connection with post-Closing matters and/or to wind-up and terminate the CCAA Proceedings and the Chapter 15 Case, and any further proceedings involving the COPL Entities; |
| | Personal information that cannot be transferred without violating Applicable Law and any information protected by attorney-client privilege or work-product doctrine; |
| | All Hedge Contracts; and |

| Term | Details |
|---|---|
| | All claims and/or Causes of Action to the extent arising from or related to the Excluded Assets or Excluded Liabilities. |
| **Assumed Liabilities** | All debts, liabilities and obligations under the Assigned Contracts and Leases (to the extent assigned or transferred to the Purchaser on the Closing) that are not Excluded Contracts.<br><br>All debts, liabilities and obligations (including Environmental Liabilities) arising from the ownership, use or operation on or after the Closing of the Purchased Assets transferred to the Purchasers on the Closing.<br><br>All Asset Taxes allocated to the Purchasers pursuant to Section 7.6 of the Purchase Agreement (being all Asset Taxes attributable to any Tax period beginning on or after the Effective Time and the portion of any Straddle Period beginning on the Effective Time).<br><br>Amounts outstanding under the Credit Agreement. |
| **Excluded Liabilities** | Except as expressly assumed pursuant to or specifically contemplated by Section 2.4 of the Purchase Agreement, the Purchasers shall not assume and shall not be liable, directly or indirectly, or otherwise responsible for any claims, debts, obligations, or Liabilities (including Environmental Liabilities) of the COPL Entities or any predecessors of the COPL Entities or otherwise with respect to the Business or Purchased Assets, of any kind or nature (collectively, the "Excluded Liabilities"), all of which Excluded Liabilities shall be retained by, and be the sole liability and obligation of, the COPL Entities and which further include the following except as expressly assumed pursuant to or specifically contemplated by Section 2.4 of the Purchase Agreement:<br><br>(a) all Liabilities (including Environmental Liabilities) arising out of the ownership, use or operation of the Purchased Assets prior to the Effective Time; provided that such Liabilities with respect to Environmental Liabilities shall only be Excluded Liabilities to the extent permitted by Applicable Law pursuant to the laws of the state where the applicable Purchased Assets are located;<br><br>(b) except with respect to the Credit Agreement, all indebtedness of the COPL Entities;<br><br>(c) all Liabilities of the COPL Entities to any owner or former owner of capital stock or warrants, or holder of indebtedness for borrowed money; |

| Term | Details |
|------|---------|
| | (d) all (i) Asset Taxes allocated to the COPL Entities pursuant to Section 7.6 of the Purchase Agreement (being all Asset Taxes attributable to any Tax period ending prior to the Effective Time and the portion of any Straddle Period ending immediately prior to the Effective Time), (ii) income, franchise or similar Taxes imposed on any COPL Entity (or any of their Affiliates); (iii) Taxes attributable to the Excluded Assets and (iv) other Taxes relating to the acquisition, ownership or operation of the Purchased Assets or the production of Hydrocarbons or the receipt of proceeds therefrom that are attributable to any Tax period (or portion thereof) ending prior to the Effective Time; |
| | (e) all guarantees of third party obligations by the COPL Entities and reimbursement obligations to guarantors of the COPL Entities' obligations or under letters of credit; |
| | (f) the Causes of Action set forth on (or that should have been set forth on) Schedule 4.6 of the Disclosure Letter and any other Causes of Action against a COPL Entity or any of its properties asserted on or prior to the Closing Date; |
| | (g) all Liabilities at any time relating to or arising out of the employment or service with or termination of employment or service from the COPL Entities or any of its Affiliates of any Person (including any employee who is employed with Purchasers or its Affiliates after Closing), including any severance or incentive compensation, bonus payments, retention payments, change of control payments or similar payments, whether or not such Liabilities, obligations or commitments arise or vest (whether fully or partially) as a result of the transactions contemplated by the Purchase Agreement and whether or not immediately due and payable upon the consummation of the transactions contemplated by the Purchase Agreement; |
| | (h) all Liabilities at any time arising out of, or relating to, the Worker Adjustment and Retraining Notification (WARN) Act or any similar Applicable Law as it relates to Business Employees terminated by the COPL Entities or their Affiliates; |
| | (i) all Liabilities at any time arising out of, or relating to, any collective bargaining agreement of which any of the COPL Entities or any of their Affiliates is a party; |
| | (j) all Liabilities (including Environmental Liabilities) related to arising out of the ownership, use or operation of the Excluded Assets; provided that such Liabilities shall only be |

| Term | Details |
|------|---------|
| | Excluded Liabilities to the extent permitted by Applicable Law pursuant to the laws of the state where the applicable Excluded Assets are located and solely limited to Environmental Liabilities for Purchased Assets that are designated as Excluded Assets after the date of the Purchase Agreement; and<br><br>(k) all intercompany obligations and balances which do not continue as Assumed Liabilities pursuant to the Implementation Steps. |
| **Employees** | The Purchasers shall, in their sole discretion, have the option, but not the obligation, to offer employment as of the Closing Date to such Business Employees as it determines (the "<u>Offered Employees</u>") on terms and conditions to be determined in the Purchaser's sole discretion.<br><br>Each Offered Employee who accepts the Purchasers' offer of employment and actually commences employment with the Purchaser shall be referred to as a "<u>Continuing Employee</u>". |
| **Release by the COPL Entities** | Except in connection with any obligations of each Purchaser and the Monitor contained in the Purchase Agreement or any Closing Documents, effective as of the Closing, and subject to the Initial CCAA Order, the COPL Entities release and forever discharge each Purchaser, the Credit Facility Agent, the CRO, the Monitor and their respective Affiliates, and each of their respective successors and assigns, and all officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them, from any and all actual or potential Released Claims which such Person had, has or may have in the future to the extent relating to the Purchased Assets, the Assumed Liabilities, the Excluded Assets or the Excluded Liabilities, save and except for Released Claims arising out of fraud or willful misconduct. |
| **Purchase of Equity** | No later than two Business Days prior to the scheduled Closing Date, the Purchasers, in their sole discretion, may elect by written notice to the COPL Entities to acquire one hundred percent (100%) of the equity of SWP (the "<u>Equity Purchase Option</u>") for no additional consideration. If the Purchasers elect the Equity Purchase Option, the applicable COPL Entities shall execute and deliver a mutually agreeable assignment of all of the equity interests of SWP (the "<u>SWP Interests</u>") to the Purchasers (or their designated affiliates) at Closing and any Purchased Assets owned by SWP shall not be conveyed at Closing under the Assignment. For the avoidance of doubt, unless the Purchasers affirmatively elect the Equity Purchase Option, the |

| Term | Details |
|---|---|
| | Purchased Assets of SWP (rather than the SWP Interests) will be acquired at Closing pursuant to the Purchase Agreement. |
| **Closing Date** | The Closing shall take place remotely and electronically (a) on **May 31, 2024**; provided that Purchasers may elect, at least two Business Days prior to May 31, 2024 with written notice to the COPL Entities, to extend such date (to a date not later than the Outside Date) if Purchasers or their designated Affiliate(s) do not have the appropriate approvals or requirements in place from a Governmental Authority to take assignment of the Purchased Assets; (b) if all conditions to Closing under Article 6 of the Purchase Agreement have not yet been satisfied or waived on such date, on the first day of the following month (or, if not a Business Day, the next Business Day) after the conditions set forth in Article 6 of the Purchase Agreement have been satisfied or waived, other than the conditions set forth in Article 6 of the Purchase Agreement that by their terms are to be satisfied or waived (to the extent permitted by Applicable Law) at the Closing, but subject to the satisfaction or waiver (to the extent permitted by Applicable Law) of such condition at the Closing; provided that, the Purchasers may (in their sole discretion) elect to close earlier than first day of the month if the conditions set forth in Article 6 of the Purchase Agreement have been satisfied or waived; or (c) on such other date as the Parties may agree in writing; provided that, in any case, if there is to be a Closing hereunder, then the Closing Date shall be no later than the Outside Date (i.e., **August 31, 2024**). |

36.     As discussed above, there was simply no other viable alternative transaction available to the Debtors after canvassing the market.  Any other structure risks the Debtors' businesses going-concern value and exposes the Debtors to significant risk, regulatory uncertainty, and delays.  Such risk and uncertainty is likely to be reflected by any purchaser in the value offered for the Debtors' businesses as the risks outlined above could have dramatic impacts on the Debtors' ability to carry on business and generate revenue for the benefit of their stakeholders, while also delaying the Debtors' emergence from the Canadian Proceedings and these Chapter 15 Cases.  The only going-concern option is the Transaction with the Purchasers under the Purchase Agreement.

37.     In connection with the Transaction, the CCAA Vesting Order approved a release provision in favor of (a) the current and former employees, directors, officers, legal counsel and advisors of the Debtors; (b) the Monitor and its legal counsel; (c) Province, its affiliates and their respecting current and former directors, officers, employees, legal counsel and advisors, including the CRO; and (d) the Purchasers, and their respective affiliates, and each of their respective current and former directors, officers, employees, legal counsel and advisors.  The releases provided in the Purchase Agreement and the CCAA Vesting Order contain carveouts for fraud, willful misconduct, and gross negligence.  Each of the parties receiving a release has made a material contribution to the success of the Debtors' businesses, the restructuring or the Transaction.  The Monitor was supportive of the proposed releases and is of the view that they are consistent with releases granted in recent CCAA proceedings where there is no plan of compromise and arrangement. *See Second Report of the Monitor*, dated April 19, 2024, and attached to the Vesting Recognition Motion as **Exhibit B**, at § 5.0.

38.     I believe the Purchase Price provided in the Purchase Agreement is fair and reasonable.  The Purchase Price was tested in a robust marketing process, was the result of extensive negotiations between the Debtors and their advisors and the Purchaser and its advisors, and provides the highest and otherwise best value to the Debtors and their stakeholders for the Purchased Interests.

39.     I understand that the parties aim to close the Transaction on May 31, 2024.  I believe that expeditious consummation of the Transaction, which is supported by the Debtors' key stakeholders, is critical to preserving the going-concern value of the Debtors' enterprise.

40.     In short, I believe that the proposed structure is necessary and that recognition of the Purchase Agreement, as approved by the CCAA Vesting Order, is in the best interests of the

Debtors and their stakeholders and will preserve and maximize the value of the Debtors'
businesses.  I believe the Purchase Agreement is the best option available to the Debtors under the
circumstances and will ensure the Debtors' enterprise continues as a going concern for the benefit
of a broad array of stakeholders, including the Debtors' customers, vendors, and employees.  Any
other transaction structure that does not enable a timely and efficient closing while achieving these
restructuring objectives would undermine the future viability of the businesses.

41.     I understand that the Monitor is supportive of the Transaction, including its
contemplated structure.

42.     None of the Purchasers are an "insider" or "affiliate" of the Debtors as I understand
the definitions of those terms in the Bankruptcy Code, and no common identity of incorporators,
directors, or stockholders exist between the Purchasers and the Debtors.

43.     Neither I nor the Debtors, nor, to my knowledge, the Purchasers, have engaged in
any collusive or improper conduct, including without limitation any bid-rigging or efforts to
manipulate the sale process under the Purchase Agreement, and to my knowledge, there were no
agreements among potential bidders.  To the best of my knowledge, information, and belief, no
party has engaged in any conduct that would cause or permit the Transaction to be set aside because
of a lack of good faith. I therefore submit that the Transaction has been proposed in good faith.

44.     I believe that the Purchase Agreement is fair and reasonable under the
circumstances, is the result of good-faith, arm's-length negotiations, and is in the best interests of
the Debtors, their creditors, and other stakeholders.  For all of these reasons, I believe this Court
should grant the Motion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated:  April 30, 2024

*/s/ Peter Kravitz*
Name:  Peter Kravitz
Title:   CRO of Canadian Overseas Petroleum Limited

11460256v.5