## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:

GOLI NUTRITION INC., *et al.*,[1]

          Debtors in a Foreign Proceeding.

------------------------------------------------------- x

: Chapter 15

: Case No. 24-10438 (LSS)

: Jointly Administered

**Ref. Nos. 8 & 45**

### PETITIONER'S SUPPLEMENT IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) RECOGNIZING AND ENFORCING THE RVO AND THE ATOS SALE ORDER, (II) APPROVING THE SALE TRANSACTIONS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF

Deloitte Restructuring Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "<u>Petitioner</u>"), as defined by section 101(24) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), of Goli Nutrition Inc., a company incorporated in Québec, Canada ("<u>Goli Canada</u>") and Goli Nutrition Inc., a company incorporated in Delaware ("<u>Goli US</u>," together with Goli Canada, the "<u>Debtors</u>"), hereby files this *Petitioner's Supplement in Support of Motion for Entry of an Order (I) Recognizing and Enforcing the RVO and the Atos Sale Order, (II) Approving the Sale Transactions Free and Clear of Liens, Claims, and Encumbrances, and (III) Granting Related Relief* (the "<u>Supplement</u>")[2] and states as follows:

### EVIDENTIARY SUPPORT

In support of the Supplement, the Petitioner relies upon and incorporates by reference the:

(1) *Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief* [Docket No. 2] (together with the form petitions filed concurrently

---

[1] The Debtors in these Chapter 15 cases are: Goli Canada (as defined herein) and the last 4 digits of its Canadian business number is 0002; and Goli US (as defined herein) and the last 4 digits of its federal tax identification number is 2655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

[2] The Supplement is submitted pursuant to a request made by the Court at the "first day" hearing that took place on March 21, 2024, requesting additional support for approval of the Goli RVO (defined below).

therewith, the "<u>Verified Petition</u>"),[3] (2) *Declaration of Noah Zucker in Support of (A) Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief, (B) Motion for Provisional Relief, and (C) Motion for Order Enforcing CCAA Vesting Orders* [Docket No. 6] (the "<u>Zucker Declaration</u>"), (3) *Petitioner's Motion for Entry of an Order (I) Recognizing and Enforcing the RVO and Atos Sale Order, (II) Approving the Sale Transactions Free and Clear of Liens, Claims, and Encumbrances, and (III) Granting Related Relief* [Docket No. 8] (the "<u>Sale Motion</u>"), (4) *Supplemental Declaration of Noah Zucker in Support of (A) Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief, (B) Motion for Provisional Relief*, filed contemporaneously herewith (the "<u>Supplemental Declaration</u>"); (5) *First Report to the Court Submitted by Deloitte Restructuring Inc. in its Capacity as Proposed Monitor* [Docket. No. 2-4, attached to the Verified Petition as Exhibit D] ("<u>First Report</u>"); (6) *Second Report to the Court Submitted by Deloitte Restructuring, Inc. in its Capacity as Monitor* ("<u>Second Report</u>");[4] and (7) *Approval and Reverse Vesting Order* entered by the Canadian Court on April 9, 2024 ("<u>Goli RVO</u>").[5]

## **INTRODUCTION**

1.     By the Sale Motion, the Petitioner is requesting that this Court recognize and enforce the order entered by the Canadian Court (the Goli RVO) authorizing the sale of Goli Canada through a "reverse vesting order" structure or "<u>RVO</u>." This type of transaction is often used in Canadian insolvency proceedings to implement a sale of a debtor's business as a going

---

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

[4]  A true and correct copy of the Second Report is attached to the Supplemental Declaration as Exhibit B

[5]  A true and correct copy of the Goli RVO is attached to the Supplemental Declaration as Exhibit C.

concern, especially when the debtor is engaged in a highly regulated industry.  As set forth in more detail below, a reverse vesting structure provides the purchaser with the benefits of equity ownership—as the transaction is effectuated through an equity acquisition—while at the same time providing the purchaser with the benefits of a "free and clear" asset sale by "vesting out" certain unwanted liabilities, claims, and unwanted assets.

2.      As described by Justice Penny in the seminal Canadian case *Harte Gold Corp. (Re),* 2022 ONSC 653, a reverse vesting structure is an "innovative" solution that courts may grant where appropriate.[6]  An RVO is a valuable tool in Canadian insolvency proceedings that maximizes value and saves debtors from possible liquidation.  Chief benefits of the RVO structure include the preservation of permits, licenses, authorizations, and tax attributes, which are typically not transferrable or difficult to transfer through a traditional asset sale.[7]  Permits and licenses are often essential in the sale of a business in a highly regulated industry.  Without them, a debtor could not continue as a going concern, and would likely have to be liquidated.  An RVO eliminates this risk and permits the transfer of permits and licenses to a purchaser resulting in an overall increased transaction value for the benefit of all stakeholders.

3.      Here, the circumstances that warrant application of an RVO structure are present. Goli Canada operates in a highly regulated industry.  Thus, a key component of Goli Canada's value stems from its licenses and permits.  To maximize value, the Debtors conducted an exhaustive marketing and sale process over the course of seven months to determine if there was

---

[6] *See also Arrangement relatif à BlackRock Metals Inc.*, 2022 QCCS 2828 (leave to appeal dismissed 2022 QCCA 1073, leave to appeal at the Supreme Court of Canada dismissed 2023 CanLII 36969) ("*BlackRock*") at ¶ 86: "Albeit new, RVOs have been confirmed by the courts as an appropriate way for a debtor to sell its business when the circumstances justify such structure. In particular, CCAA courts have approved RVO structures in several complex mining transactions and have recognized that their benefits, which include maximizing recovery for creditors, importantly limiting delays and transaction costs, and facilitating the preservation of the insolvent business' going concern, justify the use of this innovative restructuring tool.".

[7] *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCA 1488 at para 5.

a path forward that would allow Goli Canada to restructure either through an out-of-court or an in-court process.  The only result of that process was the offer that has culminated in the reverse vesting transaction, which will result in a transfer of Goli Canada's business to the Purchaser[8] as a going-concern entity, with the sale proceeds, unassumed liabilities, and excluded assets being transferred to a newly created "Residual Co."

4.     As described in the Verified Petition and further below, the sale proceeds will be paid to Lenders in accordance with applicable law.  In this instance, the value of Goli Canada, as evidenced by the Purchase Price,[9] is significantly less than the amount of the Lenders' secured claims.  Thus, the only parties potentially impacted by the Debtors' decision to proceed with the RVO transaction instead of a traditional asset sale are the Lenders,[10] and they fully support the sale.  All other creditors are far "out of the money."

5.     Given the risk of losing critical permits and licenses and the time and costs involved trying to reissue them, the Petitioner believes the RVO structure is the preferred way to save Goli Canada as a going concern business, maximize the value of the Debtors' estates, and to avoid a piecemeal liquidation of assets at a fire-sale.  Put simply, the RVO structure maximizes the value received for the assets and facilitates the preservation of Goli Canada's going concern, for the benefit of its vendors, customers, employees, and other stakeholders.

---

[8] Goli Canada entered into the Subscription Agreement with an entity affiliated with a group that includes Group KPS (a healthcare company), Bastion Capital (an investment management firm) and one of the Debtors' founders (collectively, the "Purchaser").

[9] The aggregate consideration payable by the Purchaser for the Subscribed Shares shall be an amount equal to the sum of (i) the Deposit, (ii) the Closing Payment Amount, (iii) the Priority Payments Closing Amount, if any, and (iv) the Professional Costs Budget Amount ("Purchase Price"). In total, the Purchase Price is $27 million, adjusted upwards for the Priority Payments Closing Amount and additional Professional Costs Budget Amounts, as defined and calculated therein.

[10] Goli Canada is the borrower under an amended and restated credit agreement dated September 2, 2022 entered into with Bank of Montreal (in its capacity as lender and administrative agent), National Bank of Canada, Fédération des Caisses Desjardins and HSBC Bank Canada (collectively, the "Lenders").

**FACTUAL AND PROCEDURAL BACKGROUND**

6.      On March 15, 2024, the Debtors commenced a proceeding (the "Canadian Proceedings") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") by filing an application (the "CCAA Initial Application") with the Superior Court of Québec, sitting in the Commercial Division for the district of Montréal (the "Canadian Court"). By the CCAA Initial Application, the Debtors, among other things, indicated they would request (i) entry of the Goli RVO approving the transactions contemplated under the Subscription Agreement, and (ii) entry of the Atos Sale Order approving the Agency Agreement, pursuant to which the Agent will sell the Atos Equipment (collectively, the "Sale Transactions").   In accordance with the CCAA and the procedures of the Canadian Proceedings, notice of the CCAA Initial Application was served upon a limited subset of parties.  *Supplemental Declaration*. ¶ 9.

7.      On March 19, 2024 (the "Petition Date"), the Petitioner filed with this Court verified voluntary petitions for each of the Debtors under Chapter 15 of the Bankruptcy Code. Contemporaneously, the Petitioner filed its *Petitioner's Motion for Entry of an Order Specifying Form and Manner of Service of Notice* [Docket No. 4] ("Notice Motion").

8.      On March 19, 2024, the Petitioner posted the CCAA Initial Application, certain exhibits, the First Report, the Initial Order, and a service list on the Petitioner's website— www.insolvencies.deloitte.ca/goli ("Petitioner's Website"). *Second Report*, ¶ 22.  The Petitioner has also provided a dedicated email address and phone number to allow stakeholders to contact the Petitioner directly with questions concerning the CCAA Proceedings. *Id*.

9.      On March 22 and March 29, 2024, the Petitioner published notice of the Initial Order in La Presse+ (French version), the National Post, and the Wall Street Journal, National Edition. *Second Report*, ¶ 29.

5

10.     On or around March 22, 2024, the Canadian Court set a hearing to consider the Goli RVO and the Agency Agreement ("Transaction Approval Hearing") for April 9, 2024.[11] *Second Report*, ¶ 4; *Supplemental Declaration*, ¶ 10.

11.     On March 22, 2024, this Court held a status conference with respect to the Notice Motion and subsequently issued the *Order Specifying the Form and Manner of Service of Notice* [Docket No. 35] ("Notice Order").    Among other things, the Notice Order identified certain documents (the "Notice Package") that are to be served on the Notice Parties[12] via United States or Canadian Mail.  The Notice Package includes:

(a)     the *Notice Of (I) Filing Of (A) Petitions Pursuant To Chapter 15 Of The Bankruptcy Code And (B) Petitioner's Sale Motion; (II) Entry Of Provisional Relief Order; (III) Deadline To Object To Entry Of Recognition Order And Sale Order; And (IV) Hearing For Court To Consider Chapter 15 Petitions, Sale Motion, Entry Of Recognition Order And Sale Order*, as approved by this Court;

(b)     the *Order Granting Provisional Relief Pursuant To Bankruptcy Code Section 1519*, as entered by this Court on March 22, 2024 [Docket No. 31];

(c)     the *Petitioner's Motion For Entry Of An Order (I) Recognizing And Enforcing The RVO And The Atos Sale Order, (II) Approving The Sale Transactions Free And Clear Of Liens, Claims, And Encumbrances, And (III) Granting Related Relief*, filed in this Court on March 19, 2024 [Docket No. 8];

(d)     the *First Initial Order*, as entered by the Superior Court of Québec, sitting in the Commercial Division for the district of Montréal on March 18, 2024; and

---

[11] The Transaction Approval Hearing was initially intended to go forward on March 27, 2024, but the Debtors in consultation with the Monitor determined that approval of the Sale Transactions should be sought at a later date and was scheduled for April 9, 2024. *Second Report*, ¶ 4.

[12] The following parties or their respective counsel collectively make up the "Notice Parties": (a) all persons or bodies authorized to administer foreign proceedings of the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) all parties to litigation in which any Debtor is a party and that is pending in the United States as of the date that the Chapter 15 Petitions were filed; (d) all secured creditors of the Debtors; (e) all other known creditors of the Debtors; (e) the United States Food and Drug Administration; (f) the Internal Revenue Service (g) the Debtors; and (h) any other party who has requested notice in these Chapter 15 Cases.

(e)     the *Notice to Stakeholders*, setting out: (i) details of the Comeback Hearing and the relief to be sought threat, (ii) a summary of the Sale Transactions, including references to the proposed Goli RVO and the proposed Atos Sale Order, (iii) the available details for the Transaction Approval Hearing and the process for obtaining full hearing details, once determined by the Canadian Court, and (iv) links to the website of the Petitioner, on which relevant proceedings and documents are posted, the permanent Teams links used to attend virtually at hearings before the Canadian Court and a contact email for the representative of the Petitioner.

12.     On March 25 and 26, 2024, the Petitioner served the Notice Package upon the Notice Parties by United States or Canadian Mail, via either two day courier service or first class postage prepaid. *Declaration of Service* [Docket No. 48]. The Petitioner also served the Notice Package via email to those creditors and parties in interest with known email addresses. *Certificate of Service* [Docket No. 42]. As stated in the *Notice to Stakeholders*,[13] in addition to the Notice Package, all documents, relevant pleadings, and notices of hearings are available at the Petitioner's Website. *Second Report*, ¶ 34; *Supplemental Declaration*, ¶ 11.

13.     On April 2, 2024, the Petitioner posted notice of hearing details on the Petitioner's Website in connection with the Transaction Approval Hearing in accordance with the terms of the Initial Order, including relevant objection deadlines and hearing times and location. *Second Report*, ¶ 36.

14.     Following service of the Notice Package, on April 3, 2024, the Petitioner filed the Subscription Agreement and the Agency Agreement in completely unredacted form. [Docket No. 50]; *Second Report*, ¶ 35. The Petitioner contemporaneously posted the unredacted Subscription Agreement and Agency Agreement on the Petitioner's Website. *Second Report*, ¶ 35; *Supplemental Declaration*, ¶ 12. Following filing of the unredacted agreements, on April 10,

---

[13] The *Notice to Stakeholders* served as notice to creditors contemplated under section 23 (1) (ii) (B) of the CCAA. *Second Report*, ¶ 33.

2024, the Petitioner served the unredacted Subscription Agreement and unredacted Agency Agreement on all Notice Parties by United States or Canadian Mail via either two day-courier or first class postage prepaid. *Supplemental Declaration*, ¶ 12. The service of the Notice Package and subsequent service of unredacted versions of the Subscription Agreement and Agency Agreement was much broader than the service required under the CCAA. *Id.*

## AN RVO TRANSACTION IS APPROPRIATE

### A.    The Structure of an RVO

15.    Under the CCAA, a court may approve the sale of a debtor's assets, including in the absence of a plan of arrangement.[14] An asset sale is typically completed through a sale and investment solicitation process or "SISP" that markets the debtor's assets and vets potential purchasers. Once a SISP identifies a purchaser, and an agreement to purchase the assets is negotiated, a debtor seeks approval of an approval and vesting order ("AVO"). An AVO transfers the debtor's assets free and clear to a purchaser leaving behind any excluded assets with any encumbrances that are discharged as against the purchased assets attaching to the proceeds of the sale with the same nature and priority.[15] An AVO, however, does not always maximize the debtor's value.

16.    Companies in highly regulated industries (*e.g.,* food and drug manufacturers) often cannot complete a sale of assets through an AVO without extensive delays linked to re-issuing of necessary licenses, assigning required permits, or gathering the necessary consents and approvals from relevant government entities, agencies, and issuing departments. Indeed, it is often necessary for the purchaser to reapply for these licenses, permits, and approvals altogether with no guarantee

---

[14] CCAA, s 36.

[15] In this regard, an AVO is akin to an order approving an asset sale under section 363 of the Bankruptcy Code.

of success.  The inherent risk of an AVO structure can, therefore, materially depress the value of a debtor's business and assets.  Under these circumstances, a debtor could realize a substantially higher purchase price by implementing a transaction that allows the purchaser to step directly into the debtor's shoes.  An RVO accomplishes this goal.

17.    An RVO is a hybrid asset sale and equity purchase that facilitates the acquisition of shares of a debtor-company while preserving the free and clear transfer of assets.[16]  Instead of acquiring assets, a purchaser acquires shares of the debtor company, which retains all of the assets the purchaser wants to acquire (including key contracts, licenses, and permits).[17]  An RVO transaction will typically proceed as follows:

- The debtor commences a CCAA proceeding in a Canadian Court.

- Following a SISP[18] or other marketing of the debtor's assets, an agreement is reached for the acquisition of shares of the debtor company. The sale transaction contemplates that certain assets and liabilities will be retained and others will be "vested out" of the debtor.

- The debtor seeks approval under the CCAA of the RVO, which vests the excluded assets and liabilities into a new entity, a "ResidualCo."

- Rather than transfer the retained assets to the purchaser, the purchaser acquires newly issued shares of the debtor.

- The CCAA proceeding continues in respect of ResidualCo to realize on vested assets and distribute the proceeds of the RVO transaction.

---

[16] As stated by Chief Justice Marie-Anne Paquette in *BlackRock* at para 85: "RVOs are a fairly new way to achieve the remedial objective of the CCAA: instead of selling the assets of a debtor, a series of transactions will result in i) the purchaser becoming the sole shareholder of a debtor and ii) the unwanted liabilities be vested out to a separate entity, thereby ensuring that the purchaser will not inherit the unwanted liabilities."

[17] Moreover, an RVO structure allows a debtor to implement a restructuring transaction in appropriate circumstances without enduring the cost, delay and risks associated with a plan process.  This is particularly beneficial in circumstances when a debtor has limited funds and the value of the company is eroding.  Moreover, unlike United States Bankruptcy law, the CCAA does not have a similar concept to cram down.  Therefore, out of the money creditors in a CCAA could easily reject a plan that sought to implement this type of transaction, thus putting the debtor's ability to restructure at risk.

[18] The SISP may be conducted in the context of the CCAA proceedings or prior to the commencement of such proceedings, as was the case in the present matter.

- At the conclusion of the CCAA proceeding, ResidualCo is typically placed into bankruptcy.

The effect of the RVO transaction is that (1) the debtor company continues to own the retained assets (in effect, the purchased assets) free and clear of excluded liens and encumbrances, and (2) the debtor company has a new owner.

18.     Importantly, an RVO is subject to review and approval by the Canadian court.  In seeking approval, a debtor must demonstrate the sale transaction is appropriate pursuant to Section 36 of the CCAA and the principles articulated in the seminal case, *Soundair* [1991] OJ No 1137 (QL).  Akin to a sale under Section 363 of the Bankruptcy Code, a sale under the CCAA cannot be approved unless specified criteria are met and appropriate notice has been given.  *Zucker Declaration*. ¶¶ 34, 36.  Creditors and parties in interest are afforded the opportunity to object at the RVO approval hearing. *Supplemental Declaration*, ¶ 16.  Notably, the CCAA does not permit preferential or fraudulent transfers.  *Zucker Declaration*. ¶ 27.  Therefore, the CCAA ensures that fair value is received for the debtor's business and that creditors are not prejudiced by the RVO.

**B.    RVO Transactions have been Vetted and Approved**

19.     Several courts in Canada and the United States have recognized the benefits of the RVO structure and have approved them, both in plenary Canadian insolvency cases and ancillary Chapter 15 cases in the United States.

1.    *Canadian Courts*

20.     In the past years, the Canadian Courts have approved several RVO transactions, including in order to allow for the preservation of licenses that could not otherwise be sold to a prospective purchaser.[19] Examples of significant cases considering RVOs include the following:

---

[19] *Re Green Relief Inc*, 2020 ONSC 6837 (Ont SCJ) (Re Green Relief Inc); *Beleave Inc* (18 September 2020), Toronto CV-20-00642097-00CL (Ont SCJ [Comm List]) Order of Conway J; *Re Tidal Health Solutions Ltd* (20 November 2020), Montreal 500-11-058600-202 (Que SC) Order of Paquette J.

(i)     **Blackrock Metals Inc.**

21.     In *BlackRock Metals*, the Québec Superior Court provided detailed consideration of the legal principles governing RVO transactions.[20] The Court approved the proposed RVO, highlighting in its reasons the appropriateness of this innovative transaction structure in cases "where a traditional sale of assets would lead to uncertainty regarding the transfer of numerous agreements, permits, authorizations and other regulatory approvals that are required for the continuation of a company's business"[21] while noting that BlackRock operated in a "highly regulated mining industry."[22] The Court also considered the criteria for approving releases in the context of an RVO transaction and found that the requested releases met the applicable requirements.[23] Leave to appeal this decision was denied by the Court of Appeal of Québec and the Supreme Court of Canada.

(ii)     **Brunswick Health Group, Inc.:**

22.     In this recent case, the Québec Superior Court again reviewed in detail the legal and jurisdictional basis for granting RVOs and approved an RVO transaction in the restructuring process of medical clinics under the *Bankruptcy and Insolvency Act*.[24] The Court held  that the RVO structure was appropriate "for three reasons: the highly regulated environment, the relationship between the physician and the patient and the confidentiality of the patient records."[25]

---

[20] *BlackRock*, at paras, 85 and following.

[21] *BlackRock*, at para 115.

[22] *BlackRock*, at para 116.

[23] *BlackRock*, at paras 125 and following.

[24] RSC 1985, c B-3.

[25] *Propositon de Brunswick Health Group Inc.*, 2023 QCCS 4643, at para 60.

(iii)    **Nemaska Lithium:**

23.    In *Nemaska Lithium*, the first case where an RVO was challenged, the Québec Superior Court found that approval of the RVO would maximize creditor recovery and would allow for the continuation of the debtor's business as a going concern, as well as the preservation of the debtor's tax attributes and permits.[26] The Court found that the approval of the RVO was the best possible outcome in light of the alternatives.[27] Leave to appeal this landmark decision was also denied by the Court of Appeal of Québec and the Supreme Court of Canada.

(iv)    **Quest University:**

24.    In *Quest University*, in another contested case, the Court confirmed the jurisdiction of a CCAA court to render an RVO and approved an RVO transaction as an alternative to a CCAA a plan of arrangement, notably in light of the fact that the RVO structure allowed for the transfer of Quest's "ability to confer degrees under its statutory authority."[28] The Court of Appeal of British Columbia also denied leave to appeal this decision.[29]

2.    *United States Courts*

(i)    ***In re Just Energy Group, Inc.***

25.    In *In re Just Energy Group, Inc.* No 21-30823 (Bankr. S.D. Tex. 2021) (J. Isgur), the United States Bankruptcy Court for the Southern District of Texas recognized a similar RVO

---

[26] *Arrangement relatif à Nemaska Lithium inc.,* 2020 QCCS 3218 ("*Nemaska*") (leave to appeal at the Court of Appeal of Québec dismissed (2020 QCCA 1488) and applications for leave to appeal at the Supreme Court of Canada dismissed (2021 CanLII 35003 (SCC) and 2021 CanLII 34999 (SCC)) at para 76.

[27] *Nemaska*, at para 56-57.

[28] *Quest University Canada (Re)*, 2020 BCSC 1883 at para 161-162.

[29] *Southern Star Developments Ltd. v. Quest University Canada*, 2020 BCCA 364.

transaction.  There, Just Energy Group, Inc. and its subsidiaries ("<u>Just Energy</u>") commenced Chapter 15 cases and sought recognition of an RVO transaction approved under the CCAA.[30]

26.     Just Energy is an independent retail energy provider that serves customers in the United States and Canada.  Just Energy suffered a significant liquidity crunch resulting from the unprecedented winter storm in Texas in February 2021.  Consequently, Just Energy filed a proceeding under the CCAA in Canada and a Chapter 15 case in the United States.  Following recognition of the CCAA proceeding, Just Energy conducted an extensive SISP and entered into an RVO transaction to preserve Just Energy as a going concern, including preservation of critical regulatory and licensing relationships between Just Energy and relevant market regulators ("<u>Just Energy RVO</u>").

27.     On September 19, 2022, the United States Bankruptcy Court for the Southern District of Texas recognized and enforced the Just Energy RVO over objection from creditors and stakeholders.  In so doing, the Court emphasized that "[w]hat we are doing here today is not second guessing the Canadian Court." Case No. 21-30823, Dkt. 234, Hr'g Tr. 24:12-13 (Sep. 19, 2022). Instead, the Court set out to "determine[e] whether the orders of the Canadian Court should be recognized in the United States . . ." *Id* at 24: 14-16; *see also id.* at 44: 13-17 ("When we sit as a court where the main interest proceeding is in Canada, the issue before us is whether to recognize that proceeding. It is not whether the proceeding was perfect or whether it was appealable or whether somebody might disagree with it."); 46:18-23 ("we also don't have authority under Chapter 15 to impose our view as to what a plan ought to be. We can reject what the Canadian

---

[30] *Foreign Representative's Motion for Entry of an Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially all of the Debtor's Interests Free and Clear of Liens, Claims, and Encumbrances, and (II) Granting Related* Relief, Case No. 21-30823, Dkt. No. 211 (Bankr. S.D. Tex. Nov. 3, 2022).

court did, in theory, if what we've determined is that it was done in a manner inconsistent with our policies, but we can't substitute our judgment for theirs as to what a better alternative would be").

28.     Consistent with the overarching objective of Chapter 15—to provide assistance and cooperation to a foreign court—the court entered an order recognizing and enforcing the Just Energy RVO.[31]  In particular, the court found the Just Energy RVO produced "no showing that there was anything that occurred in Canada that is inconsistent with U.S. policy." *Id*. at 45:11-13.

29.     In addition to the Texas court's approval of the Just Energy RVO, the Bankruptcy Court for the District of Delaware has approved three RVO transactions emanating from Canadian insolvency proceedings as discussed below.[32]

(ii)     **Acerus Pharmaceuticals Corp.**

30.     On January 29, 2023, Acerus Pharmaceuticals Corp. and its affiliated debtors ("Acerus") filed petitions under Chapter 15 of the Bankruptcy Code.  Following recognition, Acerus asked the Delaware bankruptcy court to recognize and enforce an RVO transaction approved by the Canadian court ("Acerus RVO").[33]

31.     During its Canadian insolvency proceeding, Acerus, which is a pharmaceutical company with critical licenses and permits, conducted an extensive SISP and determined the Acerus RVO presented the best course of action to maximize value and preserve the business as a going-concern.  Like the Just Energy RVO, the Acerus RVO was necessary because Acerus

---

[31] *Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially all of the Debtor's Interests Free and Clear of Liens, Claims, and Encumbrances, and (II) Granting Related* Relief, Case No. 21-30823, Dkt. No. 232 (Bankr. S.D. Tex. Nov. 3, 2022).

[32] *See also In re CDS U.S. Holdings, Inc.*, No. 20-11719 , Dkt. 112 (Bankr. D. Del. Oct. 29, 2020) (recognizing and enforcing a RVO entered in Canada).; *In re Dynamic Technologies Group Inc.*, No. 23-41416, Dkt 50 (Bankr. N.D. Tex. Jul 20, 2023) (same).

[33] *Foreign Representative's Motion for Entry of an Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially all of the Debtor's Interests Free and Clear of Liens, Claims, and Encumbrances, and (II) Granting Related* Relief, Case No. 23-10111, Dkt. 66 (Bankr. D. Del. Jun. 5, 2023) ("Acerus RVO Motion").

maintains various licenses, contracts, and regulatory relationships that are essential to its operations, and which would have been difficult, if not impossible, to transfer.[34]  Unlike a traditional asset sale, the RVO structure allowed for the preservation of contractual distribution and pharmaceutical product testing arrangements without the need for Acerus or the purchaser to take further steps.

32.     On June 13, 2023, this Court entered an order recognizing and enforcing the Acerus RVO without opposition.[35]

### (iii)   NextPoint Financial Inc.

33.     Just over a month after recognition of the Acerus RVO, on July 27, 2023, NextPoint Financial Inc. and its affiliated debtors ("NextPoint") gained recognition of their insolvency proceeding pending in Canada under the CCAA and sought recognition of an RVO ("NextPoint RVO").[36]

34.     Like the Just Energy RVO and the Acerus RVO before it, the NextPoint RVO provided that NextPoint would sell all of its equity interests to a purchaser, and would "vest out" certain excluded assets to a new entity, Residual Co.  According to NextPoint, the NextPoint RVO was necessary to facilitate the transition of certain non-transferable business elements, including electronic filing identification numbers, a franchise disclosure document, business critical

---

[34] *See Declaration of Naveed M. Manzoor in Support of the Foreign Representative's Motion for Entry of an Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially All of the Debtors' Interests Free and Clear of Liens, and Claims, and Encumbrances, and (III) Granting Related Relief*, Case No. 23-10111, Dkt. 67 ¶ 28–30 (Bankr. D. Del. Jun. 5, 2023).

[35] *Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially all of the Debtor's Interests Free and Clear of Liens, Claims, and Encumbrances, and (II) Granting Related* Relief, Case No. 23-10111, Dkt. 78 (Bankr. D. Del. Jun. 13, 2023).

[36] *Motion of the Foreign Representative for Entry of an Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially All of the Debtors' Interests Free and Clear of Liens, and Claims, and Encumbrances, and (III) Granting Related Relief*, Case No. 23-10983, Dkt. 80 (Bankr. D. Del. Oct. 16, 2023) ("NextPoint RVO Motion").

contracts, payroll systems, and tax attributes.  NextPoint RVO Motion, ¶ 21.  NextPoint feared

that risk associated with regulatory uncertainty made the NextPoint RVO the only going-concern

option. *Id*. at ¶ 22.

35.    On December 11, after NextPoint was able to consensually resolve all objections,

this Court recognized and enforced the NextPoint RVO on an uncontested basis.[37]

### C.    Goli Nutrition Presents the Ideal RVO Scenario

36.    In this case, ***the RVO structure is the only way for the Debtor to emerge from their***

***CCAA and bankruptcy proceedings as a viable, going-concern entity.***  Absent approval of the

Goli RVO, the Debtors would face considerable challenges in continuing their operations and

could be forced to liquidate, to the detriment of employees, creditors, vendors, and

customers.  This is the paradigm situation when the use of an RVO structure maximizes value and

saves a company that otherwise would have little prospects of successfully reorganizing.

37.    As described in detail in the Verified Petition, a key component of the Debtors'

value stems from its licenses and permits.  *First Report*, ¶ 75(a).  Specifically, the Debtors have

licenses, registrations, permits and certifications that have been granted by various food, health,

and related authorities that are essential to the Debtors' operations. *Verified Petition*, ¶ 53.  For

ease of reference, the licenses and permits held by Goli Canada are re-stated below:

---

[37] *Order (I) Recognizing and Enforcing the CCAA Vesting Order, (II) Approving the Sale of Substantially All of the Debtors' Interests Free and Clear of Liens, and Claims, and Encumbrances, and (III) Granting Related Relief*, Case No. 23-10983, Dkt. 155 (Bankr. D. Del. Dec. 11, 2023) ("NextPoint RVO Order").

(a)     various natural-health-product licenses issued by the Minister of Health in according with section 7 of the Natural Health Products Regulations, SOR/2003-196 (the "NHP Licenses"), which are required in order to sell, market, and distribute its products in Canada. For illustrative purposes, the standard delay, according to the Natural and Non-Prescription Health Product Directorate (the "NNPHPD"), to get a NHP License is 60 days for a Class I product, 90 days for a Class II product, and 210 days for a Class III product. However, the NNPHPD frequently exceeds such delays. Goli Canada showed longer delays for its own products. The vast majority of GOLI Products are classified as Class III, including the Debtors' most popular products;

(b)     a site license issued by the Minister of Health in accordance with section 29 of the Natural Health Products Regulations, SOR/2003-196, which is required in order to import its licensed natural health products in Canada;

(c)     an import license issued by the Canadian Food Inspection Agency under the Safe Food for Canadians Act (S.C. 2012, c. 24), which is required to import its apple-cider vinegar food-product gummies;

(d)     Goli Canada's GS1 license, which holds all of Goli Canada's unique identifiers (UPCs and GTINS) necessary for the sale of GOLI Products with various retailers, online marketplaces, distributors, and other partners. Goli Canada has approximately 400 existing UPCs, which represents a substantial portion of Goli Canada's product catalog and market presence. These UPCs are registered with over 30 different retailers. Changes to UPCs could take 6- 9 months to implement, involve a significant amount of paperwork, and present logistical challenges (such as needing to update all new items with Goli Canada's 3PLs, relisting all items on each of the retailer-specific platforms, and recreating all new labels with the new barcodes) as well as strategic challenges. Such changes could hinder market presence and risk losing shelf space with important retailers as well as require reprinting all labels with the new UPCs; and

(e)     Various brand and trademark registrations in international markets required to obtain regulatory permits and product registrations with the applicable authorities.

*Id*. Delays and costs associated with the potential transfer or assignment of these licenses would make implementation of the sale of the Debtors' business impossible. Therefore, a traditional asset sale is unfeasible. *Id*. ¶ 54; *First Report*, ¶ 75(b). On the other hand, the RVO structure lets Goli Canada monetize the value of its permits and licenses by allowing the purchaser to maintain ownership of the company through an equity acquisition, while allowing the purchaser to replicate

the effect of a "free and clear" asset sale by "vesting out" excluded assets and non-assumed liabilities. *Id*. at ¶ 52.

38.     Based on the Debtors' financial situation, unsecured creditors are tens of millions of dollars out of the money.[38] *First Report*, ¶ 75(c).  The Lenders, who have valid first priority liens on all of the Debtors' assets and whose collateral is subject to the Goli RVO, have consented to, and fully support, the transaction. *First Report*, ¶ 84(b).  Therefore, the RVO structure, in itself does not materially prejudice unsecured creditors, who could not have received proceeds from a distribution in a traditional AVO sale structure.  Moreover, the RVO structure allows stakeholders to benefit from the Debtors' business "[emerging] in a position to move forward as a going concern."[39]

## STATUTORY ANALYSIS

### A.     The Goli RVO Should be Enforced in the United States

39.     The fundamental purposes of Chapter 15 include fostering cooperation and comity between courts in the United States and foreign courts, protecting and maximizing the value of a debtor's assets, and facilitating the rehabilitation and reorganization of businesses.[40]  11 U.S.C. § 1501(a).  A Chapter 15 case acts "in aid of the main proceeding" or as an "adjunct or arm of a foreign bankruptcy court." *In re ABC Learning Centres Ltd*., 728 F.3d 301, 306 (3d Cir. 2013).  Chapter 15's objectives, moreover, should be interpreted by considering "its international origin, and the need to promote an application of this chapter that is consistent with the application of

---

[38] The Debtors' assets were subject to a thorough and comprehensive sale process that ultimately resulted in the Debtors' representatives engaging with forty-four (44) potential strategic buyers and/or investors.  The Petitioner, the Debtor and the secured lenders, whose collateral is the subject of the RVO transaction, all believe that the current RVO proposal was the best offer received, maximizes value and is the only viable path forward.

[39] *BlackRock*, at para 110.

[40] The Third Circuit Court of Appeals recently confirmed that "Chapter 15 will generally favor deference to parallel bankruptcy proceedings." *Vertiv, Inc. v. Wayne Burt PTE, Ltd*., 92 F.4th 169, 182 (3d Cir. 2024).

similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. In large part, the purpose of Chapter 15 is to exercise the United States's jurisdiction to bring people and property into the foreign main proceeding's jurisdiction. *In re ABC Learning Centres Ltd.*, 728 F.3d at 307.

40.     Thus, the Goli RVO should be recognized under principles of comity.[41] This Court should recognize and enforce the Canadian Court's order approving the Goli RVO so long as it does not violate the public policy of the United States and the Canadian Court abides by fundamental standards of fairness. *In re Artimm, S.r.L.*, 335 B.R. 149, 161 (Bankr. C.D. Cal. 2005). More specifically, sections 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code guide this Court's review of the Goli RVO and provide alternative bases for this Court to approve and enforce the RVO in the United States.[42]

  1.     *11 U.S.C. § 1507*

41.     Section 1507 of the Bankruptcy Code permits the Court to grant relief as to "provide additional assistance to a foreign representative under [the Bankruptcy Code] or under other laws of the United States." 11 U.S.C. § 1507. In determining whether to exercise its discretion to grant additional relief under section 1507(a), the court should consider "whether such additional assistance, consistent with the principles of comity, will reasonably assure" the: (1) just treatment of all holders of claims against or interests in the debtor's property; (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign

---

[41] "[The Canadian Court requests] the aid and recognition of any court or administrative body in any province or territory of Canada and any Canadian federal court or administrative body and any federal or state court or administrative body in the United States of America and any court or administrative body elsewhere, to act in aid of and to be complementary to this Court in carrying out the terms of the Order." *Goli RVO*, ¶ 48.

[42] Section 1525 and 1527 of the Bankruptcy Code contemplate cooperation "to the maximum extent possible with the foreign court or a foreign representative," which includes, "coordination of the administration and supervision of the debtor's assets and affairs" and "approval or implementation of agreements concerning the coordination of proceedings." 11 U.S.C. §§ 1525(a), 1527(4). Granting comity to, and enforcing, the Goli RVO in the United States is consistent with this Congressional mandate.

proceeding; (3) prevention of preferential or fraudulent dispositions of property of the debtor; and (4) distribution of the Debtors' property substantially in accordance with the Bankruptcy Code's priority scheme. *Id*. Principles of comity are at the forefront of this analysis. *In re Atlas Shipping A/S*, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009).

42.    Here, recognition of the Goli RVO is appropriate under Section 1507 as all relevant factors have been met. *First*, holders of claims have been treated fairly in the Canadian Court, which pursuant to the CCAA provides for the "equitable, orderly, and systematic" distribution of estate property. *See Collins v. Oilsands Quest, Inc.*, 484 B.R. 593, 597 (S.D.N.Y. 2012) ("Canadian proceedings have been fair and impartial, and that the Canadian proceedings have afforded creditors a full and fair opportunity to be heard in a manner that is fully consistent with this country's standards of due process."). As is the case with Canada, when a foreign proceeding is "in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings." *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd*., 238 B.R. 25, 66 (Bankr. S.D.N.Y. 1999); *see also In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. 685, 698 (Bankr. S.D.N.Y. 2010) ("Canadian courts afford creditors a full and fair opportunity to be heard in a manner consistent with standards of U.S. due process."). Specifically, the Canadian Court has thoroughly vetted the Goli RVO and ensured that all parties in interest received due process. As described further in the Zucker Declaration and the Verified Petition, the CCAA only permits the sale of assets if specified criteria are met, *Zucker Declaration*, ¶ 34, and requires that notice be given to all parties who are likely to be affected by the sale. *Id*. at ¶ 35. In this case, notice of the Goli RVO has exceeded the notice that is generally required by the CCAA. *Supplemental*

*Declaration*, ¶ 13; *see e.g. In re Energy Coal*, 582 B.R. 619, 631 (Bankr. D. Del. 2018) (finding that notice in foreign proceeding was sufficient).

43.     *Second*, holders of claims in the United States have been protected against prejudice in the Canadian Proceeding.  As described, such parties have been provided sufficient notice (beyond that required by Canadian law) and have had an opportunity to appear and be heard in the Canadian Proceeding.  *Supplemental Declaration*, ¶ 13.  Moreover, the Canadian Proceeding ensures the just treatment of all holders of claims against interests in the Debtors' estate—creditors in the U.S. are being treated the same as creditors in Canada and elsewhere.  *Supplemental Declaration*, ¶ 15.  *Third*, preferential or fraudulent transfers are not permitted under the CCAA. *Zucker Declaration*, ¶ 27.  There is no suggestion that the sale would implicate or result in a fraudulent or preferential transfer.  *Fourth*, the CCAA allows for a distribution scheme similar to that of the Bankruptcy Code, *Supplemental Declaration* ¶ 17; thus, the Goli RVO will not distribute the proceeds of the Debtors' property in contravention of the order prescribed in the Bankruptcy Code. In this case, the Lenders have liens on all of the Debtors' assets and are undersecured. *First Report*, ¶ 45.  The Sale Transactions will result in the Lenders receiving far less than the amount of their secured claims.  Therefore, unsecured creditors are not expected to receive any distributions in the Canadian Proceeding. *First Report*, ¶ 75(c).

44.     Section 1507 provides that the Court is authorized to grant any "additional assistance" available under the Bankruptcy Code or under "other laws of the United States," provided that such assistance is consistent with the principles of comity and satisfies the fairness considerations set out in the statute.  Canada is a sister common law jurisdiction and there is a long and established history of U.S. courts granting recognition and providing cooperation and assistance to Canadian courts. *See Canada Southern Railway Company v. Gebhard*, 109 U.S. 527,

538–39 (1883) (Canadian reorganization proceedings were "in entire harmony with the spirit of bankrupt[cy] laws, the binding force of which, upon those who are subject to the jurisdiction, is recognized by all civilized nations."). Based on the foregoing, recognition, approval, and enforcement of the RVO is appropriate under section 1507 of the Bankruptcy Code as such relief will provide the Debtors and all parties in interest with certainty that the Goli RVO will be enforceable not only in Canada, but also in the U.S., and will therefore protect and prevent prejudice to such parties by ensuring uniform application of the Goli RVO.

2.    *11 U.S.C. § 1520*

45.    Upon recognition of a foreign proceeding as a foreign main proceeding, relief is available to the foreign representative under section 1520 of the Bankruptcy Code. *See* 11 U.S.C. § 1520. Section 1520(a)(2) of the Bankruptcy Code provides, in relevant part, that, "[u]pon recognition of a foreign proceeding that is a foreign main proceeding . . . section[] 363 [of the Bankruptcy Code] appl[ies] to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the section[] would apply to property of an estate." 11 U.S.C. § 1520(a)(2). Moreover, section 1520(a)(3) of the Bankruptcy Code provides that, upon recognition of a foreign main proceeding, "unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by section[] 363 [of the Bankruptcy Code]." 11 U.S.C § 1520(a)(3); *see also In re Elpida Memory, Inc.*, 2012 Bankr. LEXIS 5367, at *18 (CSS) (Bankr. D. Del. Nov. 16, 2012) (holding that section 363 of the Bankruptcy Code applies to transfers of assets located within the United States outside of the ordinary course of business in connection with cases commenced under chapter 15 of the Bankruptcy Code).

46.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate," provided the debtor

has a good business reason for doing so.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp*., 242 B.R. 147, 153 (D. Del. 1999). Great judicial deference is given to a debtor's exercise of business judgment regarding the sale of estate property.  Once a debtor articulates a business justification for the sale of property, it is presumed the debtor's decision to execute the sale was made "on an informed basis, in good faith, and with the honest belief that the [transaction] was in the best interests of the [debtor] company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990).

47.    As more thoroughly explained in the Verified Petition and the Zucker Declaration, the Goli RVO is a prudent exercise of the Debtors' business judgment.  The Petitioner, in its capacity as an officer of the Canadian Court, is confident that the market has been thoroughly canvassed and there is no other viable alternative transaction available to the Debtors.  *Verified Petition*, ¶ 54; *First Report*, ¶¶ 81−85; *Second Report*, ¶ 68.  The Petitioner also believes that the Subscription Agreement, which was negotiated in good faith and at arm's length, is fair and reasonable under the circumstances, and is in the best interests of the Debtors, their creditors, and other stakeholders.  *Verified Petition*, ¶ 59.  Moreover, the reverse vesting structure is necessary and appropriate to preserve the going-concern value of the Debtors' business and produces an economic result more favorable than the available alternatives.  *Id*. at ¶ 60; *First Report*, ¶ 84(c), (e); *Second Report*, ¶ 69.

3.    *11 U.S.C. § 1521*

48.    Section 1521 of the Bankruptcy Code gives a bankruptcy court broad discretion to "grant any appropriate relief" to "effectuate the purpose of [chapter 15]." 11 U.S.C. § 1521(a). Aligned with the purpose of Chapter 15, bankruptcy courts are "guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *In re Energy Coal S.P.A.*, 582 B.R. 619, 627 (Bankr. D. Del.

2018) (LSS) (citing *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr.S.D.N.Y.2009)).   The Petitioner is seeking relief under Section 1521 by asking this Court to use its inherent authority under Section 105 of the Bankruptcy Code to recognize and enforce the Goli RVO.

       49.     Relief under Section 1521 is shaped by Section 1522 of the Bankruptcy Code, which provides that relief granted under Section 1521 may only be granted "if the interest of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).   Section 1522 of the Bankruptcy Code directs the Court to "balanc[e] the respective interests based on the relative harms and benefits in light of the circumstances presented." *In re Better Place, Inc.*, Case No. 13-11814, Dkt. 146, ¶24 (Bankr. D. Del. Feb. 5, 2018) (LSS) (citing *Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14, 27–28 (4th Cir. 2013)).   In this case, the interests of creditors, the Debtors, and parties in interest are sufficiently protected.   Refusal to recognize, approve, and enforce the Goli RVO would inflict significant harm upon the Debtor and the Lenders. *First Report*, ¶ 85.   Further, absent approval and recognition of the Goli RVO, the Debtors would likely not be able to reorganize and continue as a going concern, to the detriment of employees, vendors, trade creditors, and other stakeholders who count on the Debtors' continued viability.   On the other hand, recognition, approval, and enforcement of the Goli RVO does not prejudice any parties in interest.   In this instance, the Petitioner is confident that the going concern value of the Debtors' businesses, as tested through the SISP, is insufficient for unsecured creditors or equity holders to receive any distributions. *First Report*, ¶ 75(c), 81.   Accordingly, the only constituency that has a financial stake in the outcome of the Goli RVO transaction (*i.e.*, the Lenders) fully support the transaction, and would be negatively impacted if this Court was to not recognize, approve, and enforce the Goli RVO. *First Report*, ¶ 84(b).   Moreover, as noted

above, others, namely employees, vendors, and trade creditors, would be harmed if the Goli RVO is not approved. *First Report*, ¶ 85.

**B.     Nothing About the Goli RVO Is "Manifestly Contrary" to U.S. Public Policy**

50.     A U.S. bankruptcy court may deny chapter 15 relief that would be "manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.  Courts have emphasized that section 1506 applies only in very narrow circumstances where the most fundamental policies of the United States are implicated.  *See In re ABC Learning Centers, Ltd.*, 728 F.3d at 309; *see also Collins,* 484 B.R. at 597.  As confirmed by the Court of Appeals for the Third Circuit, the public policy exception only applies "where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections or where recognition would impinge severely a U.S. constitutional or statutory right." *In re ABC Learning Centers, Ltd.*, 728 F.3d at 309 (internal citations omitted).

51.     It is well established that a U.S. court "need not engage in an independent determination about the propriety of individual acts of a foreign court," and may not employ the public policy exception simply because certain procedural protections that may exist under U.S. law are absent from the foreign proceeding.[43] *See In re Condor Flugdienst GmbH,* 627 B.R. 366, 376 (Bankr. N.D. Ill. 2021) ("specific due process requirements of the adversarial system in the United States need not be duplicated in a foreign proceeding for that proceeding to be fair, and fairness is the ultimate goal of due process"); *In re Rede Energia S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) (noting "the well-established principle that the relief granted in a foreign proceeding and the relief available in the United States do not need to be identical").

---

[43] " . . . even the lack of the right to a jury trial has been held not to contravene U.S. fundamental public policy when the foreign proceedings afforded substantive and procedural due process protections." *In re Better Place, Inc.*, Case No. 13-11814, Dkt. 146, ¶ 30 (citing *In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 309 (3d Cir. 2013)).

52.     Here, there should be no doubt that the procedural fairness of the Canadian Proceeding is not contrary, much less manifestly contrary, to United States public policy.  As noted above, every creditor and other party-in-interest was provided  notice of the Goli RVO, both with respect to approval in the Canadian Proceeding and these Chapter 15 cases.  Indeed, the Petitioner provided significantly more notice than what the CCAA requires.  Moreover, contrary to normal protocol in Canadian insolvency proceedings, the Subscription Agreement (and Agency Agreement) was made available to creditors in completely unredacted form.  The Canadian Proceeding—particularly in light of the additional notice and disclosures afforded in this case— complies with fundamental standards of fairness and due process. *See In re Just Energy*, Case No. 21-30823, Dkt. 234, Hr'g Tr. 24:12-13 (Sep. 19, 2022) (the court's role in chapter 15 proceedings is not to question the Canadian Court's authority; rather, its "only role is to be sure that [the objecting parties] had their due process rights in Canada . . . .").

53.     Moreover, pursuant to the CCAA, an RVO transaction may not be approved without withstanding scrutiny from a Canadian court, which includes adequate marketing of the assets to ensure a fair price, and sufficient notice to parties in interest.  These procedural safeguards and level of judicial oversight are similar to those found in plenary chapter 11 cases in the United States.  In this respect, the Goli RVO (and RVO transactions generally) are not much different than sales that are frequently approved in chapter 11 cases or implemented through a chapter 11 plan.  Accordingly, there is no basis to find that an RVO transaction is manifestly contrary to United States public policy.

**C.     The Releases are Appropriate**

54.     As detailed in the Verified Petition, the Goli RVO contains certain releases in favor of Goli Canada and the Purchaser. *Verified Petition*, ¶ 57–58.  In this Circuit, third party releases akin to what are contained in the RVO may be approved if releases are integral to the

26

debtor-creditor relationship. *In re Millennium Lab Holdings, II, LLC*, 945 F.3d 126, 135 (3d Cir. 2019). Because third party releases are not categorically barred, courts have expressly held that "it cannot be argued that the issuance of such releases is manifestly contrary to public policy." *In re Sino-Forest Corp.*, 501 B.R. 655, 665 (Bankr. S.D.N.Y. 2013).

55.    It is generally understood that releases approved by foreign courts should be enforced in the United States pursuant to principles of international comity and the public policy embodied in Chapter 15 of the Bankruptcy Code. *In re Metcalfe & Mansfield Alternative Invs*., 421 B.R. 685, 700 (Bankr. S.D.N.Y. 2010) ("Principles of comity in chapter 15 cases support enforcement of the Canadian Orders in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.").[44] Courts in the United States have consistently enforced third party releases granted in foreign proceedings. *In re Avanti Commc'ns Grp. PLC*, 582 B.R. 603, 617 (Bankr. S.D.N.Y. 2018); *In re Ocean Rig UDW Inc*., 570 B.R. 687 (Bankr. S.D.N.Y. 2017) (recognizing and enforcing scheme of arrangement that released affiliate guarantees); *see also In re Xebec Holding USA Inc.*, No. 22-10934, Dkt. 102 (Bankr. D. Del. Feb. 16, 2023) (recognizing and enforcing a sale of assets containing certain releases in favor of debtors and officers consistent with releases granted under the CCAA); *see also* NextPoint RVO Order (recognizing and enforcing a sale of assets containing certain releases in favor of directors and officers consistent with releases granted under the CCAA).

---

[44] The Fifth Circuit's decision in *Vitro* does not dictate a different result. *In re Vitro S.A.B. de C.V*., 701 F.3d 1031 (5th Cir. 2012). In *Vitro*, the Fifth Circuit affirmed a bankruptcy court's decision declining to grant comity to a Mexican court order containing third party releases. The Fifth Circuit explicitly declined to decide whether the third party release containing in the order was manifestly contrary to public policy. *Id*. at 1070. Instead, the Fifth Circuit's decision was largely premised on whether distribution of assets under the Mexican order substantially approximated that of the Bankruptcy Code. *Id*. at 1065–66. Regarding third party releases, the Fifth Circuit only found reasonable the bankruptcy court's determination that Vitro had not met its burden to demonstrate the releases were reasonable in that case. *Id*. at 1070; *see also In re Agrokor d.d.,* 591 B.R. 163, 173 (Bankr. S.D.N.Y. 2018).

56.     Still, in considering whether to recognize and enforce a foreign order containing a third party release, a court must consider whether granting the release is consistent with principles of comity; *i.e.* "whether the foreign proceeding abided by fundamental standards of procedural fairness as demonstrated by a clear and formal record." *In re PT Bakrie Telecom Tbk*, 628 B.R. 859, 884 (Bankr. S.D.N.Y. 2021).  The record must contain how the foreign court considered the rights of creditors *vis-à-vis* the third releases, and justification for the third party releases in the foreign order. *Id*. at 884–85.

57.     Here, the record as set forth and the facts and circumstances of these cases demonstrate the releases were issued in a manner that is procedurally fair.  Specifically, the Canadian Court expressly considered the releases, considered timely objections, and approved their inclusion in the Goli RVO. *Goli RVO*, ¶ 33.  Ultimately, the concerns of certain parties that objected to the  releases in the Goli RVO were resolved given the carve-outs accepted by the Debtors  and other material limitations established by the CCAA and reflected in the terms of the releases, as approved by the Canadian Court. *Supplemental Declaration*, ¶ 16.

58.     In addition, the releases contemplated in the Goli RVO were the subject of hard fought negotiations.  Indeed, the releases as presented are significantly scaled back, and are narrowly tailored to apply only to those parties and classes deemed necessary.  The Goli RVO includes releases that are limited to Goli Canada and certain of its directors and officers and the Purchaser and certain of its insiders.  The releases, further, expressly exclude claims that: (i) relate to contractual rights of one or more creditors; (ii) are based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors; and (iii) certain claims against Goli Canada's past and present directors currently pending in courts of the United States.  *Goli RVO*, ¶ 33.

59.      The releases were an integral and heavily negotiated aspect of the transactions provided through the Goli RVO and the Subscription Agreement.  Notice of the releases were conspicuously set forth in the Notice of the Chapter 15 cases and the recognition hearing.  *Notice of (I) Filing Of (A) Petitions Pursuant To Chapter 15 of the Bankruptcy Code and (B) Petitioner's Sale Motion; (II) Entry of Provisional Relief Order; (III) Deadline to Object to Entry of Recognition Order and Sale Order; and (Iv) Hearing for Court to Consider Chapter 15 Petitions, Sale Motion, Entry of Recognition Order and Sale Order* [Docket No. 39].  Moreover, the releases contained in the Goli RVO are consistent with releases granted by Canadian courts in similar CCAA proceedings. *Supplemental Declaration*, ¶ 18.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court (i) grant the relief requested in the Sale Motion and herein and (ii) granting the Petitioner and the Debtors such other and further relief as the Court deems proper and just.

Dated: April 11, 2024
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  mcguire@lrclaw.com
pierce@lrclaw.com
brooks@lrclaw.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Andrew Rosenblatt (admitted *pro hac vice*)
Francisco Vazquez (admitted *pro hac vice*)
Michael Berthiaume (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email: andrew.rosenblatt@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

*Counsel to the Petitioner*