## Exhibit B

**(Second Report)**



**Deloitte Restructuring Inc.**
1190, Avenue des Canadiens-de-Montréal
Suite 500
Montreal QC H3B 0M7
Canada

Tel: 514-393-7115
Fax: 514-390-4103
www.deloitte.ca

C A N A D A
PROVINCE OF QUEBEC
DISTRICT OF QUEBEC
COURT. No.: 500-11-063787-242

S U P E R I O R   C O U R T
Commercial Division

**IN THE MATTER OF A PLAN OF ARRANGEMENT OR COMPROMISE OF:**

**GOLI NUTRITION INC.**, a duly incorporated company under the laws of Canada having its principal place of business at 2205 Boul. De la Côte-Vertu, suite 200, in the city and judicial district of Montreal, Quebec,  H4R 1N8;

- and –

**GOLI NUTRITION INC.**, a duly incorporated company under the laws of Delaware having its principal place of business at 2205 Boul. De la Côte-Vertu, suite 200, in the city and judicial district of Montreal, Quebec,  H4R 1N8

 **Debtors**

- and -

**DELOITTE RESTRUCTURING INC**., a duly incorporated company having a place of business at 500-1190 Ave des Canadiens-de-Montréal, in the city and district of Montreal, province of Quebec,  H3B 0M7.

**Monitor**

### SECOND REPORT TO THE COURT
### SUBMITTED BY DELOITTE RESTRUCTURING INC.
### IN ITS CAPACITY AS MONITOR
(*Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended)

## INTRODUCTION

1) On March 15, 2024, the Debtors filed the CCAA Application before the Court seeking, *inter alia,* a first-day initial order commencing proceedings in respect of the Debtors under the CCAA and appointing Deloitte as the monitor of the Debtors.

2) On March 16, 2024, Deloitte filed its first report to the Court (the "**First Report**") as part of the CCAA Proceedings. The purpose of the First Report was to provide

information to the Court with respect to i) Deloitte's qualifications to act as monitor; ii) the business, financial affairs and financial results of the Company; iii) the Company's creditors; iv) the SISP; v) the Proposed Transactions; vi) the Company's cash flow forecast; vii) the CCAA Charges; viii) the Chapter 15 Case; and ix) the Proposed Monitor's conclusions and recommendations.

3)   On March 18, 2024, the Court granted a first day initial order (the "**Initial Order**"), which provided for, *inter alia*, i) a stay of proceedings against the Debtors until and including March 27, 2024; ii) a stay of proceedings against the Directors and Officers; iii) the appointment of Deloitte as the Monitor; and iv) the granting of the Administration Charge in the amount of $300K and the Director's Charge in the amount of $330K.

4)   Shortly following the commencement of the CCAA Proceedings, the Debtors, in consultation with Monitor and the Syndicated Lenders as well as their respective advisors, determined that the approval of the Proposed Transactions should be sought at a later date rather than at the Comeback Hearing, as originally contemplated in the CCAA Application, and a hearing for that purpose was scheduled for April 9, 2024 (the "**Transaction Approval Hearing**").

5)   On March 26, 2024, the Debtors amended the CCAA Application and the proposed Amended and Restated Initial Order in contemplation of the Transaction Approval Hearing.

6)   On March 27, 2024, the Court amended and restated the Initial Order to provide for, *inter alia*, i) an extension of the Stay Period to June 28, 2024; and ii) an increase of the Administration Charge from $300K to $750K.

7)   At the Transaction Approval Hearing, the Debtors are seeking approval of the Proposed Transactions in accordance with the Transaction Approval Orders as well as a further amendment and restatement to the Initial Order (the "**Proposed ARIO**").

8)   Capitalized terms not otherwise defined herein have the meaning ascribed to them in the First Report.

## PURPOSE

9)   The purpose of this second report of the Monitor (the "**Second Report**") is to complement the First Report and to provide information to the Court with respect to:

   a)   An update regarding the Company's operations;

   b)   The Monitor's activities since the First Report;

   c)   An update on the Chapter 15 Case;

   d)   An update on the Proposed Transactions;

   e)   The receipts and disbursements of the Company;

   f)   The Company's updated 13-week cash flow projections; and

   g)   The Monitor's conclusions and recommendations.

10)  In preparing this Second Report and making the comments herein, the Monitor has been provided with, and has relied upon, unaudited financial information, the Debtors'

books and records and financial information prepared by the Company and discussions with Management.

11) Except as described in this Second Report in respect of the Debtors' Cash Flow Statement (as defined below):

a) The Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of such information in a manner that would wholly or partially comply with GAAS pursuant to the Chartered Professional Accountants Canada Handbook and, accordingly, the Proposed Monitor expresses no opinion or other form of assurance contemplated under GAAS in respect of the Information; and

b) Some of the information referred to in this Second Report consists of forecasts and projections. An examination or review of the financial forecast and projections, as outlined in Chartered Professional Accountants Canada Handbook, has not been performed.

12) Future oriented financial information referred to in this Second Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that are not ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

13) Except otherwise indicated, the Monitor's understanding of factual matters expressed in the Second Report concerning the Company and its business is based on the Information, and not independent factual determinations made by the Monitor.

14) Unless otherwise stated, all monetary amounts contained in this Second Report are expressed in United States dollars.

## UPDATE REGARDING THE COMPANY'S OPERATIONS

15) Since the issuance of the First Report on March 16, 2024, the Company has continued its operations on an ongoing basis and all current expenses have been paid in the ordinary course of business.

16) The Monitor understands that 12 employees of Goli Canada and 2 employees of Goli US were terminated shortly after the issuance of the Initial Order.

17) Goli Canada and Goli US continue to employ approximately 23 and 2 employees, respectively, and Goli Canada also continues to outsource certain operating functions to Liveketo and Direct Digital.

18) Despite the current CCAA Proceedings, the Company has maintained its sales as initially budgeted and has been collecting its accounts receivable on an ongoing basis, as projected.

19) The Company, with the support of the Monitor, also continues to have discussions and exchanges of information with its main suppliers and stakeholders. The Company has been proactive in responding to the various stakeholders' inquiries relating to the CCAA Proceedings and the ongoing restructuring process.

20) The Company has carefully managed its liquidity and continued to focus on limiting disbursements as much as possible with respect to its operations, while ensuring that its obligations are met.

21) The Company also updated its cash flow projection, with the support of the Monitor, as more fully detailed in a later section of this Second Report.

## THE MONITOR'S ACTIVITIES SINCE THE FIRST REPORT

### Chapter 15 Case

22) On March 19, 2024, the Monitor posted a copy of the CCAA Application, certain exhibits thereto, the First Report, the Initial Order and the Service List on the Monitor's website at www.insolvencies.deloitte.ca/goli (the "**Monitor's Website**").

23) The Monitor has also provided a dedicated email address (goliccaa@deloitte.ca) and a phone number (514-393-7115) to allow stakeholders to contact the Monitor directly if they have questions with respect to the restructuring process and the CCAA Proceedings.

24) The Monitor assisted the Debtors to compile a list of stakeholders, including all known creditors, parties with material contracts with the Debtors, taxation authorities, shareholders, retailers, customers, vendors and parties subject to litigation with the Debtors (collectively, the "**Notice Parties**").

25) On March 19, 2024, the Monitor, as foreign representative of the Debtors, commenced the Chapter 15 Case by filing petitions before the US Court seeking, *inter alia,* recognition of the CCAA Proceedings as foreign main proceedings in the United States, recognition of Deloitte as foreign representative of the Debtors and orders recognizing an enforcing the contemplated orders approving the Proposed Transactions in the United States, to the extent that such orders should be rendered by this Court.

26) On March 21, 2024, an initial hearing was held before the US Court to obtain certain preliminary orders in the context of the Chapter 15 Case.

27) On March 22, 2024, the US Court rendered:

   a) a *Joint Administration Order*, authorizing the administration of the Debtors proceedings under Chapter 15 within the same case number;

   b) a *Notice Order* approving notification procedures in connection with the Chapter 15 Case (the "**US Notice Order**"); and

   c) a *Provisional Relief Order* granting a stay of proceedings and other protections to the Debtors in the United States.

28) The US Court has scheduled a hearing on April 15, 2024 to consider the Monitor's request to recognize and enforce the CCAA Proceedings and the other relief sought pursuant to the petitions filed in the Chapter 15 Case (the "**Recognition Hearing**").

### Notice to Stakeholders

29) On March 22 and March 29, 2024, the Monitor published a notice of the Initial Order in La Presse+ (French version), the National Post and the Wall Street Journal, National Edition.

30) The Monitor filed the first and second forms (Form 1 and 2) with respect to the granting of the Initial Order and certain information as required by the Office of the Superintendent of Bankruptcy.

31) On March 25 and 26, 2024 and in accordance with the US Notice Order, the Monitor sent to the Notice Parties, via either two-day courier service or first-class postage prepaid, depending on which option proved to be the fastest, a package including various documents relevant to the CCAA Proceedings and the Chapter 15 Case (the "**Stakeholder Notice Package**").

32) The Stakeholder Notice Package included, among other things, a notice to stakeholders setting out: (i) details of the Comeback Hearing and the relief to be sought thereat, (ii) a summary of the Proposed Transactions, including references to the Transaction Approval Orders, (iii) the then available details for the Transaction Approval Hearing and information on how to obtain full hearing details once they were determined by the Court, and (iv) links to the Monitor's Website.

33) The Notice to Stakeholders served as the notice to creditors contemplated under section 23 (1) (ii) (B) of the CCAA and notified interested parties, including the Debtors' contractual counterparties, of the relief to be sought at the Transaction Approval Hearing pursuant to the CCAA Application. A copy of the Stakeholder Notice Package is attached as **Appendix A** to the Second Report.

34) The Stakeholder Notice Package was sent to approximately 557 stakeholders, and an electronic copy was posted to the Monitor's Website as well as filed on the docket in the Chapter 15 Case.

35) Complete copies of the agreements governing both of the Proposed Transactions were also made available to stakeholders by the Monitor, first with minor redactions and then in completely unredacted form, through publication on the Monitor's Website and fling on the docket in the Chapter 15 Case.

36) On April 2, 2024, the Monitor posted a notice of hearing details in connection with the Transaction Approval Hearing which indicated that the deadline to object to the relief sought at such hearing was April 5, 2024 at 5:00 p.m., in accordance with the terms of the Initial Order.

**Monitoring of the Company's operations**

37) The Monitor and its legal counsel assisted the Debtors in their discussions with certain suppliers and other key stakeholders, including with respect to negotiating the release of finished goods held by one of Goli Canada's logistics providers.

38) More generally, the Monitor, with the assistance of the Debtors, has been responding to questions and inquiries of various stakeholders in relation to the CCAA Proceedings and the restructuring process.

39) The Monitor has had multiple communications and discussions with the Company and its counsel regarding the operations, the Norco Facility, the Atos Equipment and the Proposed Transactions.

40) Since the commencement of the CCAA Proceedings, the Monitor has worked with the Company to develop and implement procedures to monitor the Company's activities in view of reporting to the Court. In addition, the Monitor has implemented weekly reviews of the Company's receipts and disbursements and had numerous discussions on same with the Company's management.

Goli Nutrition Inc.                                                                      *Page 6*
Second Report to the Court
April 8, 2024

41) The Monitor has continued to assist the Company with developing the Debtors' revised cash flow projections until June 28, 2024.

**Atos Equipment**

42) On March 28, 2024, the Monitor attended at the Norco Facility and met with the landlord, the subtenant, and representatives of Branford Auctions, LLC. The Monitor has also had various discussions with representatives of the Agent to discuss the logistics of holding an auction at the Norco Facility and the contemplated implementation of the Agency Agreement.

43) Since the commencement of the CCAA proceedings, the Monitor has been advised of several proprietary or other claims being asserted against certain properties located in the Norco Facility, namely by Sharon and Odelya Hoffman and certain related entities, including Vitamin Friends LLC, RGL Management LLC, RGL Holdings LLC, and Triple 5 Nutrition LLC (collectively, the "**Hoffman Parties**") and by Caliber Construction Inc. ("**Caliber**").

44) The Hoffman Parties, or certain of them, are minority shareholders of Goli Canada and former shareholders of BN, which is now subject to bankruptcy proceedings under Chapter 7 of the United States Bankruptcy Code (the "**BN Bankruptcy**").

45) American counsel to the Hoffman Parties, Mr. Folkenflik, contacted representatives of the Monitor for the first time on March 22, 2024 requesting information and documents in connection with the Proposed Transactions, including those that were subject to sealing orders. Mr. Folkenflik indicated he would send the Monitor a written request.

46) On March 25, 2024, the Monitor sent the Stakeholder Notice Package by two-day courier service to Mr. Folkenflik, Sharon and Odelya Hoffman, RGL Management LLC, and RGL Holdings LLC.

47) On March 26, 2024, the Monitor's counsel was contacted by Mr. Folkenflik and the latter was informed that the Transaction Approval Hearing had been scheduled for April 9, 2024 and that numerous documents related to the CCAA Proceedings and the Chapter 15 Case were available on the Monitor's Website. Following that discussion, the Monitor's counsel received a correspondence from Mr. Folkenflik with various requests and disclosing certain claims of the Hoffman Parties.

48) On March 27, 2024, the Monitor's counsel sent to Mr. Folkenflik proposed confidentiality terms to obtain copies of exhibits that were subject to sealing orders provided under the Initial order but did not receive a reply in connection the those proposed terms until the following week.

49) On April 1, 2024, the Monitor's counsel provided Mr. Folkenflik with the most up-to-date versions of the Subscription Agreement and the Agency Agreement, with minor redactions and requested information and supporting documents regarding the Hoffman Parties claims against certain assets at the Norco Facility. The Monitor's counsel also provided unredacted copies of Exhibits P-24 and P-25 subject to a confidentiality undertaking.

50) That same day Mr. Folkenflik provided certain invoices and other documents to the Monitor, which purportedly support the claims of the Hoffman Parties. Those documents were subsequently provided by the Monitor to representatives of the Company and the Syndicated Lenders and remain under review by the Monitor.

51)     On April 3, 2024, the Monitor's counsel sent to Mr. Folkenflik entirely unredacted versions of the Subscription Agreement and the Agency Agreement as well as the notice of hearing details in respect of the Transaction Approval Hearing.

52)     On April 4 and 5, 2024, various exchanges took place between Mr. Folkenflik, counsel to the Company and counsel to the Monitor in connection with the claims of the Hoffman Parties and the upcoming Transaction Approval hearing. At 3:55 p.m. on April 5, 2024, the Monitor's counsel was advised that Mr. Folkenflik was in the process of retaining Canadian counsel but that the latter's mandate would not be confirmed before the following Monday.

53)     The Monitor understands that the Hoffman Parties are asserting that RGL Management LLC ("**RGL**") owns certain equipment located at the Norco Facility, including certain of the Atos Equipment (the "**Alleged RGL Equipment**"). The claims of the Hoffman Parties as against the Alleged RGL Equipment are contested by the Company and the Syndicated Lenders, which assert that all of the Atos Equipment is owned by Goli Canada.

54)     Based on its preliminary review of the documents received from the Hoffman Parties, the Monitor notes that certain of the Alleged RGL Equipment has been identified by cross-referencing it to sale lots in the schedule of assets annexed to the Agency Agreement. Based on its review, the Monitor estimates that the total cost value of the identified Alleged RGL Equipment is approximately $1,800,000. The Monitor notes that the book value of the Atos Equipment in the Company's financial statements was $40,149,000 as of June 30, 2022 (under an equipment loan and capital lease). Accordingly, the Alleged RGL Equipment, would, in theory, represent less than 5% of the Atos Equipment.

55)     In addition, as noted in the First Report, in June 2022, Goli Canada entered into a settlement agreement with the owner of the Atos Equipment, pursuant to which Goli Canada acquired such equipment for $32,000,000, which the Company asserts included the Alleged RGL Equipment.

56)     Some of the Alleged RGL Equipment appears to be integrated in the production and packaging lines forming part of the Atos Equipment which, if segregated and removed, could impair the value of the Atos Equipment. The Monitor is therefore of the view that removing the Alleged RGL Equipment could have a detrimental impact on the contemplated realization under the Agency Agreement.

57)     On April 8, 2024 the Monitor held discussions with American and Canadian counsel to the Hoffman Parties and proposed a solution whereby the Hoffman Parties could preserve their rights to obtain the proceeds from the sale of the Alleged RGL Equipment to the extent the Hoffman Parties succeed in establishing their claims, subject to certain terms and conditions (the "**Proposed Hoffman Resolution**").

58)     Later that day, at 6:41 p.m., the Hoffman Parties notified a Notice of Objection and of Intention to Seek an Adjournment. As of the time of finalizing this Second Report, no resolution had been reached with the Hoffman Parties.

59)     With respect to Caliber, the Monitor understands that it is a contractor that provided construction services in connection with improvements to the Norco Facility. Caliber is claiming an ownership interest in certain building materials, equipment and spare parts located at the Norco Facility.

60) The Monitor expects to be able to reach an agreement with Caliber that will allow for the property that is subject to their claims to be disposed of at the auction to be conducted by the Agent as part of the Atos Transaction.

## UPDATE ON THE PROPOSED TRANSACTIONS

### The Principal Transaction

61) Since the filing of the First Report, the parties have finalized the Subscription Agreement and made certain minor adjustments to the RVO sought in connection with the Principal Transaction (the "**Proposed RVO**"). Copies of the updated Subscription Agreement and the Proposed RVO have been communicated by the Debtors as additional exhibits to the CCAA Application and posted on the Monitor's Website.

62) In particular, the Subscription Agreement has been adjusted to identify the entity constituted by the Consortium to subscribe for the new shares of Goli Canada under the Proposed RVO and to include the schedules to the agreement.

63) Closing of the Principal Transaction is now anticipated to occur in the week ending April 19, 2024 since the Recognition Hearing has been scheduled for April 15, 2024. Closing remains conditional on approval of the Principal Transaction by the Court and the US Court pursuant to orders substantially in the form of the Proposed RVO or otherwise acceptable to the Purchaser, Goli Canada, the Syndicated Lenders and the Monitor.

64) As of the date of this Second Report, the Monitor continues to be of the view that the implementation of the Principal Transaction through an RVO structure is appropriate in the circumstances for the reasons set out in paragraph 75 of the First Report.

### The Atos Transaction

65) As indicated in the First Report, on March 15, 2024, after having consulted with the Monitor and the Syndicated Lenders, Goli Canada and the Agent entered into the Agency Agreement, with the intervention of Goli US, for the purpose of liquidating the Atos Equipment for the benefit of the Debtors' creditors.

66) As noted above, the Monitor has been in discussions with representatives of the Agent in connection with the contemplated implementation of the Atos Transactions. The Agency Agreement and the proposed order in respect of the Atos Transaction (the "**Proposed Liquidation Order**") have not been materially modified since the First Report.

67) The Agency Agreement is conditional on the issuance of the Proposed Liquidation Order as well as an order in a form satisfactory to the parties recognizing and enforcing such order in the United States as part of the Chapter 15 Case.

### Monitor's assessment of the Proposed Transactions

68) Further to its appointment pursuant to the Initial Order and after several weeks of acting in that capacity in the CCAA Proceedings, the Monitor remains of the view that the market was adequately canvassed through the SISP, as described at paragraphs 55 to 69 of the First Report, and that the Proposed Transactions remain the best available

restructuring options in the circumstances for the Company and its stakeholders generally, the whole for the reasons set out at paragraphs 81 to 85 of the First Report.

69)  In particular, the Principal Transaction will allow for the continuation of the Company's business as a going concern for the benefit of its employees, clients, suppliers and trading partners, and the Atos Transaction is the best available option to liquidate the Atos Equipment for the benefit of the Company's creditors.

70)  The Monitor is of the view that the Proposed Hoffman Resolution is reasonable in the circumstances and will allow the Atos Transaction to proceed on schedule, while preserving the rights of the Hoffman Parties, the whole with a view to maximizing realization value for the benefit of all the stakeholders while limiting the risk and cost of further delays to the auction process which would necessarily result in higher occupation rent and related expenses, including the material holding costs associated with the Atos Equipment.

71)  The Syndicated Lenders, the parties with the primary economic interest in the assets being disposed of pursuant to the Proposed Transactions, also support the approval of such transactions and the issuance of the Proposed RVO and the Proposed Liquidation Order.

**Implementation of the Proposed Transactions and additional powers of the Monitor**

72)  Pursuant to the Subscription Agreement and the Proposed RVO, the Atos Equipment is excluded assets and the Agency Agreement is an excluded contract such that, upon filing of the Certificate (as defined in the Proposed RVO), the Atos Equipment and Goli Canada's rights and obligations under the Agency Agreement will vest in Residual Co. (as defined in the Proposed RVO) and Goli Canada shall no longer be a debtor in the CCAA Proceedings.

73)  It is therefore contemplated pursuant to the Proposed ARIO that the Monitor be granted the additional powers of a "super-monitor" upon the closing of the Principal Transaction and the filing of the Certificate in order to allow the Monitor to implement the Atos Transaction, for and on behalf of Residual Co., and to complete any other matters that may be required in the CCAA Proceedings.

74)  The powers sought pursuant to the Proposed ARIO are in line with those that have been granted to super-monitors in other CCAA Proceedings and are, in the view of the Monitor, appropriate in the circumstances.

## ACTUAL RECEIPTS AND DISBURSEMENTS

75)  Appendix A of the First Report set out the Company's cash flow projection for the 15-week period ended June 28, 2024 (the "**Initial Cash Flow Projection**").

76)  The Company's actual cash flow for the two-week period of March 18 to March 29, 2024, is compared to the Initial Cash Flow Projection in the table attached as **Appendix B**.

77)  The Company's closing cash balance as of March 29, 2024 was $50,000, constituting a favourable variance in the amount of $23,000. The Monitor has the following comments regarding the key elements of the Company's cash flow to March 29, 2024:

a)  Net receipts were $144,000 (7%) lower than projected, primarily due to lower than anticipated direct to consumer sales receipts, in part due to the Good Friday statutory holiday on March 29.

b) As a result of the lower than anticipated receipts, the Company deferred payment of rent to the Norco Facility landlord from March 29 to April 2, 2024, which was the primary driver of the $103,000 favourable variance in the "rent and facilities" category.

c) Professional fees were $264,000 lower than projected, primarily due to a timing difference, as payments totalling approximately $245,000 were made on April 2, after the Good Friday and Easter Monday statutory holidays when transactions could not be processed. There was a corresponding decrease in the purchaser funding of fees in the amount of $208,000.

78) As of the date of this Second Report, pursuant to section 9.4(a) of the Subscription Agreement, the Monitor has made payments from the Professional Costs Budget Amount (C$2,000,000) of approximately C$280,000.

79) As of the date of this Second Report, all post-filing expenses incurred by the Petitioners have been or will be paid in the normal course of business out of the existing working capital of the Debtors.

## OVERVIEW OF THE 13-WEEK CASH FLOW FORECAST

80) The Company, with the assistance of the Monitor, has prepared an updated statement of projected cash flow (the "**Cash Flow Statement**") for the 13-week period from March 30, 2024 to June 28, 2024,  (the "**Cash Flow Period**") for the purpose of projecting the Company's estimated liquidity needs during the Cash Flow Period. A copy of the Cash Flow Statement is attached *under seal* as **Appendix C** to this Second Report.

81) The main updates to the assumptions included in the Cash Flow Statement include:

a) An increase in the monthly Norco Facility rent from $100,000 to $130,000 reflecting the contracted increase in the base rent amount and excluding any contribution from the subtenant pursuant to the terms of the sublease.

b) Revised packaging and product purchases based on the Company's current expected purchasing plan from its co-manufacturers.

c) Minor adjustments to projected timing and quantum of professional fees and the contingency amount.

82) The Cash Flow Statement has been prepared by the Company using probable and hypothetical assumptions set out in the notes to the Cash Flow Statement.

83) The Monitor's review of the Cash Flow Statement consisted of inquiries, analytical procedures and discussions related to information supplied by Management. Since the hypothetical assumptions need not to be supported, the Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Cash Flow Statement. The Monitor also reviewed the support provided by Management for the probable assumptions, and the preparation and presentation of the Cash Flow Statement.

84) Based on the Monitor's review and the foregoing qualifications and limitations, nothing has come to its attention that causes it to believe that, in all respects:

a) The hypothetical assumptions are not consistent with the purpose of the Cash Flow Statement;

b)   As at the date of this Second Report, the probable assumptions developed by Management are not suitably supported and consistent with the plans of the Company or do not provide a reasonable basis for the Cash Flow Statement, given the hypothetical assumptions; or,

c)   The Cash Flow Statement does not reflect the probable and hypothetical assumptions.

85)   Since the Cash Flow Statement is based on assumptions regarding future events, actual results will vary from the information presented even if the hypothetical assumptions occur, and the variations may be material. Accordingly, the Monitor expresses no opinion as to whether the projections in the Cash Flow Statement will be achieved. The Monitor expresses no opinion or other form of assurance with respect to the accuracy of any financial information presented in this report, or relied upon in preparing this report. Neither does the Monitor express any opinion as to the performance of the Company's statutory obligations with regard to projected payments to be made in accordance with the Cash Flow Statement, *inter alia* the payment of wages, the government remittances and the payroll deductions to be made by the Company.

86)   The Cash Flow Statement has been prepared solely for the purpose described in the Notes to the Cash Flow Statement, and readers are cautioned that the Cash Flow Statement may not be appropriate for other purposes.

87)   The key assumptions used in the Cash Flow Statement are based on the revised 2024 fiscal year operating plan as well as recent operating performance.

88)   The Company's consolidated cash balance as of March 29, 2024, was approximately $50,000. The Cash Flow Statement demonstrates that this liquidity level should be sufficient to fund the operations during the Cash Flow Period (until June 28, 2024).

89)   Management anticipates more restrictive payment terms for purchases from suppliers following the announcement of the CCAA proceedings. As such, Management has anticipated certain "cash on delivery" purchases.

90)   As appears from the Cash Flow Statement and the Application, in order to preserve the going concern value of its operations with the view to completing the proposed Transaction, the Company intends to continue to pay its trade creditors for services rendered and goods supplied in the normal course of business during these CCAA proceedings.

91)   Management has advised the Monitor that it believes that the forecast reflected in the Cash Flow Statement is reasonable.

## THE MONITOR'S CONCLUSIONS AND RECOMMENDATIONS

92)   For the reasons set out in the First Report and this Second Report, the Monitor is of the view that the approval and implementation of the Proposed Transactions are beneficial to the Company as well as its creditors and its stakeholders generally.

93)   The Monitor therefore respectfully recommends, that the Debtors' request for the Proposed RVO, the Proposed Liquidation Order and the proposed ARIO be granted by the Court.

94)   The Monitor respectfully submits to the Court its Second Report.

Goli Nutrition Inc.                                                        *Page 12*
Second Report to the Court
April 8, 2024

DATED AT MONTREAL, this 8th day of April 2024.


**DELOITTE RESTRUCTURING INC.**
In its capacity as Court-Appointed Monitor of
Goli Nutrition Inc. (Canada) and Goli Nutrition Inc. (US)


Per:  Benoit Clouatre, CPA, CIRP, LIT              Jean-François Nadon, CPA, CIRP, LIT
      Senior Vice-President                        President

**Appendix A**

**STAKEHOLDER NOTICE PACKAGE**

**CANADA**
**PROVINCE OF QUÉBEC**
**DISTRICT OF MONTRÉAL**

No.:   500-11-063787-242

**S U P E R I O R   C O U R T**
(Commercial Division)

(Sitting as a court designated pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c. C-36)

**IN THE MATTER OF THE COMPROMISE OR ARRANGEMENT OF:**

**GOLI NUTRITION INC.**

-and-

**GOLI NUTRITION INC**.

Debtors-Applicants

**DELOITTE RESTRUCTURING INC.**

Monitor

## NOTICE TO STAKEHOLDERS

### March 22, 2024

### Commencement of CCAA Proceedings

On March 18, 2024, on application (the **Initial Application**) of Goli Nutrition Inc., a company incorporated under the laws of Canada (**Goli Canada**), and Goli Nutrition Inc., a company incorporated under the laws of Delaware (**Goli US** and together with Goli Canada, the **Debtors**), the Superior Court of Québec (Commercial Division) in Montreal, Québec, Canada (the **Canadian Court**) rendered an initial order (the **Initial Order**) pursuant to the *Companies' Creditors Arrangement Act* (Canada) (the **CCAA**) in respect of each of the Debtors (the **CCAA Proceedings**). Pursuant to the Initial Order, *inter alia*, Deloitte Restructuring Inc. (the **Monitor**) was appointed to monitor the business and financial affairs of the Debtors in accordance with the CCAA and all proceedings against the Debtors and their property were stayed until March 27, 2024 (the **Stay of Proceedings**). For clarity, the Debtors are not "bankrupt" and continue to operate in the ordinary course of business, subject to the Initial Order, as amended, and the CCAA. A complete copy of the Initial Order is attached to this notice.

### Commencement of Chapter 15 Cases

Pursuant to the Initial Order, the Monitor was also authorized to act as the "foreign representative" of the Debtors for purposes of seeking protection and assistance from courts outside Canada in connection with the CCAA Proceedings. In its capacity as foreign representative, on March 19, 2024, the Monitor commenced cases for each of the Debtors in the United States Bankruptcy Court for the District of Delaware by the filing of a petition for recognition of the CCAA Proceedings under section 1515 of the United States Bankruptcy Code (the **Chapter 15 Cases**). Enclosed herewith is a separate notice providing information about the Chapter 15 Cases, including relief that has been entered in the cases, as well as upcoming hearing dates and related deadlines.

## **Transactions being submitted for approval and hearing details**

A hearing before the Canadian Court (the **Transaction Approval Hearing**) to consider the approval of two transactions involving the Debtors' business and assets (as summarily described below, the **Proposed Transactions**) shall take place on **April 9, 2024** at the Montreal Courthouse located at 1 Notre-Dame East Street, Montreal, Québec, Canada **at a time and in a room to be determined by the Canadian Court**. The Monitor will post the details for the Transaction Approval Hearing once they are available on its website at: www.insolvencies.deloitte.ca/goli.

At the Transaction Approval Hearing, the Debtors will seek orders approving and in connection with the Proposed Transactions, which can be summarily described as follows:

- **The Principal Transaction:** an acquisition of substantially all of Goli Canada's business and assets, except the Equipment (as defined below), by a purchaser group, which includes one of the Debtors' founders. The Principal Transaction contemplates the continuation of the Debtors' business as a going concern.

  The Principal Transaction is proposed to be implemented in accordance with a Subscription Agreement entered into on March 15, 2024, between Goli Canada and the purchaser group, pursuant to which a newly constituted entity will subscribe for new shares in Goli Canada and effectively acquire 100% of the equity interest therein. The Subscription Agreement is intended to be approved pursuant to a reverse vesting order (**RVO**) and thereafter recognized and enforced in the United States in the Chapter 15 Cases. Certain excluded assets as well as certain contracts and liabilities of Goli Canada (Excluded Contracts and Liabilities) will be vested out of Goli Canada and transferred to a "Residual Co." as part of the contemplated RVO structure. All liabilities and contracts that are not Excluded Contracts and Liabilities will be retained by Goli Canada. A copy of the proposed RVO relating to the approval of the Subscription Agreement has been filed as Exhibit P-22 to the Initial Application and is available on the Monitor's website.

- **The Equipment Transaction:** the sale of certain manufacturing equipment owned by Goli Canada and located in a facility in Norco, California (the **Equipment**) to be conducted by a liquidator.

  The Equipment Transaction is proposed to be implemented in accordance with an Agency Agreement entered into on March 15, 2024, between Goli Canada and the liquidator, pursuant to which the Equipment will be marketed and sold free and clear of any encumbrances to one or more purchasers and the proceeds will be remitted to Goli Canada's secured creditors. A copy of the proposed Liquidation Order relating to the approval of the Agency Agreement has been filed as Exhibit P-23 to the Initial Application and is available on the Monitor's website.

Any party wishing to make representations at the Transaction Approval Hearing can appear in person at the address identified above or by videoconference via Teams. The permanent Teams links for all rooms at the Montreal Courthouse can be accessed at the following link: https://bit.ly/3PsEAey. Any person appearing at the Transaction Approval Hearing must respect the applicable rules of representation, which require, *inter alia,* that corporations be represented by an attorney entitled to make representations before the Canadian Court.

**Comeback Hearing on the Initial Application**

A comeback hearing on the Initial Application (the **Comeback Hearing**) has also been scheduled before the Canadian Court for **March 27, 2024 at 9:30 a.m. in room 16.11 of the Montreal Courthouse** located at 1 Notre-Dame East Street, Montreal, Québec, Canada.

At the Comeback Hearing, the Debtors intend to seek, in particular, the following relief: (i) an extension of the Stay of Proceedings until June 28, 2024; and (ii) an amendment and restatement of the Initial Order.

Any party wishing to make representations on the Initial Order or on the relief to be sought at the Comeback Hearing can appear in person at the address identified above or by videoconference via Teams. The permanent Teams links for all rooms at the Montreal Courthouse can be accessed at the following link: https://bit.ly/3PsEAey. Any person appearing at the Comeback Hearing must respect the applicable rules of representation, which require, *inter alia*, that corporations be represented by an attorney entitled to make representations before the Canadian Court.

**Additional documents and information**

Complete copies of the proceedings and other documents filed in the CCAA Proceedings and the Chapter 15 Cases are available on the Monitor's website at www.insolvencies.deloitte.ca/goli.

Please note that certain exhibits and documents are the object of sealing orders rendered by the Canadian Court, as provided for in the Initial Order.

Please also note that no claims process in respect of the Debtors or their assets is currently contemplated and creditors are not required to file proofs of claim.

If you are unable to access the Monitor's website, wish to be added to the Service List in the CCAA Proceedings, or have any other inquiries, a representative of the Monitor can be reached at goliccaa@deloitte.ca.

# Initial Order
# March 18, 2024

# SUPERIOR COURT

(Commercial Division)

(Sitting as a court designated pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36)

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

No.:     500-11-063787-242

DATE:  March 18, 2024

_____

**BY  THE HONOURABLE  MARTIN F. SHEEHAN, J.S.C.**

_____

**IN THE MATTER OF THE PLAN OF COMPROMISE OR ARRANGEMENT OF:**

**GOLI NUTRITION INC.**
and
**GOLI NUTRITION INC.**
         Applicants/Debtors

and
**DELOITTE RESTRUCTURING INC.**
         Monitor

_____

## FIRST INITIAL ORDER

_____

**ON READING** the Applicants' *Application for the Issuance of a First Day Initial Order, an Amended and Restated Initial Order and Other Relief, Including the Approval of a Transaction* pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, C-36 (as amended the "**CCAA**") and the exhibits, the affidavit filed in support thereof (the "**Application**"), the consent of Deloitte Restructuring Inc., a licensed insolvency trustee, to act as monitor (the "**Monitor**"), relying upon the submissions of counsel and being advised that the interested parties, including secured creditors who are likely to be affected by the charges created herein were given prior notice of the presentation of the Application;

JS1699

**GIVEN** the provisions of the CCAA;

**WHEREFORE, THE COURT**:

1.    **GRANTS** the Application.

2.    **ISSUES** an order pursuant to the CCAA (the "**Order**"), divided under the following headings:

- Service

- Application of the CCAA and Administrative Consolidation

- Effective Time

- Plan of Arrangement

- Stay of Proceedings against the Applicants and the Property

- Stay of Proceedings against the Directors and Officers

- Possession of Property and Operations

- No Exercise of Rights or Remedies;

- No Interference with Rights

- Continuation of Services

- Non-Derogation of Rights

- Syndicated Lenders Unaffected

- Directors' and Officers' Indemnification and Charge

- Restructuring

- Powers of the Monitor

- Priorities and General Provisions Relating to CCAA Charges

- Comeback Hearing

- General

**Service**

3.      **ORDERS** that any prior delay for the presentation of the Application is hereby abridged and validated so that the Application is properly returnable today and hereby dispenses with further service thereof.

4.      **DECLARES** that sufficient prior notice of the presentation of this Application has been given by Goli Nutrition Inc. ("**Goli**"), a corporation existing under the laws of Canada, and Goli Nutrition Inc., a corporation existing under the laws of Delaware ("**Goli US**" and, with Goli, the "**Applicants**"), to interested parties, including the secured creditors who are likely to be affected by the charges created herein.

**Application of the CCAA and Administrative Consolidation**

5.      **DECLARES** that each of the Applicants is a debtor company to which the CCAA applies.

6.      **ORDERS** the consolidation of these CCAA proceedings of the Applicants (the "**CCAA Proceedings**") under one single Court file and that all proceedings, filings, and other matters in the CCAA Proceedings be filed jointly and together in Court file number 500-11-063787-242.

7.      **DECLARES** that the consolidation of the CCAA Proceedings in respect of the Applicants shall be for administrative purposes only and shall not effect a consolidation of the assets and property or of the debts and obligations of each Applicant, including, without limitation, for the purposes of any Plan or Plans that may be hereafter proposed.

**Effective time**

8.      **DECLARES** that this Order and all of its provisions are effective as of 12:01 a.m. Montreal time, province of Quebec, on the date of this Order (the "**Effective Time**").

**Plan of Arrangement**

9.      **DECLARES** that the Applicants, in consultation with the Monitor, shall have the authority to file with this Court and to submit to their creditors one or more Plans in accordance with the CCAA.

**Stay of Proceedings against the Applicants and the Property**

10.     **ORDERS** that until and including March 27, 2024 (the "**Stay Period**"), no proceeding or enforcement process in any court or tribunal (each, a "**Proceeding**") shall be commenced or continued against or in respect of the Applicants, or affecting the Applicants' business operations and activities (the "**Business**") or the Property (as defined herein below), including as provided in paragraph 14

hereinbelow except with leave of this Court. Any and all Proceedings currently under way against or in respect of the Applicants or affecting the Business or the Property are hereby stayed and suspended pending further order of this Court, the whole subject to subsection 11.1 CCAA.

11.    **ORDERS** that the rights of His Majesty in right of Canada and His Majesty in right of a Province are suspended in accordance with the terms and conditions of Subsection 11.09 CCAA.

**Stay of Proceedings against the Directors and Officers**

12.    **ORDERS** that during the Stay Period and except as permitted under subsection 11.03(2) of the CCAA, no Proceeding may be commenced, or continued against any former, present or future director or officer of the Applicants nor against any person deemed to be a director or an officer of the Applicants under subsection 11.03(3) CCAA (each, a "**Director**", and collectively the "**Directors**") in respect of any claim against such Director which arose prior to the Effective Time and which relates to any obligation of the Applicants where it is alleged that any of the Directors is under any law liable in such capacity for the payment of such obligation.

**Possession of Property and Operations**

13.    **ORDERS** that each of the Applicants shall remain in possession and control of its present and future assets, rights, undertakings and properties of every nature and kind whatsoever, and wherever situated, including all proceeds thereof (collectively the "**Property**"), the whole in accordance with the terms and conditions of this order.

**No Exercise of Rights or Remedies**

14.    **ORDERS** that during the Stay Period, and subject to, *inter alia*, subsection 11.1 CCAA, all rights and remedies of any individual, natural person, firm, corporation, partnership, limited liability company, trust, joint venture, association, organization, governmental body or agency, or any other entity (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Applicants, or affecting the Business, the Property or any part thereof, are hereby stayed and suspended except with leave of this Court.

15. **DECLARES** that, to the extent any rights, obligations, or prescription, time or limitation periods, including, without limitation, to file grievances, relating to the Applicants or any of the Property or the Business may expire (other than pursuant to the terms of any contracts, agreements or arrangements of any nature whatsoever), the term of such rights, obligations, or prescription, time or limitation periods shall hereby be deemed to be extended by a period equal to the Stay Period. Without limitation to the foregoing, in the event that the Applicants become bankrupt or a receiver as defined in subsection 243(2) of the *Bankruptcy and Insolvency Act (Canada)* (the "**BIA**") is appointed in respect of the Applicants, the

period between the date of the Order and the day on which the Stay Period ends shall not be calculated in respect of the Applicants in determining the 30 day period referred to in Section 81.1 of the BIA or the 15 day period referred to in Section 81.2 of the BIA.

**No Interference with Rights**

16.     **ORDERS** that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, resiliate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or with leave of this Court.

**Continuation of Services**

17.     **ORDERS** that during the Stay Period and subject to paragraph 19 hereof and subsection 11.01 CCAA, all Persons having verbal or written agreements with the Applicants or statutory or regulatory mandates for the supply of goods or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation, utility, or other goods or services made available to the Applicants, are hereby restrained until further order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Applicants, and that the Applicants shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses, domain names or other services, provided in each case that the normal prices or charges for all such goods or services received after the date of the Order are paid by the Applicants, without having to provide any security deposit or any other security, in accordance with normal payment practices of the Applicants or such other practices as may be agreed upon by the supplier or service provider and the Applicants, with the consent of the Monitor, or as may be ordered by this Court.

18.     **ORDERS** that, notwithstanding anything else contained herein and subject to subsection 11.01 CCAA, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided to the Applicants on or after the date of this Order, nor shall any Person be under any obligation on or after the date of the Order to make further advance of money or otherwise extend any credit to the Applicants.

19.     **ORDERS** that, without limiting the generality of the foregoing and subject to Section 21 of the CCAA, if applicable, cash or cash equivalents placed on deposit by the Applicants with any Person during the Stay Period, whether in an operating account or otherwise for themselves or for another entity, shall not be applied by such Person in reduction or repayment of amounts owing to such Person as of the date of the Order or due on or before the expiry of the Stay Period or in satisfaction of any interest or charges accruing in respect thereof; however, this provision shall not prevent any financial institution from: (i) reimbursing themselves for the amount

of any cheques drawn by Applicants and properly honoured by such institution, or (ii) holding the amount of any cheques or other instruments deposited into the Applicants' account until those cheques or other instruments have been honoured by the financial institution on which they have been drawn.

## Non-Derogation of Rights

20.    **ORDERS** that, notwithstanding the foregoing, any Person who provided any kind of letter of credit, guarantee or bond (the "**Issuing Party**") at the request of the Applicants shall be required to continue honouring any and all such letters, guarantees and bonds, issued on or before the date of the Order, provided that all conditions under such letters, guarantees and bonds are met save and except for defaults resulting from this Order; however, the Issuing Party shall be entitled, where applicable, to retain the bills of lading or shipping or other documents relating thereto until paid.

## Syndicated Lenders Unaffected

21.    **ORDERS** and **DECLARES** that Bank of Montreal ("**BMO**"), National Bank of Canada, Fédération des Caisses Desjardins and HSBC Bank Canada (collectively, the "**Syndicated Lenders**") are unaffected by this Order or the CCAA Proceedings, or pursuant to any proposal to be filed pursuant to the BIA or any other proceedings initiated thereunder, and the relationship between the Applicants and the Syndicated Lenders shall continue as if this Order had not been granted. Without limiting the generality of the foregoing, the Syndicated Lenders shall not be subject to the stay of proceedings, as ordered herein, including during the Stay Period or any renewal or extension thereof, or to any other limitations of creditors' right or recourses under this Order. Nothing in this Order shall prevent the Syndicated Lenders from enforcing their security or their contractual rights as against the applicable Applicant, subject only to the Syndicated Lenders providing at least 5 business days advance written notice of their intention to do so to the Applicants and to the Monitor (the "**Syndicate Notice Period**"). Upon expiration of the Syndicated Notice Period, nothing in this Order shall preclude BMO, in its capacity as administrative agent for the Syndicated Lenders, from taking any and all steps under the loan documents and otherwise permitted at law, but without having to send any demands or notices under Section 244 of the BIA.

22.    **ORDERS** that the Syndicated Lenders shall be treated as unaffected creditors in any Plan and, notwithstanding anything contained in such Plan, shall be completely unaffected thereby.

## Directors' and Officers' Indemnification and Charge

23.    **ORDERS** that the Applicants shall indemnify their Directors from all claims relating to any obligations or liabilities they may incur and which have accrued by reason of or in relation to their respective capacities as directors or officers of the Applicants after the Effective Time, except where such obligations or liabilities

were incurred as a result of such directors' or officers' gross negligence, wilful misconduct or gross or intentional fault as further detailed in Section 11.51 CCAA.

24.     **ORDERS** that the Directors of the Applicants shall be entitled to the benefit of and are hereby granted a charge and security in the Property of the Applicants to the extent of the aggregate amount of $330,000 (the "**Directors' Charge**"), as security for the indemnity provided in paragraph 23 of this Order as it relates to obligations and liabilities that the Directors may incur in such capacity after the Effective Time. The Directors' Charge shall have the priority set out in paragraphs 38 and 39 of this Order.

25.     **ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) the Directors shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts for which the Directors are entitled to be indemnified in accordance with paragraph 24 of this Order.

**Restructuring**

26.     **DECLARES** that, to facilitate the orderly restructuring of their business and financial affairs (the "**Restructuring**") but subject to such requirements as are imposed by the CCAA, the Applicants shall, in consultation with the Syndicated Lenders, have the right, subject to approval of the Monitor or further order of the Court, to:

   (a)     permanently or temporarily cease, downsize or shut down any of their operations or locations as they deem appropriate and make provision for the consequences thereof in the Plan;

   (b)     pursue all avenues to finance or refinance, market, convey, transfer, assign or in any other manner dispose of the Business or Property, in whole or part, subject to further order of the Court and sections 11.3 and 36 CCAA, and under reserve of subparagraph (c);

   (c)     convey, transfer, assign, lease, or in any other manner dispose of the Property, outside of the ordinary course of business, in whole or in part, provided that the price in each case does not exceed $500,000 or $1,500,00 in the aggregate;

   (d)     terminate the employment of their employees or temporarily or permanently lay off their employees as they deem appropriate and, to the extent that any amounts in lieu of notice, termination, or severance pay or other amounts in respect thereof are not paid in the ordinary course, make provision, on such terms as may be agreed upon between the Applicants

and such employees or, failing such an agreement, make provision to deal with, any consequences thereof in the Plan, as the Applicants may determine;

(e)     subject to the provisions of section 32 CCAA, disclaim or resiliate any of their agreements, contracts or arrangements of any nature whatsoever, with such disclaimers or resiliations to be on such terms as may be agreed between the Applicants and the relevant party or, failing such an agreement, to make provision for the consequences thereof in the Plan; and

(f)     subject to section 11.3 CCAA, assign any rights or obligations of the Applicants.

27.     **DECLARES** that, if a notice of disclaimer or resiliation is given to a landlord of the Applicants pursuant to section 32 of the CCAA and subsection 26(e) of this Order, then (a) during the notice period prior to the effective time of the disclaimer or resiliation, the landlord may show the affected leased premises to prospective tenants during normal business hours by giving the Applicants and the Monitor 24 hours' prior written notice and (b) at the effective time of the disclaimer or resiliation, the landlord shall be entitled to take possession of any such leased premises and re-lease any such leased premises to third parties on such terms as the landlord may determine, without waiver of, or prejudice to, any claims or rights of the landlord against the Applicants, provided nothing herein shall relieve a landlord of its obligation to mitigate any damages claimed in connection therewith.

28.     **ORDERS** that the Applicants shall provide to any relevant landlord notice of the Applicants' intention to remove any fittings, fixtures, installations or leasehold improvements at least seven (7) days in advance. If the Applicants have already vacated the leased premises, they shall not be considered to be in occupation of such location pending the resolution of any dispute between the Applicants and the landlord.

29.     **DECLARES** that, in order to facilitate the Restructuring, the Applicants may, subject to the approval of the Monitor or further order of the Court, settle claims of customers and suppliers that are in dispute.

30.     **DECLARES** that, pursuant to sub-paragraph 7(3)(c) of the *Personal Information Protection and Electronic Documents Act*, S.C. 2000, c.5, and equivalent provisions of the *Act Respecting the Protection of Personal Information in the Private Sector*, R.S.Q. c. P-39.1, the Applicants are permitted, in the course of these proceedings, to disclose personal information of identifiable individuals in their possession or control to stakeholders or prospective investors, financiers, buyers, or strategic partners and to their advisers (individually, a "**Third Party**"), but only to the extent desirable or required to negotiate and complete the Restructuring or the preparation and implementation of the Plan or a transaction

for that purpose, provided that the Persons to whom such personal information is disclosed enter into confidentiality agreements with the Applicants binding them to maintain and protect the privacy of such information and to limit the use of such information to the extent necessary to complete the transaction or Restructuring then under negotiation. Upon the completion of the use of personal information for the limited purpose set out herein, the personal information shall be returned to the Applicants or destroyed. In the event that a Third Party acquires personal information as part of the Restructuring or the preparation or implementation of the Plan or a transaction in furtherance thereof, such Third Party may continue to use the personal information in a manner which is in all respects identical to the prior use thereof by the Applicants.

**Powers of the Monitor**

31.   **ORDERS** that Deloitte Restructuring Inc., a licensed insolvency trustee, is hereby appointed to monitor the business and financial affairs of the Applicants as an officer of this Court (the "**Monitor**") and that the Monitor, in addition to the prescribed powers and obligations, referred to in section 23 of the CCAA:

(a)   shall, without delay, (i) publish in the National Post, La Presse and the Wall Street Journal and (ii) within five (5) business days after the date of this Order, (A) post on the Monitor's website (the "**Website**"), a notice containing the information prescribed under the CCAA, (B) make this Order publicly available in the manner prescribed under the CCAA, (C) send, in the prescribed manner, a notice to all known creditors having a claim against the Applicants of more than $1,000, advising them that the Order is publicly available, and (D) prepare a list showing the names and addresses of such creditors and the estimated amounts of their respective claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder;

(b)   shall monitor the Applicants' receipts and disbursements;

(c)   shall assist the Applicants, to the extent required by the Applicants, in dealing with their creditors and other interested Persons during the Stay Period;

(d)   shall assist the Applicants, to the extent required by the Applicants, with the preparation of their cash-flow projections and any other projections or reports and the development, negotiation and implementation of the Plan;

(e)   shall advise and assist the Applicants, to the extent required by the Applicants, to review the Applicants' business and assess opportunities for cost reduction, revenue enhancement, and operating efficiencies;

(f)   shall assist the Applicants, to the extent required by the Applicants, with the Restructuring and in their negotiations with their creditors and other

interested Persons and with the holding and administering of any meetings held to consider the Plan;

(g)     shall report to the Court on the state of the business and financial affairs of the Applicants or developments in these proceedings or any related proceedings within the time limits set forth in the CCAA and at such time as considered appropriate by the Monitor or as the Court may order;

(h)     shall report to the Syndicated Lenders on the state of the operations, business and financial affairs of the Applicants or developments in the CCAA Proceedings or any related proceedings;

(i)     shall report to this Court and interested parties, including but not limited to creditors affected by the Plan, with respect to the Monitor's assessment of, and recommendations with respect to, the Plan;

(j)     may retain and employ such agents, advisers and other assistants as are reasonably necessary for the purpose of carrying out the terms of the Order, including, without limitation, one or more entities related to or affiliated with the Monitor;

(k)     may engage legal counsel to the extent the Monitor considers necessary in connection with the exercise of its powers or the discharge of its obligations in these proceedings and any related proceeding, under the Order or under the CCAA;

(l)     may act as a "foreign representative" of the Applicants or in any other similar capacity in any insolvency, bankruptcy or reorganisation proceedings outside of Canada;

(m)     may give any consent or approval as may be contemplated by the Order or the CCAA; and

(n)     may perform such other duties as are required by the Order or the CCAA or by this Court from time to time.

Unless expressly authorized to do so by this Court, the Monitor shall not otherwise interfere with the business and financial affairs carried on by the Applicants, and the Monitor is not empowered to take possession of the Property nor to manage any of the business and financial affairs of the Applicants.

32.     **ORDERS** that the Applicants and their Directors, officers, employees and agents, accountants, auditors and all other Persons having notice of the Order shall forthwith provide the Monitor with unrestricted access to all of the Business and Property, including, without limitation, the premises, books, records, data, including data in electronic form, and all other documents of the Applicants in connection with the Monitor's duties and responsibilities hereunder.

33.    **DECLARES** that the Monitor may provide creditors and other relevant stakeholders of the Applicants with information in response to requests made by them in writing addressed to the Monitor and copied to the Applicants' counsel. In the case of information that the Monitor has been advised by the Applicants is confidential, proprietary or competitive, the Monitor shall not provide such information to any Person without the consent of the Applicants, unless otherwise directed by this Court.

34.    **DECLARES** that, if the Monitor, in its capacity as Monitor, carries on the business of the Applicants or continues the employment of the Applicants' employees, the Monitor shall benefit from the provisions of section 11.8 of the CCAA.

35.    **DECLARES** that no action or other proceedings shall be commenced against the Monitor relating to its appointment, its conduct as Monitor, or the carrying out the provisions of any order of this Court, except with prior leave of this Court, on at least ten (10) days notice to the Monitor and its counsel.  The entities related to or affiliated with the Monitor referred to in subparagraph 31(j) hereof shall also be entitled to the protection, benefits and privileges afforded to the Monitor pursuant to this paragraph.

36.    **ORDERS** that Applicants shall pay the reasonable fees and disbursements of the Monitor, the Monitor's legal counsel, the Applicants' legal counsel, and other advisers that are directly related to these proceedings, the Plan, and the Restructuring, whether incurred before or after the Order, and shall provide each with a reasonable retainer in advance on account of such fees and disbursements, if so requested.

37.    **DECLARES** that the Monitor, the Monitor's legal counsel (Norton Rose Fullbright Canada LLP and Norton Rose Fullbright US LLP), the Applicants' legal counsel (Davies Ward Phillips & Vineberg LLP), legal counsel to the Syndicated Lenders (Osler Hoskin & Harcourt LLP and McDonald Hopkins), as security for the professional fees and disbursements incurred both before and after the making of the Order and directly related to these proceedings, the Plan, and the Restructuring, be entitled to the benefit of and are hereby granted a charge and security in the Property of the Applicants to the extent of the aggregate amount of $300,000 (the "**Administration Charge**"), having the priority established by paragraphs 38 and 39 hereof. Davies Ward Phillips & Vineberg LLP shall rank first amongst the beneficiairies of the Administation Charge listed in this paragraph.

**Priorities and General Provisions Relating to CCAA Charges**

38.    **DECLARES** that the priorities of the Administration Charge, the Directors' Charge (collectively, the "**CCAA Charges**") and the Syndicated Lenders' Security (as defined in the Application), as between them with respect to any Property to which they apply, shall be as follows:

(a)    first, the Administration Charge;

(b)      second, the Syndicated Lenders' Security; and

(c)      third, the Directors' Charge.

39.    **DECLARES** that each of the CCAA Charges shall rank in priority to any and all other hypothecs, mortgages, liens, security interests, priorities, charges, encumbrances or security of whatever nature or kind (collectively, the "**Encumbrances**") affecting the Property charged by such Encumbrances, other than the Directors' Charge, which shall rank after the Syndicated Lenders' Security.

40.    **ORDERS** that, except as otherwise expressly provided for herein, the Applicants shall not grant any Encumbrances in or against any Property that rank in priority to, or *pari passu* with, any of the CCAA Charges, unless the Applicants obtain the prior written consent of the Monitor, the Syndicated Lenders, and the prior approval of the Court.

41.    **DECLARES** that each of the CCAA Charges shall attach, as of the Effective Time, to all present and future Property of the Applicants, notwithstanding any requirement for the consent of any party to any such charge or to comply with any condition precedent.

42.    **DECLARES** that the CCAA Charges and the rights and remedies of the beneficiaries of such Charges, as applicable, shall be valid and enforceable and shall not otherwise be limited or impaired in any way by: (i) these proceedings and the declaration of insolvency made herein; (ii) any application for a bankruptcy order filed pursuant to the BIA in respect of the Applicants or any bankruptcy order made pursuant to any such application or any assignment in bankruptcy made or deemed to be made in respect of the Applicants; or (iii) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt, or the creation of Encumbrances, contained in any agreement, lease, sub-lease, offer to lease or other arrangement which binds the Applicants (a "**Third Party Agreement**"), and notwithstanding any provision to the contrary in any Third Party Agreement:

(a)      the creation of any of the CCAA Charges shall not create or be deemed to constitute a breach by the Applicants of any Third Party Agreement to which it is a party; and

(b)      any of the beneficiaries of the CCAA Charges shall not have liability to any Person whatsoever as a result of any breach of any Third Party Agreement caused by or resulting from the creation of the CCAA Charges.

43.    **DECLARES** that notwithstanding: (i) these proceedings and any declaration of insolvency made herein, (ii) any application for a bankruptcy order filed pursuant to the BIA in respect of the Applicants and any bankruptcy order allowing such application or any assignment in bankruptcy made or deemed to be made in

respect of the Applicants, and (iii) the provisions of any federal or provincial statute, the payments or disposition of Property made by the Applicants pursuant to the Order and the granting of the CCAA Charges, do not and will not constitute settlements, fraudulent preferences, fraudulent conveyances, transfers at undervalue or other challengeable or reviewable transactions or conduct meriting an oppression remedy under any applicable law.

44.     **DECLARES** that the CCAA Charges shall be valid and enforceable as against all Property of the Applicants and against all Persons, including, without limitation, any trustee in bankruptcy, receiver, receiver and manager or interim receiver of the Applicants, for all purposes.

**Comeback Hearing**

45.     **ORDERS** that the comeback hearing on the Application shall take place on March 27, 2024 at 9:30 am by videoconference and in room 16.11, and **PRAYS ACT** of the undertaking of Debtors' counsel to communicate this information in advance of such hearing to the parties having responded to the Application or identified on the service list maintained for these CCAA proceedings.

**General**

46.     **ORDERS** that no Person shall commence, proceed with or enforce any Proceedings against any of the Directors, employees, legal counsel, or financial advisers of the Applicants or of the Monitor in relation to the Business or Property of the Applicants, without first obtaining leave of this Court, upon ten (10) days' written notice to the Applicants and to all those referred to in this paragraph whom it is proposed be named in such Proceedings.

47.     **DECLARES** that the Order and any proceeding or affidavit leading to the Order, shall not, in and of themselves, constitute a default or failure to comply by the Applicants under any statute, regulation, licence, permit, contract, permission, covenant, agreement, undertaking or other written document or requirement.

48.     **DECLARES** that, except as otherwise specified herein, the Applicants and the Monitor are at liberty to serve any notice, proof of claim form, proxy, circular or other document in connection with these proceedings by forwarding copies by prepaid ordinary mail, courier, personal delivery, or electronic transmission to Persons or other appropriate parties at their respective given addresses as last shown on the records of the Applicants and that any such service shall be deemed to be received on the date of delivery if by personal delivery or electronic transmission, on the following business day if delivered by courier, or three business days after mailing if by ordinary mail.

49.     **DECLARES** that the Applicants and any party to these proceedings may serve any court materials in these proceedings on all represented parties electronically, by emailing a PDF or other electronic copy of such materials to counsels' email addresses.

17

50. **DECLARES** that, unless otherwise provided herein, under the CCAA, or ordered by this Court, no document, order or other material need be served on any Person in respect of these proceedings unless such Person has served a Notice of Appearance on the solicitors for the Applicants and the Monitor and has filed such notice with this Court, or appears on the service list prepared by the Monitor or its attorneys, save and except when an order is sought against a Person not previously involved in these proceedings.

51. **DECLARES** that the Applicants or the Monitor may, from time to time, apply to this Court for directions concerning the exercise of their respective powers, duties and rights hereunder or in respect of the proper execution of the Order on notice only to each other.

52. **DECLARES** that the Order and all other orders in these proceedings shall have full force and effect in all provinces and territories in Canada.

53. **AUTHORIZES** the Monitor or the Applicants to apply as they may consider necessary or desirable, with or without notice, to any other court or administrative body, whether in Canada, the United States of America or elsewhere, for orders which aid and complement this Order and any subsequent orders of this Court and, without limitation to the foregoing, any orders under Chapter 15 of the U.S. Bankruptcy Code, including an order for recognition of these CCAA proceedings as "Foreign Main Proceedings" in the United States of America pursuant to Chapter 15 of the U.S. Bankruptcy Code, for which the Monitor, shall be the foreign representative of the Applicants. All courts and administrative bodies of all such jurisdictions are hereby respectively requested to make such orders and to provide such assistance to the Applicants and the Monitor as may be deemed necessary or appropriate for that purpose.

54. **REQUESTS** the aid and recognition of any Court, tribunal, regulatory or administrative body in any Province of Canada and any Canadian federal court or in the United States of America, including without limitation the United States Bankruptcy Court for the District of Delaware, and any court or administrative body elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All Courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and the Monitor as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor or the authorized representative of the Applicants in any foreign proceeding, to assist the Applicants, and the Monitor, and to act in aid of and to be complementary to this Court, in carrying out the terms of this Order.

55. **DECLARES** that, for the purposes of any applications authorized by paragraphs 53 and 54 of this Order, the Applicants' centre of main interest is located in Montréal, Québec, Canada.

56.    **ORDERS** that Exhibits P-21, P-24 and P-25 and the Appendices A, B and D of Exhibit P-14 be kept under seal until further order from this Court.

57.    **ORDERS** the provisional execution of the Order notwithstanding any appeal.


Martin Sheehan

Signature numérique de Martin Sheehan
Date : 2024.03.18 11:53:37 -04'00'

MARTIN F. SHEEHAN, J.S.C.

# Recognition Notice
# March 22, 2024

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
----------------------------------------------------------------  x
                                                                  :
In re:                                                            :   Chapter 15
                                                                  :
GOLI NUTRITION INC., et al.,¹                                     :   Case No. 24-10438 (LSS)
                                                                  :
                                                                  :   Jointly Administered
              Debtors in a Foreign Proceeding.                    :
----------------------------------------------------------------  x
```

**NOTICE OF (I) FILING OF (A) PETITIONS PURSUANT TO CHAPTER 15 OF THE
BANKRUPTCY CODE AND (B) PETITIONER'S SALE MOTION; (II) ENTRY OF
PROVISIONAL RELIEF ORDER; (III) DEADLINE TO OBJECT TO ENTRY OF
RECOGNITION ORDER AND SALE ORDER; AND (IV) HEARING FOR COURT TO
CONSIDER CHAPTER 15 PETITIONS, SALE MOTION,
ENTRY OF RECOGNITION ORDER AND SALE ORDER**

      **PLEASE TAKE NOTICE** that on March 19, 2024, Deloitte Restructuring Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "Petitioner"), as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of Goli Nutrition Inc., a company incorporated in Québec, Canada ("Goli Canada") and Goli Nutrition Inc., a company incorporated in Delaware ("Goli US," and together with Goli Canada, the "Debtors"), in Canadian proceedings (the "Canadian Proceedings") commenced under the under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), pending before the Superior Court in the Commercial Division in the District of Montreal (the "Canadian Court"), filed petitions (collectively, the "Chapter 15 Petitions") under chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), commencing the Debtors' chapter 15 cases (collectively, the "Chapter 15 Cases") ancillary to the Canadian Proceedings, with the United States Bankruptcy Court for the District of Delaware (the "Court").

      **PLEASE TAKE FURTHER NOTICE** that on March 18, 2024, the Canadian Court issued an order (the "Initial Order") (i) appointing the Petitioner as monitor and authorizing it to act as the foreign representative of the Debtors, and (ii) granting a broad stay of proceedings in favor of the Debtors for an initial period through and including March 27, 2024 (the "Stay Period"). The Canadian Court has scheduled a hearing to consider an extension of the Stay Period and other relief for March 27, 2024 (the "Comeback Hearing").

      **PLEASE TAKE FURTHER NOTICE** that the Petitioner has filed the *Petitioner's Verified Petition Under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief* (the "Verified Petition"), requesting that the Court  enter an order (the "Recognition

---

¹ The Debtors in these Chapter 15 cases, are: Goli Nutrition, Inc., a company incorporated in Québec, Canada and the last 4 digits of its Canadian business number is 0002; and Goli Nutrition Inc., a company incorporated in Delaware and the last 4 digits of its federal tax identification number is 2655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

Order"), (a) granting recognition of the Canadian Proceedings as foreign main proceedings, or, in the alternative, as foreign nonmain proceedings, under section 1517 of the Bankruptcy Code, and (b) enforcing the Initial Order on a permanent basis in the United States and (c) granting such other and further relief as the Court deems just and proper.

       **PLEASE TAKE FURTHER NOTICE** that by Order dated March 22, 2024, the Chapter 15 Cases are being jointly administered for procedural purposes only and all pleadings filed in the Chapter 15 Cases should bear the above-referenced caption.

       **PLEASE TAKE FURTHER NOTICE** that on March 22, 2024, the Court entered an order (the "Provisional Relief Order"), on an interim basis, applying sections 362 and 365(e) of the Bankruptcy Code to stay any and all collection and enforcement actions by creditors, lessors and any other parties against the Debtors and their assets in the United States.

       **PLEASE TAKE FURTHER NOTICE** that the Debtors have made applications in the Canadian Court for (i) a reverse vesting order (the "RVO") approving a transaction, pursuant to which a purchaser will subscribe for new shares in Goli Canada and effectively acquire 100% of the equity interest in Goli Canada and become the sole shareholder of Goli Canada and its subsidiaries, and (ii) an order (the "Atos Sale Order") approving the terms of a second and separate transaction to implement the liquidation of certain assets of Goli Canada located in the United States. The Canadian Court has scheduled a hearing (the "Transaction Approval Hearing") to consider the Debtors' request for the RVO and the Atos Sale Order on **April 9, 2024** at the Montreal Courthouse located at 1 Notre-Dame East Street, Montreal, Quebec, Canada **at a time and in a room to be determined by the Canadian Court**. The Petitioner, in its capacity as the monitor, will post the details for the Transaction Approval Hearing once they are available on its website at: www.insolvencies.deloitte.ca/goli.

       **PLEASE TAKE FURTHER NOTICE that the RVO provides, among other things, that the following (i) Goli Canada and certain of its directors and officers; and (ii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors (collectively the "Released Parties") shall be released from any and all present and future claims based upon any fact or matter of occurrence related to the RVO or the Debtors, their assets, business or affairs or administration of the Debtors, subject to certain limited exceptions, including any claims against the directors or officers of Goli Canada that: (i) relates to contractual rights of one or more creditors; or (ii) is based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors.**

       **PLEASE TAKE FURTHER NOTICE that the Atos Sale Order contains certain indemnification provisions and limitations of liability in favor of the Agent in connection with its performance under the Agency Agreement.**

       **PLEASE TAKE FURTHER NOTICE** that the Petitioner has filed the *Petitioners' Motion for Entry of an Order (I) Recognizing and Enforcing the RVO and the Atos Sale Order, (II) Approving the Sale Transactions Free and Clear of Liens, Claims, and Encumbrances, and (III) Granting Related Relief* (the "Sale Motion").

Click or tap here to enter text.

**PLEASE TAKE FURTHER NOTICE** that, by the Sale Motion, the Petitioner is seeking an order, among other things, recognizing and enforcing the RVO and the Atos Sale Order in the U.S., including the releases and limitations of liability contained therein.

**PLEASE TAKE FURTHER NOTICE** that copies of the Chapter 15 Petitions, the Sale Motion, the Initial Order, the Provisional Relief Order, and certain other papers filed contemporaneously therewith in the Canadian Proceedings and/or the Chapter 15 Cases, including the Verified Petition, are available (i) by contacting counsel to the Petitioner, Andrew Rosenblatt, at Norton Rose Fulbright US LLP at (212) 408-5100 or andrew.rosenblatt@nortonrosefulbright.com, (ii) by accessing the Petitioner's website http://www.insolvencies.deloitte.ca/goli, or (iii) on the Court's website at www.deb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE** that the Court has (i) scheduled a hearing (the "Recognition Hearing") to consider the Chapter 15 Petitions and the Sale Motion for **April 15, 2024 at 12:00 p.m. (prevailing Eastern Time)** before the Honorable Laurie Selber Silverstein at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom No. 2, Wilmington, Delaware 19801, and (ii) established on or before **4:00 p.m. (prevailing Eastern Time) on April 8, 2024** (the "Objection Deadline") as the deadline to object to the Chapter 15 Petitions and/or the Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections to the Chapter 15 Petitions or the Sale Motion shall be (i) made in writing, describe the basis therefore, and indicate the nature and extent of the respondent's interests in the Debtors' Chapter 15 Cases, (ii) filed with the Office of the Clerk of the Court, 824 Market Street, Third Floor, Wilmington, Delaware 19801, and (iii) served upon Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019 (Attn: Andrew Rosenblatt) and Landis Rath & Cobb LLP, 919 Market Street, Ste. 1800, Wilmington, Delaware 19801 (Attn: Matthew B. McGuire) on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that all parties-in-interest in the Chapter 15 Cases that are opposed to the Chapter 15 Petitions or the Sale Motion must appear at the Recognition Hearing, which hearing may be adjourned from time to time without further notice except for an in-Court announcement at the Recognition Hearing or a filing by the Petitioner on the docket of the Chapter 15 Cases of the date and time to which the Recognition Hearing has been adjourned.

**PLEASE TAKE FURTHER NOTICE THAT IF NO RESPONSES OR OBJECTIONS ARE RECEIVED IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY THE PETITIONER AND ENTER THE RECOGNITION ORDER AND/OR AN ORDER APPROVING THE SALE MOTION WITHOUT FURTHER NOTICE OR A HEARING.**

*[Signature Page to Follow]*

Click or tap here to enter text.

Dated: March 22, 2024
          Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  mcguire@lrclaw.com
           pierce@lrclaw.com
           brooks@lrclaw.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Andrew Rosenblatt (*pro hac vice* pending)
Francisco Vazquez (*pro hac vice* pending)
Michael Berthiaume (*pro hac vice* pending)
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email: andrew.rosenblatt@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

*Counsel to the Petitioner*

# Provisional Relief Order
# March 22, 2024

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
In re:                                                        :   Chapter 15
                                                              :
GOLI NUTRITION INC., et al.,[1]                               :   Case No. 24-10438 (LSS)
                                                              :
              Debtors in a Foreign Proceeding.                :   Jointly Administered
                                                              :
------------------------------------------------------------- x
```

## ORDER GRANTING PROVISIONAL RELIEF
## PURSUANT TO BANKRUPTCY CODE SECTION 1519

Upon the motion (the "Motion")[2] of Deloitte Restructuring Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "Petitioner"), as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of Goli Nutrition Inc., a company incorporated in Québec, Canada ("Goli Canada") and Goli Nutrition Inc., a company incorporated in Delaware ("Goli US," and together with Goli Canada, the "Debtors"), through its United States co-counsels, Landis Rath & Cobb LLP and Norton Rose Fulbright US LLP, in this court, pursuant to section 1519 of title 11 of the United States Code (the "Bankruptcy Code") for entry of a provisional order enforcing the Initial Order and granting a stay against any collection or enforcement against the Debtors or the Debtors' assets in the United States and otherwise applying section 362 and 365(e) of the Bankruptcy Code on an interim basis under section 1519 of the Bankruptcy Code; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with sections 157 and 1334 of title 28 of the United States Code, sections 109 and 1501 of the Bankruptcy Code, and the Amended Standing

---

[1] The Debtors in these Chapter 15 cases, along with the last four digits of each Debtor's federal identification number, are: Goli Canada (as defined herein), federal tax identification number 732063086RC0002; and Goli US (as defined herein), federal tax identification number 35-2662655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

Order of Reference from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "Amended Standing Order"); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to section 157(b) of title 28 of the United States Code; and due and proper notice of the provisional relief sought in the Motion having been provided under the circumstances; and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "Hearing"); and the appearances of all interested parties having been noted in the record of the Hearing; and upon (i) the *Petitioner's Verified Petition Under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief* (the "Verified Petition") and (ii) the *Declaration of Noah Zucker in Support of (A) Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief, (B) Motion for Provisional Relief, and (C) Motion for Order Enforcing CCAA Vesting Orders* (the "Zucker Declaration" and together with the Verified Petition the "Chapter 15 Papers"), filed contemporaneously with the Motion, the record of the Hearing and all of the proceedings before the Court in these Chapter 15 cases; and the Court having found and determined that the provisional relief sought in the Motion is in the best interests of the Debtors, their creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation thereon and sufficient cause appearing therefor,

**THIS COURT HEREBY FINDS AND DETERMINES THAT:**

A.     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of

law constitute findings of fact, they are adopted as such.

B.    This Court has jurisdiction to consider this matter pursuant to sections 157 and 1334 of title 28 of the United States Code and the Amended Standing Order.

C.    This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.

D.    Venue for this proceeding is proper before this Court pursuant to section 1410 of title 28 of the United States Code.

E.    Service of the Motion on the Notice Parties was due, proper, and sufficient under the circumstances and no other notice is required.

F.    On March 18, 2024, these Chapter 15 cases were commenced by the Petitioner's filing of a voluntary Chapter 15 Petition for Recognition of a Foreign Proceeding for each Debtor contemporaneously with the filing of the Verified Petition.  Attached to the Verified Petition was an order (the "Initial Order") of the Canadian Court in the Canadian Proceedings appointing the Petitioner and granting additional relief.

G.    The Petitioner has demonstrated a substantial likelihood of success on the merits that (a) each of the Canadian Proceedings is a "foreign main proceeding" as that term is defined in section 1502(4) of the Bankruptcy Code, (b) the Petitioner is a "foreign representative" as that term is defined in section 101(24) of the Bankruptcy Code, (c) all statutory elements for recognition of the Canadian Proceedings are satisfied in accordance with section 1517 of the Bankruptcy Code, and (d) upon recognition of the Canadian Proceedings as foreign main proceedings, section 362 of the Bankruptcy Code will automatically apply in these Chapter 15 cases pursuant to section 1520(a)(l) of the Bankruptcy Code.

H.    The Petitioner has demonstrated that (a) the commencement or continuation of any

28

proceeding or action in the United States against the Debtors and their business and all of their assets should be stayed pursuant to sections 105(a), 1519, and 1521 of the Bankruptcy Code, which protections, in each case, shall be coextensive with the provisions of sections 362 and 365(e) of the Bankruptcy Code, to permit the fair and efficient administration of the Canadian Proceedings for the benefit of all stakeholders and (b) the relief requested in the Motion will neither cause an undue hardship nor create any hardship to parties in interest that is not outweighed by the benefits of the relief granted herein.

I.      The Petitioner has demonstrated that application of the automatic stay on a provisional basis is crucial to prevent irreparable harm to the Debtors and/or their assets resulting from potential collection, enforcement efforts, or other actions of creditors and/or landlords prior to the disposition of the Petitions for recognition.

J.      The Petitioner has demonstrated that no injury will result to any party that is greater than the harm to the Debtors' assets and property in the absence of the relief requested in the Motion.

K.      The interests of the public and public policy of United States will be served by entry of this Order.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted as set forth herein.

2.      While this Order is in effect, the Petitioner, the Debtors, and the Debtors' property are entitled to the full protections and rights pursuant to section 1519(a)(l) of the Bankruptcy Code, which protections shall be coextensive with the provisions of sections 362 and 365(e) of the Bankruptcy Code, and this Order shall operate to stay, without limitation, any collection, enforcement efforts, or other actions of creditors, lessors, and any other parties against the Debtors

and their property in the United States.

3.      All entities (as that term is defined in section 101(15) of the Bankruptcy Code), other than the Petitioner and its authorized representatives and agents, are hereby enjoined from, without limitation:

(a)      enforcing any rights or obligations or otherwise executing against any of the Debtors' assets or other properties;

(b)      commencing or continuing, including the issuance or employment of process, of a judicial, administrative, arbitral, or other action or proceeding, or to recover a claim, including without limitation any and all unpaid judgments, settlements, or otherwise against the Debtors in the United States;

(c)      taking or continuing any act to create, perfect, or enforce a lien or other security interest, set-off, or other claim against the Debtors or any of their property;

(d)      transferring, relinquishing, or disposing of any property of the Debtors to any entity (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Petitioner;

(e)      enforcing, commencing, or continuing an individual action or proceeding concerning the Debtors' assets, rights, obligations, or liabilities; and

(f)      terminating any agreements, leases, contracts, or understandings, or otherwise enforcing rights, accelerating obligations, or exercising remedies of any kind in respect thereof.

4.      Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to these proceedings pursuant to Bankruptcy Rule 7065, no notice to any person is required prior to entry and issuance of this Order.  Pursuant to Bankruptcy Rule 7065, the provisions of Federal Rule 65(c) are hereby waived, to the extent applicable.

5.      Notwithstanding any applicability of any Bankruptcy Rules, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

6.      The Petitioner is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

7.     This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: March 22nd, 2024
Wilmington, Delaware

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

# Sale Motion
# March 19, 2024

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x

In re:

GOLI NUTRITION INC., *et al.*,[1]

                  Debtors in a Foreign Proceeding.

---------------------------------------------------------- x

    :   Chapter 15
    :
    :   Case No. 24-10438 (LSS)
    :
    :   Joint Administration Requested
    :

## PETITIONER'S MOTION FOR ENTRY OF AN ORDER (I) RECOGNIZING AND ENFORCING THE RVO AND THE ATOS SALE ORDER, (II) APPROVING THE SALE TRANSACTIONS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF

Deloitte Restructuring Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "<u>Petitioner</u>"), as defined by section 101(24) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), of Goli Nutrition Inc., a company incorporated in Québec, Canada ("<u>Goli Canada</u>") and Goli Nutrition Inc., a company incorporated in Delaware ("<u>Goli US</u>," together with Goli Canada, the "<u>Debtors</u>"), through its United States co-counsels, Landis Rath & Cobb LLP and Norton Rose Fulbright US LLP, respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed Order</u>"), pursuant to sections 105(a), 363, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code:

    1.   recognizing and enforcing the Canadian Court's order, (the "<u>RVO</u>"), approving (i) the subscription agreement (the "<u>Subscription Agreement</u>") attached hereto as **Exhibit B**, which is filed under seal in the Canadian Court, and (ii) the transactions contemplated thereunder;

    2.   recognizing and enforcing the Canadian Court's order, (the "<u>Atos Sale Order</u>," together with the RVO, the "<u>CCAA Vesting Orders</u>"), approving the Agency Agreement (the "<u>Agency Agreement</u>") attached hereto as **Exhibit C**, which is filed under seal in the Canadian Court**,** entered into by the Debtors with Gordon Brothers Commercial & Industrial, LLC, on behalf of its contractual joint venture Brandford

---

[1] The Debtors in these Chapter 15 cases are: Goli Nutrition, Inc., a company incorporated in Québec, Canada and the last 4 digits of its Canadian business number is 0002; and Goli Nutrition Inc., a company incorporated in Delaware and the last 4 digits of its federal tax identification number is 2655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

Auctions, LLC, (the "<u>Agent</u>") pursuant to which the Agent shall be engaged for the purpose of proceeding with the orderly liquidation of the Atos Equipment (as defined below), and (ii) the transactions contemplated thereunder;

3.   approving pursuant to section 363 of the Bankruptcy Code, the issuance of the Subscribed Shares (as defined below) to the Purchaser (as defined below) pursuant to the Subscription Agreement and the sale of the Atos Equipment pursuant to the Agency Agreement, free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances as defined in the Subscription Agreement and the Agency Agreement, as applicable); and

4.   granting such other relief as the Court deems just and proper (collectively, the "<u>Requested Relief</u>").

In support of this motion (this "<u>Motion</u>"), the Petitioner relies upon and incorporates by reference the (1) *Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief* (together with the form petitions filed concurrently therewith, the "<u>Verified Petition</u>"),[2] and (2) *Declaration of Noah Zucker in Support of (A) Petitioner's Verified Petition under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief, (B) Motion for Provisional Relief, and (C) Motion for Order Enforcing CCAA Vesting Orders* (the "<u>Zucker Declaration</u>") filed contemporaneously herewith.  In further support of this Motion, the Petitioner respectfully states the following:

## <u>JURISDICTION AND VENUE</u>

1.      On March 19, 2024 (the "<u>Petition Date</u>"), the Petitioner commenced these chapter 15 cases as ancillary proceedings to the Canadian Proceedings pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code.

2.      The United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. §§ 109 and 1501,

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Petition.

and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

3.      Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code are core matters under 28 U.S.C. § 157(b)(2)(P).

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

5.      The Petitioner confirms its consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f) to the entry of final orders or judgments by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      Venue in this district is proper under 28 U.S.C. § 1410.

### **BACKGROUND**

7.      A complete description of the Debtors and the events leading to the filing of the Canadian Proceedings (defined below) are set forth in the Petition.

8.      On March 15, 2024, the Debtors filed an application (the "CCAA Initial Application") with the Superior Court of Québec, sitting in the Commercial Division for the district of Montréal (the "Canadian Court") pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") seeking the entry of an initial order (the "Initial Order"), a copy of which is annexed to the Petition as Exhibit D (the "Canadian Proceedings").  Pursuant to the Initial Order, which was issued by the Canadian Court on March 18, 2024, the Petitioner was appointed as monitor in the Canadian Proceedings and was authorized to apply to act as the

"foreign representative" of the Debtors in connection with seeking cross-border approval of the Canadian Proceedings pursuant to Chapter 15 of the Bankruptcy Code.

9.      The Debtors commenced the Canadian Proceedings in order to implement a restructuring centered around the transfer of the Debtors' business and assets, which is to be effectuated through two transactions.  In particular, following a sale investment solicitation process (a "SISP") that took place starting in June 2023, prior to the commencement of the Canadian Proceedings, Goli Canada entered into the Subscription Agreement with an entity affiliated with a group of that includes Group KPS (a healthcare company), Bastion Capital (an investment management firm) and one of the Debtors' founders (collectively, the "Purchaser") pursuant to which the Purchaser will subscribe for new shares in Goli Canada (the "Subscribed Shares") and effectively acquire 100% of the equity interest in Goli Canada in accordance with the terms and conditions of the Subscription Agreement.  This transaction is intended to be approved and implemented under the CCAA pursuant to a reverse vesting order, the RVO, as requested in the CCAA Initial Application.  Pursuant to the RVO, certain excluded assets (including notably the Atos Equipment and the shares of Goli US), contracts and liabilities will be transferred or "vested" out of Goli Canada and transferred to a newly created "Residual Co." that will replace Goli Canada as a debtor in the Canadian Proceedings.  Accordingly, the Proposed Order provides, among other things, that Residual Co. will replace Goli Canada as a debtor in the Chapter 15 case and approves the form of an amended caption that reflects same upon the closing of the Principal Transaction.

10.      In addition, the Debtors have negotiated and finalized the terms of a second and separate transaction to implement the liquidation of the Atos Equipment.  Specifically, the Debtors have entered into the Agency Agreement, pursuant to which the Agent will sell and auction, if

necessary, the Atos Equipment (the "Atos Sale" and, together with the Principal Transaction (as defined below), the "Sale Transactions").

11. By the CCAA Initial Application, the Debtors indicated that they would request entry of the RVO approving the sale of the Subscribed Shares pursuant to the Subscription Agreement at a comeback hearing scheduled for March 27, 2024. Initial Order, ¶ 45. In addition, pursuant to the CCAA Initial Application, the Debtors requested entry of the Atos Sale Order approving the Agency Agreement, pursuant to which the Agent will sell the Atos Equipment.

12. The Initial Order provides for a broad stay of proceedings in favor of the Debtors. In particular, for an initial ten-day period through and including March 27, 2024 (the "Stay Period"), "no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced or continued against or in respect of the [Debtors], or affecting the [Debtors'] business operations and activities (the "Business") or the Property … except with leave of this Court." Initial Order, ¶ 10.

13. The Canadian Court has scheduled a hearing for March 27, 2024 (the "Comeback Hearing") to consider the Debtors' request for an extension of the Stay Period and entry of an amended and restated Initial Order. Initial Order, ¶ 46. Thereafter, at the CCAA Sale Approval Hearing (as defined below), the Canadian Court will consider (i) the RVO approving the issuance of the Subscribed Shares pursuant to the Subscription Agreement, and (ii) the Atos Sale Order approving the Agency Agreement, pursuant to which the Agent will sell the Atos Equipment.

14. Petitioner requests this Court schedule a hearing to consider the Petition and the relief requested by this Motion simultaneously ("Hearing"). The Petitioner anticipates that the CCAA Vesting Orders will be entered at the CCAA Sale Approval Hearing, which will occur prior

to the Hearing, and will file copies of the CCAA Vesting Orders with this Court as soon as reasonably practicable after they are entered by the Canadian Court.

      **A.**      **The Sales and Investment Solicitation Process**

            1.      *Pre-Filing Restructuring Efforts*

      15.      As detailed in the Petition, the Debtors tried to rationalize operations in the United States, Canada and worldwide by developing strategies to improve profitability and conducting a review of their operations to identify potential synergies and costs savings across the board. Many changes were made, including but not limited to (i) negotiating the early termination of one of their leased office space and the non-renewal of other leased office space as following the COVID-19 pandemic, most of the employees were working from home; (ii) developing a new pricing strategy for both retailers and direct-to-consumers; (iii) reducing their workforce and payroll (including refraining from paying bonuses to management and equity drawing no salary); (iv) terminating any non-essential services; (v) engaging in negotiations with various vendors, service providers and suppliers for additional cost savings; (vi) settling (whether for monetary amounts or otherwise) certain legal disputes to try to avoid the substantial continued expense of further litigation; and (vii) subletting portions of the Atos Equipment to help with the financial burden. Unfortunately, these efforts alone were not sufficient to offset the ongoing cash flow problems the Debtors suffered over the last several months and to pay liabilities as they become due.

      16.      As part their strategic review of capital and business alternatives, with the support and input of their prepetition secured lenders (the "Lenders"),[3] the Debtors and their advisors

---

[3]    The Lenders are Bank of Montreal, HSBC Bank Canada, National Bank of Canada, and Fédération Des Caisses Desjardins Du Québec. Pursuant to the amended and restated credit agreement dated September 2, 2022 (as amended, the "Credit Agreement"), the Lenders hold claims of approximately $100 million, subject to adjustments, against Goli Canada. Goli US has guaranteed all of Goli Canada's obligations under the Credit

implemented the SISP for the Debtors, their assets and business. Petitioner, then acting as financial advisor for the Lenders, was kept apprised of the progress of the SISP. The objective of the SISP was to identify one or more transactions in respect of a potential sale, investment in, or refinancing of all or part of the business and/or assets of the Debtors that could, ideally, permit the Debtors to repay its substantial secured indebtedness, with any balance to be used to pay other debt and allow for the continuation of all or part of the Debtors' activities on a going concern basis.

17.     The SISP began in June 2023 and concluded in January 2024. As described below, the long and comprehensive sale and marketing process included (i) the creation of a process for identifying and notifying potentially interested purchasers, and/or investors; (ii) the preparation of bidding procedures; (iii) the creation of a protocol for the selection of a successful bidder; and (iv) the establishment of procedures and requirements for approval of any proposed transaction.

### 2.     *The Execution and Results of the SISP*

18.     With the support, cooperation and input of the Lenders, the Debtors engaged the services of BMO Capital Markets ("BMOCM") to develop and implement the SISP. In accordance with the SISP procedures, BMOCM, with the assistance of the Debtors, prepared and/or maintained all SISP related documents (including the preparation of a teaser letter, a target list of potential Purchaser or investors, and confidentiality agreements) and provided all required information to potential bidders.

19.     In June 2023, BMOCM delivered a teaser letter (the "Teaser") to forty-two (42) potential bidders from both strategic and financial sectors. Two (2) other potential bidders were also contacted by BMOCM, for a total of forty-four (44) potential bidders. The Teaser invited

---

Agreement. The Lenders hold liens or security interests over all of the Debtors' present and after-acquired real and personal property in Canada and in the United States.

potential bidders to submit a (i) a confidentiality agreement to access the Debtors' virtual data room (the "VDR"), and (ii) a non-binding letter of intent for the entirety of the Debtors' business and assets, including the Atos Equipment. Ultimately, twenty-nine (29) parties signed confidentiality agreements and were invited to submit non-binding letters of intent by no later than August 8, 2023.

20. On August 8, 2023, the Debtors received four (4) non-binding letters of interest for their business (excluding the Atos Equipment). The Debtors received an additional letter of interest from a late entrant in November 2023.

21. On October 31, 2023, BMOCM sent a process letter to five (5) interested parties inviting the submission of final, binding proposals and including a draft definitive sale agreement for review and mark-up. The Debtors set the deadline for submission of proposals as November 14, 2023 ("Binding Proposal Deadline"). No binding offers were received by BMOCM or the Debtors by the Binding Proposal Deadline.

22. BMOCM continued its efforts to advance a transaction with interested parties and to facilitate due diligence requests, but several of the parties raised concerns regarding the Debtors' operating results and required more time for the Debtors to demonstrate an improvement in its results. A number of the interested parties undertook financial and commercial due diligence from September 2023 to January 2024. However, none of these parties decided to proceed with submitting a binding offer to acquire the Debtors.

### 3. *The Debtors Enter Into the Subscription Agreement*

23. On January 15, 2024, considering the worsening liquidity position of the Debtors and the failure of the SISP to generate a binding offer, the Purchaser submitted an LOI to Goli Canada (the "Initial Purchaser LOI"). The terms of the Initial Purchaser LOI provided for a rapid

transaction that would preserve the value of the business as a going concern and allow it to continue its operations.

24.     The transaction value put forward in the Initial Purchaser LOI was significantly less than the amount owed to the Lenders under the Credit Facilities. Accordingly, being the stakeholder with the primary economic interest in the outcome of the transaction, over the next three (3) weeks, the Lenders negotiated enhanced terms, including an increase to the proposed transaction value.

25.     On February 3, 2024, the Purchaser entered into a non-binding LOI with the Lenders, pursuant to which the Lenders agreed to work towards the drafting and execution of a definitive agreement in respect of the contemplated transaction.  This culminated in the Subscription Agreement.

26.     Goli Canada entered into the Subscription Agreement with the Purchaser pursuant to which the Purchaser agreed to subscribe for new shares in Goli Canada (i.e., the Subscribed Shares) and effectively acquire 100% of the equity interests in Goli Canada in accordance with the terms and conditions of the Subscription Agreement (the "Principal Transaction").

27.     The Principal Transaction is intended to be approved and implemented under the CCAA pursuant to a reverse vesting order (*i.e.*, the RVO) and thereafter recognized and enforced in the United States in this Chapter 15 case.  Certain excluded assets (including notably the Atos Equipment and shares of Goli US), contracts and liabilities will be vested out of Goli Canada and transferred to "Residual Co." as part of the contemplated RVO structure.

28.     Under the terms of the Subscription Agreement, consideration payable by the Purchaser will include a cash payment, the payment of any priority claims of Goli Canada and payment of certain amounts to cover the professional fees of the Monitor, its legal counsel and

legal counsel to the Lenders, in connection with the Sale Transactions, the Canadian Proceedings and this Chapter 15 Case.

29.     Pursuant to the terms of the Subscription Agreement, closing of the Principal Transaction is scheduled to occur on or around April 11, 2024, subject to the required court approvals, or as otherwise agreed upon by the Debtors and the Purchaser with the consent of the Petitioner, as monitor, and the Lenders ("Closing").  The transaction is not subject to any financing condition and the Purchaser has provided certain documents to the Lenders and the Monitor to demonstrate its ability to fund the transaction value.

30.     Closing is conditional on approval of the Principal Transaction pursuant to the entry of the RVO by the Canadian Court and the recognition and enforcement thereof in the United States.

4.     *Disposition of the Atos Equipment*

31.     As noted above, the four non-binding indications of interest for the Debtors' business received in August 2023 excluded the Atos Equipment.  However, in the same month, the Debtors received a separate indication of interest from another party for the Atos Equipment.  Such party was granted access to the VDR and visited the Norco Facility to conduct due diligence.

32.     Following due diligence of the Norco Facility and the Atos Equipment, it became clear that the party was not interested in moving forward.  Left with no other options, Goli Canada, with the consent of the Lenders, engaged in a process to liquidate the Atos Equipment through an auction.  After receipt of multiple proposals and extensive negotiations, Goli Canada and the Lenders selected Gordon Brothers Commercial & Industrial, LLC (the "Agent") acting on behalf of a contractual joint venture between Agent and Brandford Auctions, LLC.  The proposal by the Agent (through which the Agent would serve as the agent of Goli Canada in the conduct of the sale) ultimately offered the highest guaranteed return and, given their familiarity and knowledge

of the equipment, Goli Canada and the Lenders believe that they are best positioned to sell the Atos Equipment at maximum value.  On March 15, 2024, Goli Canada entered into an agency agreement with the Agent for the purpose of liquidating the Atos Equipment for the benefit of Goli Canada's creditors ("Agency Agreement").  Pursuant to the Agency Agreement, the Agent will provide a net minimum guarantee, a portion of which will be paid in advance of the sale and will share any further proceeds realized from the sale of the Atos Equipment with Goli Canada.  The Agent is also entitled to mark up the price of the Atos Equipment by a certain percentage and to retain the benefit of that markup as compensation for its services.

33.     Pursuant to the Agency Agreement, the Agent has specified they will require a period commencing as at the date of the Agency Agreement, namely March 15, 2024, and expiring on June 30, 2024, of peaceful access to the Norco Facility where the Atos Equipment is located to complete the sale and auction process, during which time Goli US will pay occupation rent and certain other related expenses. All amounts payable to Goli Canada under the Agency Agreement are to be made to the Monitor for the benefit of the creditors.

34.     As security for all obligations of Goli Canada to the Agent under or in connection with the Agency Agreement, the Atos Equipment and all proceeds from sales thereof shall be subject to a first ranking charge and security in favor of the Agent as contemplated in the Atos Sale Order.

35.     The implementation of the Agency Agreement is conditional on approval of the Agency Agreement by the Canadian Court and the recognition and enforcement of the Atos Sale Order.

### B.     The Subscription Agreement

36.     The Subscription Agreement is the culmination of the Debtors' nearly year-long efforts to restructure.  Through the Canadian Proceedings, the Debtors seek to implement a strategy

that will enable Goli Canada to exit the Canadian insolvency proceedings as a viable going-concern business and, at the same time, maximize the value of the Debtors' business for the benefit of stakeholders. Key features and aspects of the Principal Transaction can be summarized as follows:

a. based on the price payable under the Subscription Agreement, all the Lenders are suffering a significant shortfall on their senior secured position such that no recovery would be expected for any other secured or unsecured creditors under the Principal Transaction, regardless of the structure employed;

b. creditors and other stakeholders of the Debtors affected by the Principal Transaction will not be in a worse position than they would be if the transaction was implemented pursuant to a traditional asset sale or similar structure;

c. the Subscription Agreement provides for various unsecured and contingent liabilities to be assumed by the Purchaser;

d. various agreements, licenses and authorizations are part of the purchased assets that must be transferred as part of the Principal Transaction. It will be more complicated and costly to transfer these assets under a traditional sale order or other structure since consents, approvals or authorizations may be required. An RVO structure will minimizes the risks, costs or delays of having these assets transferred;

e. all options, securities and other rights held by any person that are convertible or exchangeable for any securities of Goli Canada shall terminate or be cancelled; and

f. the completion of the Principal Transaction will allow for the Debtors to continue operations as a going concern, resulting in (i) the potential for employees to preserve their employment; (ii) suppliers of goods and services being able to maintain their business relationships with the Debtors; and (iii) many of the contractual distribution arrangements will remain intact without need for the Debtors to take further steps.

37.     The Principal Transaction contemplated under the Subscription Agreement has been structured as a so-called "reverse vesting" transaction. The Purchaser would not have entered into the Subscription Agreement and would not consummate the purchase of the Subscribed Shares and the related transactions, thus adversely affecting the Debtors, their estates, and their creditors, and other parties in interest, if the sale of the Subscribed Shares to the Purchaser was not free and

clear of all liens, claims, encumbrances, and other interests. In sum, instead of providing for a traditional asset sale transaction where all purchased assets are purchased and transferred to the purchaser on a "free and clear" basis, the Principal Transaction provides for a transaction whereby essentially:

    a.  the Purchaser will subscribe for and purchase new shares of Goli Canada, which will, in turn, cancel and terminate all of its existing shares so that the Purchaser may become the sole shareholder of Goli Canada; and

    b.  all excluded contracts, excluded assets, and excluded liabilities with respect to the Debtors (including the Atos Equipment and the shares of Goli US) will be transferred and "vested out" to a Canadian corporation (Residual Co..) to be incorporated by Goli Canada in advance of the Closing, so as to allow the Purchaser to indirectly acquire Goli Canada's business and other assets, including, for the avoidance of doubt, all of the Debtors' assets, licenses, undertaking, and properties of every kind whatsoever and wherever situated, including property held in trust for the Debtors on a "free and clear" basis.

38.    The Subscription Agreement was structured as a reverse vesting transaction primarily because Goli Canada maintains various licenses that are required to maintain its operations, as well as in-progress trials and testing programs that are proceeding under and in the name of Goli Canada.  Under a traditional asset sale transaction structure, some of these licenses would be difficult to transfer to a purchaser and, to the extent that such transfer is possible, the steps required to proceed with such a transfer would likely result in additional delays, costs and uncertainty.  The Purchaser was willing to enter into the Subscription Agreement on the understanding that the Primary Transaction could be completed quickly and with certainty that the key licenses would be transferred.  As the Debtors are facing significant liquidity constraints, the delays, costs and uncertainty associated with transferring or obtaining new permits and licenses would have a detrimental impact on the Goli's business.  Therefore, the Subscription Agreement's structure as a reverse vesting transaction is appropriate and necessary to give effect to the Primary Transaction given the following:

(a)     A reverse vesting-order structure allows for the licenses, registrations, permits, and certifications that are essential to the Debtors' operations to remain in place. These include, among others, licenses, registrations, permits, and certifications granted by various food, health, and other authorities across the world, which are essential to its operations.

(b)     For instance, in Canada alone, Goli Canada holds:

i.      various natural-health-product licenses issued by the Minister of Health in according with section 7 of the Natural Health Products Regulations, SOR/2003-196 (the "NHP Licenses"), which are required in order to sell, market, and distribute its products in Canada. For illustrative purposes, the standard delay, according to the Natural and Non-Prescription Health Product Directorate (the "NNPHPD"), to get a NHP License is 60 days for a Class I product, 90 days for a Class II product, and 210 days for a Class III product. However, the NNPHPD frequently exceeds such delays. Goli Canada showed longer delays for its own products. The vast majority of GOLI Products are classified as Class III, including the Debtors' most popular products;

ii.     a site license issued by the Minister of Health in accordance with section 29 of the Natural Health Products Regulations, SOR/2003-196, which is required in order to import its licensed natural health products in Canada;

iii.    an import license issued by the Canadian Food Inspection Agency under the Safe Food for Canadians Act (S.C. 2012, c. 24), which is required to import its apple-cider vinegar food-product gummies;

iv.     Goli Canada's GS1 license, which holds all of Goli Canada's unique identifiers (UPCs and GTINS) necessary for the sale of GOLI Products with various retailers, online marketplaces, distributors, and other partners. Goli Canada has approximately 400 existing UPCs, which represents a substantial portion of Goli Canada's product catalog and market presence. These UPCs are registered with over 30 different retailers. Changes to UPCs could take 6- 9 months to implement, involve a significant amount of paperwork, and present logistical challenges (such as needing to update all new items with Goli Canada's 3PLs, relisting all items on each of the retailer-specific platforms, and recreating all new labels with the new barcodes) as well as strategic challenges. Such changes could hinder market presence and risk losing shelf space with important retailers as well as require reprinting all labels with the new UPCs

> v. Various brand and trademark registrations in international markets required to obtain regulatory permits and product registrations with the applicable authorities.
>
> (c) Those delays mentioned above will render the implementation of the Principal Transaction impossible. Indeed, the Debtors simply do not have required liquidity to wait that long to close the Principal Transaction. Moreover, the Lenders are unlikely to support any transaction which could take a minimum of 7 months before to materialized.
>
> (d) The Lenders are the sole stakeholders that have a financial interest in the Principal Transaction and, therefore, the reverse vesting order structure is not prejudicing any creditor in the present instance.

39. The reverse vesting structure will also allow the Debtors to maintain all of its licenses and intellectual property without requiring any additional steps or regulatory approvals to transfer them to the Purchaser. Under a traditional vesting order structure, the transfer of such permits, registrations, licenses, and certifications would involve a complex transfer and/or new application process of indeterminate risk, which as illustrated above, would interrupt or delay the continued operations of Goli Canada, impact current relationships and partnerships with third parties, and lead to regulatory challenges and significantly increased costs that could ultimately jeopardize the Principal Transaction as well as the value of the business.

40. In light of the foregoing, the Petitioner, in its capacity as an officer of the Canadian Court, is confident that the market has been thoroughly canvassed and there is no other viable alternative transaction available to the Debtors. *Verified Petition*. ¶ 54. The only going-concern option that results in an ongoing customer or supplier for contract counterparties, among other benefits, are the transactions with the Purchaser under the Subscription Agreement, which are to be implemented through a reverse vesting structure. The reverse vesting order represents the best outcome for all of the Debtors' stakeholders.

41. A reverse vesting transaction generally involves a series of steps, whereby: (1) the purchaser becomes the sole shareholder of the debtor company, (2) the debtor company retains its

assets, including key contracts and permits; and (3) the assets and liabilities not retained by the debtor company are "vested out" and transferred, together with any excluded assets, into a newly incorporated entity.[4] *See* Zucker Declaration ¶ 32.

42.    The Canadian Court may approve a reverse vesting transaction pursuant to sections 11 and 36 of the CCAA and may consider several factors in determining if such a transaction should be approved.  *See id.* ¶ 36.  Those factors, similar to those that United States bankruptcy courts consider in the context of a section 363 sale, include, but are not limited to: (i) whether the process leading to the proposed sale or disposition was reasonable in the circumstances; (ii) whether the monitor approved the process leading to the proposed sale or disposition; (iii) whether the monitor filed with the court a report stating that in their opinion the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy; (iv) the extent to which the creditors were consulted; (v) the effects of the proposed sale or disposition on the creditors and other interested parties; and (vi) whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.  *Id.*

43.    The Subscription Agreement includes releases in favor of: (i) Goli Canada and certain of its directors and officers; and (ii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors (collectively the "Released Parties"). The releases cover any and all present and future claims against the Released Parties based upon any fact or matter of occurrence related to the Principal Transaction or the Debtors, their assets, business or affairs or administration of the Debtors, subject to certain limited exceptions.  Further,

---

[4]    While those liabilities and assets are "vested out" into a newly incorporated entity, the outcome would be the same as if the Principal Transaction had been carried out using an asset purchase structure.  There will be no inter-company transfer of assets and liabilities among the existing Debtors prior to closing.  Accordingly, there will be no material prejudice or impairment of any creditors' rights which would have been avoided in an asset purchase transaction.

the releases provided in the Subscription Agreement and RVO explicitly do not release or discharge: (a) any claims against the directors or officers of Goli Canada that: (i) relates to contractual rights of one or more creditors; or (ii) is based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors; or (c) any obligations of any of the Released Parties under or in connection with the Subscription Agreement, the closing documents, and/or the consummation of the Principal Transaction.

44.     As a result of the entry of the RVO, and consistent with reverse vesting transactions previously approved by Canadian courts, all options, securities and other rights held by any person that are convertible or exchangeable for any securities of Goli Canada shall terminate or be cancelled. *Verified Petition,* ¶ 52(e). As recognized by Canadian courts, in situations (as here) where shareholders have no economic interest, present or future, it is within the Canadian Court's jurisdiction to approve the cancellation of all outstanding shares and the issuance of new shares to the purchaser. *Zucker Declaration*, ¶ 32.

45.     The closing of the Subscription Agreement is subject to a number of customary conditions precedent, including the requirements that the RVO and the Proposed Order shall have been granted and become final orders. The parties anticipate closing the Principal Transaction on or before April 11, 2024. *Verified Petition,* ¶ 58. Expeditiously consummating the Principal Transaction, which is supported by the Debtors' key stakeholders, is critical to preserving the going-concern value of the Debtors' enterprise.

46.     The Petitioner, in its capacity as an officer of the Canadian Court, believes that the Subscription Agreement is fair and reasonable under the circumstances, and is in the best interests of the Debtors, their creditors, and other stakeholders. *Verified Petition,* ¶ 59. Moreover, the reverse vesting structure of the Principal Transaction is necessary and appropriate to preserve the

going-concern value of the Debtors' business and produces an economic result more favorable than the available alternatives. *Id*. at ¶60. In sum, the Subscription Agreement represents the best and only viable outcome for the Debtors, their creditors, and other stakeholders under the circumstances.

### C. The Agency Agreement

47.     In addition, the Debtors have negotiated and finalized the terms of a second and separate transaction to implement the liquidation of the Atos Equipment. As described above, the Debtors have entered into the Agency Agreement with the Agent pursuant to which the Agent shall be engaged for the purpose of proceeding with the orderly liquidation of the Atos Equipment.

48.     The Agency Agreement, like the Subscription Agreement, has been concluded based on the results of the SISP. Given the extensive marketing process and other protections provided by the SISP, the Petitioner believes that the Agency Agreement is fair and reasonable under the circumstances and provides the highest and best value to the Debtors and their stakeholders for the Atos Equipment. *Verified Petition,* ¶ 62. The proposal by the Agent (through which the Agent would serve as the agent of Goli Canada in the conduct of the sale) ultimately offered the highest guaranteed return and, given their familiarity and knowledge of the equipment, Goli Canada and the Lenders believe that they are best-positioned to sell the Atos Equipment at maximum value. *Id*. All amounts payable to Goli Canada under the Agency Agreement are to be made to the Petitioner for the benefit of the creditors. *Id*.

### D. Local Rule 6004-1 Disclosures in regard to Subscription Agreement

49.     The following is a summary of certain material provisions of the Subscription Agreement and/or the Agency Agreement as required by Local Rule 6004-1(iv):[5]

---

[5]     Any summary of, or reference to, the terms and conditions of the Subscription Agreement and/or the Proposed Order herein are qualified in their entirety by the actual terms and conditions of the Subscription Agreement and

| Provision | Description | Location in Order, Subscription Agreement, or Agency Agreement |
|---|---|---|
| Sale to Insider (L.R. 6004-1(iv)(A)). | Group KPS (a healthcare company), Bastion Capital (an investment management firm) and one of the Debtors' founders (collectively, the "Purchaser") | Subscription Agreement |
| Agreements with Management (L.R. 6004-1(iv)(B)). | N/A | N/A |
| Releases (L.R. 6004-1(iv)(C)). | The Subscription Agreement includes releases in favor of: (i) Goli Canada and certain of its directors and officers; and (ii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors, (collectively the "Released Parties"). *See Verified Petition,* ¶ 58.<br><br>The releases cover any and all present and future claims against the Released Parties based upon any fact or matter of occurrence related to the Principal Transaction or the Debtors, their assets, business or affairs or administration of the Debtors, subject to certain limited exceptions. *Id.* Further, the releases provided in the Subscription Agreement and CCAA Vesting Order explicitly do not release or discharge: (a) any claim that is not permitted to be released pursuant to the CCAA; (b) any claim against the directors or officers of Goli Canada that: (i) relates to contractual rights of one or more creditors; or (ii) is based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors; or (c) any obligations of any of the Released Parties under or in connection with the Subscription Agreement, the closing documents, and/or the consummation of the Principal Transaction.. *Id.* | *See* Subscription Agreement |

---

the Proposed Order. To the extent there is any inconsistency between any such summary or reference herein and the actual terms and conditions of the Subscription Agreement and the Proposed Order, the actual terms and conditions of the Subscription Agreement and/or the Proposed Order shall control.

| Private Sale/No Competitive Bidding (L.R. 6004-1(iv)(D)). | N/A | N/A |
|---|---|---|
| Closing and Other Deadlines (L.R.6004-1(iv)(E)). | Section 7.1 of the Subscription Agreement includes the entry of an order by this Court recognizing the RVO as a condition precedent to close the transactions.  Similarly, section 8.1 of the Subscription Agreement provides that the Purchaser may terminate the agreement if this Court does not issue an order recognizing and enforcing the CCAA Reverse Vesting Order by the "Target Closing Date," which is defined as April 11, 2024. | *See* Subscription Agreement §§ 7.1, 8.1 |
| Good Faith Deposit (L.R. 6004-1(iv)(F)). | USD $5,000,000 held in escrow by the Monitor. If the Closing does not occur for any reason other than the Agreement having been terminated by the Corporation pursuant to Section 8.1(a)(iv), the Deposit will be refunded to the Purchaser. If the Agreement is terminated by the Corporation pursuant to Section 8.1(a)(iv), the Deposit shall be transferred to Goli Canada as liquidated damages. | *See* Subscription Agreement §2.2 |
| Interim Arrangements with Proposed Buyer (L.R. 6004-1(iv)(G)). | N/A | N/A |
| Use of Proceeds (L.R. 6004-1(iv)(H)). | Proceeds from the Principal Transaction shall be allocated as set forth as set forth in Schedule B. | *See* Subscription Agreement §2.6, Schedule B |
| Tax Exemption (L.R. 6004-1(iv)(I)). | The Proposed Order does not seek to have the Principal Transaction declared exempt from taxes under section 1146(a) of the Bankruptcy Code. | N/A |
| Record Retention (L.R. 6004- 1(iv)(J)). | The Subscription Agreement contemplates that the members of the Debtors shall make all books and records reasonably available to the Monitor and any trustee in bankruptcy for a period of six (6) years after the Closing. | *See* Subscription Agreement § 5.7 |
| Sale of Avoidance Actions (L.R. 6004-1(iv)(K)). | N/A | N/A |
| Requested Findings as to Successor Liability (L.R. 6004-1(iv)(L)). | As stated herein, the Subscription Agreement and Proposed Order provides for certain releases as to the Purchaser.  *See, e.g.*, *Verified Petition,* ¶ 55. | *See* Subscription Agreement §§. |

| Sale Free and Clear of Unexpired Leases (L.R. 6004-1(iv)(M)). | N/A | N/A |
|---|---|---|
| Credit Bid (L.R. 6004-1(iv)(N)). | N/A | N/A |
| Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(iv)(O)) | Given the need to obtain final approval of the Sale Transactions in the United States by no later than April 11, 2024, the Petitioner seeks to waive the 14-day stay under Bankruptcy Rule 6004(h). | N/A |

### E. Local Rule 6004-1 Disclosures in regard to Agency Agreement

| Provision | Description | Location in Order, Subscription Agreement, or Agency Agreement |
|---|---|---|
| Sale to Insider (L.R. 6004-1(iv)(A)). | N/A | N/A |
| Agreements with Management (L.R. 6004-1(iv)(B)). | N/A | N/A |
| Releases (L.R. 6004-1(iv)(C)). | The Agency Agreement contains certain indemnification provisions and limitations of liability in favor of the Agent in connection with its performance under the Agency Agreement. | Agency Agreement §§ 13, 14. |
| Private Sale/No Competitive Bidding (L.R. 6004-1(iv)(D)). | N/A | N/A |
| Closing and Other Deadlines (L.R.6004-1(iv)(E)). | The Agency Agreement requires that the Assets (as defined therein) be sold within 120 days after entry of the Atos Sale Order by the Canadian Court, and shall use best efforts to complete the Sale by no later than June 30, 2024. | Agency Agreement § 1(a). |
| Good Faith Deposit (L.R. 6004-1(iv)(F)). | The Agent shall remit $3 million of the Guaranteed Minimum to Goli Canada within two business days of this Court's entry of the Recognition Order. | Agency Agreement §2(a). |
| Interim Arrangements with Proposed Buyer (L.R. 6004-1(iv)(G)). | N/A | N/A |

| Use of Proceeds (L.R. 6004-1(iv)(H)). | Proceeds from the Sale are payable to the Agent in amounts up to the Guaranteed Minimum; thereafter, amounts above the Guaranteed Minimum and to be split between the Agent (80%) and Goli Canada (20%). Amounts payable to Goli Canada shall be remitted to the Petitioner for the benefit of creditors. | Agency Agreement §2(b). |
| --- | --- | --- |
| Tax Exemption (L.R. 6004-1(iv)(I)). | N/A | N/A |
| Record Retention (L.R. 6004- 1(iv)(J)). | N/A | N/A |
| Sale of Avoidance Actions (L.R. 6004-1(iv)(K)). | N/A | N/A |
| Requested Findings as to Successor Liability (L.R. 6004-1(iv)(L)). | N/A | N/A |
| Sale Free and Clear of Unexpired Leases (L.R. 6004-1(iv)(M)). | N/A | N/A |
| Credit Bid (L.R. 6004-1(iv)(N)). | N/A | N/A |
| Relief from Bankruptcy Rule 6004(h) (L.R. 6004-1(iv)(O)) | Given the need to obtain final approval of the Transaction in the United States as soon as possible, the Petitioner seeks to waive the 14-day stay under Bankruptcy Rule 6004(h). | N/A |

## RELIEF REQUESTED

50.     As of the date hereof, the Canadian Court has not considered entry of the RVO or the Atos Sale Order, or the approval of the Sale Transactions.  The Petitioner, however, anticipates the Canadian Court will shortly schedule a hearing to consider approval of the Sale Transaction and entry of the RVO and the Atos Sale Order for a date after April 1, 2024 (the "CCAA Sale Approval Hearing").  The Petitioner filed the Motion at this time in order to avoid delay and in anticipation that the Canadian Court will enter the RVO and the Atos Sale Order at the CCAA

Sale Approval Hearing.  The Petitioner will file a copy of the RVO and the Atos Sale Order upon their entry as soon as reasonably practicable with this Court.

51.      Pursuant to the Motion, the Petitioners seek entry of the Proposed Order, pursuant to sections 105(a), 363, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code (i) recognizing and enforcing the RVO and the Atos Sale Order in the United States; (ii) approving the sale of the Subscribed Shares to the Purchaser pursuant to the Subscription Agreement and the sale of the Atos Equipment pursuant to the Agency Agreement, free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances (as defined in the Subscription Agreement and the Agency Agreement, as applicable ); and (iii) granting such other relief as the Court deems just and proper.

## BASIS FOR RELIEF REQUESTED

### A.      The Court Should Recognize and Enforce the CCAA Vesting Orders and Authorize the Sale Transactions Pursuant to Bankruptcy Code Section 363[6]

52.      Upon recognition of a foreign proceeding as a foreign main proceeding, relief is available to the foreign representative under section 1520 of the Bankruptcy Code.  *See* 11 U.S.C.

---

[6]      In addition to sections 1520 and 363, the Petitioner respectfully submits that the relief requested in this Motion is available under section 1521 and 1507.  Under section 1521(a)(7), this Court may grant "any additional relief that may be available to a trustee."  Given that a trustee may sell a debtor's assets under section 363, the Petitioner should similarly be authorized to sell the Subscribed Shares and the Atos Equipment.  Moreover, the, relief requested may be granted pursuant to Bankruptcy Code section 1507.  Section 1507 authorizes this Court to "provide additional assistance to a foreign representative under [the Bankruptcy Code] or under other laws of the United States." 11 U.S.C. § 1507. In deciding whether to extend relief under section 1507, this Court must consider principles of comity and determine whether the requested relief would reasonably assure: (a) just treatment of the Debtors' creditors and equity holders; (b) protection of the Debtors' United States creditors against prejudice and inconvenience in claim processing; (c) prevention of preferential or fraudulent dispositions of the Debtors' property; and (d) distribution of the Debtors' property substantially in accordance with the Bankruptcy Code's priority scheme. *See id.* "These provisions embody the protections that were previously contained in section 304 of the Bankruptcy Code . . . ." *In re Rede Energia S.A.*, 515 B.R. 69, 95 (Bankr. S.D.N.Y. 2014). Given the long history of Canadian proceedings being recognized and relief granted in such proceedings being enforced by United States courts, we are not aware of any facts or circumstances that would counsel against granting comity to the RVO or the Norco Sale Order, including the authorization therein to sell the Subscription Share and the Atos Equipment, respectively.  Such relief will provide the Debtors and all parties in interest with certainty that the RVO and Norco Sale Order will be enforceable not only in Canada, but in the United States, and will therefore protect and prevent prejudice to such parties by ensuring uniform application of such orders.

§ 1520. Section 1520(a)(2) of the Bankruptcy Code provides, in relevant part, that, "[u]pon recognition of a foreign proceeding that is a foreign main proceeding . . . sections 363, 549 and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate." 11 U.S.C. § 1520(a)(2). Moreover, section 1520(a)(3) of the Bankruptcy Code provides that, upon recognition of a foreign main proceeding, "unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552." 11 U.S.C § 1520(a)(3); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 16, 2012) (holding that section 363 of the Bankruptcy Code applies to transfers of assets located within the United States outside of the ordinary course of business in connection with cases commenced under chapter 15 of the Bankruptcy Code).

53.     In addition, sections 1525 and 1527 of the Bankruptcy Code contemplate cooperation "to the maximum extent possible with the foreign court or a foreign representative," which includes, "coordination of the administration and supervision of the debtor's assets and affairs" and "approval or implementation of agreements concerning the coordination of proceedings." 11 U.S.C. §§ 1525(a), 1527(4).

1.     *The Sale Transactions are a Prudent Exercise of Business Judgement*

54.     Bankruptcy Code section 363(b)(1) provides that the Petitioner, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property, bankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d

Cir. 1996); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991). The demonstration of a valid business justification by the debtor leads to a strong presumption "that in making [the] business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1990).

55.      In the context of an asset sale pursuant to section 363 of the Bankruptcy Code, it is well established that it is not required that debtors conduct an auction in order to meet the business judgment standard. *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (A "section 363(b) sale transaction does not require an auction procedure.").

56.      Here, entering into the Transactions is a prudent exercise of the Debtors' business judgment. The Transactions are the culmination of the Debtors' extensive restructuring efforts and a marketing process that lasted almost a year. The process included extensive input and cooperation from the Lenders, and was overseen by professionals engaged by the Debtors to manage the process (BMOCM). These efforts resulted in a transparent and fair marketing process pursuant to the SISP. The implementation of the Transactions following the SISP is a prudent exercise of the Debtors' business judgment and is supported by Petitioner in its capacity as the court-appointed monitor.

57.      The Petitioner believes that the issuance  of the Subscribed Shares to the Purchaser and sale of the Atos Equipment in accordance with the terms and conditions of the Subscription Agreement and the Agency Agreement, respectively, represents the best realization of value of the Debtors' asset for the benefit of the Debtors' stakeholders under the circumstances. Indeed, the

Petitioner is confident, given the results of the SISP and the Lenders' support for the Motion and CCAA Initial Application, that the Principal Transaction is the **only** viable going-concern transaction available to the Debtors, and will allow Goli Canada to exit the Canadian insolvency proceedings and continue its business. Given the above, the Petitioner is also confident that the Agency Agreement is the best way to maximize the value of the Atos Equipment. *Verified Petition*, ¶ 57. This Court's recognition of the CCAA Vesting Orders is a critical step in achieving that result.[7]

58.     Recognition and enforcement of the CCAA Vesting Orders will permit the Debtors to dispose of the Subscribed Shares and the Atos Equipment without disruption and in a timely and efficient manner.  Absent the relief requested herein, the Debtors, their creditors, their employees and their contract counterparties (and other business-related counterparties) will potentially suffer significant, if not irreparable, harm due to an inability to close the Transactions. Accordingly, the Petitioner hereby seeks recognition of the CCAA Vesting Orders in these chapter 15 cases.[8]

## 2.     *Creditors and Parties-in-Interest Received Adequate Notice*

59.     All creditors and parties-in-interest, including all U.S. based creditors, contract counterparties and litigation parties, received adequate notice of the Canadian Proceedings, the CCAA Initial Application, the Initial Order, and the Comeback Hearing.  As proposed in the *Petitioner's Motion for Entry of an Order Specifying Form and Manner of Service and Notice*,

---

[7]     Pursuant to Article 7.1 of the Subscription Agreement, and Section 5(a) of the Agency Agreement, entry of the Proposed Order substantially in the form attached hereto is a condition precedent to the consummation of the Principal Transaction and the Atos Sale.

[8]     RVO transactions have been recognized and enforced in the U.S. under Chapter 15 on several occasions, including by bankruptcy courts in this district.  *See In re In re Acerus Pharmaceuticals Corp., et al.*, No. 23-10111 (TMH) (Bankr. D. Del. June 13, 2023), Docket No. 78; *In Re NextPoint Financial Inc., et al.*, No. 23-10983 (Bankr. D. Del. Dec. 11, 2023), Docket No. 155; *In re Just Energy Group Inc., et. al.*, No. 21-30823 (MI) (Bankr. S.D. Tex., Dec. 1, 2022), Docket No. 232.

filed contemporaneously herewith (the "Notice Motion"), the Petitioner intends to serve the Notice Package (as defined in the Notice Motion) on all known creditors, including litigation parties and contract counterparties, regardless of location, to ensure that all creditors are given notice and are afforded an opportunity to appear and be heard at the upcoming hearings in the Canadian Court, including the Comeback Hearing and the CCAA Sale Approval Hearing. The Notice Package includes (i) a copy of the Initial Order; (ii) a notice of the Comeback Hearing and the deadline to object to the extension of the Stay Period ; (iii) a summary of the Sale Transactions, including the date of the CCAA Sale Approval Hearing and the deadline to object to the approval of the Sale Transactions and entry of the CCAA Vesting Orders. and (iv) a copy of the Recognition Notice (as defined in the Notice Motion). In addition, the Petitioner posted copies of the CCAA Initial Application, the publicly available exhibits thereto, its First Report to the Court and the Initial Order on the Petitioner's webpage at http://www.insolvencies.deloitte.ca/goli, which will be maintained in connection with the Canadian Proceedings and updated to include pleadings filed in both the Canadian Proceedings and these Chapter 15 Cases. Moreover, the Petitioner will serve, or cause to be served the Recognition Notice, which includes a notice of the hearing on this motion, by electronic mail and/or domestic or foreign mail upon the following parties or their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) all parties to litigation in which any Debtor is a party and that is pending in the United States as of the date that the Chapter 15 Petitions were filed; (c) all secured creditors of the Debtors in these cases; (d) contract counterparties; (e) all other known creditors of the Debtors in these cases; (f) all parties that were served with the Notice Package in the Canadian Proceedings; (g) the United States Food and Drug Administration; (h) the Debtors; and (i) all other parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002.

60.     The Recognition Notice will, among other things, (a) set forth the time for filing objections to the relief requested in this Motion, (b) the date, time, and place to attend a hearing on this Motion, (c) notify parties that copies of this Motion, including the Proposed Order, are available and may be examined (i) free of charge at the webpage maintained by the Petitioner at http://www.insolvencies.deloitte.ca/goli, or (ii) downloaded for a fee from the Court's electronic docket at https://ecf.deb.uscourts.gov.  As such, the Recognition Notice will provide notice that is "reasonably calculated, under all the circumstances, to inform interested parties of the pendency of a proceeding." *In re Energy Future Holdings Corp.*, 522 B.R. 520, 529 (Bankr. D. Del. 2015) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)).  This notice comes in addition to the notice provided in the Canadian Proceedings in connection with the filing of the CCAA Initial Application.  Accordingly, the Petitioner submits that notice of the Sale Transactions and the hearing on approval thereof is sufficient and appropriate.

### 3.     *The Purchase Price is Fair and Reasonable*

61.     The purchase price for the Subscribed Shares and the Atos Equipment provided in the Subscription Agreement and the Atos Sale Order, respectively, is fair, reasonable, the result of the SISP and provides the highest and best value to the Debtors and their stakeholders for the Subscribed Shares and the Atos Equipment.  The fairness and reasonableness of the consideration to be received by the Debtors is validated by a "market test" through the SISP.  *See In re Champion Enterprises, Inc.*, No. 09-14019 KG, 2012 WL 3778872, at *35 (Bankr. D. Del. Aug. 30, 2012) ("A market test is the best evidence of a company's value at a given point in time.").  The Subscription Agreement presents the best and only opportunity to maximize the value of the Subscribed Shares will allow Goli Canada to continue on a going-concern basis and avoid any decline and devaluation of the Subscribed Shares.  The Agency Agreement is the best way to maximize the value of the Atos Equipment.  Indeed, the fact that the Lenders—the parties with the

greatest economic interest in the Sale Transactions—support the Motion is clear evidence that the Sale Transactions will yield maximum value. For all of the foregoing reasons, the Petitioner have concluded that the Sale Transaction are in the best interests of the Debtors, their estates, creditors, and other parties in interest.

4. *The Releases Under the Subscription Agreement and Agent Protections in the Agency Agreement Are Appropriately Recognized Under Chapter 15 and the Bankruptcy Code*

62. As stated above, the definition of Released Parties under the Subscription Agreement includes releases and protections in favor of: (i) Goli Canada and Residual Co. and their respective present and former directors, officers, employees, shareholders, legal counsel and advisors, (ii) the Monitor and its legal counsel, and their respective present and former directors, officers, partners, employees and advisors, (iii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors, and (iv) the Lenders and their respective present and former directors, officers, employees, legal counsel and advisors. In addition, the Agency Agreement contains certain indemnification provisions and limitations of liability in favor of the Agent in connection with its performance under the Agency Agreement. The releases, as approved by the Canadian Court, are limited in scope and only cover present and future claims related to the Principal Transaction or the Debtors, their assets, business or affairs or administration of the Debtors, subject to certain limited exceptions. They also do not release claims arising out of fraud, bad faith, illegal acts or claims that are not permitted to be released under Canadian law.

63. Notably, Canadian courts have approved releases in similar reverse vesting transactions, and such releases have been in favor of the debtor's directors, officers, the monitors, counsel, employees of the debtor, shareholders and the debtor's advisors. *See Zucker Declaration*, ¶ 32 & n. 3.

64.     Recognition of such releases is appropriate and routinely granted to foreign debtors through chapter 15 of the Bankruptcy Code. *See, e.g.*, *In re In re Acerus Pharmaceuticals Corp., et al.*, No. 23-10111 (TMH) (Bankr. D. Del. June 13, 2023), Docket No. 78; *In Re NextPoint Financial Inc., et al.*, No. 23-10983 (Bankr. D. Del. Dec. 11, 2023), Docket No. 155; *In re Just Energy Group Inc., et. al.*, No. 21-30823 (MI) (Bankr. S.D. Tex., Dec. 1, 2022), Docket No. 232; *see also .In re Catalyst Paper Corp.*, No. 16-12419 (CSS), 2017 WL 5479405, at *2 (Bankr. D. Del. Jan. 20, 2017) (granting recognition to orders issued by the Canadian court, including the releases set forth therein).

65.     Here, recognition of the releases and similar protections under the Subscription Agreement and Agency Agreement serves the principal purpose of chapter 15—granting comity and full force and effect to the orders of foreign courts. *See In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010) (noting that "principles of enforcement of foreign judgments and comity in chapter 15 cases strongly counsel approval of enforcement in the United States of the third-party non-debtor release and injunction provisions included in the Canadian [o]rders," even if those provisions may not be appropriate in a plenary chapter 11 case.). Moreover, as similar releases are also granted in a chapter 11 case there can be no finding that the releases are manifestly contrary to public policy and are prohibited under section 1506. Accordingly, the RVO, including the releases thereunder, and the Atos Sale Order should appropriately be recognized by this Court.

5.     *The Cancellation of Interests Through the RVO is Appropriate and Permissible Under Chapter 15*

66.     As discussed above, the RVO terminates and cancels all options, securities and other rights held by any person that are convertible or exchangeable for any securities of Goli Canada. *Verified Petition* ¶ 51(e).   The shareholders of Goli Canada were, as recognized by the

Canadian Court, adequately notified of the Canadian Proceedings and the proposed Principal Transaction. *Zucker Declaration*, ¶ 39. None of the shareholders of Goli Canada have objected to the Principal Transaction.

67. Additionally, the cancellation of all outstanding shares and the issuance of new shares to the Purchaser pursuant to the RVO, was within the jurisdiction of the Canadian Court. *See, e.g.*, *Harte Gold (Re)*, 2022 ONSC 653 at para. 62 (finding that where shareholders have no economic interest, present or future, it would be unnecessary and, indeed, inappropriate to require a vote of the shareholders to effectuate an action achievable through the court); CBCA, s. 173 and 191(2) (permitting the Canadian court to amend the articles of a corporation that is subject to a reorganization). *Zucker Declaration*. ¶ 33.

68. Here, the Canadian Court has approved and permitted the cancellation of the shares in Goli Canada through the RVO and recognition of that order from the Canadian Court serves the purpose of chapter 15—extending comity and cooperation to the Canadian Court and its order. Additionally, the shareholders were adequately notified of the relief sought in respect of the Principal Transaction, were given notice of the Comeback Hearing and given the opportunity to appear and be heard in connection with such relief before the Canadian Court. As such, the Canadian Court and the Canadian Proceedings provided an adequate mechanism through which the shareholders' interests were protected.

**B.** **The Court Should Authorize and Approve the Sale Transactions "Free and Clear" Under Section 363(f) of the Bankruptcy Code.**

69. Bankruptcy Code Section 363(f) permits a debtor to sell property free and clear of another party's interest in the property if: (a) applicable non-bankruptcy law permits such a free and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is the subject of a bona

fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest. *See* 11 U.S.C. § 363(f).

70.    Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the approval of the Sale Transactions free and clear of all interests (*i.e.*, all liens, claims, rights, interests, charges or encumbrances), except with respect to any interests that may be assumed or preserved under the Subscription Agreement or the Agency Agreement, as applicable.  *See In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citing *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988)).

71.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtors have obtained the requisite consent to enter into the Sale Transactions and sell the Subscribed Shares and the Atos Equipment free and clear of all liens, claims, interests, or encumbrances (other than Permitted Encumbrances as defined in the Subscription Agreement and the Agency Agreement, as applicable).  As noted above, the Lenders are fully supportive of, and have consented to, the Sale Transactions.  Any other creditors that may hold such liens, claims, encumbrances, or other interests who did not object, or who withdrew their objections, to the Motion, the CCAA Initial Application, entry of the RVO, the sale of the Subscribed Shares, entry of the Atos Sale Order, and the sale of the Atos Equipment should be deemed, subject to the terms of the Proposed Order and the CCAA Vesting Orders, to have consented to such sale free and clear pursuant to section 363(f)(2) of the Bankruptcy Code.  The Petitioner submits that the sale of the Subscribed Shares and the Atos Equipment free and clear of all interests, other than as provided in the Proposed Order

and the RVO or Atos Sale Order, as applicable, satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

72.     The sale of the Subscribed Shares and the Atos Equipment free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances as defined in the Subscription Agreement and the Agency Agreement, as applicable) is consistent with the best interests of the Debtors' estates and creditors.  Pursuing a sale other than one free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrance as defined in the Subscription Agreement and the Agency Agreement, as applicable) would yield substantially less value for the Debtors' estates.  Therefore, a sale free and clear of all interests is in the best interests of the Debtors, their creditors, and other stakeholders, and is consistent with the Sale Transactions for which the Debtors are seeking approval in the Canadian Proceedings, in accordance with the terms of the CCAA Vesting Orders. *Verified Petition*, ¶ 59.

C.     **The Court Should Afford the Purchaser All Protections Under Section 363(m) and (n) of the Bankruptcy Code as a Good Faith Purchaser.**

73.     The Petitioner also requests that the Court find that the Purchaser are entitled to the benefits and protections set forth in sections 363(m) and (n) of the Bankruptcy Code.  Specifically, section 363(m) of the Bankruptcy Code provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

74.     Bankruptcy Code Section 363(m) thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased

assets if the order allowing the sale is reversed on appeal so long as such purchaser leased or purchased the assets in "good faith."

75.     Such relief is appropriate as the Principal Transaction was the result of the SISP, which consisted of a robust marketing process, and provides parties in interest with the opportunity to review and object to the Principal Transaction both in the Canadian Court and in this Court.  *See Esposito v. Title Ins. Co. of Pa. (In re Fernwood Mkts.)*, 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (good faith purchasers are protected under section 363(m) where notice is provided to lienholders). Courts generally conclude that a purchaser has acted in good faith as long as the consideration is adequate and reasonable, and the terms of the transaction are fully disclosed.  *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149-50 (3d Cir. 1986).

76.     Here, the Debtors' assets and business were subjected to a robust solicitation and competitive bidding process (*i.e.*, the SISP) conducted by an experienced third party.  *Verified Petition*, ¶ 31.  The Petitioner, in its capacity as an officer of the Canadian Court, believes that the Subscription Agreement is fair and reasonable under the circumstances, and is generally beneficial to the Debtors' stakeholders, including its creditors, employees and trading partners . In that regard the Petitioner has considered, in particular, that the Principal Transaction is supported by the Lenders, which have the primary economic interest in the Debtors' assets, and that the Principal Transaction will allow for the continuation of the Debtors' business as a going concern.  The protections of sections 363(m) and 363(n) of the Bankruptcy Code are essential to the willingness of the Purchaser to consummate the Sale Transactions.

77.     The Petitioner is not aware of any indication of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause or permit the Principal Transaction to be avoided

under section 363(n) of the Bankruptcy Code. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d at 147 (describing types of misconduct that negate a purchaser's good faith status (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978))). The Principal Transaction is the result of an extensive marketing process and the product of negotiations between the parties thereto, pursuant to the SISP, which was crafted by the Debtors and their advisors, in consultations with the Lenders, to ensure the maximum potential price was received by the Debtors.

78. Accordingly, the Petitioner seeks a finding that the Purchaser is a good faith Purchaser under section 363(m) of the Bankruptcy Code and have not violated section 363(n) of the Bankruptcy Code.

## **WAIVER OF RULE 6004(h)**

79. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The relief sought by the Petitioner herein is a condition precedent to closing each of the Transaction and is time sensitive. Any delay in closing could jeopardize the Sale Transactions to the detriment of the Debtors and their stakeholders. Accordingly, the Petitioner respectfully requests that the Court waive the 14-day stay imposed by Bankruptcy Rule 6004(h).

## **NOTICE**

80. As set forth in the Notice Motion, the Petitioner intends to serve, or cause to be served, the Recognition Notice, which will, among other things, (a) set forth the time for filing objections to the relief requested in this Motion, (b) the date, time, and place to attend a hearing on this Motion, (c) notify parties that copies of this Motion, including the Proposed Order, are available and may be examined (i) free of charge at the webpage maintained by the Petitioner at

http://www.insolvencies.deloitte.ca/goli, or (ii) downloaded for a fee from the Court's electronic docket at https://ecf.deb.uscourts.gov, by electronic mail and/or domestic or foreign mail upon the following parties or their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) all parties to litigation in which any Debtor is a party and that is pending in the United States as of the date that the Chapter 15 Petitions were filed; (c) all secured creditors of the Debtors in these cases; (d) contract counterparties; (e) all other known creditors of the Debtors in these cases; (f) all parties that were served with the Notice Package in the Canadian Proceedings; (g) the United States Food and Drug Administration; (h) the Debtors; and (i) all other parties that have requested notice in these cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Petitioner requests that this Court find that no further notice is required.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order, substantially in the form as the attached Proposed Order: (i) granting the relief requested herein and (ii) granting the Petitioner and the Debtors such other and further relief as the Court deems proper and just.

Dated: March 19, 2024
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5964)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  mcguire@lrclaw.com
      pierce@lrclaw.com
      brooks@lrclaw.com

-and-

**NORTON ROSE FULBRIGHT US LLP**
Andrew Rosenblatt (*pro hac vice* pending)
Francisco Vazquez (*pro hac vice* pending)
Michael Berthiaume (*pro hac vice* pending)
1301 Avenue of the Americas
New York, New York  10019
Telephone: (212) 408-5100
Facsimile: (212) 541-5369
Email: andrew.rosenblatt@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
michael.berthiaume@nortonrosefulbright.com

*Counsel to the Petitioner*

## Exhibit A

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x

In re:                                             :    Chapter 15
                                                   :
GOLI NUTRITION INC., *et al.*,[1]                  :    Case No. 24-10438 (LSS)
                                                   :
           Debtors in a Foreign Proceeding.        :    (Jointly Administered)
                                                   :
-------------------------------------------------------------- x    **Ref. No. ___**

## ORDER (I) RECOGNIZING AND ENFORCING (A) THE RVO AND (B) THE ATOS SALE ORDER, (II) APPROVING THE SALE OF THE DEBTORS' INTERESTS AND ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion (the "<u>Motion</u>")[2] filed by Deloitte Restructuring Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "<u>Petitioner</u>"), as defined by section 101(24) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), of Goli Nutrition Inc., a company incorporated in Québec, Canada ("<u>Goli Canada</u>"), and Goli Nutrition Inc., a company incorporated in Delaware ("<u>Goli US</u>," and, together with Goli Canada, the "<u>Debtors</u>"), pursuant to sections 105(a), 363, 365, 1501, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, for entry of an order (this "<u>Order</u>"): (a) recognizing and enforcing (i) the RVO, attached hereto as **Exhibit 1** and (ii) the Atos Sale Order, attached hereto as **Exhibit 2**; (b) approving, under section 363 of the Bankruptcy Code, the sale of the Subscribed Shares to the Purchaser, free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances and Retained Liabilities, as defined in the RVO) in accordance with the RVO; (c) approving, under section 363 of the Bankruptcy Code, the sale of the Atos

---

[1]    The Debtors in these Chapter 15 cases, are: Goli Nutrition, Inc., a company incorporated in Québec, Canada and the last 4 digits of its Canadian business number is 0002; and Goli Nutrition Inc., a company incorporated in Delaware and the last 4 digits of its federal tax identification number is 2655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Equipment by the Agent free and clear of all liens, claims, encumbrances, and other interests in accordance with the Agency Agreement; and (d) granting such other relief as the Court deems just and proper, all as more fully set forth in the Motion; and upon consideration of the Verified Petition and the Zucker Declaration; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 109 and 1501; and venue being proper before this Court pursuant to § 1410; and the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and that this Court may enter a final order consistent with Article III of the United States Constitution; and adequate and sufficient notice of the filing of the Motion having been given by the Petitioner; and it appearing that the relief requested in the Motion is necessary and beneficial to the Debtors and the Petitioner; and, if deemed necessary, this Court having held a hearing (the "Hearing") to consider the relief requested in the Motion; and there being no objections or other responses filed that have not been overruled, withdrawn, or otherwise resolved; and after due deliberation and sufficient cause appearing therefore,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A.      This Court entered the Recognition Order [Docket No. ____] on March __, 2024, and has found that the Debtors have satisfied the requirements of, among others, sections 101(23) and (24), 1502(4), 1504, 1509, 1515, 1517, 1520, 1521, and 1522 of the Bankruptcy Code.  All such findings by this Court are hereby incorporated by reference herein and such Recognition Order shall continue in effect in all respects except to the extent this Order directly modifies or directly contradicts such Recognition Order.

B.      On March __ 2024, the Canadian Court entered the RVO, approving, among other things, the RVO transaction and all related documents and adding Residual Co. as an applicant in the CCAA proceedings and removing Goli Canada as an applicant in the CCAA Proceedings;

ordering Goli Canada to issue the Subscribed Shares, and vesting in the Purchaser all right, title and interest in and to the Subscribed Shares, free and clear of any encumbrances; ordering Goli Canada to redeem and cancel the Legacy Equity Interests (as defined in the RVO) without any payment or other consideration; and approving the Pre-Closing Reorganization (as defined in the RVO) and vesting out of Goli Canada certain excluded assets, contracts and liabilities and discharging all encumbrances against Goli Canada other than certain permitted encumbrances..

C.      On March __ 2024, the Canadian Court entered the Atos Sale Order, approving, among other things, the Debtors' entry into the Agency Agreement for the sale of the Atos Equipment in accordance therewith.

D.      Based on the affidavits of service filed with, and the representations made to, this Court: (i) notice of the Motion, the Hearing, if necessary, and the CCAA Vesting Orders was proper, timely, adequate, and sufficient under the circumstances of these Chapter 15 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; and (ii) no other or further notice of the Motion, the CCAA Vesting Orders, or the entry of this Order is necessary or shall be required.

E.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

F.      The relief granted herein is necessary and appropriate, is in the interest of the public, promotes international comity, is consistent with the public policies of the United States, is warranted pursuant to sections 105(a), 363(b), (f), (m) and (n), 364, 365, 1501, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, and will not cause any hardship to any parties in interest that is not outweighed by the benefits of the relief granted.

G.    Based on the information contained in the Motion, the Petition, the Zucker Declaration and the record made at the Hearing, if necessary, the Debtors, with the consent of and in consultation with the Lenders, conducted an extensive marketing and sales process prior to the commencement of the CCAA Proceedings with respect to the Debtors' business and their assets, including the Atos Equipment, and such process was non-collusive, duly noticed, and provided a reasonable opportunity for potential buyers to make any offer.  The Petitioner, the Debtors and the Lenders, whose collateral is the subject to the sale transactions, support the disposition of (i) the Subscribed Shares pursuant to the Subscription Agreement in connection with the RVO transaction, and (ii) the Atos Equipment pursuant to the Agency Agreement and the liquidation process that will be conducted by the Agent thereunder.  As such, it is appropriate that the Subscribed Shares be issued to the Purchaser on the terms and subject to the conditions set forth in the Subscription Agreement and that the Atos Equipment be sold on the terms and subject to the conditions set forth in the Agency Agreement.

H.    Based on information contained in the Motion, the Verified Petition, the Zucker Declaration, and the record made at the Hearing, if necessary, the relief granted herein relates to assets and interests that, under the laws of the United States, should be administered in the Canadian Proceedings.

I.    The Debtors' performance under the Subscription Agreement and the Agency Agreement and related agreements: (i) constitute a sound and reasonable exercise of the Debtors' business judgment; (ii) provide value and are beneficial to the Debtors and are in the best interests of the Debtors; their estates, and their stakeholders; and (iii) are reasonable and appropriate under the circumstances.  The consideration provided by the Purchaser for the Subscribed Shares under the Subscription Agreement, and the consideration to be provided by the Purchaser of the Atos

Equipment to be sold in accordance with the Agency Agreement, was the highest and best offer providing a greater recovery than any alternative and constitute fair consideration and reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, Uniform Avoidance Transaction Act, and other laws of the United States, any state, territory, possession thereof, or the District of Columbia.

J. The transactions implemented pursuant to the Subscription Agreement do not amount to a consolidation, merger, or *de facto* merger of the Purchaser with any of the Debtors. Likewise, the transactions implemented pursuant to the Agency Agreement do not amount to a consolidation, merger, or *de facto* merger of the Agent and/or any subsequent purchaser of the Atos Equipment with any of the Debtors.

K. Time is of the essence in consummating the transactions implemented pursuant to the Subscription Agreement and the Agency Agreement. To maximize the value of the Subscribed Shares and the Atos Equipment, it is essential that the pertinent transactions occur and be recognized and enforced in the United States promptly. The Petitioner, on behalf of the Debtors, has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of such transactions. Accordingly, there is cause to waive the stay that would otherwise be applicable under Bankruptcy Rule 6004(h), and accordingly, the transactions contemplated by the Subscription Agreement and Agency Agreement and related agreements can be closed as soon as reasonably practicable upon entry of this Order.

L. Based upon the information contained in the Motion, the Verified Petition, the Zucker Declaration, the other pleadings filed in these chapter 15 cases, and the record made at any hearing on the Motion, if necessary, the Subscription Agreement and Agency Agreement and each

of the transactions contemplated thereby were negotiated, proposed, and entered into by the Debtors and the Purchaser and the Agent, as applicable, in good faith, without collusion, and from arm's-length bargaining positions. The Purchaser is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. None of the Debtors, the Petitioner, the Purchaser, or the Agent has engaged in any conduct that would cause or permit the Subscription Agreement or the Agency Agreement, as applicable, or the consummation of the transactions contemplated thereby to be avoided or costs and damages to be imposed, including under section 363(n) of the Bankruptcy Code.

M.     The Agent is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code. No common identity of directors or controlling stockholders exists between the Agent and the Debtors.

N.     The Sale Procedures (as defined in the Agency Agreement) are reasonable and will maximize the returns on the Atos Equipment for the benefit of the Debtors and their creditors.

O.     The Subscription Agreement and Agency Agreement were not entered into for the purpose of hindering, delaying, or defrauding any present or future creditors of the Debtors.

P.     The Debtors may sell and transfer the Subscribed Shares and the Atos Equipment free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances, and other interests of any kind or nature whatsoever (including rights of setoff and recoupment) against the Debtors, the Subscribed Shares, the Atos Equipment, other than the Permitted Encumbrances and Retained Liabilities (as defined in the RVO and the Atos Sale Order, as applicable), because with respect to each creditor asserting any liens, claims, encumbrances, and other interests, one or more of the standards set forth in section 363(f)(l)–(5) of the Bankruptcy Code has been satisfied. Each creditor that did not object to the Motion is

deemed to have consented to the sale of the Subscribed Shares and the Atos Equipment free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances and Retained Liabilities, each as defined in the RVO and the Atos Sale Order, as applicable) pursuant to section 363(f)(2) of the Bankruptcy Code.

Q.      The total consideration to be provided under the Subscription Agreement reflects the reliance of the Purchaser on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Subscribed Shares, free and clear of all liens, claims, encumbrances, and other interests, other than the Permitted Encumbrances and Retained Liabilities (as defined in the RVO).  Likewise, the total consideration to be provided under the Agency Agreement reflects the reliance of the Agent on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with authority to possess and sell the Atos Equipment, free and clear of all liens, claims, encumbrances, and other interests.

R.      The sale of the Subscribed Shares to the Purchaser will be a legal, valid, and effective sale of the Subscribed Shares, and will vest the Purchaser with all rights, title, and interests in and to the Subscribed Shares, free and clear of all liens, claims, encumbrances, and other interests, other than the Permitted Encumbrances and Retained Liabilities (as defined in the RVO).

S.      The sale of the Atos Equipment in accordance with the Agency Agreement will be a legal, valid, and effective sale of the Atos Equipment, and will vest any purchaser with all rights, title, and interests in and to the Atos Equipment, free and clear of all liens, claims, encumbrances, and other interests.

T.      The Petitioner and the Debtors, as appropriate: (i) have full power and authority to execute the Subscription Agreement and the Agency Agreement and all other documents

contemplated thereby; (ii) have all the power and authority necessary to consummate the transactions contemplated by the Subscription Agreement and the Agency Agreement; and (iii) upon entry of this Order, other than any consents identified in the Subscription Agreement and the Agency Agreement, need no consent or approval from any other person or governmental unit to consummate the transactions contemplated thereby. Such transactions have been duly and validly authorized by all necessary corporate action of the Debtors.

U.  The Subscription Agreement is a valid and binding contract between the Debtors and the Purchaser and shall be enforceable pursuant to its terms. The Subscription Agreement, the transactions contemplated thereby, and the consummation thereof shall be specifically enforceable against and binding upon the Debtors and the Petitioner in these chapter 15 cases and shall not be subject to rejection or avoidance by the foregoing parties or any other Person (as defined in section 101(41) of the Bankruptcy Code).

V.  The Agency Agreement is a valid and binding contract between the Debtors and the Agent and shall be enforceable pursuant to its terms. The Agency Agreement, the transactions contemplated thereby, and the consummation thereof shall be specifically enforceable against and binding upon the Debtors and the Petitioner in these chapter 15 cases and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

W.  The security interests and liens provided for in the Agency Agreement to secure the obligations of the Debtors under the Agency Agreement to the Agent are necessary to induce the Agent to agree to the terms of the Agency Agreement. But for the protections afforded to the Agent under the Bankruptcy Code, this Order, and the Agency Agreement, the Agent would not have agreed to pay the Debtors the compensation provided for under the Agency Agreement.

X.    The Purchaser would not have entered into the Subscription Agreement and would not consummate the purchase of the Subscribed Shares and the related transactions, thus adversely affecting the Debtors, their estates, and their creditors, and other parties in interest, if the sale of the Subscribed Shares to the Purchaser was not free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances and Retained Liabilities as defined in the RVO), or if the Purchaser would, or in the future could, be liable on account of any such lien, claim, encumbrance, or any other interest, including, as applicable, certain liabilities related to the Subscribed Shares that will not be assumed by the Purchaser, as described in the Subscription Agreement.

Y.    The Agent would not have entered into the Agency Agreement and agree to undertake the liquidation of the Atos Equipment, thus adversely affecting the Debtors, their estates, and their creditors, and other parties in interest, if it, on behalf of the Debtors, was not permitted to sell and transfer the Atos Equipment, free and clear of all liens, claims, encumbrances, and other interests, or if the Agent would, or in the future could, be liable on account of any such lien, claim, encumbrance, or any other interest, including, as applicable, certain liabilities related to the Atos Equipment that will not be assumed, as described in the Agency Agreement.

Z.    A sale of the Subscribed Shares and the Atos Equipment other than free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances or Retained Liabilities as defined in the RVO) would yield substantially less value than the sale of the Subscribed Shares pursuant to the Subscription Agreement or the Atos Equipment pursuant to the Agency Agreement, respectively; thus, the sale free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances and Retained

Liabilities as defined in the RVO), in addition to all of the relief provided herein, is in the best interests of the Debtors, their creditors, and other parties in interest.

AA.    The interests of the Debtors' creditors in the United States are sufficiently protected. The relief granted herein is necessary and appropriate, in the interests of the public and international comity, consistent with the public policies of the United States, and warranted pursuant to sections 1521(b) and 1522 of the Bankruptcy Code.

BB.    The legal and factual bases set forth in the Motion and at the Hearing, if necessary, establish just cause for the relief granted herein.

CC.    Any and all findings of fact and conclusions of law announced by this Court at the Hearing are incorporated herein.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    The Motion is granted as set forth herein.

2.    All objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived, or settled by stipulation filed with this Court, and all reservations of rights included therein, are hereby overruled on the merits.

### Recognition and Enforcement of the RVO

3.    The RVO, a copy of which is annexed hereto as **Exhibit 1**, and all of its respective terms, including any immaterial or administrative amendments thereto, including those necessary to give effect to the substance of such order, either pursuant to the terms therein or as approved by the Canadian Court, are fully recognized and given full force and effect in the United States in their entirety.

4.    The Subscription Agreement and the transactions contemplated thereunder, including, for the avoidance of doubt, the sale of the Subscribed Shares and the transfers of the

Subscribed Shares on the terms set forth in the Subscription Agreement and the RVO, including all transactions contemplated thereunder, this Order, including all transactions contemplated hereunder, and all of the terms and conditions of each of the foregoing are hereby approved and authorized pursuant to sections 105, 363, 365, 1501, 1520, 1521, 1525 and 1527 of the Bankruptcy Code.  The failure specifically to include any particular provision of the Subscription Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Subscription Agreement and the transactions contemplated thereunder, be authorized and approved in their entirety.

5.     Pursuant to sections 105, 363, 365, 1501, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, the RVO and this Order, the Debtors, the Purchaser, and the Petitioner (as well as their respective officers, employees, and agents) are authorized to take any and all actions necessary or appropriate to: (a) consummate the transactions contemplated by the Subscription Agreement, including the sale of the Subscribed Shares to the Purchaser, in accordance with the Subscription Agreement, the RVO, and this Order; (b) distribute proceeds of the Subscription Agreement in accordance with and as authorized therein; and (c) perform, consummate, implement, and close fully the transactions contemplated by the Subscription Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Subscription Agreement and the transactions contemplated thereunder and to take such additional steps and all further actions as may be necessary or appropriate to the performance of the obligations contemplated by the Subscription Agreement, all without further order of the Court, and are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases, and other documents on behalf of such Person with respect to the Subscribed Shares that are necessary or appropriate to effectuate the Subscription Agreement and the

transactions contemplated thereunder, any related agreements, the RVO, and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors or the Purchaser may determine are necessary or appropriate, and are hereby authorized and empowered to cause to be filed, registered, or otherwise recorded a certified copy of the RVO, this Order or the Subscription Agreement, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests against the Subscribed Shares.  The RVO and this Order are deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

### Transfer of the Subscribed Shares Free and Clear [3]

6.      Pursuant to sections 105(a), 363, 365, 1501, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, on the Closing Date, the Subscribed Shares shall be transferred and absolutely vest in the Purchaser, in accordance with RVO and the Subscription Agreement, without further instrument of transfer or assignment, and such transfer shall: (a) be a legal, valid, binding, and effective transfer of the Subscribed Shares to the Purchaser; (b) vest the Purchaser with all rights, title, and interests in the Subscribed Shares; and (c) be free and clear of all liens, claims, encumbrances, and other interests, other than the Permitted Encumbrances and Retained Liabilities (as defined in the RVO).

---

[3]      Capitalized terms used in this section but not defined elsewhere in this Order shall have the meanings ascribed to such terms in the RVO.

7.      Pursuant to sections 105(a), 363(f), 365, 1501, 1520, 1521, 1525 and 1527 of the Bankruptcy Code, upon the closing of the transaction contemplated by the Subscription Agreement except with respect to solely Permitted Encumbrances and Retained Liabilities (as defined in the RVO): (a) no holder of a lien, claim, encumbrance, or other interest against or in the Debtors and/or their assets shall interfere, and each and every such holder is enjoined from interfering with the Purchaser's rights and title to or use and enjoyment of the Subscribed Shares; and (b) the sale of the Subscribed Shares, the Subscription Agreement, and any instruments contemplated thereby shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any successor thereof.  All Persons holding a lien, claim, encumbrance, or other interest against or in the Debtors and/or their assets are forever barred and enjoined from asserting such lien, claim, encumbrance, or other interest against the Subscribed Shares, the Purchaser, or any of its members, and their respective affiliates and their respective officers, directors, employees, managers, partners, members, financial advisors, attorneys, agents, and representatives, successors, and assigns from and after closing of the transactions contemplated by the Subscription Agreement.

8.      Each and every federal, state, and local governmental agency or department is authorized and directed to accept (and not impose any fee, charge, or tax in connection therewith) any and all documents and instruments necessary or appropriate to consummate the sale of the Subscribed Shares to the Purchaser.  Effective as of the Closing Date, the RVO and this Order shall constitute for any and all purposes a full and complete conveyance and transfer of the Subscribed Shares to the Purchaser free and clear of all liens, claims, encumbrances, and other interests, other than the Permitted Encumbrances and Retained Liabilities (as defined in the RVO).

9.      This Order shall be effective as a determination that, as of the Closing Date, (a) all liens, claims, encumbrances, and other interests against or in the Debtors and/or their assets, other than the Permitted Encumbrances and Retained Liabilities (as defined in the RVO) have been unconditionally released, discharged, and terminated as to the Purchaser and the Subscribed Shares, and that the conveyances and transfers described herein have been effected, (b) no creditors of Residual Co. shall have any claim upon, cause of action against, or interest in, the Subscribed Shares or the Purchaser (as to the Purchaser, solely in connection with or with respect to the Debtors) as of the Closing Date, and (c) such Order is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease.  Each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Subscription Agreement and effect the discharge of all liens, claims, encumbrances, and other interests, other than the Permitted Encumbrances (as defined in the RVO) pursuant to this Order and the RVO, and not impose any fee, charge, or tax in connection therewith.

10.     The Purchaser shall not be deemed to: (a) be a legal successor, or otherwise be deemed a successor, to any of the Debtors; (b) have, *de facto* or otherwise, merged with or into any or all Debtors; or (c) be a mere continuation or substantial continuation of any or all Debtors or the enterprise or operations of any or all Debtors.  Without limiting the generality of the

foregoing, except as otherwise provided in the Subscription Agreement, the RVO, this Order, and/or any other order of the Canadian Court, the conveyance of the Debtors' rights, title, and interest in the Purchased Assets to the Purchaser under the Subscription Agreement shall not result in the Purchaser having any liability or responsibility whatsoever for any: (a) interest, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly; (b) obligation under any of the Debtors' labor or employment agreements; (c) of the Debtors' mortgages, deeds of trust, and security interests; (d) intercompany loans and receivables between the Debtors and any non-debtor subsidiary or affiliate; (e) of the Debtors' pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs; (f) of the Debtors' other employee, workers' compensation, occupational disease, unemployment, or temporary disability related claims, including, without limitation, claims that might arise under or pursuant to: (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Worker Adjustment and Retraining Act of 1988; (vii) the Age Discrimination and Employee Act of 1976 and the Age Discrimination in Employment Act, as amended, (viii) the Americans with Disabilities Act of 1990; (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985, (x) state discrimination laws, (xi) state unemployment compensation laws or any other similar state laws, (xii) or any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; or (g) successor or vicarious liabilities of any kind or character, including, but not limited to, federal, state, or other tax liabilities, U.S. or foreign pension liabilities, or liabilities based on any theory of antitrust, environmental, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, de facto merger or substantial continuity, whether known or unknown, whether legal

or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these Chapter 15 Cases, whether imposed by agreement, understanding, law, equity, or otherwise with respect to any of the Debtors or any obligations of the Debtors, including, but not limited to, in the case of liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the time of Closing or any taxes in connection with, or in any way relating to the cancellation of debt of the Debtors or their affiliates.

11.     The transaction contemplated by the Subscription Agreement, including the purchase of the Subscribed Shares, is undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorizations provided herein shall neither affect the validity of the Subscription Agreement nor the transfer of the Subscribed Shares to the Purchaser free and clear of all liens, claims, encumbrances, and other interests, unless such authorization is duly stayed before the closing of the transactions contemplated by the Subscription Agreement pending such appeal.

12.     None of the Debtors or the Purchaser, has engaged in any conduct that would cause or permit the Subscription Agreement or the Agency Agreement, as applicable, to be avoided or costs and damages to be imposed, including under section 363(n) of the Bankruptcy Code.

13.     The terms and provisions of the Subscription Agreement, the RVO, and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Purchaser, the Petitioner, the Debtors' creditors, and all other parties in interest, and any successors of the Debtors, the Purchaser, the Petitioner, and the Debtors' creditors, including any foreign representative(s) of the Debtors, trustee(s), examiner(s), or receiver(s) appointed in any

proceeding, including, without limitation, any proceeding under any chapter of the Bankruptcy Code, the CCAA, or any other law, and all such terms and provisions shall likewise be binding on such foreign representative(s), trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, their creditors, or any trustee(s), examiner(s), or receiver(s).

14.     Subject to the terms and conditions of the RVO, the Subscription Agreement and any related agreements, documents, or other instruments, may be modified, amended, or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of this Court; *provided* that any such modification, amendment, or supplement does not materially change the terms of such agreements, documents, or other instruments and is otherwise in accordance with the terms of the RVO.

15.     Paragraphs 6–15 of this Order and the Subscription Agreement are non-severable and mutually dependent.  To the extent that there are any inconsistencies between the terms of this Order and the RVO, on the one hand, and the Subscription Agreement, on the other, this Order and the RVO shall govern.

**<u>Recognition and Enforcement of the Atos Sale Order</u>**

16.     The Atos Sale Order and all of its respective terms, including any immaterial or administrative amendments thereto, including those necessary to give effect to the substance of such order, either pursuant to the terms therein or as approved by the Canadian Court, are fully recognized and given full force and effect in the United States in their entirety.

17.     The Agency Agreement and the transactions contemplated thereunder, including, for the avoidance of doubt, the sale of the Atos Equipment and the transfer of the Atos Equipment, on the terms set forth in the Agency Agreement and the Atos Sale Order, including all transactions contemplated thereunder, this Order, including all transactions contemplated hereunder, and all of the terms and conditions of each of the foregoing are hereby approved and authorized pursuant to

sections 105, 363, 364, 365, 1501, 1520, 1521, 1525 and 1527 of the Bankruptcy Code.  The failure specifically to include any particular provision of the Agency Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agency Agreement and the transactions contemplated thereunder, be authorized and approved in their entirety.

18.     Pursuant to sections 105, 363, 364, 365, 1501, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, the Atos Sale Order, and this Order, the Agent, the Debtors, and the Petitioner (as well as their respective officers, employees, and agents) are authorized to take any and all actions necessary or appropriate to: (a) consummate the transactions contemplated by the Agency Agreement, including the sale of the Atos Equipment in accordance with the Agency Agreement, the Atos Sale Order, and this Order; and (b) perform, consummate, implement, and close fully the transactions contemplated by the Agency Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agency Agreement and the transactions contemplated thereunder and to take such additional steps and all further actions as may be necessary or appropriate to the performance of the obligations contemplated by the Agency Agreement, all without further order of the Court, and are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases, and other documents on behalf of such Person with respect to the Atos Equipment that are necessary or appropriate to effectuate the Agency Agreement and the transactions contemplated thereunder, any related agreements, the Atos Sale Order, and this Order.

**Transfer of the Atos Equipment Free and Clear** [4]

19.     Upon the closing of the transactions contemplated by the Agency Agreement, the sale of the Atos Equipment by the Agent to a purchaser pursuant to the terms of the Agency Agreement and the Atos Sale Order shall: (a) be a legal, valid, binding and effective transfer of the Atos Equipment to such purchaser; (b) vest the purchaser with all rights, title, and interests in the Atos Equipment; and (c) be free and clear of all liens, claims, encumbrances, and other interests.  All Persons holding a lien, claim, encumbrance, or other interest against or in the Debtors and/or their assets are forever barred and enjoined from asserting such lien, claim, encumbrance, or other interest against the Atos Equipment, the Agent (or any subsequent purchaser of the Atos Equipment pursuant to the Agency Agreement), or any of its members, and their respective affiliates and their respective officers, directors, employees, managers, partners, members, financial advisors, attorneys, agents, and representatives, successors, and assigns from and after closing of the transactions contemplated by the Agency Agreement.

20.     The Sale Procedures are approved in their entirety.

21.     None of the Debtors, the Petitioner, or the Agent, nor any of their respective officers, employees, or agents shall be required to obtain the approval of any third parties, including without limitation, any Governmental Unit or any landlord, to conduct any Sale in accordance with the Agency Agreement and this Order.

22.     Any Sale shall be conducted by the Agent notwithstanding any restrictive provision of any lease or other agreement relative to occupancy affecting or purporting to restrict such Sale.  No person or entity, shall take any action to directly or indirectly prevent, interfere with, or

---

[4]     Capitalized terms used in this section but not defined elsewhere in this Order shall have the meanings ascribed to such terms in the Atos Sale Order.

otherwise hinder any Sale or seeks to recover damages for breaches of covenants or provisions in any lease based upon any relief authorized herein.

23.     Each and every federal, state, and local governmental agency or department is authorized and directed to accept (and not impose any fee, charge, or tax in connection therewith) any and all documents and instruments necessary or appropriate to consummate the sale of the Atos Equipment.

24.     In accordance with the Atos Sale Order and effective upon the payment of the Guaranteed Minimum (as defined in the Agency Agreement), as security for all obligations of Goli Canada to the Agent under or in connection with the Agency Agreement, the Agent is granted a first priority security lien in the Atos Equipment and all proceeds thereof including all proceeds from sales of the Atos Equipment in accordance with the Agency Agreement.  Without any further act by or on behalf of the Agent or any other party, the Agent's security interest in and liens upon the Atos Equipment and all Gross Proceeds (as defined in the Agency Agreement) are (i) validly created, (ii) effective upon the entry of this Order, and (iii) senior to all other liens, charges, and security interests in the Atos Equipment and all Gross Proceeds.

25.     This Order shall be effective as a determination that, as of the closing of the transactions contemplated by the Agency Agreement, (a) all liens, claims, encumbrances, and other interests against or in the Atos Equipment have been unconditionally released, discharged, and terminated as to the Atos Equipment, and that the conveyances and transfers described herein have been effected, (b) no creditors of Residual Co. shall have any claim upon, cause of action against, or interest in, the Atos Equipment, and (c) such Order is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease.  Each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agency Agreement and effect the discharge of all liens, claims, encumbrances, and other interests, pursuant to this Order and the Atos Sale Order, and not impose any fee, charge, or tax in connection therewith.

26.     The Agent shall not be deemed to: (a) be a legal successor, or otherwise be deemed a successor, to any of the Debtors; (b) have, *de facto* or otherwise, merged with or into any or all Debtors; or (c) be a mere continuation or substantial continuation of any or all Debtors or the enterprise or operations of any or all Debtors.

27.     All Persons that are currently in possession of some or all of the Atos Equipment located in the United States or that are otherwise subject to the jurisdiction of this Court are hereby directed to surrender possession of such Atos Equipment to the Debtors or the Agent.

28.     None of the Debtors nor the Agent has engaged in any conduct that would cause or permit the Agency Agreement, as applicable, to be avoided or costs and damages to be imposed, including under section 363(n) of the Bankruptcy Code.

29.     The terms and provisions of the Agency Agreement, the Atos Sale Order, and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Agent, the Petitioner, the Debtors' creditors, and all other parties in interest, and any successors of the Debtors, the Agent, the Petitioner, and the Debtors' creditors, including any foreign representative(s) of the Debtors, trustee(s), examiner(s), or receiver(s) appointed in any

proceeding, including, without limitation, any proceeding under any chapter of the Bankruptcy Code, the CCAA, or any other law, and all such terms and provisions shall likewise be binding on such foreign representative(s), trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, their creditors, or any trustee(s), examiner(s), or receiver(s).

30.     Subject to the terms and conditions of the Atos Sale Order, the Agency Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of this Court; *provided* that any such modification, amendment, or supplement does not materially change the terms of such agreements, documents, or other instruments and is otherwise in accordance with the terms of the Atos Sale Order.

31.     Paragraphs 19–31 of this Order and the Agency Agreement, are non-severable and mutually dependent.  To the extent that there are any inconsistencies between the terms of this Order and the Atos Sale Order, on the one hand, and the Agency Agreement, on the other, this Order and the Atos Sale Order shall govern.

## **Releases**

32.     The releases, exculpation, and injunctive provisions set forth in the CCAA Vesting Orders are expressly recognized by this Court and given full force and effect in the United States. For the avoidance of doubt, nothing herein shall release, exculpate, or enjoin any claims arising out of fraud, bad faith or illegal acts.

33.     The releases in favor of: (i) Goli Canada and certain of its directors and officers; and (ii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors (collectively the "Released Parties") contained in the RVO are expressly recognized by this Court and given full force and effect in the United States.  Consistent with the RVO, the Released Parties shall be deemed released and discharged from liability arising from any

and all present and future claims against the Released Parties based upon any fact or matter of occurrence related to the Principal Transaction or the Debtors, their assets, business or affairs or administration of the Debtors; provided that, nothing in this paragraph shall waive, discharge, release, cancel or bar (a) any claim that is not permitted to be released pursuant to the CCAA; (b) any claims arising out of fraud, bad faith or illegal acts against the directors or officers of Goli Canada that: (i) relates to contractual rights of one or more creditors; or (ii) is based on allegations of misrepresentations made by directors to creditors or of wrongful or oppressive conduct by directors; or (c) any obligations of any of the Released Parties under or in connection with the Subscription Agreement, the closing documents, and/or the consummation of the Principal Transaction.

34.     In addition, the indemnification provisions and limitations of liability in favor of the Agent in connection with its performance under the Agency Agreement are expressly recognized by this Court and given full force and effect in the United States.

35.     Any legal, factual, equitable, or other defenses (including, but not limited to, waiver, release, estoppel, or res judicata) held by any current or former officer or director of the Debtors in connection with any claim held by, asserted, or asserted in the future by any person relating in any manner to such current or former officer or director's role, position, conduct, acts, or omissions as an officer or director of any Debtor are hereby preserved and shall not be limited, waived, released, modified, or affected whatsoever by the entry of this Order.  Without limiting the foregoing, the rights of any current or former officer or director of any of the Debtors to (a) raise or assert that the releases, exculpation, and/or injunctive provisions contained in the CCAA Vesting Orders entered in the Canadian Proceedings are applicable to them and are fully enforceable as a defense in any action brought in any court, tribunal, or forum within the United

States, and (b) seek recognition of the releases, exculpation, and injunctions contained in the CCAA Vesting Orders under the comity doctrine or any other similar cross-border cooperation doctrine or treaty are fully preserved and retained in full.

36.     Pursuant to the terms of the RVO, and without limiting any other protections afforded to the Monitor under the RVO and/or CCAA, the Monitor "shall incur no liability whatsoever as a result of acting in accordance with the RVO and the Subscription Agreement approved herein, other than any liability arising directly out of the gross negligence or wilful misconduct of the Monitor; and no action lies against the Monitor by reason of the RVO or the performance of any act authorized by the RVO, except by leave of the Canadian Court on ten (10) days notice to the Monitor and its counsel."

## **Additional Provisions**

37.     To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the Debtors' operations on account of the filing or pendency of these Chapter 15 Cases or the consummation of the Sale.

38.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

39.     Notwithstanding anything to the contrary in this Order, the CCAA Vesting Orders, or any other document, this Court shall retain exclusive jurisdiction to hear and determine all disputes which are in any forum or court within the territorial United States involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the RVO, the Atos Sale Order, or recognized by this Order.

40.     Nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or the Petitioner from asserting, or otherwise impair or diminish, any right (including,

without limitation, any right of recoupment), claim, cause of action, defense, offset, or counterclaim in respect of any asset or interest that is not a Subscribed Share or Atos Equipment.

41.     All Persons subject to the jurisdiction of the United States are permanently enjoined and restrained from taking any actions inconsistent with, or interfering with, the enforcement and implementation of the CCAA Vesting Orders or any documents incorporated by the foregoing.

42.     The Petitioner is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and the RVO and/or Atos Sale Order, as applicable.

43.     Upon the closing of the Principal Transaction, as evidenced by the Monitor filing a copy of the Monitor's certificate in the form attached to the RVO with this Court, and without further order of the Court, Goli Canada shall be removed as a debtor and Residual Co. shall be added as a debtor in the Chapter 15 Cases, and the caption shall be amended as follows:

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| ------------------------------------------------------------ x | |
| In re : | Chapter 15 |
| RESIDUAL CO., *et al.*,[1] | Case No. 24-_____ (___) |
| Debtors in a Foreign Proceeding. : | Joint Administration Requested |
| ------------------------------------------------------------ x | |

44.     Notwithstanding any provisions in the Bankruptcy Rules to the contrary, including but limited to Rules 6004(h) and 6006(d), the terms and conditions of this Order shall be

---

[1]   The Debtors in these Chapter 15 cases, are: Residual Co., a company incorporated in Québec, Canada and the last 4 digits of its Canadian business number is ____; and Goli Nutrition Inc., a company incorporated in Delaware and the last 4 digits of its federal tax identification number is 2655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

immediately effective and enforceable upon its entry and the Debtors, the Purchaser, and Gordon Brothers are authorized, each in its discretion, to close the transactions contemplated by the Subscription Agreement and the Agency Agreement, respectively, immediately upon entry of this Order.

45.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order, the CCAA RVO and the Atos Sale Order in the United States.

Dated: _____, 2024
Wilmington, Delaware                     _____
                                         UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**RVO**

**(to be supplemented)**

**Exhibit 2**

**Atos Sale Order**

**(to be supplemented)**

**Appendix B**
**(Under Seal)**

**CASH FLOW VARIANCE SUMMARY**

**Appendix C**
**(under seal)**

**CASH FLOW STATEMENT**