# **<u>EXHIBIT A</u>**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:                         :    Chapter 15

GOLI NUTRITION INC., *et al.*,[1]     :    Case No. 24-10438 (LSS)

                               :    Jointly Administered

         Debtors in a Foreign Proceeding.    :

---------------------------------------------------------- x    **Ref. Nos. 7 & 53**

## ORDER RECOGNIZING AND ENFORCING THE RVO
## AND GRANTING RELATED RELIEF

Upon consideration of the motion to approve, among other things, the RVO [Docket No. 7](the "Motion")[2] filed by Deloitte Restructuring Inc., in its capacity as the court-appointed monitor and duly authorized foreign representative (in such capacity, the "Petitioner"), as defined by section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of Goli Nutrition Inc., a company incorporated in Québec, Canada ("Goli Canada"), and Goli Nutrition Inc., a company incorporated in Delaware ("Goli US," and, together with Goli Canada, the "Debtors"); and upon consideration of the Verified Petition, the Zucker Declaration, the *Petitioner's Supplement in Support of Motion for Entry of an Order (I) Recognizing and Enforcing the RVO and the ATOS Sale Order, (II) Approving the Sale Transactions Free and Clear of Liens, Claims, and Encumbrances, and (III) Granting Related Relief* [Docket No. 53] (the "Supplemental Brief"), and the *Supplemental Declaration of Noah Zucker in Support of (A) Petitioner's Verified Petition Under Chapter 15 for Recognition of the Canadian Proceedings and Request for Related Relief, (B) Motion for Provisional Relief, and (C) Motion for Order Enforcing CCAA Vesting Orders*

---

[1] The Debtors in these Chapter 15 cases, are: Goli Canada (as defined herein) and the last 4 digits of its Canadian business number is 0002; and Goli US (as defined herein) and the last 4 digits of its federal tax identification number is 2655. The Debtors are collectively managed from their corporate headquarters which are located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

dated April 11, 2024 [Docket No. 56] and the Declaration of Noah Zucker dated April 13, 2024 {Docket No. 67] (collectively, the "Supplemental Zucker Declarations"); and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 109 and 1501; and venue being proper before this Court pursuant to § 1410; and the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and that this Court may enter a final order consistent with Article III of the United States Constitution; and adequate and sufficient notice of the filing of the Motion having been given by the Petitioner; and it appearing that the relief requested in the Motion is necessary and beneficial to the Debtors and the Petitioner; and this Court having held a hearing (the "Hearing") to consider the relief requested in the Motion; and there being no objections or other responses filed that have not been overruled, withdrawn, or otherwise resolved; and after due deliberation and sufficient cause appearing therefore,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A.      This Court entered the Recognition Order [Docket No. ____] on April __, 2024, and has found that the Debtors have satisfied the requirements of, among others, sections 101(23) and (24), 1502(4), 1504, 1509, 1515, 1517, 1520, 1521, and 1522 of the Bankruptcy Code. All such findings by this Court are hereby incorporated by reference herein and such Recognition Order shall continue in effect in all respects except to the extent this Order directly modifies or directly contradicts such Recognition Order.

B.      On April 9, 2024, the Canadian Court entered the RVO, approving, among other things, the RVO transaction and all related documents, and the addition of Residual Co. as an applicant in the Canadian Proceedings and the removal of Goli Canada as an applicant in the Canadian Proceedings; ordering Goli Canada to issue the Subscribed Shares, and vesting in the

Purchaser all right, title and interest in and to the Subscribed Shares, free and clear of any encumbrances; ordering Goli Canada to redeem and cancel the Legacy Equity Interests (as defined in the RVO) without any payment or other consideration; and approving the Pre-Closing Reorganization (as defined in the RVO) and vesting out of Goli Canada certain excluded assets, contracts and liabilities and discharging all encumbrances against Goli Canada other than certain permitted encumbrances.

C.    Based on the affidavits of service filed with, and the representations made to, this Court: (i) notice of the Motion, the Hearing, and the RVO was proper, timely, adequate, and sufficient under the circumstances of these Chapter 15 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; and (ii) no other or further notice of the Motion, the RVO, or the entry of this Order is necessary or shall be required.

D.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

E.    The relief granted herein is necessary and appropriate, is in the interest of the public, promotes international comity, is consistent with the public policies of the United States, is warranted pursuant to sections 105(a), 1501, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, and will not cause any hardship to any parties in interest that is not outweighed by the benefits of the relief granted.

F.    Based on the information contained in the Motion, the Petition, the Zucker Declaration, the Supplemental Brief, the Supplemental Zucker Declarations, and the record made at the Hearing, the Debtors, with the consent of and in consultation with the Lenders, conducted an extensive marketing and sales process prior to the commencement of the Canadian Proceedings

with respect to the Debtors' business and their assets, and such process was non-collusive, duly noticed, and provided a reasonable opportunity for potential buyers to make any offer. The Petitioner, the Debtors and the Lenders, whose collateral is the subject to the Sale Transactions, support RVO transaction, including the disposition of the Subscribed Shares pursuant to the Subscription Agreement in connection with the RVO transaction. As such, it is appropriate that the Subscribed Shares be issued to the Purchaser on the terms and subject to the conditions set forth in the Subscription Agreement.

G.      Based on information contained in the Motion, the Verified Petition, the Zucker Declaration, the Supplemental Brief, the Supplemental Zucker Declarations, and the record made at the Hearing, the relief granted herein relates to assets and interests that, under the laws of the United States, should be administered in the Canadian Proceedings.

H.      Based on information contained in the Motion, the Verified Petition, the Zucker Declaration, the Supplemental Brief, the Supplemental Zucker Declarations, and the record made at the Hearing, the Debtors' performance under the Subscription Agreement: (i) constitute a sound and reasonable exercise of the Debtors' business judgment; (ii) provide value and are beneficial to the Debtors and is in the best interests of the Debtors, their estates, and their stakeholders; and (iii) are reasonable and appropriate under the circumstances. The consideration provided by the Purchaser for the Subscribed Shares under the Subscription Agreement was the highest and best offer providing a greater recovery than any available alternative and constitute fair consideration and reasonably equivalent value under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, Uniform Avoidance Transaction Act, and other laws of the United States, any state, territory, possession thereof, or the District of Columbia.

I.      Time is of the essence in consummating the transactions implemented pursuant to the Subscription Agreement.  To maximize the value of the Subscribed Shares, it is essential that the pertinent transactions occur and be recognized and enforced in the United States promptly. The Petitioner, on behalf of the Debtors, has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate implementation and consummation of such transactions.    Accordingly, the transactions contemplated by the Subscription Agreement can be closed as soon as reasonably practicable upon entry of this Order.

J.      Based upon the information contained in the Motion, the Verified Petition, the Zucker Declaration, the Supplemental Brief, the Supplemental Zucker Declarations, the other pleadings and documents filed in these chapter 15 cases, and the record made at the Hearing, the Subscription Agreement was negotiated, proposed, and entered into by the Debtors and the Purchaser, in good faith, without collusion, and from arm's-length bargaining positions.

K.      Based upon the information contained in the Motion, the Verified Petition, the Zucker Declaration, the Supplemental Brief, the Supplemental Zucker Declarations, the Subscription Agreement was not entered into for the purpose of hindering, delaying, or defrauding any present or future creditors of the Debtors.

L.      In accordance with the RVO, the Purchaser will acquire the Subscribed Share and will be vested with all rights, title, and interests in and to the Subscribed Shares, free and clear of all liens, claims, encumbrances, and other interests, other than the Permitted Encumbrances and Retained Liabilities (as defined in the RVO).

M.      Based upon the information contained in the Motion, the Verified Petition, the Zucker Declaration, the Supplemental Brief, the Supplemental Zucker Declarations, the Petitioner and the Debtors, as appropriate: (i) have full power and authority to execute the Subscription

Agreement and all other documents contemplated thereby; (ii) have all the power and authority necessary to consummate the transactions contemplated by the Subscription Agreement; and (iii) upon entry of this Order, other than any consents identified in the RVO and Subscription Agreement, need no consent or approval from any other person or governmental unit to consummate the transactions contemplated thereby.  Such transactions have been duly and validly authorized by all necessary corporate action of the Debtors.

N.      Pursuant to the RVO, the Subscription Agreement is a valid and binding contract between the Debtors and the Purchaser and shall be enforceable pursuant to its terms.  The Subscription Agreement, the transactions contemplated thereby, and the consummation thereof shall be specifically enforceable against and binding upon the Debtors and the Petitioner in these chapter 15 cases and shall not be subject to rejection or avoidance by the foregoing parties or any other Person (as defined in section 101(41) of the Bankruptcy Code).

O.      Based upon the information contained in the Motion, the Verified Petition, the Zucker Declaration, the Supplemental Brief, the Supplemental Zucker Declarations, the Purchaser would not have entered into the Subscription Agreement and would not consummate the related transactions, thus adversely affecting the Debtors, their estates, and their creditors, and other parties in interest, if Purchaser did not, in accordance with the RVO, acquire the Subscribed Shares free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances and Retained Liabilities as defined in the RVO), or if the Purchaser would, or in the future could, be liable on account of any such lien, claim, encumbrance, or any other interest, including, as applicable, certain liabilities related to the Subscribed Shares that will not be assumed by the Purchaser, as described in the Subscription Agreement.

P.      The interests of the Debtors' creditors in the United States are sufficiently protected. The relief granted herein is necessary and appropriate, in the interests of the public and international comity, consistent with the public policies of the United States, and warranted pursuant to sections 1521(b) and 1522 of the Bankruptcy Code.

Q.      The legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein.

R.      Any and all findings of fact and conclusions of law announced by this Court at the Hearing are incorporated herein.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED THAT**:

1.      The Motion is granted as set forth herein.

2.      All objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived, or settled by stipulation filed with this Court, and all reservations of rights included therein, are hereby overruled on the merits.

### Recognition and Enforcement of the RVO

3.      The RVO, a copy of which is annexed hereto as **Exhibit 1**, and all of its respective terms, including any immaterial or administrative amendments thereto, including those necessary to give effect to the substance of such order, either pursuant to the terms therein or as approved by the Canadian Court, are fully recognized, enforced, and given full force and effect in the United States in their entirety. The failure specifically to refer to or include any particular provision of the Subscription Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Subscription Agreement and the transactions contemplated thereunder, be fully recognized, enforced, and given full force and effect in the United States in their entirety.

4.      Pursuant to sections 105, 1501, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, the RVO and this Order, the Debtors, the Purchaser, and the Petitioner (as well as their respective officers, employees, and agents) are authorized to take any and all actions necessary or appropriate to: (a) consummate the transactions contemplated by the Subscription Agreement, including the sale of the Subscribed Shares to the Purchaser, in accordance with the Subscription Agreement, the RVO, and this Order; (b) distribute proceeds of the Subscription Agreement in accordance with and as authorized therein; (c) issue the Monitor's certificate in the form attached as Schedule A to Goli US and the Purchaser (the "Certificate"), and (d) perform, consummate, implement, and close fully the transactions contemplated by the Subscription Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Subscription Agreement and the transactions contemplated thereunder and to take such additional steps and all further actions as may be necessary or appropriate to the performance of the obligations contemplated by the Subscription Agreement, all without further order of the Court, and are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases, and other documents on behalf of such Person (as defined in section 101(41) of the Bankruptcy Code) with respect to the Subscribed Shares that are necessary or appropriate to effectuate the Subscription Agreement and the transactions contemplated thereunder, any related agreements, the RVO, and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors or the Purchaser may determine are necessary or appropriate, and are hereby authorized and empowered to cause to be filed, registered, or otherwise recorded a certified copy

of the RVO, this Order or the Subscription Agreement, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all liens, claims, encumbrances, and other interests against the Subscribed Shares. The RVO and this Order are deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office.

5.    Pursuant to sections 105(a), 1501, 1507, 1520, 1521, 1525, and 1527 of the Bankruptcy Code, and in accordance with and subject to the RVO and Subscription Agreement, on the Closing Date, the Subscribed Shares shall be transferred and absolutely vest in the Purchaser, without further instrument of transfer or assignment, and such transfer shall: (a) be a legal, valid, binding, and effective transfer of the Subscribed Shares to the Purchaser; (b) vest the Purchaser with all rights, title, and interests in the Subscribed Shares; and (c) be free and clear of all liens, claims, encumbrances, and other interests, other than the Permitted Encumbrances and Retained Liabilities (as defined in the RVO).

6.    Pursuant to sections 105(a), 1501, 1507, 1520, 1521, 1525 and 1527 of the Bankruptcy Code, and in accordance with and subject to the RVO and Subscription Agreement, upon the closing of the transaction contemplated by the Subscription Agreement, except with respect to solely Permitted Encumbrances and Retained Liabilities (as defined in the RVO): (a) no holder of a lien, claim, encumbrance, or other interest against or in the Debtors and/or their assets shall interfere, and each and every such holder is enjoined from interfering with the Purchaser's rights and title to or use and enjoyment of the Subscribed Shares; and (b) the sale of the Subscribed Shares, the Subscription Agreement, and any instruments contemplated thereby shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any successor thereof. All Persons holding a lien, claim, encumbrance, or other interest against or

in the Debtors and/or their assets are forever barred and enjoined from asserting such lien, claim, encumbrance, or other interest against the Subscribed Shares, the Purchaser, or any of its members, and their respective affiliates and their respective officers, directors, employees, managers, partners, members, financial advisors, attorneys, agents, and representatives, successors, and assigns from and after closing of the transactions contemplated by the Subscription Agreement.

7.      The terms and provisions of the Subscription Agreement, the RVO, and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Purchaser, the Petitioner, the Debtors' creditors, and all other parties in interest, and any successors of the Debtors, the Purchaser, the Petitioner, and the Debtors' creditors, including any foreign representative(s) of the Debtors, trustee(s), examiner(s), or receiver(s) appointed in any proceeding, including, without limitation, any proceeding under any chapter of the Bankruptcy Code, the CCAA, or any other law, and all such terms and provisions shall likewise be binding on such foreign representative(s), trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, their creditors, or any trustee(s), examiner(s), or receiver(s).

8.      Subject to the terms and conditions of the RVO, the Subscription Agreement and any related agreements, documents, or other instruments, may be modified, amended, or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of this Court; *provided* that any such modification, amendment, or supplement does not materially change the terms of such agreements, documents, or other instruments and is otherwise in accordance with the terms of the RVO.

9.      The provisions of this Order and the Subscription Agreement are non-severable and mutually dependent.  To the extent that there are any inconsistencies between the terms of this

Order and the RVO, on the one hand, and the Subscription Agreement, on the other, this Order and the RVO shall govern.

**Releases**

10.     The releases, exculpation, and injunctive provisions set forth in the RVO are expressly recognized by this Court and given full force and effect in the United States.  For the avoidance of doubt, nothing herein shall release, exculpate, or enjoin any claims arising out of fraud, bad faith or illegal acts.

11.     In accordance with and subject to the RVO and the Subscription Agreement, effective upon the issuance of the Certificate, (i) Goli Canada, Martin Leroux, Michael Bitensky, Deepak Agarwal, and Randy Bitensky, and (ii) the Purchaser and its present and former directors, officers, employees, shareholders, legal counsel and advisors (the Persons listed in (i) and (ii) being collectively, the "Released Parties") shall be deemed to be forever irrevocably released and discharged from any and all present and future claims whatsoever (including, without limitation, claims for contribution or indemnity), liabilities, indebtedness, demands, actions, causes of action, complaints, counterclaims, suits, damages, judgements, orders (including for injunctive relief or specific performance), executions, recoupments, debts, sums of money, expenses, accounts, liens, taxes, recoveries, and obligations of any nature or kind whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured or due or not yet due, in law or equity and whether based in statute or otherwise) based in whole or in part on any act or omission, transaction, offer, investment proposal, dealing, statutory declaration under the Canada Business Corporations Act, R.S.C., 1985, c. C-44 as permitted pursuant to the terms of the RVO, or other occurrence existing or taking place prior to the issuance of the Certificate or completed pursuant to the terms of the RVO and/or in connection with the Subscription Agreement, in respect of Goli Canada or its assets, business or

affairs, or prior dealings with Goli Canada, wherever or however conducted or governed, the administration and/or management of Goli Canada and the Canadian Proceedings (collectively, the "Released Claims"), which Released Claims are hereby fully, finally, irrevocably and forever waived, discharged, released, cancelled and barred as against the Released Parties, and are not vested nor transferred to Residual Co. or to any other entity and are extinguished. Nothing in this paragraph shall waive, discharge, release, cancel or bar any claim against past and present directors of Goli Canada (Martin Leroux, Michael Bitensky and Deepak Agarwal) that relate to contractual rights of one or more creditors, or that is based on allegations of misrepresentations made by directors to creditors, or based on wrongful or oppressive conduct by directors, as it is not permitted pursuant to section 5.1(2) CCAA. Furthermore, nothing in this paragraph shall waive, discharge, release, cancel or bar the claims against past and present directors, officers and employees of Goli Canada asserted in (a) the claims before the United States District Court for the Central District of California (case 2:23-cv-06597-CAS-MAA) against Goli Nutrition, Inc., 12416913 Canada Inc. (Predecessor 3), Deepak Agarwal, Michael Bitensky, VMG Partners Mentors Circle IV L.P., VMG Partners IV, 11 L.P., Merical Inc., Randy Bitensky, VMG Partners, Wayne Wu, Jonathan Marshall and Roger Tyre by Sharon Hoffman and Odelya Hoffman et al., as amended (the "Hoffman v Goli Claim"), and (b) any filing of the claims asserted in the Hoffman v Goli Claim as compulsory counterclaims in the claim before the United States District Court for the Central District of California (case 5:23- cv-00514-GW-DTB) against Sharon Hoffman by Goli Nutrition Inc.

12.    Pursuant to the terms of the RVO, and without limiting any other protections afforded to the Monitor under the RVO and/or CCAA, (a) "the Monitor, as well as its employees and representatives shall incur no liability whatsoever as a result of acting in accordance with [the RVO] and the Subscription Agreement approved [by the RVO], other than any liability arising

directly out of the gross negligence or wilful misconduct of the Monitor; and (b) no action lies against the Monitor by reason of [the RVO] or the performance of any act authorized by [the RVO], except by leave of the Canadian Court on ten (10) days notice to the Monitor and its counsel."

### Additional Provisions

13.    To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the Debtors' operations on account of the filing or pendency of these Chapter 15 Cases or the consummation of the Sale.

14.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion.

15.    Notwithstanding anything to the contrary in this Order, the RVO, or any other document, this Court shall retain exclusive jurisdiction to hear and determine all disputes which are in any forum or court within the territorial United States involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the RVO, or recognized by this Order.

16.    Nothing in this Order shall be deemed to waive, release, extinguish, or estop the Debtors or the Petitioner from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset, or counterclaim in respect of any asset or interest that is not a Subscribed Share.

17.    Consistent with the RVO, all Persons subject to the jurisdiction of the United States are permanently enjoined and restrained from taking any actions inconsistent with, or interfering with, the enforcement and implementation of the RVO or any documents incorporated by the foregoing.

18.     The Petitioner is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and the RVO.

19.     Upon the closing of the Principal Transaction, as evidenced by the issuance of the Certificate, Goli Canada shall cease to be an applicant in the Canadian Proceedings, and thus upon the filing of a copy of the Certificate with this Court, and without further order of the Court, the Chapter 15 case of Goli Canada shall be deemed fully administered and the Chapter 15 Cases closed with respect to Goli Canada, subject to the rights of any interested party to request an order reopening the case under section 350(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 5010 and the applicable Local Bankruptcy Rules.

20.     The Chapter 15 Case of Goli US shall proceed after the closing of the Goli Canada Chapter 15 Case with the following caption:

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ------------------------------------------------------- x | | |
| In re | : | Chapter 15 |
| GOLI NUTRITION INC., *et al.*,[1] | : | Case No. 24-10439 (LSS) |
| Debtors in a Foreign Proceeding. | : | |
| ------------------------------------------------------- x | | |

21.     Upon the addition of any Residual Co. or any other residual company as an applicant in the Canadian Proceeding pursuant to the RVO and subject to the filing of a Chapter 15 petition on behalf of such Residual Co. or other residual company with this Court and the granting of a motion for joint administration, (a) such Chapter 15 case will be jointly administered

---

[1] The Debtors in this Chapter 15 case is Goli US (as defined herein) and the last 4 digits of its federal tax identification number is 2655. The Debtor is managed from its corporate headquarters which is located at 2205 Boul. De la Côte-Vertu, suite 200, Montreal, Québec, Canada.

with the above-captioned Chapter 15 case of Goli US, (b) any and all relief granted by and findings of this Court with respect to the Debtors in these Chapter 15 Cases following the Petition Date shall apply to such Residual Co. or other residual company to the same extent as such relief and findings apply to the Debtors, and (c) any reference in any order of this Court to a "Debtor" in these Chapter 15 Cases shall be deemed to include a reference such Residual Co. or other residual company, *mutatis mutandis*.

22.     Notwithstanding any provisions in the Bankruptcy Rules to the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry and the Debtors, the Petitioner, and the Purchaser, are authorized, each in its discretion, in accordance with the RVO, to close the transactions contemplated by the Subscription Agreement immediately upon entry of this Order.

23.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order and the RVO in the United States.

Dated: _____, 2024                    _____
Wilmington, Delaware                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

# SUPERIOR COURT

(Commercial Division)

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL


No.:     500-11-063787-242


DATE:  April 11, 2024

_____

**BY  THE HONOURABLE   MARTIN F. SHEEHAN, J.S.C.**

_____

**IN THE MATTER OF THE PLAN OF COMPROMISE OR ARRANGEMENT OF:**

**GOLI NUTRITION INC.**
and
**GOLI NUTRITION INC.**
        Applicants/Debtors


and
**DELOITTE RESTRUCTURING INC.**
        Monitor

_____

### AMENDED AND RESTATED INITIAL ORDER AND OTHER RELIEF, INCLUDING THE APPROVAL OF A TRANSACTION AND AN AGENCY AGREEMENT

_____

[1]     On March 18, 2024, the undersigned issued a First Day Initial Order pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, C-36 (as amended the "**CCAA**") which was subsequently amended on March 27, 2024 (the "**Initial Order**").

[2]     The Initial Order provides for:

> 2.1.   a stay of all proceedings (the "**Stay**") against Debtors, Goli Nutrition Inc. ("**GOLI Canada**") and Goli Nutrition Inc. ("**GOLI USA**", collectively with GOLI Canada the "**Debtors**" or "**GOLI**") and their respective past, present or future directors and officers until June 28, 2024 (the "**Stay Period**");

JS1699

2.2.    the appointment of Deloitte Restructuring Inc. ("**Deloitte**" or the "**Monitor**") as the monitor of the Debtors in these proceedings (the "**CCAA Proceedings**") and granting the Monitor certain powers;

2.3.    an Administration Charge and a D&O Charge in amounts sufficient to cover the potential exposure of the beneficiaries of such charges for the initial Stay Period;

2.4.    a declaration that Québec is the "center of main interest" of the Debtors and, accordingly, an authorization that the Applicants or the Monitor may apply, as they may consider necessary or desirable, to any other court, tribunal, regulatory, administrative or other body, wherever located, for orders to recognize and/or assist in carrying out the terms of the Initial Order and any subsequent Orders rendered by this Court in the context of these proceedings, including, without limitation, orders under Chapter 15 of the United States Bankruptcy Code 11 U.S.C. §§ 101-1532 (the "**U.S. Bankruptcy Code**").

[3]    In its application for the Initial Order, Debtors indicated that they would be proposing a transaction (the "**Contemplated Transaction**") which has two components:

3.1.    the execution by GOLI Canada of an Agency Agreement (the "**Agency Agreement**") with Gordon Brothers Commercial & Industrial, LLC (on behalf of its contractual joint venture with Brandford Auctions, LLC) (the "**Agent**") pursuant to which the Agent shall be engaged for the purpose of proceeding with the orderly liquidation of the Atos Equipment (the "**Liquidation Order**");

3.2.    a reverse vesting order (the "**RVO**"), comprising of:

3.2.1.    the subscription of shares in GOLI Canada by a group that includes Group KPS (a healthcare company), Bastion Capital (an investment management firm) and one of the Debtors' founders (the "**Purchaser**") and effectively acquire 100% of the equity interest in GOLI Canada.

3.2.2.    a transfer or vesting out of GOLI Canada of certain excluded assets (including the Atos Equipment and the shares of GOLI US), contracts and liabilities to a newly created residual company ("**Residual Co.**") that will eventually replace GOLI Canada as debtor in the CCAA proceedings.

[4]    The comeback hearing to approve the Contemplated Transaction was scheduled for April 9, 2024 (the "**Transaction Approval Hearing**").

[5]     The Contemplated Transaction was designed in consultation with the Monitor following a sale investment solicitation process ("**SISP**") that began in June 2023 and ended in January 2014. It involved the Debtors (via the active involvement of the Debtors' founders and their broader management team), BMO Capital Markets and GOLI's principal lenders (the "**Lenders**"). Deloitte acted as consultant to the Lenders. The SISP process is described in more detail in this Court's prior ruling on the Initial Order[1] as well as in the Monitor's first report dated March 16, 2024 (the "**First Report**").

[6]     The SISP failed to generate a binding offer. Five non-binding offers were received but none of these allowed for the repayment in full of the Lenders. All indications of interest only contemplated a partial repayment or a partial assumption of the Lenders' secured debt.

[7]     Eventually the Purchaser submitted an offer for an amount well below the amount owed to the Lenders. After further negotiations, the Contemplated Transaction was reached which is now supported by the Lenders.

[8]     The Debtors ask that the Contemplated Transaction be approved by way of a Liquidation Order, a Reverse Vesting Order and an Amended and Restated Initial Order.

[9]     On April 9 last, the parties agreed to postpone the hearing for the issuance of the Liquidation Order and the Amended and Restated Initial Order to Thursday, April 11th.

[10]   Given that time is of the essence since the parties have a Court hearing before the Bankruptcy Court for the state of Delaware (the "**US Court**") on April 15, 2024, the Court agreed to sign the Reverse Vesting Order with reasons to follow the hearing of April 11th.

[11]   The present judgment deals with all three orders.

## CONTEXT

### 1.    Notices to Stakeholders

[12]   On March 19, 2024, the Monitor posted a copy of the Debtors' application for an initial order, certain exhibits, the First Report, the Initial Order and the Service List on the Monitor's website at www.insolvencies.deloitte.ca/goli (the "**Monitor's Website**").

[13]   The Monitor provided a dedicated email address (goliccaa@deloitte.ca) and a phone number (514-393-7115) to allow stakeholders to contact the Monitor directly with regard to the restructuring process and the CCAA proceedings.

---

[1]     *Arrangement relatif à Goli Nutrition Inc.*, 2024 QCCS 869.

[14]  The Monitor and the Debtors compiled a list of stakeholders, including all known creditors, parties with material contracts with the Debtors, taxation authorities, shareholders, retailers, customers, vendors and parties subject to litigation with the Debtors (collectively, the "**Notice Parties**").

[15]  On March 22 and March 29, 2024, the Monitor published a notice of the Initial Order in Montreal newspaper La Presse+ (French version), the National Post and the Wall Street Journal, National Edition.

[16]  On March 25 and 26, 2024, the Monitor sent to the Notice Parties, via either two-day courier service or first-class postage prepaid, depending on which option proved to be the fastest, a package including various documents relevant to the CCAA Proceedings and the Chapter 15 Case (the "**Stakeholder Notice Package**").

[17]  The Stakeholder Notice Package included, among other things, a notice to stakeholders setting out: (i) details of the Transaction Approval Hearing and the relief to be sought at that time, (ii) a summary of the Contemplated Transaction, including references to eventual orders in this regard, (iii) the then available details for the Contemplated Transaction and information on how to obtain full hearing details once they were determined.

[18]  The Notice to Stakeholders served as the notice to creditors contemplated under section 23(1)(ii)(B) of the CCAA and notified interested parties, including the Debtors' contractual counterparties, of the relief to be sought at the Transaction Approval Hearing.

[19]  The Stakeholder Notice Package was sent to approximately 557 stakeholders, and an electronic copy was posted to the Monitor's Website as well as filed on the docket in the Chapter 15 Case.

[20] Complete copies of the agreements governing both components of the Contemplated Transaction were made available to stakeholders by the Monitor, first with minor redactions and then in completely unredacted form, through publication on the Monitor's Website and filing on the docket in the Chapter 15 Case.

[21]  On April 2, 2024, the Monitor posted a notice of hearing details in connection with the Transaction Approval Hearing which indicated that the deadline to object to the relief sought at such hearing was April 5, 2024 at 5:00 p.m., in accordance with the terms of the Initial Order.

## 2.    The US Proceedings

[22]  On March 19, 2024, the Monitor filed petitions before the US Court seeking the recognition of the CCAA proceedings as foreign main proceedings in the United States, recognition of Deloitte as foreign representative of the Debtors and orders recognizing

and enforcing the contemplated orders approving the Contemplated Transation in the United States.

[23]  On March 22, 2024, the US Court rendered:

> 23.1.  a Joint Administration Order, authorizing the administration of the Debtors proceedings under Chapter 15 within the same case number;
>
> 23.2.  a Notice Order approving notification procedures in connection with the Chapter 15 Case (the "**US Notice Order**"); and
>
> 23.3.  a Provisional Relief Order granting a stay of proceedings and other protections to the Debtors in the United States.

[24]  A hearing before the US Court is scheduled on April 15, 2024 to consider the Monitor's request to recognize and enforce the CCAA Proceedings and the other relief sought pursuant to the petitions filed in the Chapter 15 Case (the "**Recognition Hearing**").

## ANALYSIS

[25]  The Court will deal separately with 1) the Liquidation Order and the corresponding Amended and Restated Initial Order regarding the Atos Equipment and 2) the Reverse Vesting Order.

**1.    Disposition of the Atos Equipment and Expanded Powers of the Monitor**

1.1   The Liquidation Order

[26]  The non-binding indications of interest received throughout the SISP process, excluded the Atos Equipment.

[27]  In August 2023, the Debtors received a separate indication of interest for the Atos Equipment but after a due diligence, the potential purchaser decided to back away.

[28]  According to the Monitor, the only realistic avenue for the Atos Equipment is to proceed with a liquidation process by auction.

[29]  After soliciting bids from different auctioneers to proceed with the liquidation, four proposals were received. GOLI, in consultation with the Monitor and the Lenders entered into the Agency Agreement[2] with the Agent for the purpose of liquidating the Atos Equipment for the benefit of the Debtors' creditors.

---

[2]    Exhibit P-24.

[30]   The Monitor believes that the Agent ultimately offered the highest guaranteed return and, given the Agent's familiarity and knowledge of the Atos Equipment, the strongest chances of selling the equipment and maximizing its value.

[31]   The proposed plan is to market the Atos Equipment for sale and to hold an auction in late April or the first week of May.

[32]   Under the Agency Agreement, the Agent provides a net minimum guarantee, (the "**Guaranteed Minimum Amount**") consisting of an upfront cash payment with the balance of the Guaranteed Minimum Amount payable following the sale of the Atos Equipment. Any excess balance over the Guaranteed Minimum Amount (the "**Excess Amount**") will be shared between the Agent and the Debtors according to the terms of the Agency Agreement.

[33]   The Liquidation Agreement also provides for a court-ordered priority charge (the "**Agent Charge**") on the Atos Equipment and the proceeds derived from their contemplated sale, in order to secure the payment of the Debtors' obligations towards the Agent under the Agency Agreement.

[34]   The Agency Agreement is conditional upon the approvals of both this Court and the US Court.

[35]   The Monitor has inspected the Atos Equipment and met with the Agent to discuss the logistics of holding an auction at the Norco Facility where the equipment is located.

[36]   The Monitor has been advised of proprietary or other claims being asserted against certain of the equipment located in the Norco Facility, namely by Ms. Sharon and Odelya Hoffman and certain related entities, including Vitamin Friends LLC, RGL Management LLC, RGL Holdings LLC, and Triple 5 Nutrition LLC (collectively, the "**Hoffman Parties**").

[37]   Some of the Hoffman Parties are minority shareholders of GOLI Canada and former shareholders of Better Nutritionals, which is partly owned by GOLI Canada and now subject to bankruptcy proceedings under Chapter 7 of the United States Bankruptcy Code (the "**BN Bankruptcy**").

[38]   According to the Monitor, the Hoffman Parties are asserting that RGL Management LLC ("**RGL**") owns certain equipment located at the Norco Facility, including certain of the Atos Equipment (the "**Alleged RGL Equipment**"). The Hoffman Parties' claims with regard to the Alleged RGL Equipment are contested by the Debtors and the Lenders, who assert that all of the Atos Equipment (including the Alleged RGL Equipment) is owned by GOLI Canada having acquired it as part of a settlement agreement with Atos for $32,000,000. They also allege that any amount owed to RGL has been paid.[3] As such,

---

[3]   Exhibit RGL-3.

they believe that the Hoffman Parties' position is abusive and is meant to grant them unwarranted leverage over other potential creditors.

[39]   The Hoffman Parties filed an opposition late on April 8, 2024.

[40]   A postponement of the hearing was granted until April 11, to allow all parties to understand each other's position and propose a viable solution.

[41]   On April 10, 2024, Monitor's counsel sent to the Hoffman Parties' counsel a confirmation of the agreement allegedly reached asking for confirmation of same.[4] Confirmation did not come.[5]

[42]   Based on its review of invoices provided by the Hoffman Parties, the Monitor estimates that the total cost paid for the Alleged RGL Equipment is approximately $1,800,000. The Monitor notes that the book value of the Atos Equipment in the Debtors' financial statements was $40,149,000 as of June 30, 2022 which would mean that the Alleged RGL Equipment would represent less than 5% of the Atos Equipment value. This assessment appears reasonable when the list of the equipment comprised in the Alleged RGL Equipment[6] is compared with the overall list comprising the Atos Equipment.[7]

[43]   The Hoffman Parties ask that the Alleged RGL Property be segregated or that the liquidation sale be deferred until their property rights have been adjudicated. They have so far filed no proceedings to have their rights recognized nor have they filed evidence supporting any prejudice they could suffer if the liquidation proceeds.

[44]   The market has already spoken once. After a seven-month process, no binding offers were received for the Atos Equipment or the Alleged RGL Equipment.

[45]   Because the Alleged RGL Equipment is integrated in the production and packaging lines forming part of the Atos Equipment, the Monitor and the Agent are adamant that segregation and removal of the Alleged RGL Equipment would have a detrimental impact on the contemplated realization under the Agency Agreement. This would prejudice all stakeholders including the Hoffman Parties.

[46]   Deferring the sale is not an option.

[47]   The upfront cash payment of the Guaranteed Minimum Amount is required to finance the operations of the Debtors (including the rent to be paid for the Norco Facility) until the equipment is sold. Without this payment, interim financing would be needed which, so far, no party has volunteered to provide.

---

4    Exhibit P-26.
5    Exhibit P-27.
6    Exhibit P-26.
7    Exhibit P-24A, Exhibit A.

[48]  According to the Monitor, all costs related to the Atos Equipment (including the Alleged RGL Equipment) (the "**Atos Equipment Expenses**") have been assumed by GOLI to the exclusion of the Hoffman Parties. For example, the Hoffman Parties have not contributed to the significant rent for the Norco Facility where the Atos Equipment is located. This rent remains one of the Debtors main ongoing expenses. It is telling that the Hoffman Parties have not proposed to contribute to the Atos Equipment Expenses in the event the sale is postponed.

[49]  As mentioned, the Hoffman Parties have not provided evidence of prejudice in the event the sale proceeds. No one knows what they propose to use the RGL Equipment for. No third-party evaluation has been provided.

[50]  Based on the evidence before the Court, the Hoffman Parties are unlikely to suffer any prejudice if the Atos Equipment is sold according to the Agency Agreement.

[51]  Firstly, all indications are that the sale proceeds will be higher if none of the Atos Equipment is segregated.

[52]  Secondly, the Guaranteed Amount under the Agency Agreement as well the Debtors' portion of the Excess Amount will be paid to the Monitor. The Monitor has undertaken to set aside an amount of 1M $ on the second installment of the Guaranteed Minimum Amount until this Court can pronounce itself on the Hoffman Parties' claim with regard to the Alleged RGL Equipment. This amount is reasonable given that:

    52.1. The Alleged RGL Equipment cost approximately $1.8M four years ago;

    52.2. No offers were made for the Alleged RGL Equipment during the SISP;

    52.3. If the Hoffman Parties have any right to the sale proceeds, an amount will have to be deducted for payment of a portion of the Atos Equipment Expenses;

    52.4. If the Hoffman Parties allege that the Alleged RGL Equipment is worth significantly more, they are free to make a bid for it during the Agent's liquidation process.

[53]  Finally, the Agency Agreement is contingent upon the approval of both the Canadian and US Courts. If the Hoffman Parties have representations to make before the US Courts, nothing prevents them from doing so.

[54]  In the meantime, the Court cannot allow the Hoffman Parties to hijack the restructuring process to the detriment of the Lenders and other stakeholders.

[55]  As such the Court approves the Liquidation Order, prays act of the Monitor's undertaking and schedules a hearing within a short delay to allow the parties to assert their rights.

[56]  The hearing will deal with the Hoffman Parties claims to the sale proceeds, the Monitor's claim with regard to a retroactive contribution to the Atos Equipment Expenses and any claim the Monitor may wish to present for abuse of process.

### 1.2   Expanded Powers of the Monitor

[57]  The Atos Equipment is an excluded assets and the Agency Agreement is an excluded contract under the Contemplated Transaction. As such, after the Contemplated Transction is consumed, the Atos Equipment and GOLI Canada's rights and obligations under the Agency Agreement will vest in Residual Co. and GOLI Canada will no longer be a debtor in the CCAA Proceedings.

[58]  A further amendment to the Initial Order is required to grant the Monitor the additional powers of a "super-monitor" upon the closing of the Contemplated Transaction in order to allow the Monitor to implement the Atos Transaction, for and on behalf of Residual Co., and to complete any other matters that may be required in the CCAA Proceedings.

## 2.   The Proposed Transaction by Way of a Reverse Vesting Order

[59]  On January 9, 2024, the Purchaser (composed of Group KPS, Bastion Capital and Mr. Agarwal one of GOLI's founders) sent a letter of interest for the purchase of GOLI's business, subject to certain terms and conditions, including the exclusion of the Atos Equipment.

[60]  After negotiations with the Lenders, a formal offer was presented on February 3, 2024[8] and was accepted by the Lenders on February 5, 2024, despite the fact that they will suffer a significant loss on their loans.

[61]  Group KPS is a healthcare company with an extensive distribution network in Latin America. It currently distributes GOLI products in Mexico and understands the brand well. Bastion Capital has an extensive track record of financing and supporting successful consumer-based businesses. Group KPS and Bastion insisted that Mr. Agarwal form part of the purchaser consortium. They agreed that other existing shareholders of GOLI could participate in the transaction contemplated by the offer. Mr. Agarwal's in-depth knowledge of the business and the lack of any requirement for due diligence allows the Purchasers to pursue the acquisition quickly with minimal costs.

[62]  The Contemplated Transaction requires that GOLI's business be conveyed to the Purchaser through a formal insolvency process involving a reverse vesting order ("**RVO**").

---

[8]   Exhibit P-21 (under seal).

[63]  Consideration payable by the Purchasers includes a cash payment, the payment of any priority claims to which the Debtors is subject and payment to cover the professional fees of the Monitor, its legal counsel and the legal counsel to the Lenders.

[64]  The Debtors, the Lenders and the Monitor are all of the view that the Contemplated Transaction represents the best outcome available for GOLI and its stakeholders in the circumstances.

[65]  Professor Sara has summarised the RVOP process as follows:

> The result of an RVO is to expunge the existing corporate structure of the debtor company of anything the purchaser does not want. The newco is added to the insolvency proceeding and continues in that process while the debtor company exits the insolvency proceeding with broad liability releases; then the newco is liquidated or placed in bankruptcy to be liquidated. The transaction takes place outside of a negotiated and court-approved plan of arrangement or compromise. The RVO structure was crafted to allow those businesses to continue through the debtor company, since it was that corporate vehicle who owned the valuable "assets" that could be not transferred.[9]

[66]  Reverse vesting orders deviate significantly from the usual CCAA framework as they bypass provisions of insolvency legislation aimed at giving both secured and unsecured creditors a meaningful voice/vote in the proceedings.[10]

[67]  As such, it is often stated that RVO structures should remain the exception and not the rule.[11]

[68]  After reviewing the applicable caselaw, Justice Immer listed a number of principles useful to determine when an RVO structure may be appropriate and where the court draws its jurisdiction to issue such orders :

> 39.1  The RVO structure was crafted to allow businesses to continue through the debtor company, when the corporate vehicle owned the valuable "assets" that could be not transferred.
>
> 39.2.  The following are examples of situations where valuable assets cannot be transferred:
>
>> -  if the debtor operates in a highly-regulated environment in which its existing permits, licenses or other rights are difficult or impossible to reassign to a purchaser;

---

9    Janis SARRA, "Reverse Vesting Orders – Developing Principles and Guardrails to Inform Judicial Decisions", 2022 CanLIIDocs 431.

10   *Id.*

11   *Arrangement relatif à Blackrock Metals Inc.*, supra, note 11, para. 95.

-   if the debtor company is a party to certain key agreements that would be difficult or impossible to assign to a purchaser; or

-   if maintaining the existing legal entities would preserve certain tax attributes that would otherwise be lost in a traditional vesting order transaction tax losses.

39.3.   When deciding to grant relief, Courts must rely first on an interpretation of the provisions of the CCAA's text before turning to inherent or equitable jurisdiction to anchor measures taken in a CCAA proceeding.

39.4.   The features of an RVO make it different from the transaction contemplated by par. 36(1) CCAA, because what is contemplated is not the sale of assets of the debtor, but rather "a purchase of the shares of the debtor and "vesting out" from the debtor to a new company of unwanted assets, obligations and liabilities".

39.5.   Given that s. 36(1) may not anchor an RVO, the inherent or equitable jurisdiction of Section 11 of the CCAA must be relied on.

39.6.   S. 11 confers jurisdiction on the supervising court to "make any order that it considers appropriate in the circumstances". This power is vast.

39.7.   The jurisdiction granted by s. 11 is constrained only by restrictions set out in the CCAA itself, and the requirement that the order made be "appropriate in the circumstances". The exercise of this discretion must further the remedial objectives of the CCAA and be guided by the baseline considerations of appropriateness – i.e. whether it advances the policy objectives of the CCAA - , good faith, and due diligence.

39.8.   Resort to RVOs must be unusual and extraordinary and involve close scrutiny.

39.9.   The debtor must seek the relief in good faith and while acting with due diligence to promote the best outcome for all stakeholders.

39.10.  Debtors should not seek an RVO structure simply to expedite their desired result without regard to the remedial objectives of the CCAA.[12]

[References omitted]

[69]  In assessing whether to approve a reverse vesting order the court must examine:

69.1.   Whether sufficient efforts to get the best price have been made and whether the parties acted providently;

69.2.   The efficacy and integrity of the process followed;

---

[12]  *Proposition de Brunswick Health Group Inc.*, 2023 QCCS 4643, par. 39.

69.3.   The interests of the parties; and

69.4.   Whether any unfairness resulted from the process.[13]

[70]  In the present circumstances, the Court believes that a reverse vesting order structure is appropriate and necessary to give effect to the Contemplated Transaction for the following reasons.

[71]  The Monitor was privy to the SISP which lasted a period of seven months. It confirms that it was a fair, transparent, and robust process. The market was extensively canvassed by BMO Capital Markets. It does not believe that proceeding with a further SISP would increase the value to the stakeholders.

[72]  The Lenders, who have the most at stake here, also believe that a timely transaction is the best course of action to maximise the proceeds of sale. During the SISP process no offers, even non-binding ones, would have resulted in a return to unsecured creditors. As such, unsecured creditors are not prejudiced by an RVO as they would have obtained no return under a regular sales process.

[73]  More importantly, GOLI's stakeholders, including current employees and subcontractors, vendors, customers and other trading partners all stand to benefit from the business being transferred as a going concern. According to the Monitor, the RVO is the vehicle that affords the only chance for the debtors' continued operations which remains one of the goals of the CCAA.

[74]  Indeed, there are many licenses, registrations, permits and certifications that are essential to GOLI's operations and must remain in place for the operations to continue. to remain in place. These include, among others, licences, registrations, permits, and certifications granted by various food, health, or other authorities across the world which are essential to its operations. The maintenance of such licenses is an essential component of the KPS-Bastion offer.

[75]  Standard delays to reissue these licenses vary but, in many cases, the process can take many months, time that the Debtors do not have. Such delays would impair the realisation of the Contemplated Transaction as the Debtors do not have the required liquidity to wait that long to close the Contemplated Transaction. No one has offered to finance the operations pending the reissuance of such licenses, permits and registrations.

[76]  The Contemplated Transaction is more beneficial to the stakeholders than a liquidation under a bankruptcy, which would likely result in a materially worse outcome for the Lenders and employees without any benefit to other creditors.

---

[13]   *Arrangement relatif à Blackrock Metals Inc.*, 2022 QCCS 2828, para. 95; *Harte Gold Corp. (Re)*, 2022 ONSC 653, par. 38; *Arrangement relatif à Nemaska Lithium inc.*, 2020 QCCS 3218, par. 50 (leave to appeal dismissed, 2020 QCCA 1488; leave to appeal to SCC dismissed, 2021 CanLII 34999); *Clearbeach and Forbes*, 2021 ONSC 5564, para. 25.

[77]  Some creditors have raised suspicions with regard to the Contemplated Transaction, the legality of the Lenders' security or the appropriateness of pre-filing transactions. It has been suggested that the proceeds be kept in trust pending final analysis. No factual support has been provided for these suspicions.

[78]  The Monitor indicates that he has received legal opinions with regard to the value of Lenders' security. These opinions have been shared with those creditors who have asked for them.

[79]  Generally speaking, it is not up to the courts to dictate the terms and conditions to be included in the offer which stems from a SISP. The Court's role is to approve the transaction or refuse to do so.

[80]  The Court has no reason to doubt the good faith of the Debtors. This feeling is shared by both the Lenders and the Monitors.

[81]  The Contemplated Transaction is approved.

[82]  Finally, the Reverse Vesting Order provides releases (the "**Releases**") in favour of (i) the Purchaser, its present and former directors, officers, employees, shareholders, legal counsel and advisors; and (ii) GOLI Canada, Martin Leroux, Michael Bitensky, Deepak Agarwal, and Randy Bitensky (Messrs. Leroux, Michael Bitensky, Agarwal, and Ms. Randy Bitensky being the "**Individual Releasees**", and, collectively with the other released parties, the "**Releasees**").

[83]  These Releases are necessary to maximize the value of the Debtors' assets via the Contemplated Transaction and are thus in the interest of stakeholders.

[84]  The Releases are tailored to the circumstances. The number of Individual Releasees is limited The Releases exclude claims that cannot be released under section 5.1(2) of the CCAA.

[85]  It is important to the Purchaser that Mr. Agarwal and Mr. Bitensky be involved in the GOLI Canada business going forward. The granting of the releases will allow them to focus on closing the Contemplated Transaction and the post-closing business, both of which benefit the Debtors and their stakeholders.

[86]  Mr. Leroux and Mr. Bitensky have each entered into non-compete agreements with GOLI Canada which provides value to the Purchaser.

**FOR THESE REASONS, THE COURT:**

[87]  **SIGNS** the Transaction Approval and Reverse Vesting Order, the Liquidation Order and the Amended and Restated Initial Order submitted by the parties on April 9 and April 11, 2024;

[88]  **PRAYS ACT** of the Monitor's undertaking, without prejudice, to reserve an amount of 1M $ on the second portion of the Guaranteed Minimum Amount if the Hoffman Parties' claim cannot be resolved before then;

[89]  **SCHEDULES** a hearing on April 30, 2024, to adjudicate any claim the Hoffman Parties may have with regard to the liquidation proceeds resulting form the sale of the Atos Equipment, any claim by the Monitor for retroactive payment of the Atos Equipment Expenses (including rent for the Norco Facility) and the Monitor's allegation of abuse;

[90]  **PRAYS ACT** of the Hoffman Parties' undertaking to file their motion and evidence by April 18, 2024;

[91]  **PRAYS ACT** of the Monitor's undertaking to file its reply, any motion for contribution of the Atos Equipment Expenses and/or a Motion for Abuse of proceedings as well as any evidence in support thereof prior to April 25, 2024;

[92]  **THE WHOLE** without costs.


Martin Sheehan

Signature numérique
de Martin Sheehan
Date : 2024.04.11
14:13:48 -04'00'

MARTIN F. SHEEHAN, J.S.C.


Mtre Christian Lachance
Mtre Benjamin Jarvis
**DAVIES WARD PHILLIPS & VINEBERG LLP**
Attorneys for the Debtors


Mtre Noah Zucker
Mtre Charlotte Dion
**NORTON ROSE FULBRIGHT CANADA S.E.N.C.R.L.,S.R.L.**
Attorneys for the Monitor


Mtre Sandra Abitan
Mtre Ilia Kravtsov
**OSLER, HOSKIN & HARCOURT LLP**
Attorneys for the Lenders

Mtre Alexander Bayus
**FASKEN MARTINEAU LLC**
Attorney for the Agent

Mtre Jonathan Bashir-Legault
Attorney for the Canadian Revenue Agency

Mtre Gerry Apostolatos
**LANGLOIS LAWYERS LLP**
Attorney for Parker Group Inc.

Mtre Jonathan Bell
Mtre Pascale Dionne Bourassa
**BENNETT JONES S.E.N.C.R.L., SRL**
Attorney for the Purchasers

Mtre Nick Scheib
Attorney for Mr. Michael Betinsky

Mtre Joseph Reynaud
Mtre Maria Kunyukhova
**STIKEMAN ELLIOTT LLP**
Attorneys for VMG Partners II, LLC, Mr. Jon Marshall and Mr. Wayne Wu

Mtre Joshua Bouzaglou
**MTRE SYLVAIN RIGAUD**
Woods LLP
Attorneys for the Hoffman Parties

Mtre Mélanie Martel
**DLA PIPER (CANADA) LLP**
Attorneys for DLA Piper (US) LLP

Hearing dates:        April 9 and 11, 2024